## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UFCW LOCAL 1500 WELFARE FUND, on behalf of itself and all others similarly situated, | Civil Action No. |
| *Plaintiff*, | |
| v. | **CLASS ACTION COMPLAINT** |
| ABBVIE INC., ABBVIE BIOTECHNOLOGY LTD., AMGEN INC., SAMSUNG BIOEPIS CO., LTD., MYLAN INC., MYLAN PHARMACEUTICALS, INC., SANDOZ, INC., FRESENIUS KABI USA, LLC, PFIZER INC., and MOMENTA PHARMACEUTICALS, INC., | **JURY TRIAL DEMANDED** |
| *Defendants*. | |

Plaintiff UFCW Local 1500 Welfare Fund, on behalf of itself and all others similarly situated, files this Complaint against Defendants AbbVie Inc., AbbVie Biotechnology Ltd. (together, "AbbVie"), Amgen Inc. ("Amgen"), Samsung Bioepis Co., Ltd. ("Bioepis"), Mylan Inc., Mylan Pharmaceuticals, Inc. (together, "Mylan"), Sandoz, Inc. ("Sandoz"), Fresenius Kabi USA, LLC ("Fresenius"), Pfizer Inc. ("Pfizer"), and Momenta Pharmaceuticals, Inc. ("Momenta") (collectively, "Defendants") for violations of federal antitrust laws and state antitrust, consumer protection, and common laws. Plaintiff's claims arise from Defendants' anticompetitive scheme to restrain competition in the market for Humira® and its biosimilar competitors in the United States. Plaintiff's allegations are made on personal knowledge as to Plaintiff and Plaintiff's own acts and upon information and belief as to all other matters.

## I.     NATURE OF THE ACTION

1.      Humira (adalimumab) is a biologic injectable therapy indicated to treat a variety of chronic conditions, including rheumatoid arthritis, ankylosing spondylitis, psoriatic arthritis, plaque psoriasis, Crohn's disease (adult and pediatric), and ulcerative colitis. Humira is sold primarily in the United States and Europe.

2.      For over 15 years, Humira has been a blockbuster drug. Indeed, Humira is presently the best-selling prescription drug in the world with over $130 billion in total sales since its launch.

3.      Humira is the single largest revenue source for AbbVie, with sales of nearly $20 billion in 2018 alone, which account for approximately 61% of the company's global revenues.

4.      Humira's price to patients has skyrocketed over the past decade. Per patient costs doubled from $19,000 per year in 2012 to more than $38,000 in 2018 (after rebates).[1] Humira's list price, absent rebates, can now reach $50,000 per year per patient.[2]

5.      Many other pharmaceutical manufacturers have sought to launch lower-priced adalimumab "biosimilars"—generic versions of Humira that treat the same underlying conditions—to garner their own share of the enormous U.S. market for this biologic. However, despite eight other manufacturers developing adalimumab biosimilars—three of which have received Food and Drug Administration ("FDA") approval—AbbVie has successfully prevented all biosimilars from launching in the U.S. market through widespread anticompetitive conduct that has allowed it to maintain its monopoly and supracompetitive prices.

6.      AbbVie has erected significant barriers to entry to block biosimilar competition. Specifically, AbbVie has created and employed an exclusionary "patent thicket"—an unlawful scheme whereby it secured over 100 patents designed solely to insulate Humira from any biosimilar competition in the U.S. for years to come. Then, AbbVie entered into illegal market division agreements with the remaining Defendants in a concerted effort to delay biosimilar entry in the U.S. until at least 2023. Meanwhile, patients in Europe do not have to wait, as AbbVie agreed to earlier entry dates, thereby permitting biosimilar competitors to launch there. This trade-off meant that the lower price for Humira in Europe was subsidized by the much higher price in the United States where AbbVie unlawfully maintained its monopoly.

---

[1] *Humira's Best-Selling Drug Formula: Start at a High Price. Go Higher*, New York Times, https://www.nytimes.com/2018/01/06/business/humira-drug-prices.html (last accessed Mar. 13, 2019).

[2] *How AbbVie's Humira Undercuts The Drug Industry Price Defense*, Forbes, https://www.forbes.com/sites/brucejapsen/2016/07/21/how-abbvies-humira-undercuts-the-drug-industry-price-defense/ (last accessed Mar. 13, 2019).

7.      The primary patent for Humira expired in December 2016. However, in order to create its patent thicket, AbbVie has applied for nearly 250 patents since its biologic was first developed, *89% of which were filed after the FDA's approval of its initial new drug application*.[3] Humira is now blanketed by over 100 issued patents. Many of the Humira patents expire in 2034, over three decades since the drug's launch.

8.      The sheer number of patents makes it "nearly impossible for any biosimilar to feasibly litigate all of these patents."[4] The long duration and extensive scope of AbbVie's patent thicket blocks biosimilar entry regardless of whether parts of the thicket die from time to time as AbbVie patents may be adjudged invalid or non-infringed.

9.      AbbVie has abused the patent system—collecting dozens and dozens of patents, many of which are overlapping and non-inventive—as a means to block competition in the U.S. market. It simply is not feasible for biosimilar manufacturers to engage in time-consuming and expensive patent litigation against this mass of dubious patents.

10.      Condemnation of this practice has been intense. Industry commentators, the former Commissioner of the Food and Drug Administration ("FDA"), and a very recent U.S. Congressional investigation have criticized the use of patent thickets to deter biosimilar competition. For example, FDA Commissioner Scott Gottlieb remarked in April 2018 that manufacturers are employing "schemes to hamstring biosimilar competition" with "patent

---

[3] *Initiative for Medicines, Access & Knowledge – Public Comment to Federal Trade Commission*, https://www.ftc.gov/system/files/documents/public_comments/2018/12/ftc-2018-0090-d-0029-163403.pdf (last accessed Mar. 13, 2019).

[4] *Did AbbVie create a wrongful "patent thicket" around Humira®?*, Markman Advisors, https://www.markmanadvisors.com/blog/2018/8/27/did-abbvie-create-a-wrongful-patent-thicket-around-humira (last accessed Mar. 13, 2019).

thickets on biologics deter[ring] market entry for years after FDA approval."[5] Commissioner Gottlieb stated that, at the time, the FDA had approved nine biosimilar products, but only three were available to U.S. patients, and that patients therefore "won't see the benefits of lower prices."[6]

11.     To carry out its patent thicket scheme, AbbVie has pursued "infringement" litigation against biosimilar manufacturers, openly touting its litigation strategy to investors as a means of insulating its blockbuster drug from competition. Biosimilar manufacturers must either engage in years of protracted, expensive patent litigation as they cut their way through AbbVie's approximately 100 patents, or else settle the litigation under terms that significantly delay the launch of their FDA-approved biosimilar products.

12.     Not surprisingly, seven competitors have opted to settle. AbbVie has entered into unlawful market division agreements with seven biosimilar manufacturers, which permit competition in Europe, but which delay biosimilars in the U.S. market until at least January 2023:

| Competitor | Earliest Entry Date |
| --- | --- |
| Amgen | January 31, 2023 |
| Bioepis | June 30, 2023 |
| Mylan | July 31, 2023 |
| Sandoz | September 30, 2023 |
| Fresenius | September 30, 2023 |
| Pfizer | November 20, 2023 |
| Momenta | November 20, 2023 |

---

[5] *Advancing Patient Care Through Competition*, Remarks by FDA Commissioner Scott Gottlieb, https://www.fda.gov/NewsEvents/Speeches/ucm605143.htm (last accessed Mar. 13, 2019).

[6] *Id.*

13.     Through these agreements, Defendants illegally allocated the market for adalimumab. AbbVie has maintained its adalimumab monopoly in the U.S. market and continues to charge inflated prices—capturing nearly $20 billion in 2018 revenues—while allowing biosimilars to sell in the European market, where drug prices—and hence profits—are generally much lower.

14.     Lower prices in Europe mean that, when biosimilar versions enter there, the "hit" to AbbVie's bottom line is less than it would be in the U.S. Accordingly, AbbVie has agreed with other Defendants to permit entry in Europe years earlier than the 2023 U.S. entry date. Simply put, AbbVie has cooked up a monopoly maintenance scheme that has U.S. patients paying higher monopoly prices while patients in Europe benefit from competition.

15.     Only one manufacturer—Boehringer Ingelheim International GmbH along with its affiliated companies Boehringer Ingelheim Pharmaceutical, Inc. and Boehringer Ingelheim Fremont, Inc. (collectively, "Boehringer")—has chosen to battle AbbVie through litigation in an effort to launch its own proposed adalimumab biosimilar, Cyltezo. Boehringer has alleged that AbbVie has used its patent thicket—and the enforcement litigation—as a means to prevent any biosimilar competition. But despite Boehringer's efforts, the litigation has no resolution in sight, just as AbbVie intended through the creation of its patent thicket.

16.     AbbVie's claim that it "believe[s] biosimilars will play an important role in our healthcare system," is hollow, indeed.[7] *At every turn*, AbbVie has worked to prevent biosimilars from entering the U.S. market, by both amassing its unlawful patent thicket and entering into agreements dividing market entry between Europe and the U.S.

---

[7] *AbbVie Announces Global Resolution of HUMIRA® (adalimumab) Patent Disputes with Sandoz*, https://news.abbvie.com/news/abbvie-announces-global-resolution-humira-adalimumab-patent-disputes-with-sandoz.htm (last accessed Mar. 13, 2019).

17.     Top AbbVie executives directly benefit from thwarting biosimilar entry and raising Humira prices to exorbitant levels. The company's policy directly links financial compensation to Humira revenue goals.[8] Last year, for example, CEO Richard Gonzalez took home $21.27 million, with $3.9 million as a performance-based cash incentive award.[9]

18.     AbbVie's scheme to keep out biosimilar competition has cost the U.S. healthcare system billions of dollars. For example, Wells Fargo analyst David Maris calculated that AbbVie's 9.7% price hike on Humira in 2018 cost the country's healthcare system approximately $1.2 billion.[10]

19.     Absent Defendants' anticompetitive conduct, Plaintiff and members of the Classes would have been able to purchase adalimumab biosimilars as early as January 1, 2017 (the expiration of Humira's primary patent), at significantly lower prices than AbbVie has charged. The injury to Plaintiff and the Classes is ongoing, as there still is no biosimilar alternative to AbbVie's Humira available to purchase in this country.

20.     A market division agreement by rivals is "anticompetitive regardless of whether the parties split a market within which both do business or whether they merely reserve one market for one and another for the other."[11] Accordingly, to redress the economic injury Defendants have already caused—and continue to cause—Plaintiff, on behalf of itself and all others similarly situated, seeks injunctive and other equitable relief under the federal antitrust

---

[8] *AbbVie Schedule 14A Proxy Statement*, *Executive Compensation*, U.S. Securities and Exchange Commission, https://investors.abbvie.com/node/12731/html#dm10001 (last accessed Mar. 13, 2019).

[9] *AbbVie hands CEO $21M—and a hefty bonus—even as exec pay scrutiny mounts*, FiercePharma, https://www.fiercepharma.com/pharma/abbvie-again-uses-humira-for-ceo-s-21-3m-pay-2018-even-as-pricing-scrutiny-mounts (last accessed Mar. 13, 2019).

[10] *How Allergan Continues to Make Drug Prices Insane*, Bloomberg Opinion, https://www.bloomberg.com/opinion/articles/2018-01-09/how-allergan-continues-to-make-drug-prices-insane (last accessed Mar. 13, 2019).

[11] *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49-50 (1990).

laws, as well as damages and other monetary relief under state antitrust, consumer protection, and common laws.

## II.     JURISDICTION AND VENUE

21.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1337 because this action seeks injunctive and equitable relief under the Clayton Act, 15 U.S.C. § 26. This Court also has jurisdiction under Clayton Act § 12, 15 U.S.C. § 22.

22.     This Court also has jurisdiction under 28 U.S.C. § 1332(d) because this action is a class action in which the aggregate amount in controversy for the proposed Damages Class (defined below) exceeds $5,000,000, and at least one member of the Damages Class is a citizen of a state different from that of one of Defendants. This Court also has supplemental jurisdiction over state law claims under 28 U.S.C. § 1367(a).

23.     Venue is appropriate in this District under 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. §1391(b). Defendants reside, transact business, are found, or have agents within this District, and a portion of the affected interstate trade and commerce discussed below was carried out in this District. Defendants' conduct, as described in this Complaint, was within the flow of, was intended to, and did have a substantial effect on, the interstate commerce of the United States, including in this District. Moreover, the effects of Defendants' conduct on interstate trade or commerce are ongoing.

24.     This Court has personal jurisdiction over each Defendant. Each Defendant has transacted business, maintained substantial contacts, or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this District. The scheme and conspiracy have been directed at, and have had the intended effect of causing injury to, persons residing in, located in, or doing business throughout the United States, including in this District.

25.     Amgen, Bioepis, Mylan, Sandoz, Fresenius, Pfizer, and Momenta each entered in an unlawful market division agreement with AbbVie, a company headquartered in this District. By entering into unlawful agreements—the basis for many of Plaintiff's claims—with a company in this District, Defendants have transacted business in and availed themselves of the laws of Illinois. The Court therefore has personal jurisdiction over each Defendant.

26.     Additionally, because each Defendant conspired with AbbVie to violate federal and state laws by entering into unlawful market division agreements, and because AbbVie used these agreements to maintain its Humira monopoly and committed tortious acts from its Illinois headquarters in furtherance of the conspiracy, each Defendant is subject to this Court's jurisdiction under the conspiracy theory of jurisdiction.

## III.   THE PARTIES

27.     Plaintiff UFCW Local 1500 Welfare Fund ("Local 1500") is an employee welfare benefits fund with its principal place of business at 425 Merrick Avenue, Westbury, New York. With 15,000 members, Local 1500 is the largest grocery union in New York and provides health and welfare benefits to nearly 23,000 plan participants. During the Class Period, Local 1500 purchased and paid for some or all of the purchase price of Humira, thereby suffering injury to its business and property. Local 1500 paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct.

28.     Defendant AbbVie Inc. is a Delaware corporation with its principal place of business at 1 North Waukegan Road, North Chicago, IL 60064.

29.     Defendant AbbVie Biotechnology Ltd. is a Bermuda corporation with its principal place of business at Clarendon House, 2 Church Street, Hamilton HM11, Bermuda.

30.     AbbVie Inc. and AbbVie Biotechnology Ltd. are collectively referred to herein as "AbbVie." During the Class Period, AbbVie sold Humira in this District and throughout the United States.

31.     Defendant Amgen Inc. ("Amgen") is a Delaware corporation with its principal place of business at One Amgen Center Drive, Thousand Oaks, CA 91320.

32.     Defendant Samsung Bioepis Co., Ltd. ("Bioepis") is a company organized and existing under the laws of the Republic of Korea with its principal place of business at 107, Cheomdan-daero, Yeonsu-gu, Incheon, Republic of Korea.

33.     Defendant Mylan Inc. is a Pennsylvania corporation with its principal place of business at 1000 Mylan Blvd., Canonsburg, PA 15317.

34.     Defendant Mylan Pharmaceuticals, Inc. is a West Virginia corporation with its principal place of business at 781 Chestnut Ridge Rd., Morgantown, WV 26505. It is a subsidiary of Mylan Inc.

35.     Mylan Inc. and Mylan Pharmaceuticals, Inc., which are wholly-owned subsidiaries of Mylan N.V., a Dutch pharmaceutical company, are collectively referred to herein as "Mylan."

36.     Defendant Sandoz, Inc. ("Sandoz") is a Colorado corporation with its principal place of business at 100 College Rd. West, Princeton, NJ 08540. Sandoz is a subsidiary of Novartis AG, a global pharmaceutical company based in Basel, Switzerland.

37.     Defendant Fresenius Kabi USA, LLC ("Fresenius") is a Delaware limited liability company with its principal place of business at Three Corporate Drive, Lake Zurich, IL 60047.

38.     Defendant Pfizer Inc. ("Pfizer") is a Delaware corporation with its principal place of business at 235 East 42nd Street, New York, NY 10017.

39.     Defendant Momenta Pharmaceuticals, Inc. ("Momenta") is a Delaware corporation with its principal place of business at 301 Binney Street, Cambridge, MA 02142.

40.     Defendants AbbVie, Amgen, Bioepis, Mylan, Sandoz, Fresenius, Pfizer, and Momenta are collectively referred to as "Defendants."

41.     All of Defendants' actions described in this Complaint are part of, and in furtherance of, the unlawful conduct alleged in this Complaint. These actions were authorized, ordered, or undertaken by Defendants' various officers, agents, employees, or other representatives while engaged in the management of Defendants' affairs (or those of their predecessors-in-interest) within the course and scope of their duties and employment or with the actual, apparent, and/or ostensible authority of Defendants.

## IV.     FACTUAL ALLEGATIONS

### A.     The Market for Biologics and Biosimilars

42.     Many of today's important medications are biological products. Biologics encompass a wide range of products, including "vaccines, blood and blood components, allergenics, somatic cells, gene therapy, tissues, and recombinant therapeutic proteins."[12] They can be composed of sugars, proteins, or nucleic acids, or combinations of these substances, or may even be living cells and tissues. They are derived from a variety of natural sources—human, animal, or micro-organism.[13] Biologics are used to treat a range of diseases including cancer, rheumatoid arthritis, diabetes, and anemia.

---

[12] FDA, What Are "Biologics" Questions and Answers, http://www.fda.gov/AboutFDA/CentersOffices/OfficeofMedicalProductsandTobacco/CBER/ucm133077.htm.

[13] *Id.*

43.     Biologic products are far more complex than small-molecule drugs. The chemical structures below depict the disparity in complexity between small-molecule drugs (e.g., aspirin) and biologic products (e.g., adalimumab)[14]:



44.     Due to a biologic's complexity, biosimilars, the generic equivalent of biologics, are generally more challenging and expensive to produce than small-molecule generic drugs. Products containing living cells are sensitive to their environments; to produce a product that is sufficiently similar to the pioneer biologic, a biosimilar manufacturer must create unique processes to manipulate the cells. Further, slight variations in the chemical structure of each biosimilar make it more challenging to achieve consistent clinical study results.

45.     As healthcare costs continue to rise, biosimilars offer significant cost savings opportunities for drug purchasers, insurers, and consumers.[15] A Federal Trade Commission

---

[14] *See* UCLA, "Illustrated Glossary of Organic Chemistry",
http://www.chem.ucla.edu/~harding/IGOC/A/aspirin.html; Drug Bank,
https://www.drugbank.ca/drugs/DB00051.
[15] Federal Trade Comm'n, Emerging Health Care Issues: Follow-On Biologic Drug Competition; A Federal Trade Commission Report 47, 53 (June 2009),
https://www.ftc.gov/sites/default/files/documents/reports/emerging-health-care-issues-follow-biologic-drug-competition-federal-trade-commission-report/p083901biologicsreport.pdf.

("FTC") study found that biosimilars can be as much as 30% cheaper than pioneer biologics.[16] Studies on the effects of biosimilar competition in Europe suggest that pioneer biologic manufacturers also reduce prices on their own products in the face of biosimilar competition. One biosimilar developer projected that biosimilars could generate $250 billion in savings to consumers over ten years.[17]

**B.      Congress Enacted the Biologics Price Competition and Innovation Act ("BCPIA") to Spur Price Competition for Biologic Medications**

46.      In the United States, pharmaceutical companies seeking approval to market biologic products must file a Biologic License Application ("BLA"). The BLA must include certain data demonstrating, among other things, the proposed product's therapeutic properties, as well as the product's conformity with FDA requirements on safety, purity, and potency.[18]

47.      Prior to 2010, there was no clear pathway for "genericized" versions of biologic products to reach the market. However, in March 2010, Congress passed the BPCIA, which provides a pathway for biosimilars to receive FDA approval.[19]

48.      Under the BPCIA, if a manufacturer can demonstrate that its biologic is "highly similar," and has no clinically meaningful differences in terms of safety and effectiveness to an FDA-approved biological product, also known as a "reference" product, then it can be approved as a "biosimilar" to the reference product.[20] A pharmaceutical company may file an abbreviated

---

[16] *Id.*

[17] *See* Sumant Ramachandra, Senior V.P., Hospira, Presentation, Lessons for the United States: Biosimilar Market Development Worldwide (Feb. 4, 2014), https://www.ftc.gov/news-events/events-calendar/2014/02/follow-biologicsworkshop-impact-recent-legislative-regulatory,then follow Event Speakers.

[18] 21 C.F.R. § 601.2.

[19] Pub. L. No. 111-148, 124 Stat. 804 (2010), *codified as* 42 U.S.C. § 262, *et seq.*

[20] 42 U.S.C. § 262(i)(2)(A)-(B).

Biologic License Application ("aBLA"), which can rely on the reference product's sponsor's clinical studies to demonstrate that the biosimilar will be safe and effective.

49.     The FDA publishes a list of licensed biological products with reference product exclusivity and biosimilarity evaluations, known as the "Purple Book." Currently, the FDA has approved 18 biosimilars.

50.     As noted above, FDA-approved biosimilars that make it to market offer significant cost savings to drug purchasers, insurers, and patients over their reference biologic counterparts.

**C.     AbbVie's Acquisition and Development of Adalimumab**

51.     Adalimumab, the antibody underlying AbbVie's blockbuster biologic Humira, was originally developed through a partnership between BASF AG and Cambridge Antibody Technology.

52.     On February 9, 1996, BASF AG filed a U.S. patent application disclosing adalimumab, which later was issued as U.S. Patent No. 6,090,382 ("the '382 patent"). This patent created exclusivity in adalimumab, formulations containing adalimumab, and methods of making and using adalimumab.

53.     Just five years later, on March 2, 2001, Abbott Laboratories ("Abbott")—the predecessor to AbbVie through a spin-off in 2013—purchased BASF AG's pharmaceutical business for $6.9 billion, which included the rights to adalimumab.

54.     At the time of purchase, Abbott was aware that the '382 patent, the primary patent underlying Humira, was set to expire in December 2016.

55. The FDA subsequently approved AbbVie's BLA No. 125057, Humira (adalimumab), 40 mg/0.8 mL single-use syringes, for use in treating humans on December 31, 2002.[21] Adalimumab was the first fully human antibody approved by the FDA.

56. Humira, which is given by injection, was originally indicated for moderate to severe rheumatoid arthritis in adults, but over time was approved for a number of additional indications: moderate to severe polyarticular juvenile idiopathic arthritis in children, psoriatic arthritis in adults, ankylosing spondylitis in adults, moderate to severe Crohn's disease in adults and children, moderate to severe hidradenitis suppurativa, moderate to severe ulcerative colitis, plaque psoriasis, and non-infectious intermediate, posterior, and panuveitis.[22]

**D.      The FDA Has Approved Three Adalimumab Biosimilars in the U.S. Market**

57. Given the massive size of the market for Humira (with global annual sales reaching nearly $20 billion in 2018 alone), many other pharmaceutical manufacturers have developed adalimumab biosimilars in an effort to compete.

58. Two Defendants and one other manufacturer have received FDA approval for their biosimilars.

59. On September 23, 2016, in response to BLA No. 761024, Defendant Amgen received FDA approval for its biosimilar, Amjevita (adalimumab-atto) Injection, 20 mg/0.4 mL and 40 mg/0.8 mL.[23] Amjevita is indicated for rheumatoid arthritis, juvenile idiopathic arthritis, psoriatic arthritis, ankylosing spondylitis, adult Crohn's disease, ulcerative colitis, and plaque psoriasis.

---

[21] *FDA Approved Drug Products, Biologic License Application No. 125057*, https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=125057.
[22] *FDA Prescribing Information for Humira*, https://www.accessdata.fda.gov/drugsatfda_docs/label/2018/125057s409lbl.pdf#page=4.
[23] *FDA Approved Drug Products, Biologic License Application No. 761024*, https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=761024.

60.     On August 25, 2017, in response to BLA No. 761058, Boehringer received FDA approval for Cyltezo (adalimumab-adbm), 40 mg/0.8 mL.[24] Cyltezo is indicated for rheumatoid arthritis, juvenile idiopathic arthritis, psoriatic arthritis, ankylosing spondylitis, adult Crohn's disease, ulcerative colitis, and plaque psoriasis.

61.     On October 30, 2018, in response to BLA No. 761071, Defendant Sandoz received FDA approval for its biosimilar, Hyrimoz (adalimumab-adaz), 40 mg/0.8 mL.[25] Hyrimoz is indicated for rheumatoid arthritis, juvenile idiopathic arthritis, psoriatic arthritis, ankylosing spondylitis, adult Crohn's disease, ulcerative colitis, and plaque psoriasis.

62.     Meanwhile, Defendant Bioepis filed its BLA in September 2018 seeking approval of its adalimumab biosimilar, Imraldi,[26] and based on industry estimates, could receive FDA approval before the end of 2019. Defendant Momenta, on the other hand, delayed its planned BLA filing to an unspecified future date.

## E.     AbbVie's Unlawful Scheme to Develop and Erect a Patent Thicket to Exclude Competition

63.     Despite there being just one primary patent issued for adalimumab at the time of the FDA's approval in December 2002, AbbVie engaged in an unlawful scheme to develop an extensive "patent thicket," designed to block biosimilar entry in the U.S. market.

64.     AbbVie knew that its primary Humira patent was set to expire in December 2016. The company also knew that adalimumab biosimilars could enter the U.S. market after

---

[24] *FDA Approved Drug Products, Biologic License Application No. 761058*, https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&applno=761058.

[25] *FDA Approved Drug Products, Biologic License Application No. 761071*, https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&varApplNo=761071

[26] *Samsung Bioepis Biosimilar Pipeline*, http://www.samsungbioepis.com/en/pipeline/ (last accessed Mar. 13, 2019).

December 2016, at significantly lower prices, and capture a huge part of AbbVie's record-setting Humira revenue.

65.     AbbVie therefore spent considerable effort seeking U.S. approval for hundreds of patents with the purpose of creating an impenetrable wall around its blockbuster drug. The company filed nearly 250 patent applications, many of which were overlapping and non-inventive. Notably, over 50 of AbbVie's Humira patents were granted in 2015 and 2016—*more than a dozen years after the biologic's initial FDA approval, and immediately before the clock expired on the primary patent*. AbbVie's timing was specifically designed to block competitors seeking biosimilar entry in the U.S. market.

66.     AbbVie's scheme—while unlawful under federal and state law—was fruitful. The company accumulated over 100 patents in the U.S. alone—thereby creating an enormous patent thicket used to block biosimilar entry. Even if a biosimilar manufacturer were to successfully challenge dozens of the Humira patents through expensive, protracted litigation, AbbVie would nevertheless be left with dozens more patents to prevent any U.S. biosimilar launch for years to come. Meanwhile, Humira's price to patients continues to skyrocket.

67.     In an extensive study on new drug patents and generic challenges, New York University School of Law Professor Scott Hemphill analyzed nearly 700 new drugs between 1985 and 2002.[27] Over the final three years of that time period, the *mean number of patents per new drug was only 3.9*—a far cry from the over 100 patents blanketing Humira. Even then, though, Professor Hemphill's analysis is illuminating:

> These patents, though weak, nevertheless have the effect of making the patent portfolio stronger. If they overlap in duration with a strong composition of matter patent, they provide an additional barrier to generic entry prior to expiration of the

---

[27] C. Scott Hemphill & Bhaven N. Sampat, *When Do Generics Challenge Drug Patents?*, 8 J. Empirical Legal Stud. 613 (2011).

strong patent, since the generic firm must defeat the weak patent in addition to the strong one. Indeed, the prospect of having to defeat both patents might cause a generic firm to decline or delay a challenge. Moreover, the additional patent strengthens the portfolio in a second way. A patent that expires later than the strong patent potentially provides a substantial temporal extension in a brand-name drug maker's effective exclusivity.[28]

68.    AbbVie's patent thicket is well-documented in news reports, and was even the subject of a recent U.S. Congressional investigation into overpriced drugs. Commentators have remarked that a patent thicket effectively bars biosimilar competition, raises patient prices, and costs the U.S. healthcare system billions of dollars each year.

69.    For example, *Bloomberg Businessweek* reported on the "shield of patents" protecting Humira: "The real challenge [for biosimilar versions] was the seemingly *impregnable* fortress of patents AbbVie has methodically constructed around its prized moneymaker."[29]

70.    The *Wall Street Journal* similarly reported that "U.S. patients and insurers will have to wait to access less-expensive versions" as a result of "a formidable wall of patents built up by Humira-maker AbbVie Inc."[30]

71.    Former FDA Commissioner Gottlieb remarked that patent thickets were particularly problematic in the biologic market. He stated that manufacturers use this patent thicket "scheme[]" to "hamstring biosimilar competition . . . "deter[ring] market entry for years

---

[28] *Id.* at 12.

[29] *This Shield of Patents Protects the World's Best-Selling Drug*, Bloomberg Businessweek, https://www.bloomberg.com/news/articles/2017-09-07/this-shield-of-patents-protects-the-world-s-best-selling-drug (emphasis added) (last accessed Mar. 13, 2019).

[30] *By Adding Patents, Drugmaker Keeps Cheaper Humira Copies Out of U.S.*, Wall Street Journal, https://www.wsj.com/articles/biosimilar-humira-goes-on-sale-in-europe-widening-gap-with-u-s-1539687603 (last accessed Mar. 13, 2019).

after FDA approval."[31] He stated just one year ago that, despite the FDA having approved nine biosimilars at the time, only three had entered the market.

72.     A bipartisan group of U.S. Senators recently criticized this type of anticompetitive scheme as well. Senator Susan Collins (R-ME) stated that "we cannot be blind to the costs of these drugs, nor to cases where patent laws are manipulated to preserve monopolies." Senator Mike Braun (R-IN) called out "the legal tricks contributing to higher prices" amid the "skyrocketing" patients "costs for critical biologic medications." And Senator Tim Kaine (D-VA) remarked that "patents can be used to deter competition" in the biologic market.[32]

73.     Despite the justifiable outcry, AbbVie brazenly brags about its patent thicket. CEO Richard Gonzalez has explained, "Any company seeking to market a biosimilar version of Humira will have to contend with this extensive patent estate, which AbbVie intends to enforce vigorously."[33] By AbbVie's own estimate, "Total Litigation Timing" for a patent trial and appeal is "4 to 5 years." Biosimilar competitors thus face generations of litigation.

74.     Similarly, in company presentations, AbbVie touts its "Broad U.S. Humira Patent Estate" as a strategy to prevent biosimilar competition through at least 2023, even though the primary patent covering adalimumab expired in December 2016 (a full 14 years after FDA approval).[34]

---

[31] *Advancing Patient Care Through Competition*, Remarks by FDA Commissioner Scott Gottlieb, https://www.fda.gov/NewsEvents/Speeches/ucm605143.htm.

[32] *Bipartisan Group of Senators Launch Effort to Stop Patent Gaming & Increase Access to Lower-Cost Drugs*, https://www.collins.senate.gov/newsroom/bipartisan-group-senators-launch-effort-stop-patent-gaming-increase-access-lower-cost-drugs (last accessed Mar. 13, 2019).

[33] *Makers of Humira and Enbrel Using New Drug Patents to Delay Generic Versions*, New York Times, https://www.nytimes.com/2016/07/16/business/makers-of-humira-and-enbrel-using-new-drug-patents-to-delay-generic-versions.html (last accessed Mar. 13, 2019).

[34] *AbbVie Long-Term Strategy* – October 30, 2015 (presented by CEO Richard Gonzalez), http://www.biotechduediligence.com/uploads/6/3/6/7/6367956/abbvie_strategy_presentation__1_.pdf (last accessed Mar. 13, 2019).

## Broad U.S. Humira Patent Estate

| Approved Indication | Rheumatoid Arthritis | Gastro Indications | Psoriasis | Psoriatic Arthritis | Ankylosing Spondylitis | Juvenile Idiopathic Arthritis | Hidradenitis Suppurativa |
|---|---|---|---|---|---|---|---|
| Composition of Matter | Expires Dec. 31, 2016 | | | | | | |
| Indication / Method of Treatment | 4 patents Earliest Expiry: 2022 | 6 patents Earliest Expiry: 2022 | 3 patents Earliest Expiry: 2023 | 4 patents Earliest Expiry: 2023 | 3 patents Earliest Expiry: 2022 | 1 patent Earliest Expiry: 2030 | 1 Patent Earliest Expiry: 2031 |
| Formulation | 14 Patents Expire 2022 −2028 | | | | | | |
| Manufacturing | 24 patents Expire 2027 − 2034 | | | | | | |
| Other (Device, Diagnostics, etc.) | 15 patents Expire 2024−2032 | | | | | | |

abbvie                                                                AbbVie Long-Term Strategy © 2015    14

75.     As the 2016 expiration of the primary patent for adalimumab approached, AbbVie was particularly aggressive in obtaining additional patents: "A review of Humira's patents by the Association for Accessible Medicines shows the drugmaker has been obtaining patents at a feverish clip in recent years: 21 in 2016 and 32 in 2015."[35]

76.     AbbVie has been similarly active in asserting its patent thicket against potential biosimilar entrants. Its appetite for litigation highlights AbbVie's ongoing efforts to prevent biosimilar entry and to monopolize the U.S. market for Humira.

77.     To date, nearly every adalimumab biosimilar manufacturer has settled with AbbVie (either after litigation or threat of litigation). Those competitors have agreed to delay

---

[35] *This Shield of Patents Protects the World's Best-Selling Drug*, Bloomberg Businessweek, https://www.bloomberg.com/news/articles/2017-09-07/this-shield-of-patents-protects-the-world-s-best-selling-drug (last accessed Mar. 13, 2019).

launching their biosimilars in the U.S. until 2023. Only one biosimilar manufacturer—
Boehringer—has continued to litigate against AbbVie in an effort to launch its biosimilar earlier
in the U.S.

78.     In August 2017, just weeks before Boehringer received FDA approval for its
biosimilar, AbbVie filed an infringement lawsuit in the U.S. District Court for the District of
Delaware. AbbVie asserted in its Complaint that Boehringer's biosimilar would infringe
*approximately 1,600 claims from among 74 different AbbVie patents* (with the total number of
Humira patents exceeding 100).

79.     While many of the documents in the Boehringer litigation are sealed from the
public record, court papers available to the public reveal significant anticompetitive conduct
alleged against AbbVie. For example, Boehringer asserts that[36]:

    (a)     AbbVie's "patents do not represent innovation, but rather are attempts to
claim methods of treatment, methods of production, and formulations derived from the prior art
for the purpose of creating a patent thicket or estate that competitors must, as AbbVie has
publicly stated, 'contend with' to sell the active ingredient previously disclosed and claimed in
the now-expired '382 patent."

    (b)     "Humira's success is not due to the alleged inventions of the patents
[AbbVie] now assert[s] against [Boehringer], but rather is because of the properties of its active
ingredient, adalimumab. Adalimumab was the first fully human monoclonal antibody approved
by the FDA, and as such represented a true scientific achievement. The formulations, production
processes, and dosing regimens claimed in [AbbVie's] patent estate are not." (AbbVie's patent
on adalimumab expired in 2016.)

---

[36] *AbbVie Inc. v. Boehringer Ingelheim Int'l GMBH*, Case No. 1:17-cv-1065 (D. Del.), Boehringer's
Answer, Defenses, and Counterclaims at 41—45 (Doc. 20, September 11, 2017).

80. Boehringer emphasized the weak nature of AbbVie's asserted patents. AbbVie alleges infringement of three patents that the Patent Trial and Appeal Board has *already found unpatentable*.[37]

81. Boehringer also highlighted AbbVie's patent "gamesmanship," citing to a United Kingdom High Court decision that "reached a final ruling on invalidity . . . despite the fact that AbbVie . . . revoked or de-designated its patents with respect to the United Kingdom during the proceedings." The High Court stated in its decision that "the intention and the objective effect [of AbbVie's efforts] is to shield its patent portfolio from examination of validity whilst continuing to file further divisionals and to threaten infringement proceedings against biosimilars, wherever they may be launched."[38]

82. Meanwhile, Boehringer has not yet launched its biosimilar.

83. AbbVie's unlawful scheme to amass and to use its patent thicket to maintain its Humira monopoly has injured Plaintiff and the members of the Classes. This patent thicket prevents biosimilar competition and increases patients costs—an injury that is ongoing.

**F.      Defendants Entered Into Unlawful Market Division Agreements to Eliminate and Delay Biosimilar Competition in the U.S.**

84. Between September 2017 and November 2018, Defendants entered into a series of confidential agreements that eliminate and delay sales of adalimumab biosimilars from the U.S. market until at least January 2023. The agreements, while announced as settlements or licensing agreements, operate as unlawful market division between the U.S. and European markets. As in the U.S., AbbVie had Humira patent protection in Europe. But AbbVie ceded the

---

[37] *Id.* at 46.
[38] *Id.* at 46—47.

European market to biosimilar competition—despite that patent protection—in exchange for maintaining its monopoly in the U.S.

85.     On September 28, 2017, AbbVie announced an agreement with Amgen to globally resolve intellectual property-related litigation over Amgen's biosimilar, Amjevita.[39] AbbVie granted Amgen a license to launch in Europe on October 16, 2018. By contrast, Amgen's license for the U.S. blocks a U.S. launch until January 31, 2023—more than four years later. Amgen agreed to pay licensing royalties to AbbVie as part of the resolution.

86.     On April 5, 2018, AbbVie announced an agreement with Bioepis to globally resolve intellectual property-related litigation over Bioepis's biosimilar, Imraldi.[40] AbbVie granted Bioepis a license to launch in Europe on October 16, 2018. By contrast, Bioepis's license for the U.S. blocks a U.S. launch until June 30, 2023—again more than four years later. Bioepis agreed to pay licensing royalties to AbbVie as part of the resolution.

87.     On July 17, 2018, AbbVie announced an agreement with Mylan to license Mylan's biosimilar, Hulio.[41] AbbVie granted Mylan, through its global partner Fujifilm Kyowa Kirin Biologics Co., Ltd., a sublicense to launch its biosimilar in Europe on October 16, 2018. By contract, Mylan's license for U.S. blocks a U.S. launch until July 31, 2023—more than four years later. Mylan agreed to pay licensing royalties to AbbVie as part of the resolution.[42]

---

[39] *AbbVie Announces Global Resolution of HUMIRA® (adalimumab) Patent Disputes with Amgen*, https://news.abbvie.com/news/press-releases/abbvie-announces-global-resolution-humira-adalimumab-patent-disputes-with-amgen.htm (last accessed Mar. 13, 2019).

[40] *AbbVie Announces Global Resolution of HUMIRA® (adalimumab) Patent Disputes with Samsung Bioepis*, https://news.abbvie.com/news/press-releases/abbvie-announces-global-resolution-humira-adalimumab-patent-disputes-with-samsung-bioepis.htm (last accessed Mar. 13, 2019).

[41] *AbbVie Announces HUMIRA® (adalimumab) Patent License with Mylan*, https://news.abbvie.com/news/press-releases/abbvie-announces-humira-adalimumab-patent-license-with-mylan.htm (last accessed Mar. 13, 2019).

[42] *Mylan and Fujifilm Kyowa Kirin Biologics Receive European Marketing Authorization for Hulio®, Biosimilar Adalimumab*, https://kyowa-kirin.com/news_releases/2018/pdf/e20180920_01.pdf (last accessed Mar. 13, 2019).

88.     On October 11, 2018, AbbVie announced an agreement with Sandoz to globally resolve intellectual property-related litigation over Sandoz's biosimilar, Hyrimoz.[43] AbbVie granted Sandoz a license to launch in Europe on October 16, 2018. By contract, Sandoz's license for the U.S. blocks a U.S. launch until September 30, 2023—nearly five years later. Sandoz agreed to pay licensing royalties to AbbVie as part of the resolution.

89.     On October 18, 2018, AbbVie announced an agreement with Fresenius to globally resolve intellectual property-related litigation over Fresenius's biosimilar, MSB11022.[44] AbbVie granted Fresenius a license to launch in Europe upon approval from the European Medicines Agency. Indeed, the European Medicines Agency's Committee for Medicinal Products for Human Use issued a positive opinion for Fresenius's biosimilar, but the European Commission must still grant marketing authorizations before the company can launch. A final decision could come as soon as the second quarter of 2019.[45] By contrast, Fresenius's license for the U.S. blocks a U.S. launch until September 20, 2023. Fresenius agreed to pay licensing royalties to AbbVie as part of the resolution.

90.     On November 6, 2018, AbbVie announced an agreement with Momenta to license Momenta's biosimilar, M923.[46] AbbVie granted Momenta a license to launch in Europe upon approval from the European Medicines Agency. By contrast, Momenta's license in the U.S.

---

[43] *AbbVie Announces Global Resolution of HUMIRA® (adalimumab) Patent Disputes with Sandoz*, https://news.abbvie.com/news/abbvie-announces-global-resolution-humira-adalimumab-patent-disputes-with-sandoz.htm (last accessed Mar. 13, 2019).

[44] https://news.abbvie.com/news/press-releases/abbvie-announces-global-resolution-humira-adalimumab-patent-disputes-with-fresenius-kabi.htm (last accessed Mar. 13, 2019).

[45] Positive CHMP Opinion for 2 Brands of Fresenius' Adalimumab Biosimilar, available at https://www.centerforbiosimilars.com/news/positive-chmp-opinion-for-2-brands-of-fresenius-kabis-adalimumab-biosimilar.

[46] *AbbVie Announces HUMIRA® (adalimumab) Global Patent License with Momenta*, https://news.abbvie.com/news/press-releases/abbvie-announces-humira-adalimumab-global-patent-license-with-momenta.htm (last accessed Mar. 13, 2019).

blocks a U.S. launch until November 20, 2023. Momenta agreed to pay licensing royalties to AbbVie as part of the resolution.

91.     On November 30, 2018, AbbVie announced an agreement with Pfizer to license Pfizer's biosimilar, PF-06410293.[47] AbbVie granted Pfizer a non-exclusive license to launch in Europe upon approval from the European Medicines Agency. By contract, Pfizer's license in the U.S. blocks a U.S. launch until November 20, 2023. Pfizer agreed to pay licensing royalties to AbbVie as part of the resolution.

92.     The timeline below demonstrates that no biosimilar can launch in the U.S. until at least January 31, 2023. The only potential exception is Boehringer—if it litigates long enough to invalidate AbbVie's patents before 2023.

| Competitor | Biosimilar | U.S. Launch Date |
|---|---|---|
| Amgen | Amjevita | January 31, 2023 |
| Bioepis | Imraldi | June 30, 2023 |
| Mylan | Hulio | July 31, 2023 |
| Sandoz | Hyrimoz | September 30, 2023 |
| Fresenius | MSB11022 | September 30, 2023 |
| Pfizer | PF-06410293 | November 20, 2023 |
| Momenta | M923 | November 20, 2023 |

93.     As a result of this market division arrangement, AbbVie has blocked biosimilars from the U.S. market until 2023, thereby preserving billions of dollars in revenue. Meanwhile, the remaining Defendants, who settled, are today selling biosimilars in Europe, or will be in the near future—way before 2023.

94.     Through these agreements, AbbVie and other Defendants have divided the markets for Humira and its biosimilars. In exchange for allowing European market entry,

---

[47] *AbbVie Announces HUMIRA® (adalimumab) Global Patent License with Pfizer*, https://news.abbvie.com/news/abbvie-announces-humira-adalimumab-global-patent-license-with-pfizer.htm (last accessed Mar. 13, 2019).

AbbVie received the remaining Defendants' promises to delay entry into the U.S. market until 2023. AbbVie has maintained its Humira monopoly in the U.S., where patients and other customers are, in effect, subsidizing lower prices charged for biosimilars in Europe.

95.     AbbVie's motive for dividing the market geographically is plain enough. AbbVie's price for Humira in Europe has remained significantly lower than in the U.S., as depicted by the chart below comparing Humira costs per carton in 2013.[48] So, competition in Europe affects AbbVie's profits far less than would competition in the U.S. Accordingly, AbbVie chose to allow biosimilar competition to drive down the prevailing—already lower—prices in Europe while maintaining its monopoly on Humira and the associated supracompetitive prices in the U.S.



96.     Biosimilar competition necessarily has a significant impact on pricing. From its already lower price in Europe, with biosimilar entry, Humira's price has dropped between 10%

---

[48] *Our Health Spending Problem is All About Prices*, Vox, https://www.vox.com/2014/4/17/18076656/health-prices (last accessed Mar. 14, 2019).

and 80%.[49] If comparable discounts were applied to U.S. prices, the hit to AbbVie's profit would be dramatically larger. One analyst recently reported that while AbbVie's revenue dropped slightly in Europe after adalimumab biosimilar competition, Humira revenue in the U.S. is a much more important metric for AbbVie's financial health.[50]

97. With no competition in the U.S., AbbVie's price for Humira has skyrocketed since the drug's launch in 2003, and can now cost patients $50,000 per year.

98. Defendants' unlawful market division agreement has injured Plaintiff and the members of the Classes. They are denied the ability to buy less expensive adalimumab biosimilars—an injury that is ongoing.

## V. THE ANTICOMPETITIVE EFFECTS ON INTERSTATE AND INTRASTATE COMMERCE

99. Defendants' anticompetitive scheme has the purpose and effect of unreasonably restraining trade by eliminating competition between AbbVie and companies with competing biosimilar products. But for AbbVie's anticompetitive patent thicket and Defendants' market division arrangement, three FDA-approved biosimilars could have already launched in the U.S., and other biosimilars could enter immediately upon FDA approval.

100. But for Defendants' illegal conduct, Plaintiff and members of the Classes would have paid less for Humira and would have had the choice to purchase biosimilars. Defendants' conduct proximately caused Plaintiff's and the Classes' injuries. It forced them to pay hundreds of millions of dollars in overcharges on purchases of AbbVie's Humira and denied them the opportunity to save by purchasing biosimilars.

---

[49] *Why The U.S. Remains The Most Expensive Market For 'Biologic' Drugs In The World*, NPR, https://www.npr.org/sections/health-shots/2018/12/19/676401634/why-the-u-s-remains-the-most-expensive-market-for-biologic-drugs-in-the-world (last accessed Mar. 13, 2019).

[50] *AbbVie Suffers Market Loss For Humira In Europe, But The U.S. Is A Different Story*, Seeking Alpha, https://seekingalpha.com/article/4240000-abbvie-suffers-market-loss-humira-europe-u-s-different-story (last accessed Mar. 13, 2019).

101.    If Defendants had not prevented biosimilar competition for Humira in the U.S., Plaintiff and members of the Classes would have paid less for adalimumab by: (a) purchasing less-expensive biosimilars of adalimumab instead of branded Humira; and (b) purchasing biosimilars at lower prices sooner.

102.    Defendants' restraints of competition in the market for branded and biosimilar Humira have substantially affected both interstate and intrastate commerce.

103.    At all material times, AbbVie manufactured, promoted, distributed, and sold substantial amounts of branded Humira in a continuous and uninterrupted flow of commerce across state lines and throughout the United States. Defendants' anticompetitive conduct also had substantial intrastate effects in every state of purchase in that, among other things, retailers within each state were foreclosed from offering less-expensive Humira biosimilars to purchasers within each state, which directly impacted and disrupted commerce for consumers and third-party payors within each state.

104.    At all material times, Defendants transmitted funds and contracts, invoices, and other forms of business communications and transactions in a continuous and uninterrupted flow of commerce across state lines in connection with the sale of branded Humira and its biosimilars.

105.    Economics recognizes that any overcharge at a higher level of distribution generally results in higher prices at every level below. Professor Herbert Hovenkamp explains that "[e]very person at every stage in the chain will be poorer" as a result of the anticompetitive price at the top.[51] Professor Hovenkamp also states that "[t]heoretically, one can calculate the percentage of any overcharge that a firm at one distribution level will pass on to those at the next

---

[51] *See* Herbert Hovenkamp, *Federal Antitrust Policy: The Law of Competition and Its Practice*, at 564 (1994).

level."[52] Here, wholesalers and retailers passed on the inflated prices of branded Humira and its biosimilars to Plaintiff and members of the Classes.

106.    AbbVie's patent thicket and Defendants' unlawful agreement enabled AbbVie to charge consumers and third-party payors prices in excess of what they otherwise would have been able to charge absent the Defendants' agreement. These prices were inflated as a direct and foreseeable result of Defendants' anticompetitive conduct.

## VI.    MONOPOLY POWER AND MARKET DEFINITION

107.    To the extent the conduct here may be held subject to the Rule of Reason—and thus requires pleading a relevant product and geographical market—the relevant product market is adalimumab, including branded Humira and its biosimilars. The relevant geographic market is the United States, including its territories, possessions, and the Commonwealth of Puerto Rico.

108.    At all relevant times, AbbVie has had monopoly power over the market for adalimumab. Direct evidence of AbbVie's monopoly power includes, among other things, AbbVie's ability to profitably maintain the price of Humira above competitive levels and its success in excluding all biosimilars from the U.S. market.

109.    A small but significant non-transitory price increase above the competitive level for Humira by AbbVie would not cause a loss of sales sufficient to make the price increase unprofitable.

110.    Other biologics that are not biosimilars cannot be substituted automatically for Humira by pharmacists and do not exhibit substantial cross-price elasticity of demand with respect to Humira. Thus, they are not economic substitutes for, nor reasonably interchangeable with, Humira.

---

[52] *Id.*

111. AbbVie needed to control only Humira and its biosimilars, and no other products, in order to maintain the price of Humira profitably at supracompetitive prices. Only the market entry of a competing biosimilar would render AbbVie unable to profitably maintain its prices of Humira without losing substantial sales.

112. AbbVie, at all relevant times, enjoyed high barriers to entry with respect to competition to the above-defined relevant product and geographic markets due to patent and other regulatory protections and high costs of entry and expansion.

113. AbbVie has maintained and exercised the power to exclude and restrict competition to Humira and biosimilars.

114. At all relevant times, AbbVie's market share in the relevant market was at or near 100%.

## VII.    CLASS ACTION ALLEGATIONS

115. Plaintiff brings this action on behalf of itself and all others similarly situated as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following classes (the "Classes"):

**The Injunctive Class**

All persons and entities that indirectly purchased, paid, and/or provided reimbursement for some or all of the purchase price of Humira from AbbVie in the United States, beginning at least as early as January 1, 2017, until the effects of Defendants' conduct cease ("Class Period").

**The Damages Class**

All persons and entities that indirectly purchased, paid, and/or provided reimbursement for some or all of the purchase price of Humira from AbbVie, beginning at least as early as January 1, 2017, until the effects of Defendants' conduct cease ("Class Period"), in the District of Columbia, Puerto Rico, or any of the following states and commonwealths: Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida,

Georgia, Hawaii, Idaho, Illinois, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, or Wyoming.

116.    The following persons and entities are excluded from each of the above-described proposed Classes:

(a)    Defendants and their counsel, officers, directors, management, employees, subsidiaries, or affiliates;

(b)    All governmental entities, except for government-funded employee benefit plans;

(c)    All persons or entities who purchased Humira for purposes of resale or directly from Defendants or their affiliates;

(d)    Fully-insured health plans (plans that purchased insurance from another third-party payor covering 100 percent of the plan's reimbursement obligations to its members);

(e)    Flat co-payers (consumers who paid the same co-payment amount for brand and generic drugs);

(f)    Pharmacy Benefit Managers;

(g)    All Counsel of Record; and

(h)    The Court, Court personnel, and any member of their immediate families.

117.    Members of the Classes are so numerous and geographically dispersed that joinder of all members of the Classes is impracticable. Plaintiff believes that there are thousands of members of the Classes widely dispersed throughout the United States. Moreover, given the costs of complex antitrust litigation, it would be uneconomic for many plaintiffs to bring individual claims and join them together.

118. Plaintiff's claims are typical of the claims of members of the Classes. Plaintiff and members of the Classes were harmed by the same wrongful conduct by Defendants in that they paid artificially inflated prices for Humira and were deprived of the benefits of earlier and more robust competition from less-expensive biosimilar versions of Humira as a result of Defendants' wrongful conduct.

119. Plaintiff will fairly and adequately protect and represent the interests of the members of the Classes. Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Classes.

120. Plaintiff is represented by counsel with experience in the prosecution of class action antitrust litigation in the pharmaceutical industry and with experience in class action litigation involving biologics.

121. Questions of law and fact common to the members of the Classes predominate over questions that may affect only individual members of the Classes because Defendants have acted on grounds generally applicable to both Classes. Such generally applicable conduct is inherent in Defendants' wrongful conduct.

122. Questions of law and fact common to the Classes include:

(a) Whether Defendants conspired to delay biosimilar competition in the market for adalimumab;

(b) Whether Defendants' agreements were *per se* violations of federal and state antitrust laws;

(c) Whether Defendants' agreements violated federal and state antitrust laws under a "quick look" analysis;

(d)     To the extent the Rule of Reason applies, whether Defendants' agreements violated federal and state antitrust laws under a Rule of Reason analysis;

(e)     To the extent the Rule of Reason applies, whether the relevant product market is adalimumab;

(f)     To the extent the Rule of Reason applies, whether the relevant geographic market is the United States, including its territories, possessions, and the Commonwealth of Puerto Rico.

(g)     Whether AbbVie unlawfully maintained monopoly power through the Defendants' Agreements;

(h)     Whether AbbVie monopolized the relevant market by creating and enforcing a patent thicket;

(i)     Whether AbbVie filed hundreds of patents in an effort to prevent or delay biosimilar competition;

(j)     Whether AbbVie's patent thicket enforcement violates federal and state laws;

(k)     Whether Defendants' scheme, in whole or in part, has substantially affected intrastate and interstate commerce;

(l)     Whether Defendants' agreements harmed competition;

(m)     For the Injunctive Class, the nature and scope of injunctive relief;

(n)     For the Damages Class, whether Defendants' unlawful agreements, in whole or in part, caused antitrust injury to the business or property of Plaintiff and the members of the Class;

(o)     For the Damages Class, the quantum of overcharges paid by the Class in the aggregate.

123.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

124.    Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## VIII.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Contract, Combination, and Conspiracy in Restraint of Trade under the Sherman Act § 1
### (Against All Defendants)

125.    Plaintiff incorporates the preceding paragraphs by reference.

126.    Defendants entered into an unlawful market division arrangement that restrained competition in the market for Humira and its biosimilars. Their arrangement is and was a contract, combination, and/or conspiracy that substantially, unreasonably, and unduly restrained trade in the relevant market, the purpose and effect of which were to:

(a)     prevent biosimilar manufacturers from competing with AbbVie by securing their agreement to delay launching their adalimumab biosimilars in the U.S. until January 2023 at the earliest; and

(b)     raise to and maintain at supra-competitive levels the prices that Plaintiff and the Damages Class Members paid and continue to pay for Humira.

127. The unlawful market division arrangement is a *per se* violation of the Sherman Act, 15 U.S.C. § 1. Moreover, if the conduct alleged in this Complaint is held subject to a "quick look" analysis, it satisfies the Supreme Court's test in *California Dental*.[53] That is, "an observer with even a rudimentary understanding of economics could conclude that the [Defendants' agreements] in question would have an anticompetitive effect on customers and markets."[54]

128. Even if the conduct alleged in this Complaint is held subject to the Rule of Reason, there is no legitimate, non-pretextual, procompetitive business justification for the value Defendants Amgen, Bioepis, Mylan, Sandoz, Fresenius, Pfizer, and Momenta received that outweighs the arrangement's harmful effects. Specifically, under *FTC v. Actavis, Inc.*, 133 S. Ct. 2223, 2237 (2013), a patent settlement agreement between a brand and generic manufacturer may be unlawful when the brand provides the generic manufacturer a "large and unjustified" payment in exchange for the generic manufacturer dropping its challenge to the brand manufacturer's patents. This is particularly the case when the size of the payment exceeds any saved or avoided litigation costs.

129. Here, in exchange for Amgen's, Bioepis's, Mylan's, Sandoz's, Fresnius's, Pfizer's, and Momenta's agreement to delay entering the market in the U.S. until 2023, these Defendants received the opportunity to launch their biosimilars in Europe well before 2023, as a result of which these Defendants sold (or will soon sell) millions of dollars of their Humira biosimilars in Europe.

130. Absent the arrangement with AbbVie, Defendants' sales of their biosimilar versions of Humira would have been made by AbbVie and thus represent a transfer of value from AbbVie to the remaining Defendants.

---

[53] *California Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999).
[54] *Id.* at 770.

131.    Individually and collectively, the value that AbbVie transferred and the other Defendants received under their agreements exceeded the costs of continued litigation or any arguably procompetitive benefits—and thus was "large and unjustified." Accordingly, the agreements are unlawful as described below.

132.    As a direct and proximate result of Defendants' violation of Sherman Act § 1, Plaintiff and the Injunctive Class have been injured in their business and property throughout the Class Period.

133.    Plaintiff and the Injunctive Class are entitled to injunctive and other equitable relief, pursuant to 15 U.S.C. § 26.

## SECOND CLAIM FOR RELIEF
### Contract, Combination, and Conspiracy in Restraint of Trade under the Sherman Act § 1
### (Against AbbVie and Amgen)

134.    Plaintiff incorporates the preceding paragraphs by reference.

135.    An agreement by competing companies to cease competing is "anticompetitive regardless of whether the parties split a market within which both do business or whether they merely reserve one market for one and another for the other."[55] Defendants AbbVie and Amgen entered into an unlawful market division agreement that restrained competition in the market for Humira and its biosimilars. Their agreement is and was a contract, combination, and/or conspiracy that substantially, unreasonably, and unduly restrained trade in the relevant market, the purpose and effect of which was to:

(a)    prevent Amgen from competing with AbbVie by selling its adalimumab biosimilar in the U.S. until January 2023; and

---

[55] *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49-50 (1990).

(b)     raise to and maintain at supra-competitive levels the prices that Plaintiff and the Injunctive Class Members paid and continue to pay for Humira.

136.    The unlawful AbbVie-Amgen market division agreement is a *per se* violation of the Sherman Act, 15 U.S.C. § 1. Moreover, if the conduct alleged in this Complaint is held subject to a "quick look" analysis, it satisfies the Supreme Court's test in *California Dental*.[56]

137.    Even if the conduct alleged in this Complaint is held subject to the Rule of Reason, there is no legitimate, non-pretextual, procompetitive business justification for the value Amgen received that outweighs the agreement's harmful effects.

138.    Here, in exchange for Amgen's agreement to delay entering the market until January 2023, under the AbbVie-Amgen agreement, Amgen received from AbbVie the opportunity to launch its biosimilar in Europe well before January 2023, as a result of which Amgen sold millions of dollars of its Humira biosimilar in Europe and realized profits from those sales.

139.    Absent the agreement between AbbVie and Amgen, Amgen's sales of its biosimilar version of Humira would have been made by AbbVie and thus represent a transfer of value from AbbVie to Amgen.

140.    Individually and collectively, the value that AbbVie transferred and Amgen received under their agreement exceeded the costs of continued litigation or any arguably procompetitive benefits—and thus was "large and unjustified." Accordingly, the AbbVie-Amgen agreement is unlawful.

---

[56] *California Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999).

141.    As a direct and proximate result of Defendants' violation of Sherman Act § 1, Plaintiff and the Injunctive Class have been injured in their business and property throughout the Class Period.

142.    Plaintiff and the Injunctive Class are entitled to injunctive and other equitable relief, pursuant to 15 U.S.C. § 26.

**THIRD CLAIM FOR RELIEF**
**Contract, Combination, and Conspiracy in Restraint of Trade under the Sherman Act § 1**
**(Against AbbVie and Bioepis)**

143.    Plaintiff incorporates the preceding paragraphs by reference.

144.    An agreement by competing companies to cease competing is "anticompetitive regardless of whether the parties split a market within which both do business or whether they merely reserve one market for one and another for the other."[57] Defendants AbbVie and Bioepis entered into an unlawful market division agreement that restrained competition in the market for Humira and its biosimilars. Their agreement is and was a contract, combination, and/or conspiracy that substantially, unreasonably, and unduly restrained trade in the relevant market, the purpose and effect of which was to:

(a)    prevent Bioepis from competing with AbbVie by selling its adalimumab biosimilar in the U.S. until June 2023; and

(b)    raise to and maintain at supra-competitive levels the prices that Plaintiff and the Injunctive Class Members paid and continue to pay for Humira.

---

[57] *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49-50 (1990).

145. The unlawful AbbVie-Bioepis market division agreement is a *per se* violation of the Sherman Act, 15 U.S.C. § 1. Moreover, if the conduct alleged in this Complaint is held subject to a "quick look" analysis, it satisfies the Supreme Court's test in *California Dental*.[58]

146. Even if the conduct alleged in this Complaint is held subject to the Rule of Reason, there is no legitimate, non-pretextual, procompetitive business justification for the value Bioepis received that outweighs the agreement's harmful effects.

147. Here, in exchange for Bioepis's agreement to delay entering the market until June 2023, under the AbbVie-Bioepis agreement, Bioepis received from AbbVie the opportunity to launch its biosimilar in Europe well before June 2023, as a result of which Bioepis sold millions of dollars of its Humira biosimilar in Europe and realized profits from those sales.

148. Absent the agreement between AbbVie and Bioepis, Bioepis's sales of its biosimilar version of Humira would have been made by AbbVie and thus represent a transfer of value from AbbVie to Bioepis.

149. Individually and collectively, the value that AbbVie transferred and Bioepis received under their agreement exceeded the costs of continued litigation or any arguably procompetitive benefits—and thus was "large and unjustified." Accordingly, the AbbVie-Bioepis agreement is unlawful.

150. As a direct and proximate result of Defendants' violation of Sherman Act § 1, Plaintiff and the Injunctive Class have been injured in their business and property throughout the Class Period.

151. Plaintiff and the Injunctive Class are entitled to injunctive and other equitable relief, pursuant to 15 U.S.C. § 26.

---

[58] *California Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999).

**FOURTH CLAIM FOR RELIEF**
**Contract, Combination, and Conspiracy in Restraint of Trade under the Sherman Act § 1**
**(Against AbbVie and Mylan)**

152.    Plaintiff incorporates the preceding paragraphs by reference.

153.    An agreement by competing companies to cease competing is "anticompetitive regardless of whether the parties split a market within which both do business or whether they merely reserve one market for one and another for the other."[59] Defendants AbbVie and Mylan entered into an unlawful market division agreement that restrained competition in the market for Humira and its biosimilars. Their agreement is and was a contract, combination, and/or conspiracy that substantially, unreasonably, and unduly restrained trade in the relevant market, the purpose and effect of which was to:

(a)    prevent Mylan from competing with AbbVie by selling its adalimumab biosimilar in the U.S. until July 2023; and

(b)    raise to and maintain at supra-competitive levels the prices that Plaintiff and the Injunctive Class Members paid and continue to pay for Humira.

154.    The unlawful AbbVie-Mylan market division agreement is a *per se* violation of the Sherman Act, 15 U.S.C. § 1. Moreover, if the conduct alleged in this Complaint is held subject to a "quick look" analysis, it would satisfy the Supreme Court's test in *California Dental*.[60]

155.    Even if the conduct alleged in this Complaint is held subject to the Rule of Reason, there is no legitimate, non-pretextual, procompetitive business justification for the value Mylan received that outweighs the agreement's harmful effects.

---

[59] *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49-50 (1990).
[60] *California Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999).

156.    Here, in exchange for Mylan's agreement to delay entering the market until July 2023, under the AbbVie-Mylan agreement, Mylan received from AbbVie the opportunity to launch its biosimilar in Europe well before July 2023, as a result of which Mylan sold millions of dollars of its Humira biosimilar in Europe and realized profits from those sales.

157.    Absent the agreement between AbbVie and Mylan, Mylan's sales of its biosimilar version of Humira would have been made by AbbVie and thus represent a transfer of value from AbbVie to Mylan.

158.    Individually and collectively, the value that AbbVie transferred and Mylan received under their agreement exceeded the costs of continued litigation or any arguably procompetitive benefits—and thus was "large and unjustified." Accordingly, the AbbVie-Mylan agreement is unlawful.

159.    As a direct and proximate result of Defendants' violation of Sherman Act § 1, Plaintiff and the Injunctive Class have been injured in their business and property throughout the Class Period.

160.    Plaintiff and the Injunctive Class are entitled to injunctive and other equitable relief, pursuant to 15 U.S.C. § 26.

### FIFTH CLAIM FOR RELIEF
**Contract, Combination, and Conspiracy in Restraint of Trade under the Sherman Act § 1
(Against AbbVie and Sandoz)**

161.    Plaintiff incorporates the preceding paragraphs by reference.

162.    An agreement by competing companies to cease competing is "anticompetitive regardless of whether the parties split a market within which both do business or whether they merely reserve one market for one and another for the other."[61] Defendants AbbVie and Sandoz

---

[61] *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49-50 (1990).

entered into an unlawful market division agreement that restrained competition in the market for Humira and its biosimilars. Their agreement is and was a contract, combination, and/or conspiracy that substantially, unreasonably, and unduly restrained trade in the relevant market, the purpose and effect of which was to:

(a)     prevent Sandoz from competing with AbbVie by selling its adalimumab biosimilar in the U.S. until September 2023; and

(b)     raise to and maintain at supra-competitive levels the prices that Plaintiff and the Injunctive Class Members paid and continue to pay for Humira.

163.    The unlawful AbbVie-Sandoz market division agreement is a *per se* violation of the Sherman Act, 15 U.S.C. § 1. Moreover, if the conduct alleged in this Complaint is held subject to a "quick look" analysis, it satisfies the Supreme Court's test in *California Dental*.[62]

164.    Even if the conduct alleged in this Complaint is held subject to the Rule of Reason, there is no legitimate, non-pretextual, procompetitive business justification for the value Sandoz received that outweighs the agreement's harmful effects.

165.    Here, in exchange for Sandoz's agreement to delay entering the market until September 2023, under the AbbVie-Sandoz agreement, Sandoz received from AbbVie the opportunity to launch its biosimilar in Europe well before September 2023, as a result of which Sandoz sold millions of dollars of its Humira biosimilar in Europe and realized profits from those sales.

166.    Absent the agreement between AbbVie and Sandoz, Sandoz's sales of its biosimilar version of Humira would have been made by AbbVie and thus represent a transfer of value from AbbVie to Sandoz.

---

[62] *California Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999).

167.     Individually and collectively, the value that AbbVie transferred and Sandoz received under their agreement exceeded the costs of continued litigation or any arguably procompetitive benefits—and thus was "large and unjustified." Accordingly, the AbbVie-Sandoz agreement is unlawful.

168.     As a direct and proximate result of Defendants' violation of Sherman Act § 1, Plaintiff and the Injunctive Class have been injured in their business and property throughout the Class Period.

169.     Plaintiff and the Injunctive Class are entitled to injunctive and other equitable relief, pursuant to 15 U.S.C. § 26.

### SIXTH CLAIM FOR RELIEF
**Contract, Combination, and Conspiracy in Restraint of Trade under the Sherman Act § 1**
**(Against AbbVie and Fresenius)**

170.     Plaintiff incorporates the preceding paragraphs by reference.

171.     An agreement by competing companies to cease competing is "anticompetitive regardless of whether the parties split a market within which both do business or whether they merely reserve one market for one and another for the other."[63] Defendants AbbVie and Fresenius entered into an unlawful market division agreement that restrained competition in the market for Humira and its biosimilars. Their agreement is and was a contract, combination, and/or conspiracy that substantially, unreasonably, and unduly restrained trade in the relevant market, the purpose and effect of which was to:

(a)     prevent Fresenius from competing with AbbVie by selling its adalimumab biosimilar in the U.S. until September 2023; and

---

[63] *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49-50 (1990).

(b) raise to and maintain at supra-competitive levels the prices that Plaintiff and the Injunctive Class Members paid and continue to pay for Humira.

172. The unlawful AbbVie-Fresenius market division agreement is a *per se* violation of the Sherman Act, 15 U.S.C. § 1. Moreover, if the conduct alleged in this Complaint is held subject to a "quick look" analysis, it satisfies the Supreme Court's test in *California Dental*.[64]

173. Even if the conduct alleged in this Complaint is held subject to the Rule of Reason, there is no legitimate, non-pretextual, procompetitive business justification for the value Fresenius received that outweighs the agreement's harmful effects.

174. Here, in exchange for Fresenius's agreement to delay entering the market until September 2023, under the AbbVie-Fresenius agreement, Fresenius received from AbbVie the opportunity to launch its biosimilar in Europe well before September 2023, as a result of which Fresenius is poised to sell millions of dollars of its Humira biosimilar in Europe and realize profits from those sales.

175. Absent the agreement between AbbVie and Fresenius, Fresenius's projected sales of its biosimilar version of Humira would instead be made by AbbVie and thus represent a transfer of value from AbbVie to Fresenius.

176. Individually and collectively, the value that AbbVie transferred and Fresenius received under their agreement exceeded the costs of continued litigation or any arguably procompetitive benefits—and thus was "large and unjustified." Accordingly, the AbbVie-Fresenius agreement is unlawful.

---

[64] *California Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999).

177.    As a direct and proximate result of Defendants' violation of Sherman Act § 1, Plaintiff and the Injunctive Class have been injured in their business and property throughout the Class Period.

178.    Plaintiff and the Injunctive Class are entitled to injunctive and other equitable relief, pursuant to 15 U.S.C. § 26.

### SEVENTH CLAIM FOR RELIEF
**Contract, Combination, and Conspiracy in Restraint of Trade under the Sherman Act § 1**
**(Against AbbVie and Pfizer)**

179.    Plaintiff incorporates the preceding paragraphs by reference.

180.    An agreement by competing companies to cease competing is "anticompetitive regardless of whether the parties split a market within which both do business or whether they merely reserve one market for one and another for the other."[65] Defendants AbbVie and Pfizer entered into an unlawful market division agreement that restrained competition in the market for Humira and its biosimilars. Their agreement is and was a contract, combination, and/or conspiracy that substantially, unreasonably, and unduly restrained trade in the relevant market, the purpose and effect of which was to:

(a)    prevent Pfizer from competing with AbbVie by selling its adalimumab biosimilar in the U.S. until November 2023; and

(b)    raise to and maintain at supra-competitive levels the prices that Plaintiff and the Injunctive Class Members paid and continue to pay for Humira.

181.    The unlawful AbbVie-Pfizer market division agreement is a *per se* violation of the Sherman Act, 15 U.S.C. § 1. Moreover, if the conduct alleged in this Complaint is held

---

[65] *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49-50 (1990).

subject to a "quick look" analysis, it would satisfy the Supreme Court's test in *California Dental*.[66]

182.    Even if the conduct alleged in this Complaint is held subject to the Rule of Reason, there is no legitimate, non-pretextual, procompetitive business justification for the value Momenta received that outweighs the agreement's harmful effects.

183.    Here, in exchange for Pfizer's agreement to delay entering the market until November 2023, under the AbbVie-Pfizer agreement, Pfizer received from AbbVie the opportunity to launch its biosimilar in Europe well before November 2023, as a result of which Pfizer is poised to sell millions of dollars of its Humira biosimilar in Europe and realize profits from those sales.

184.    Absent the agreement between AbbVie and Pfizer, Pfizer's projected sales of its biosimilar version of Humira would instead be made by AbbVie and thus represent a transfer of value from AbbVie to Pfizer.

185.    Individually and collectively, the value that AbbVie transferred and Pfizer received under their agreement exceeded the costs of continued litigation or any arguably procompetitive benefits—and thus was "large and unjustified." Accordingly, the AbbVie-Pfizer agreement is unlawful.

186.    As a direct and proximate result of Defendants' violation of Sherman Act § 1, Plaintiff and the Injunctive Class have been injured in their business and property throughout the Class Period.

187.    Plaintiff and the Injunctive Class are entitled to injunctive and other equitable relief, pursuant to 15 U.S.C. § 26.

---

[66] *California Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999).

## <u>EIGHTH CLAIM FOR RELIEF</u>
**Contract, Combination, and Conspiracy in Restraint of Trade under the Sherman Act § 1
(Against AbbVie and Momenta)**

188.　Plaintiff incorporates the preceding paragraphs by reference.

189.　An agreement by competing companies to cease competing is "anticompetitive regardless of whether the parties split a market within which both do business or whether they merely reserve one market for one and another for the other."[67] Defendants AbbVie and Momenta entered into an unlawful market division agreement that restrained competition in the market for Humira and its biosimilars. Their agreement is and was a contract, combination, and/or conspiracy that substantially, unreasonably, and unduly restrained trade in the relevant market, the purpose and effect of which was to:

　　　　(a)　prevent Momenta from competing with AbbVie by selling its adalimumab biosimilar in the U.S. until November 2023; and

　　　　(b)　raise to and maintain at supra-competitive levels the prices that Plaintiff and the Injunctive Class Members paid and continue to pay for Humira.

190.　The unlawful AbbVie-Momenta market division agreement is a *per se* violation of the Sherman Act, 15 U.S.C. § 1. Moreover, if the conduct alleged in this Complaint is held subject to a "quick look" analysis, it would satisfy the Supreme Court's test in *California Dental*.[68]

191.　Even if the conduct alleged in this Complaint is held subject to the Rule of Reason, there is no legitimate, non-pretextual, procompetitive business justification for the value Momenta received that outweighs the agreement's harmful effects.

---

[67] *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49-50 (1990).
[68] *California Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999).

192.     Here, in exchange for Momenta's agreement to delay entering the market until November 2023, under the AbbVie-Momenta agreement, Momenta received from AbbVie the opportunity to launch its biosimilar in Europe well before November 2023, as a result of which Fresenius is poised to sell millions of dollars of its Humira biosimilar in Europe and realize profits from those sales.

193.     Absent the agreement between AbbVie and Momenta, Momenta's projected sales of its biosimilar version of Humira would instead be made by AbbVie and thus represent a transfer of value from AbbVie to Momenta.

194.     Individually and collectively, the value that AbbVie transferred and Momenta received under their agreement exceeded the costs of continued litigation or any arguably procompetitive benefits—and thus was "large and unjustified." Accordingly, the AbbVie-Momenta agreement is unlawful.

195.     As a direct and proximate result of Defendants' violation of Sherman Act § 1, Plaintiff and the Injunctive Class have been injured in their business and property throughout the Class Period.

196.     Plaintiff and the Injunctive Class are entitled to injunctive and other equitable relief, pursuant to 15 U.S.C. § 26.

## NINTH CLAIM FOR RELIEF
### Monopolization under the Sherman Act § 2
### (Against AbbVie)

197.     Plaintiff incorporates the preceding paragraphs by reference.

198.     AbbVie entered into a series of unlawful market division agreements that restrained competition in the market for Humira and its biosimilar versions. The agreements:

(a)     prevent the remaining Defendants from launching biosimilars until at least January 2023;

(b)     maintain AbbVie's monopoly on adalimumab in the relevant U.S. market; and

(c)     raise and maintain the prices that Plaintiff and the Injunctive Class Members have to pay for Humira to and at supra-competitive levels.

199.     Additionally, AbbVie's patent thicket and resulting patent litigation operates to exclude biosimilar competition (including AbbVie's ongoing litigation against Boehringer). The sheer volume of AbbVie's patents blocks entry regardless of whether individual challenged patents are adjudged invalid or non-infringed.

200.     AbbVie knew that its primary patent on Humira expired in December 2016. At that point, biosimilars could launch in the U.S. Market. AbbVie, though, engaged in an unlawful scheme to develop a patent thicket to delay biosimilar competition. The patent thicket effectively bars competing manufacturers from launching biosimilars in the U.S.

201.     As part of its anticompetitive scheme, AbbVie sought approval for hundreds of patents for Humira. The company ultimately secured over 100 Humira patents, many of which are overlapping and non-inventive.

202.     The patent thicket prevents biosimilar competition, and maintains AbbVie's Humira monopoly.

203.     AbbVie's conduct violates Section 2 of the Sherman Act, 15 U.S.C. § 2. AbbVie's anticompetitive conduct has maintained its monopoly in the relevant U.S. market by excluding biosimilar competition.

204.     As a result, AbbVie's share of the U.S. adalimumab market is at or near 100%.

205.     As a direct and proximate result of AbbVie's violation of Sherman Act § 2, Plaintiff and the Injunctive Class have been injured in their business and property throughout the Class Period.

206.     Plaintiff and the Injunctive Class are entitled to injunctive and other equitable relief, pursuant to 15 U.S.C. § 26.

### TENTH CLAIM FOR RELIEF
**Conspiracy and Combination in Restraint of Trade under State Law**
**(Against All Defendants)**

207.     Plaintiff incorporates the preceding paragraphs by reference.

208.     Defendants entered into an unlawful market division arrangement that restrained competition in the market for Humira and its biosimilars. Their arrangement is and was a contract, combination, and/or conspiracy that substantially, unreasonably, and unduly restrained trade in the relevant market, the purpose and effect of which were to:

(a)     prevent biosimilar manufacturers from competing with AbbVie by securing their agreement to delay launching their adalimumab biosimilar in the U.S. until January 2023 at the earliest; and

(b)     raise to and maintain at supra-competitive levels the prices that Plaintiff and the Damages Class Members paid and continue to pay for Humira.

209.     The unlawful market division agreements are *per se* violations of the below-listed state antitrust laws. Moreover, if the conduct alleged in this Complaint is held subject to a "quick look" analysis, it satisfies the Supreme Court's test in *California Dental*.[69] That is, "an observer

---

[69] *California Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999).

with even a rudimentary understanding of economics could conclude that the [Defendants' agreements] in question would have an anticompetitive effect on customers and markets."[70]

210.    Even if the conduct alleged in this Complaint is held subject to the Rule of Reason, there is no legitimate, non-pretextual, procompetitive business justification for the value Defendants Amgen, Bioepis, Mylan, Sandoz, Fresenius, Pfizer, and Momenta received that outweighs the agreements' harmful effects. Specifically, under *FTC v. Actavis, Inc.*, 133 S. Ct. 2223, 2237 (2013), a patent settlement agreement between a brand and generic manufacturer may be unlawful, when the brand provides the generic manufacturer a "large and unjustified" payment in exchange for the generic manufacturer dropping its challenge to the brand manufacturer's patents. This is particularly the case when the size of the payment exceeds any saved or avoided litigation costs.

211.    Here, in exchange for Amgen's, Bioepis's, Mylan's, Sandoz's, Fresenius's, Pfizer's, and Momenta's agreement to delay entering the market until 2023, these Defendants received the opportunity to launch their biosimilars in Europe well before 2023, as a result of which these Defendants sold (or will soon sell) millions of dollars of their Humira biosimilars in Europe.

212.    Absent the arrangement with AbbVie, Defendants' sales of their biosimilar versions of Humira would have been made by AbbVie and thus represent a transfer of value from AbbVie to the remaining Defendants.

213.    Individually and collectively, the value that AbbVie transferred and the other Defendants received under their agreements exceeded the costs of continued litigation or any

---

[70] *Id.* at 770.

51

arguably procompetitive benefits—and thus was "large and unjustified." Accordingly, the agreements are unlawful as described below.

214. Defendants' conduct violated the following state antitrust laws:

(a) Ariz. Rev. Stat. §§ 44-1401, et seq., with respect to purchases in Arizona by the Damages Class Members;

(b) Cal. Bus. Code §§ 16700, et seq., and Cal. Bus. Code §§ 17200, et seq., with respect to purchases in California by the Damages Class Members;

(c) Conn. Gen. Stat. § 35-24, et seq., with respect to purchases in Connecticut by the Damages Class Members;

(d) D.C. Code Ann. §§ 28-4501, et seq., with respect to purchases in the District of Columbia by the Damages Class Members;

(e) Hawaii Code § 480, et seq., with respect to purchases in Hawaii by the Damages Class Members;

(f) 740 Ill. Comp. Stat. Ann. 10 / 3, *et seq.*, with respect to purchases in Illinois by the Damages Class Members;

(g) Iowa Code §§ 553 et seq., with respect to purchases in Iowa by the Damages Class Members;

(h) Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases in Kansas by Damages Class Members;

(i) Md. Code, Com. Law § 11-201, et seq., with respect to purchases in Maryland by Damages Class Members;

(j) Me. Rev. Stat. Ann. 10, §§ 1101, et seq., with respect to purchases in Maine by the Damages Class Members;

(k)     Mich. Comp. Laws Ann. §§ 445.772, et seq., with respect to purchases in Michigan by the Damages Class Members;

(l)     Minn. Stat. §§ 325D.49, et seq., with respect to purchases in Minnesota by the Damages Class Members;

(m)     Miss. Code Ann. §§ 75-21-1, *et seq.*, with respect to purchases in Mississippi by members of the Damages Class Members;

(n)     Neb. Code Ann. §§ 59-801, et seq., with respect to purchases in Nebraska by the Damages Class Members;

(o)     Nev. Rev. Stat. Ann. §§ 598A, et seq., with respect to purchases in Nevada by the Damages Class Members, in that thousands of sales of Humira took place at Nevada pharmacies, purchased by Nevada end-payors at supracompetitive prices caused by Defendants' conduct;

(p)     N.H. Rev. Stat. Ann. §§ 356:1, et seq., with respect to purchases in New Hampshire by the Damages Class Members;

(q)     N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico by the Damages Class Members;

(r)     N.Y. Gen. Bus. L. §§ 340, et seq., with respect to purchases in New York by the Damages Class Members;

(s)     N.C. Gen. Stat. §§ 75-1, et seq., with respect to purchases in North Carolina by the Damages Class Members;

(t)     N.D. Cent. Code §§ 51-08.1-01, et seq., with respect to purchases in North Dakota by the Damages Class Members;

(u)    Or. Rev. Stat. §§ 6.46.705, et seq., with respect to purchases in Oregon by the Damages Class Members;

(v)    S.D. Codified Laws Ann. §§ 37-1, et seq., with respect to purchases in South Dakota by the Damages Class Members;

(w)    Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee by the Damages Class Members, with thousands of end-payors in Tennessee paying substantially higher prices for Humira at Tennessee pharmacies;

(x)    Utah Code Ann. §§ 76-10-3101, *et seq.*, with respect to purchases in Utah by Damages Class Members who are either citizens or residents of Utah;

(y)    Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont by the Damages Class Members;

(z)    W.Va. Code §§ 47-18-3, et seq., with respect to purchases in West Virginia by the Damages Class Members; and

(aa)    Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin by the Damages Class Members, in that the actions alleged herein substantially affected the people of Wisconsin, with thousands of end-payors in Wisconsin paying substantially higher prices for Humira at Wisconsin pharmacies.

215.    Plaintiff and the Damages Class Members seek damages and multiple damages as permitted by law for the injuries they suffered as a result of Defendants' anticompetitive conduct.

216.    Defendants are jointly and severally liable for all damages suffered by Plaintiff and the Damages Class Members.

54

## ELEVENTH CLAIM FOR RELIEF
### Monopolization and Monopolistic Scheme under State Law
### (Against AbbVie)

217. Plaintiff incorporates the preceding paragraphs by reference.

218. AbbVie entered into a series of unlawful market division agreements that restrained competition in the market for Humira and its biosimilar versions. The agreements:

      (a)      prevent the remaining Defendants from launching biosimilars until at least January 2023;

      (b)      maintain AbbVie's 100% market share for adalimumab in the relevant market; and

      (c)      raise and maintain the prices that Plaintiff and the Damages Class Members have to pay for Humira to and at supra-competitive levels.

219. Additionally, AbbVie's patent thicket and resulting patent litigation has excluded biosimilar competition from the U.S. market (including the company's ongoing litigation against Boehringer).

220. AbbVie knew that its primary patent on Humira expired in December 2016. At that point, biosimilars could launch in the U.S. Market. AbbVie, though, engaged in an unlawful scheme to develop a patent thicket to delay biosimilar competition. The patent thicket effectively bars competing manufacturers from launching biosimilars in the U.S.

221. As part of its anticompetitive scheme, AbbVie sought approval for hundreds of patents for Humira. The company ultimately secured over 100 Humira patents, many of which are overlapping and non-inventive.

222. The patent thicket has prevented biosimilar competition, and maintains AbbVie's Humira monopoly.

223. AbbVie's conduct has maintained its monopoly in the relevant market by excluding biosimilar competition.

224. As a result, AbbVie's share of the U.S. adalimumab market is at or near 100%.

225. AbbVie's conduct violated the following state antitrust laws:

(a) Ariz. Rev. Stat. §§ 44-1401, et seq., with respect to purchases in Arizona by the Damages Class Members;

(b) Cal. Bus. Code §§ 16700, et seq., and Cal. Bus. Code §§ 17200, et seq., with respect to purchases in California by the Damages Class Members;

(c) Conn. Gen. Stat. § 35-24, et seq., with respect to purchases in Connecticut by the Damages Class Members;

(d) D.C. Code Ann. §§ 28-4501, et seq., with respect to purchases in the District of Columbia by the Damages Class Members;

(e) Hawaii Code § 480, et seq., with respect to purchases in Hawaii by the Damages Class Members;

(f) 740 Ill. Comp. Stat. Ann. 10 / 3, *et seq.*, with respect to purchases in Illinois by the Damages Class Members;

(g) Iowa Code §§ 553 et seq., with respect to purchases in Iowa by the Damages Class Members;

(h) Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases in Kansas by Damages Class Members;

(i) Md. Code, Com. Law § 11-201, et seq., with respect to purchases in Maryland by Damages Class Members;

(j)     Me. Rev. Stat. Ann. 10, §§ 1101, et seq., with respect to purchases in

Maine by the Damages Class Members;

(k)     Mich. Comp. Laws Ann. §§ 445.772, et seq., with respect to purchases in

Michigan by the Damages Class Members;

(l)     Minn. Stat. §§ 325D.49, et seq., with respect to purchases in Minnesota by

the Damages Class Members;

(m)     Miss. Code Ann. §§ 75-21-1, *et seq.*, with respect to purchases in

Mississippi by members of the Damages Class Members;

(n)     Neb. Code Ann. §§ 59-801, et seq., with respect to purchases in Nebraska

by the Damages Class Members;

(o)     Nev. Rev. Stat. Ann. §§ 598A, et seq., with respect to purchases in Nevada

by the Damages Class Members, in that thousands of sales of Humira took place at Nevada

pharmacies, purchased by Nevada end-payors at supracompetitive prices caused by Defendant's

conduct;

(p)     N.H. Rev. Stat. Ann. §§ 356:1, et seq., with respect to purchases in New

Hampshire by the Damages Class Members;

(q)     N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New

Mexico by the Damages Class Members;

(r)     N.Y. Gen. Bus. L. §§ 340, et seq., with respect to purchases in New York

by the Damages Class Members;

(s)     N.C. Gen. Stat. §§ 75-1, et seq., with respect to purchases in North

Carolina by the Damages Class Members;

(t)     N.D. Cent. Code §§ 51-08.1-01, et seq., with respect to purchases in North Dakota by the Damages Class Members;

(u)     Or. Rev. Stat. §§ 6.46.705, et seq., with respect to purchases in Oregon by the Damages Class Members;

(v)     S.D. Codified Laws Ann. §§ 37-1, et seq., with respect to purchases in South Dakota by the Damages Class Members;

(w)     Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee by the Damages Class Members, with thousands of end-payors in Tennessee paying substantially higher prices for Humira at Tennessee pharmacies;

(x)     Utah Code Ann. §§ 76-10-3101, *et seq.*, with respect to purchases in Utah by Damages Class Members who are either citizens or residents of Utah;

(y)     Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont by the Damages Class Members;

(z)     W.Va. Code §§ 47-18-3, et seq., with respect to purchases in West Virginia by the Damages Class Members; and

(aa)    Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin by the Damages Class Members, in that the actions alleged herein substantially affected the people of Wisconsin, with thousands of end-payors in Wisconsin paying substantially higher prices for Humira at Wisconsin pharmacies.

226.    Plaintiff and the Damages Class Members seek damages and multiple damages as permitted by law for the injuries they suffered as a result of AbbVie's anticompetitive conduct.

## TWELFTH CLAIM FOR RELIEF
### State Consumer Protection Violations
### (Against All Defendants)

227.    Plaintiff incorporates the preceding paragraphs by reference.

58

228. Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Plaintiff and the Damages Class Members were deprived of the opportunity to purchase biosimilar versions of Humira and were forced to pay higher prices for Humira and its biosimilar versions.

229. There is gross disparity between the price that Plaintiff and the Damages Class Members paid for Humira compared to what they would have paid for less expensive biosimilar versions of Humira, which should and would have been available but for Defendants' unlawful conduct.

230. By engaging in the foregoing conduct, Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of the following state unfair and deceptive trade practices and consumer protection statutes:

**Florida Deceptive & Unfair Trade Practices Act ("FDUTPA")**
**Florida Stat. §§ 501.201, et seq.**

231. The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Florida Stat. §§ 501.202(2).

232. A claim for damages under the FDUTPA has three elements: (1) a prohibited practice; (2) causation; and (3) actual damages.

233. Under Florida law, indirect purchasers have standing to maintain an action under the FDUTPA based on the facts alleged in this Complaint:

(a)      Defendants' conduct constitutes an unfair method of competition because Defendants' market division agreements restrained trade in the market for Humira and its biosimilars by (1) preventing biosimilar manufacturers from competing with AbbVie by selling their adalimumab biosimilars until January 2023 at the earliest; and (2) raising and maintaining the prices that Plaintiff and the Damages Class Members paid for Humira to and at supra-competitive levels.

234.    AbbVie sold Humira in Florida, and its conduct had a direct and substantial impact on trade and commerce in Florida. Accordingly, such conduct falls within the prohibitions in Florida Stat. § 501.202(2).

## Massachusetts Consumer Protection Act ("MCPA") Mass. Gen. L. Ch. 93A, et seq.

235.    The MCPA regulates trade and commerce "directly or indirectly affecting the people of this commonwealth." Mass. Gen. L. Ch. 93A § 9(1).

236.    Under the MCPA, "[a]ny person, who has been injured by another person's use or employment of any method, act or practice" that constitutes "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. L. Ch. 93A §§ 2, 9(1). MCPA § 2(b) provides that these terms are interpreted consistent with Section 5 of the FTC Act (15 U.S.C. § 45(a)), which also prohibits "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." Mass. Gen. L. Ch. 93A § 2(b); 15 U.S. § 45(a)(1).

237.    Defendants' conduct constitutes an unfair method of competition because Defendants' market division agreements restrained trade in the market for Humira and its biosimilars by (1) preventing biosimilar manufacturers from competing with AbbVie by selling their adalimumab biosimilars until January 2023 at the earliest; and (2) raising and maintaining

the prices that Plaintiff and the Damages Class Members paid for Humira to and at supra-competitive levels.

238.     AbbVie sold Humira in Massachusetts, and its conduct had a direct and substantial impact on trade and commerce in Massachusetts. Accordingly, such conduct falls within the prohibitions in Ch. 93A § 2.

### Missouri Merchandising Practices Act ("MMPA")
### Mo. Rev. Stat. 407.020

239.     Under Section 407.020, the MMPA prohibits "[t]he act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce." Mo. Rev. Stat. 407.020.

240.     The Missouri Attorney General has defined an "unfair practice" as:

> any practice which . . . [o]ffends any public policy as it has been established by the Constitution, statutes or common law of this state, or by the Federal Trade Commission, or its interpretive decisions; or . . . [i]s unethical, oppressive, or unscrupulous; and . . . [p]resents a risk of, or causes, substantial injury to consumers.

Mo. Att'y Gen. Reg., 15 CSR 60-8.02.

241.     Defendants' conduct constitutes an unfair method of competition because Defendants' market division agreements restrained trade in the market for Humira and its biosimilars by (1) preventing biosimilar manufacturers from competing with AbbVie by selling their adalimumab biosimilars until January 2023 at the earliest; and (2) raising and maintaining the prices that Plaintiff and the Damages Class Members paid for Humira to and at supra-competitive levels.

242.     AbbVie sold Humira in Missouri, and its conduct had a direct and substantial impact on trade and commerce in Missouri. Upon information and belief, Defendants also

directed advertising and marketing efforts for Humira in Missouri. Accordingly, Defendants' conduct falls within the prohibitions in the MMPA.

## THIRTEENTH CLAIM FOR RELIEF
### Unjust Enrichment
### (Against All Defendants)

243.    Plaintiff incorporates by reference the preceding allegations.

244.    To the extent required, this claim is pled in the alternative to the other claims in this Complaint.

245.    This claim is pled by Plaintiff and the Damages Class against all Defendants.

246.    Defendants have financially benefited from overcharges on sales of Humira, which resulted from the unlawful and inequitable acts alleged in this Complaint. These overcharges were borne by Plaintiff and the Damages Class Members who purchased and/or reimbursed all or part of the purchase price of Humira. The benefits conferred upon Defendants are substantial and measurable, in that the revenues Defendants have earned due to unlawful overcharges are ascertainable by review of both sales records and the unlawful agreement itself.

247.    There is gross disparity between the price that Plaintiff and the Damages Class Members paid for Humira compared to what they would have paid for less expensive biosimilars, which should and would have been available but for Defendants' unlawful and inequitable conduct.

248.    Defendants repeatedly and continuously received financial benefits at the expense of Plaintiff and the Damages Class Members through each sale of Humira at an inflated price.

249.    It would be futile for Plaintiff and the Damages Class Members to seek a remedy from any party with whom they had or have privity of contract. Defendants have paid no consideration to any other person for any of the benefits they received indirectly from Plaintiff and the Damages Class Members.

250. It would be futile for Plaintiff and the Damages Class Members to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased Humira, as those intermediaries cannot reasonably be expected to compensate Plaintiff and the Damages Class Members for Defendants' unlawful conduct.

251. The financial benefits that Defendants derived rightfully belong to Plaintiff and the Damages Class Members, which paid anticompetitive prices that inured to Defendants' benefit.

252. It would be inequitable under the unjust enrichment principles of the states listed below for Defendants to retain any of the overcharges that Plaintiff and the Damages Class Members paid for Humira, which were derived from Defendants' anticompetitive, unfair, and unconscionable methods, acts, and trade practices.

253. Defendants should be compelled to disgorge all unlawful or inequitable proceeds received by them into a common fund for the benefit of Plaintiff and the Damages Class Members.

254. A constructive trust should be imposed upon all unlawful or inequitable sums Defendants received, which arise from overpayments for Humira by Plaintiff and the Damages Class Members.

255. Plaintiff and the Damages Class Members have no adequate remedy at law.

256. By engaging in the foregoing unlawful or inequitable conduct, which deprived Plaintiff and the Damages Class Members of the opportunity to purchase lower-priced Humira biosimilars and forced them to pay higher prices for Humira, Defendants have been unjustly enriched in violation of the common law of various states and commonwealths, as outlined below:

**Alabama**

257.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for Humira in Alabama at prices that were more than they would have been but for Defendants' actions. Defendants received money from the Damages Class as a direct result of the unlawful overcharges and have retained this money. Defendants have benefitted at the expense of the Damages Class from revenue resulting from unlawful overcharges for Humira. It is inequitable for Defendants to accept and retain the benefits received without compensating the Damages Class.

**Alaska**

258.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for Humira in Alaska at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants appreciated the benefits bestowed upon them by the Damages Class. Defendants accepted and retained the benefits bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**Arizona**

259.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for Humira in Arizona at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for Humira. The Damages Class has been impoverished by the overcharges for Humira resulting from Defendants' unlawful conduct. Defendants' enrichment

and the Damages Class's impoverishment are connected. There is no justification for Defendants' receipt of the benefits causing their enrichment and the Damages Class's impoverishment, because the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. The Damages Class has no remedy at law.

**Arkansas**

260.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for Humira in Arkansas at prices that were more than they would have been but for Defendants' actions. Defendants received money from the Damages Class as a direct result of the unlawful overcharges and have retained this money. Defendants have paid no consideration to any other person in exchange for this money. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**California**

261.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for Humira in California at prices that were more than they would have been but for Defendants' actions. Defendants have received a benefit from the Damages Class as a direct result of the unlawful overcharges. Defendants retained the benefits bestowed upon them under inequitable and unjust circumstances at the expense of the Damages Class.

**Colorado**

262.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for Humira in Colorado at prices that were more than they would have been but for Defendants' actions. Defendants have received a benefit from the

Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. Defendants have benefitted at the expense of the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**Connecticut**

263.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for Humira in Connecticut at prices that were more than they would have been but for Defendants' actions. Defendants were benefitted in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants have paid no consideration to any other person in exchange for this benefit. Defendants retained the benefits bestowed upon them under inequitable and unjust circumstances at the expense of the Damages Class.

**Delaware**

264.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for Humira in Delaware at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for Humira. The Damages Class has been impoverished by the overcharges for Humira resulting from Defendants' unlawful conduct. Defendants' enrichment and the Damages Class's impoverishment are connected. There is no justification for Defendants' receipt of the benefits causing their enrichment, because the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. The Damages Class has no remedy at law.

**District of Columbia**

265.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for Humira in the District of Columbia at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to the Damages Class. Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits.

**Florida**

266.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for Humira in Florida at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants appreciated the benefits bestowed upon them by the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**Georgia**

267.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for Humira in Georgia at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**Hawaii**

268.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for Humira in Hawaii at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**Idaho**

269.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for Humira in Idaho at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants appreciated the benefit conferred upon them by the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**Illinois**

270.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for Humira in Illinois at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to the Damages Class. It is against equity, justice, and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

**Iowa**

271.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for Humira in Iowa at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for Humira, which revenue resulted from anticompetitive prices paid by the Damages Class, which inured to Defendants' benefit. Defendants' enrichment has occurred at the expense of the Damages Class. Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating the Damages Class.

**Kansas**

272.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for Humira in Kansas at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**Kentucky**

273.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for Humira in Kentucky at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants appreciated the benefit conferred upon

them by the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**Louisiana**

274.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for Humira in Louisiana at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for Humira. The Damages Class has been impoverished by the overcharges for Humira resulting from Defendants' unlawful conduct. Defendants' enrichment and the Damages Class's impoverishment are connected. There is no justification for Defendants' receipt of the benefits causing their enrichment, because the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. The Damages Class has no other remedy at law.

**Maine**

275.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for Humira in Maine at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants were aware of or appreciated the benefit bestowed upon them by the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**Maryland**

276.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for Humira in Maryland at prices that were more than they

would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants were aware of or appreciated the benefit bestowed upon them by the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**Massachusetts**

277.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for Humira in Massachusetts at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants were aware of or appreciated the benefit conferred upon them by the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**Michigan**

278.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for Humira in Michigan at prices that were more than they would have been but for Defendants' actions. Defendants have received a benefit from the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**Minnesota**

279.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for Humira in Minnesota at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants appreciated and knowingly accepted the benefits bestowed upon them by the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**Mississippi**

280.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for Humira in Mississippi at prices that were more than they would have been but for Defendants' actions. Defendants received money from the Damages Class as a direct result of the unlawful overcharges. Defendants retain the benefit of overcharges received on the sales of Humira, which in equity and good conscience belong to the Damages Class on account of Defendants' anticompetitive conduct. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**Missouri**

281.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for Humira in Missouri at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants appreciated the benefit bestowed upon them by the Damages Class. Defendants accepted and retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to the Damages Class.

**Montana**

282.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for Humira in Montana at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**Nebraska**

283.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for Humira in Nebraska at prices that were more than they would have been but for Defendants' actions. Defendants received money from the Damages Class as a direct result of the unlawful overcharges and have retained this money. Defendants have paid no consideration to any other person in exchange for this money. In justice and fairness, Defendants should disgorge such money and remit the overcharged payments back to the Damages Class.

**Nevada**

284.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for Humira in Nevada at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants in the nature of revenue resulting from unlawful overcharges for Humira. Defendants appreciated the benefits bestowed upon them by the Damages Class, for which they have paid no consideration to any other person. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**New Hampshire**

285.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for Humira in New Hampshire at prices that were more than they would have been but for Defendants' actions. Defendants have received a benefit from the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. Under the circumstances, it would be unconscionable for Defendants to retain such benefits.

**New Jersey**

286.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for Humira in New Jersey at prices that were more than they would have been but for Defendants' actions. Defendants have received a benefit from the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from unlawful overcharges to the Damages Class. Defendants have paid no consideration to any other person for any of the unlawful benefits they received from the Damages Class with respect to Defendants' sales of Humira. Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating the Damages Class.

**New Mexico**

287.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for Humira in New Mexico at prices that were more than they would have been but for Defendants' actions. Defendants have knowingly benefitted at the expense of the Damages Class from revenue resulting from unlawful overcharges for Humira. To allow Defendants to retain the benefits would be unjust because the benefits resulted from

anticompetitive pricing that inured to Defendants' benefit and because Defendants have paid no consideration to any other person for any of the benefits they received.

**New York**

288.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for Humira in New York at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for Humira, which revenue resulted from anticompetitive prices paid by the Damages Class, which inured to Defendants' benefit. Defendants' enrichment has occurred at the expense of the Damages Class. It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

**North Carolina**

289.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for Humira in North Carolina at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. The Damages Class did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants. The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from unlawful overcharges to the Damages Class. The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to unlawful overcharges are ascertainable by review of sales records. Defendants consciously accepted the benefits conferred upon them.

**North Dakota**

290.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for Humira in North Dakota at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for Humira. The Damages Class has been impoverished by the overcharges for Humira resulting from Defendants' unlawful conduct. Defendants' enrichment and the Damages Class's impoverishment are connected. There is no justification for Defendants' receipt of the benefits causing their enrichment, because the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. The Damages Class has no remedy at law. Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating the Damages Class.

**Oklahoma**

291.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for Humira in Oklahoma at prices that were more than they would have been but for Defendants' actions. Defendants received money from the Damages Class as a direct result of the unlawful overcharges and have retained this money. Defendants have paid no consideration to any other person in exchange for this money. The Damages Class has no remedy at law. It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

**Oregon**

292.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for Humira in Oregon at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit

upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants were aware of the benefit bestowed upon them by the Damages Class. Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating the Damages Class.

**Pennsylvania**

293.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for Humira in Pennsylvania at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants appreciated the benefit bestowed upon them by the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**Puerto Rico**

294.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for Humira in Puerto Rico at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for Humira. The Damages Class has been impoverished by the overcharges for Humira resulting from Defendants' unlawful conduct. Defendants' enrichment and the Damages Class's impoverishment are connected. There is no justification for Defendants' receipt of the benefits causing their enrichment and the Damages Class's impoverishment, because the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. The Damages Class has no remedy at law.

**Rhode Island**

295.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for Humira in Rhode Island at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants appreciated the benefit bestowed upon them by the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**South Carolina**

296.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for Humira in South Carolina at prices that were more than they would have been but for Defendants' actions. The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from unlawful overcharges to the Damages Class. Defendants realized value from the benefit bestowed upon them by the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**South Dakota**

297.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for Humira in South Dakota at prices that were more than they would have been but for Defendants' actions. Defendants have received a benefit from the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. Defendants were aware of the benefit bestowed upon them by the Damages Class. Under the circumstances, it

would be inequitable and unjust for Defendants to retain such benefits without reimbursing the Damages Class.

**Tennessee**

298.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for Humira in Tennessee at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants appreciated the benefit bestowed upon them by the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class. It would be futile for the Damages Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from the Damages Class with respect to Defendants' sales of Humira. It would be futile for the Damages Class to exhaust all remedies against the entities with which the Damages Class has privity of contract because the Damages Class did not purchase Humira directly from any Defendant.

**Texas**

299.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for Humira in Texas at prices that were more than they would have been but for Defendants' actions. Defendants have received a benefit from the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. Defendants were aware of or appreciated the benefit bestowed upon them by the Damages Class. The circumstances under which Defendants have retained the benefits bestowed upon them by the Damages Class are

inequitable in that they result from Defendants' unlawful overcharges for Humira. The Damages Class has no remedy at law.

**Utah**

300.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for Humira in Utah at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants were aware of or appreciated the benefit bestowed upon them by the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**Vermont**

301.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for Humira in Vermont at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants accepted the benefit bestowed upon them by the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**Virginia**

302.     Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for Humira in Virginia at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants were aware of the benefit bestowed upon them.

Defendants should reasonably have expected to repay the Damages Class. The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of Humira. Defendants have paid no consideration to any other person for any of the benefits they have received from the Damages Class.

**Washington**

303.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for Humira in Washington at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants were aware of or appreciated the benefit conferred upon them by the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**West Virginia**

304.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for Humira in West Virginia at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants were aware of or appreciated the benefit bestowed upon them by the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**Wisconsin**

305.    Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for Humira in Wisconsin at prices that were more than they

would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants appreciated the benefit bestowed upon them by the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

**Wyoming**

306. Defendants unlawfully overcharged Damages Class Members, who made purchases of or reimbursements for Humira in Wyoming at prices that were more than they would have been but for Defendants' actions. The Damages Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Damages Class. Defendants accepted, used and enjoyed the benefits bestowed upon them by the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Damages Class.

## IX. RELIEF REQUESTED

307. Accordingly, Plaintiff, on behalf of itself and the proposed Classes, respectfully requests that this Court:

(a) Determine that this action may be maintained as a class action pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2), be given to the Classes, and declare Plaintiff as the representative of the Classes;

(b) Enter joint and several judgments against the Defendants and in favor of Plaintiff and the Classes;

(c) Enjoin AbbVie from continuing its unlawful scheme to maintain and enforce its patent thicket;

(d)     Enjoin Defendants from continuing their unlawful market division agreements;

(e)     Grant Plaintiff and the Classes equitable relief in the nature of disgorgement, restitution, and the creation of a constructive trust to remedy Defendants' unjust enrichment;

(f)     Award the Damages Class damages, and, where applicable, treble, multiple, punitive, and other damages, in an amount to be determined at trial;

(g)     Award Plaintiff and the Classes their costs of suit, including reasonable attorneys' fees as provided by law; and

(h)     Award such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

## X.     JURY DEMAND

308.     Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff, on behalf of itself and the proposed Classes, demands a trial by jury on all issues so triable.

Date: March 18, 2019

By: */s/ Michael J. Freed_____*
Michael J. Freed
Steven A. Kanner
Robert J. Wozniak
Brian M. Hogan
**FREED KANNER LONDON & MILLEN LLC**
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
(224) 632-4500
skanner@fklmlaw.com
mfreed@fklmlaw.com
rwozniak@fklmlaw.com
bhogan@fklmlaw.com

Gregory S. Asciolla (*pro hac vice pending*)
Jay L. Himes (*pro hac vice pending*)
Christopher J. McDonald (*pro hac vice pending*)
Robin A. van der Meulen (*pro hac vice pending*)
Brian Morrison (*pro hac vice pending*)
Domenico Minerva (*pro hac vice pending*)
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
gasciolla@labaton.com
jhimes@labaton.com
cmdconald@labaton.com
rvandermeulen@labaton.com
bmorrison@labaton.com
dminerva@labaton.com

Roberta D. Liebenberg (*pro hac vice pending*)
Jeffrey S. Istvan (*pro hac vice pending*)
Paul Costa (*pro hac vice pending*)
Adam J. Pessin (*pro hac vice pending*)
**FINE, KAPLAN AND BLACK, R.P.C.**
One South Broad Street, 23rd Floor
Philadelphia, PA 19107
Tel: (215) 567-6565
Fax: (215) 568-5872
rliebenberg@finekaplan.com
jistvan@finekaplan.com
pcosta@finekaplan.com
apessin@finekaplan.com

*Counsel for UFCW Local 1500 Welfare Fund and the Proposed Classes*