# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| MAYOR AND CITY COUNCIL OF BALTIMORE, FRATERNAL ORDER OF POLICE, MIAMI LODGE 20, INSURANCE TRUST FUND, PIPE TRADES SERVICES MN WELFARE FUND, LOCALS 302 & 612 OF THE INTERNATIONAL UNION OF OPERATING ENGINEERS-EMPLOYERS CONSTRUCTION INDUSTRY HEALTH AND SECURITY TRUST FUND, and LOUISIANA HEALTH SERVICE & INDEMNITY COMPANY, D/B/A/ BLUE CROSS AND BLUE SHIELD OF LOUISIANA, on behalf of themselves and all those similarly situated, | Civil Action No. 19-cv-01873<br><br>Hon. Manish S. Shah |

    *Plaintiffs,*

 v.

ABBVIE INC., ABBVIE BIOTECHNOLOGY LTD., AMGEN INC., SAMSUNG BIOEPIS CO., LTD., SANDOZ, INC., and FRESENIUS KABI USA, LLC,

    *Defendants.*

**CONSOLIDATED CLASS ACTION COMPLAINT AND JURY TRIAL DEMAND**

# TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................................1

II.     PARTIES ...........................................................................................................5

        A.      The Plaintiffs.........................................................................................5

        B.      The Defendants .....................................................................................8

III.    JURISDICTION AND VENUE ..........................................................................10

IV.     REGULATORY BACKGROUND .......................................................................11

        A.      The federal regulatory structure encourages competition among drug
                companies. ..........................................................................................11

        B.      Follow-on drugs (including biosimilars) have a real effect on competition. .........15

        C.      New products may be protected by valid patents for a limited time, but not
                forever. ..............................................................................................18

        D.      Regulatory frameworks permit challenges to drug patents...................20

        E.      Biologic companies can abuse the patent system and BPCIA framework. ..........24

V.      FACTS ...............................................................................................................26

        A.      Humira is the best-selling drug in the world and AbbVie's lifeblood. .................26

        B.      AbbVie works to preserve its Humira profits at all costs, purposely
                creating a minefield of patents to trap its would-be competitors.........................28

                1.      AbbVie has admitted that it sought to extend its exclusivity over
                        Humira by several years by creating an elaborate minefield of
                        patents. .................................................................................29

                2.      AbbVie's patent minefield consists of overlapping patents, drawn
                        from just a few families, and largely from applications filed more
                        than a decade after Humira launched.........................................36

                3.      AbbVie sought to obtain patents regardless of their merits. ....................38

        C.      AbbVie is precluded from raising, as a defense to antitrust liability, most
                of the patents that comprise its minefield of IP for adalimumab.........................43

                1.      AbbVie is precluded from raising, as a defense to antitrust liability,
                        formulation and manufacturing/process patents applied for more
                        than one year after Humira's market entry. ...............................44

2.      AbbVie is precluded from raising, as a defense to antitrust liability, formulation and manufacturing patents acquired outside the original formulation patent group. .............................................47

D.    Amgen submits the first application for a Humira biosimilar and ultimately gets paid to delay entry by five years. ..................................49

E.    AbbVie enters into deals with other would-be competitors, delaying their entry and preserving Amgen's *de facto* five-month exclusivity payment. ............54

    1.      AbbVie next settles with Samsung Bioepis despite there being no litigation between the companies. ..............................................54

    2.      The third would-be biosimilar to settle receives the third earliest entry date. ....................................................................54

    3.      AbbVie next settles with Sandoz and gives it the next entry date. ............54

    4.      Fresenius settles on the heels of Sandoz and gets the same entry date without even filing a biosimilar application in the United States. ....................................................................56

    5.      AbbVie enters a deal with Momenta without litigation, allowing it the fifth entry date. ......................................................57

    6.      AbbVie makes its next deal with Pfizer in a matter of weeks, allowing it to enter with Momenta. ..............................................57

    7.      AbbVie gives Coherus the latest entry date. ................................58

    8.      AbbVie settles with Boehringer, the last biosimilar manufacturer who was challenging AbbVie's patents. ....................................58

F.    AbbVie manipulates the European patent system and enters unlawful agreements with biosimilar manufacturers to ensure delayed entry in the United States. ....................................................................60

    1.      AbbVie manipulates European patent regimes to thwart biosimilar rivals. ....................................................................60

    2.      AbbVie agrees to permit its biosimilar rivals to launch in Europe in exchange for their agreement to delay entry in the United States. ............66

G.    AbbVie's deals are having their intended effect: delaying competition for Humira and maintaining high prices for payers. ....................................69

H.    Abbvie's conduct draws legislative scrutiny over patent abuse. ..........................70

1. Senators introduce the Biologic Patent Transparency Act in March 2019 ...................................................................................... 71

2. Senators introduce the Affordable Prescriptions for Patients Act in May 2019. ...................................................................... 72

3. The House passes the Purple Book Continuity Act in May 2019 ............. 73

VI. CLASS ALLEGATIONS ....................................................................... 74

VII. MARKET POWER AND RELEVANT MARKET ............................................ 77

VIII. MARKET EFFECTS AND CLASS DAMAGES ........................................... 78

IX. ANTITRUST IMPACT ......................................................................... 80

X. INTERSTATE AND INTRASTATE COMMERCE ........................................ 81

XI. CLAIMS FOR RELIEF ........................................................................ 82

COUNT I ............................................................................................ 82

Violation of Section 1 of the Sherman Act: Pay-For-Delay Agreements ......................... 82

(Against All Defendants on Behalf of the Injunctive Relief Class) .................................. 82

COUNT II ........................................................................................... 83

Violation of State Law: Pay-For-Delay Agreements ........................................................ 83

(Against All Defendants on Behalf of the Damages Class) ............................................... 83

COUNT III .......................................................................................... 88

Violation of Sherman Act § 1: Market Allocation Agreements ....................................... 88

(Against All Defendants on Behalf of the Damages Class) ............................................... 88

COUNT IV ........................................................................................... 90

Violation of State Law: Market Allocation Agreements .................................................. 90

(Against All Defendants on Behalf of the Damages Class) ............................................... 90

COUNT V ............................................................................................ 96

Violation of Sherman Act § 2: Monopolization (Against AbbVie on Behalf of the Injunctive Relief Class) .......................................................................................... 96

COUNT VI ..................................................................................................................97

Violation of State Law Monopolization .....................................................................97

(Against AbbVie on Behalf of the Damages Class) ....................................................97

COUNT VII ................................................................................................................101

Violation of State Law: Unfair and Unconscionable Conduct ......................................101

(Against AbbVie on Behalf of the Damages Class) ...................................................101

    A.     Alaska .......................................................................................................103

    B.     Arizona .....................................................................................................104

    C.     California ..................................................................................................104

    D.     District of Columbia ................................................................................105

    E.     Florida ......................................................................................................106

    F.     Georgia .....................................................................................................107

    G.     Illinois ......................................................................................................107

    H.     Nebraska ..................................................................................................108

    I.     Nevada .....................................................................................................109

    J.     New Hampshire .......................................................................................109

    K.     New Mexico .............................................................................................110

    L.     North Carolina .........................................................................................111

    M.     North Dakota ...........................................................................................111

    N.     South Carolina .........................................................................................112

    O.     Utah ..........................................................................................................113

    P.     West Virginia ...........................................................................................113

XII.    DEMAND FOR RELIEF ...........................................................................................114

XIII.    JURY DEMAND .......................................................................................................115

1.      Plaintiffs, the Mayor and City Council of Baltimore, Fraternal Order of Police, Miami Lodge 20, Insurance Trust Fund, Pipe Trades Services MN Welfare Fund, Locals 302 & 612 of the International Union of Operating Engineers-Employers Construction Industry Health and Security Trust Fund, and Louisiana Health Service & Indemnity Company, d/b/a/ Blue Cross and Blue Shield of Louisiana (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, file this Consolidated Amended Complaint against Defendants AbbVie Inc., AbbVie Biotechnology Ltd. (together, "AbbVie"), Amgen Inc. ("Amgen"), Samsung Bioepis Co., Ltd. ("Bioepis"), Sandoz, Inc. ("Sandoz"), and Fresenius Kabi USA, LLC ("Fresenius") (collectively, "Defendants") for violations of federal antitrust laws and state antitrust and consumer protection laws. Plaintiffs' claims arise from Defendants' anticompetitive scheme to restrain competition in the market for Humira® and its biosimilar competitors in the United States. Plaintiffs allege the facts in the complaint on the basis of (a) personal knowledge, (b) the investigation of counsel, and (c) information and belief.

## I.      INTRODUCTION

2.      AbbVie's rheumatoid arthritis drug Humira has been the best-selling drug in the United States for six consecutive years, bringing in more than $13.6 billion in sales in the U.S. in 2018 and nearly $20 billion worldwide. Approved in the U.S. in 2002, Humira's sales have been on the increase since the beginning. But the original patent on Humira, a biologic drug, would expire in late 2016, which, under normal, lawful circumstances, would lead to competition for Humira prescriptions from manufacturers of biosimilar drugs. Biologics and their biosimilars are relatively new but, in many respects, they are similar to traditional brand drugs and their generics. The effect of competition on brand drugs by their generics is, of course, well-established: once competitors enter, brand sales fall rapidly as the market shifts toward less-expensive generic competitor products. Generics quickly erode the sales of the corresponding

1

brand drug by pricing at a discount, with generic discounts increasing as more generic sellers enter the market. Biosimilars of Humira similarly can be expected to enter at a lower price than Humira and take substantial market share.

3.      Humira's sales have kept AbbVie afloat since 2013, generating roughly two-thirds of the company's revenues in recent years. AbbVie has other drugs in the pipeline, but sales of those drugs would not start until 2019 or beyond, potentially leaving a gaping hole to fill if competition for Humira began in late 2016. So, AbbVie found an ingenious—albeit illegal—way to bridge the gap.

4.      AbbVie's scheme was fairly simple. *First*, AbbVie would obtain a huge number of patents—variously referred to as a "patent thicket" or "minefield of IP"—to snare and mire down any potential competitor. The more patents—valid or not—to contend with, the longer AbbVie could keep competition for Humira at bay and thus the longer AbbVie could charge supra-competitive prices for Humira. AbbVie now has more than 100 (and maybe as many as 130 or more) patents that it contends cover Humira. More than 90% of these were issued in 2014 or later, despite approval and marketing of Humira beginning 12 years earlier. Many of AbbVie's patents have clear deficiencies and would not withstand court scrutiny; for example, some claim not Humira but Humira-like compounds, and others have been invalidated by the U.S. Patent and Trademark Office. But the patents served their purpose: creating a minefield of IP so extensive that competitors would have to engage in costly and time-consuming litigation over dozens upon dozens of patents before they could launch competing products.

5.      AbbVie has been up front about its intentions to use its patent thicket or IP minefield to delay potential competition, talking publicly about AbbVie's "U.S. patent estate" and the fact that the "bulk of [the] IP strategy . . . is designed to make it more difficult for a

biosimilar to follow behind you and come up with a very, very similar biosimilar." Bogging potential competitors down in litigation over the patents meant a delay of years: "As you evaluate the timeframe for a potential U.S. biosimilar market entry, it is important that you consider the legal process and the likely timeline for resolution . . . . [B]ased on similar cases, the total litigation timing may be as long as four or five years."

6.      AbbVie used the patent system to make the costs to any potential competitor so high that the would-be competitor would not become an actual competitor. Despite the patents' weaknesses—and despite the fact that AbbVie frequently asserted patents that it had no basis to believe were infringed—the sheer volume of patents and claims in AbbVie's patent thicket frustrated biosimilar companies' efforts to come to market.

7.      *Second*, AbbVie paid potential competitors to delay entry even further. At least ten companies have indicated their intent to market biosimilars to compete with Humira. Four currently have approval from the FDA, but none has launched. Instead, AbbVie entered into deals with each to delay their entry until various dates in 2023.

8.      Not everyone has the same 2023 entry date, though. Amgen was the first biosimilar competitor to receive FDA approval, but under the regulatory framework it was not entitled to any period of exclusivity during which it would be the only biosimilar on the market. In exchange for Amgen dropping its challenges to AbbVie's patents and agreeing not to launch its biosimilar product until January 2023, however, AbbVie provided Amgen with a *de facto* exclusivity by settling with other competitors on terms that do not allow other biosimilars to enter the market within five months of Amgen. Amgen thus will have five months as the only biosimilar on the market, enabling it to charge higher prices and realize hundreds of millions of

dollars in higher profits than it would have realized if it faced competition during this period. The pay-for-delay deal between AbbVie and Amgen was anticompetitive and unlawful.

9. *Third*, AbbVie and certain biosimilar competitors—namely, Amgen, Samsung Bioepis, Sandoz, and Fresenius (the "biosimilar defendants")—entered into market division agreements whereby AbbVie ceded earlier access to European markets in exchange for an agreement from would-be biosimilar competitors to delay entry in the United States. Like it did in the United States, AbbVie abused the European patent system by disclaiming existing patents in certain jurisdictions and then refiling patent applications covering essentially the same subject matter, some of which were ultimately issued as patents. Through this patent "whack-a-mole" strategy, AbbVie ensured that its rivals had no guarantee that they could market their product in most European markets—even well after the expiration of the main Humira patents in October 2018. Because AbbVie's U.S. patent thicket was likewise proving to be impassable, the biosimilar defendants were motivated to take licenses entitling them to earlier entry in Europe, which are worth hundreds of millions of dollars per year to each biosimilar defendant. And because these deals protected its cash-cow in the United States, AbbVie, of course, was similarly motivated to enter these collusive agreements with its biosimilar rivals. The practical effect of these agreements is that while European consumers are now able to experience the economic benefits of biosimilar competition for Humira (*i.e.,* reduced costs), U.S. consumers are still stuck paying monopoly prices for Humira.

10. AbbVie's conduct has also prompted public outcry. Members of Congress have proposed several pieces of legislation, which seek to prohibit the types of regulatory and patent abuses AbbVie committed in furtherance of its scheme to monopolize the market.

11.     Because of AbbVie's unlawful scheme and monopolization of the market, Humira's sales did not slow down after the primary patent on Humira expired at the end of 2016. They did not slow down after the FDA approved the first drug to compete with Humira in 2016. Absent AbbVie's minefield of IP, pay-for-delay, and market division deals, competition for Humira would have begun as early as the original composition patent for Humira expired at the end of 2016. Because of AbbVie's unlawful scheme and the delay it bought from Amgen and the other biosimilar defendants, Humira has not yet faced competition and may not face competition until 2023. AbbVie and the other defendants win. Payers lose.

12.     Plaintiffs and members of the classes (defined below) are end payers of Humira. They are the last links in the pharmaceutical distribution chain, and they paid overcharges for Humira as a result of AbbVie's anticompetitive conduct and the biosimilar defendants' agreements not to compete with AbbVie. This action seeks to recover those overcharges for all similarly situated.

## II.     PARTIES

### A.     The Plaintiffs

13.     Plaintiff the Mayor and City Council of Baltimore ("City of Baltimore") is a municipality located in Baltimore, Maryland. The City of Baltimore purchased, paid and/or provided reimbursement for some or all of the purchase price of Humira, other than for re-sale, in Arizona, the District of Columbia, Florida, Indiana, Illinois, Louisiana, Massachusetts, Maryland, Michigan, Minnesota, Missouri, New Hampshire, Pennsylvania, Rhode Island, Texas, and Virginia, among other locations, during the Class Period, at supra-competitive prices. As a result of the alleged conspiracy, the City of Baltimore was injured in its business or property by reason of the violations of law alleged herein.

14.     Plaintiff Fraternal Order of Police, Miami Lodge 20, Insurance Trust Fund is a governmental plan established and funded through contributions from the City of Miami and the plan's members, who are current and retired sworn officers from the City of Miami Police Department and their dependents. FOP Miami was established pursuant to a duly executed Trust Agreement for the purpose of providing medical, surgical, and hospital care or benefits, including prescription drug benefits, to its members. FOP Miami maintains its principal place of business at 400 NW Second Avenue, Miami, Florida, and is a citizen of Florida. FOP Miami purchased, paid and/or provided reimbursement for some or all of the purchase price of Humira, other than for re-sale, in Florida and Pennsylvania, among other locations, during the Class Period, at supra-competitive prices. As a result of the alleged conspiracy, FOP Miami was injured in its business or property by reason of the violations of law alleged herein.

15.     Plaintiff Pipe Trades Services MN Welfare Fund ("Pipe Trades Fund") is a Taft-Hartley fund authorized under Section 302(c)(5) of the National Labor Relations Act, with its principal place of business in White Bear Lake, Minnesota, and an employee welfare benefit plan as defined in Section 3(1) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*. Pipe Trades Fund is the sponsor of a plan of benefits which provides health benefits, including prescription-drug benefits, to approximately 16,000 active participants and retirees, plus their spouses and dependents. Pipe Trades Fund purchased, paid and/or provided reimbursement for some or all of the purchase price of Humira, other than for re-sale, in Indiana, Kansas, Minnesota, and Michigan, among other locations, during the Class Period, at supra-competitive prices. As a result of the alleged conspiracy, Pipe Trades Fund was injured in its business or property by reason of the violations of law alleged herein.

16.     Plaintiff Locals 302 & 612 of the International Union of Operating Engineers-Employers Construction Industry Health and Security Trust Fund ("IUOE Locals 302 & 612") is an employee welfare benefits fund. IUOE Locals 302 & 612 was formed as a joint health and welfare trust in 1957 for the International Union of Operating Engineers and provides members with health and welfare benefits. IUOE Locals 302 & 612 purchased, paid and/or provided reimbursement for some or all of the purchase price of Humira, other than for re-sale, in Alaska, California, Colorado, Florida, Indiana, Louisiana, Missouri, Nevada, Pennsylvania, Texas, and Washington, among other locations, during the Class Period, at supra-competitive prices. As a result of the alleged conspiracy, IUOE Locals 302 & 612 was injured in its business or property by reason of the violations of law alleged herein.

17.     Plaintiff Louisiana Health Service & Indemnity Company, d/b/a Blue Cross and Blue Shield of Louisiana ("BCBSLA") is a not-for-profit mutual insurance company organized and existing under the laws of the state of Louisiana. BCBSLA provides and manages health benefits to more than one million participants, members, and beneficiaries primarily in the state of Louisiana, as well as throughout the United States. BCBSLA also provides third-party administrative ("TPA") services for members of self-funded employee health plans. BCBSLA purchased, paid and/or provided reimbursement for some or all of the purchase price of Humira, other than for re-sale, in Alabama, Arkansas, Arizona, California, Colorado, Connecticut, the District of Columbia, Delaware, Florida, Georgia, Illinois, Indiana, Kansas, Kentucky, Louisiana, Massachusetts, Maryland, Maine, Missouri, Mississippi, Montana, North Carolina, New Jersey, New York, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, West Virginia, and Wyoming, among other locations, during the Class Period, at supra-

competitive prices. As a result of the alleged conspiracy, BCBSLA was injured in its business or property by reason of the violations of law alleged herein.

18.     During the Class Period, as defined below, Plaintiffs purchased, paid, and/or provided reimbursement for some or all of the purchase price of Humira. Plaintiffs paid more than they would have absent Defendants' unlawful anticompetitive scheme to prevent biosimilar entry and were injured as a result of the illegal and wrongful conduct alleged herein.

**B.     The Defendants**

19.     Defendant AbbVie Inc. is a corporation organized and existing under the laws of Delaware with its corporate headquarters at 1 North Waukegan Road, North Chicago, Illinois 60064. AbbVie Inc. is engaged in the development, sale, and distribution of a broad range of pharmaceutical and biologic drugs. AbbVie Inc. is the holder of Biologic License Application ("BLA") No. 125057 for Humira, whose active pharmaceutical ingredient is the antibody adalimumab.

20.     Defendant AbbVie Biotechnology Ltd. is a corporation organized and existing under the laws of Bermuda, with a place of business at Clarendon House, 2 Church Street, Hamilton HM1l, Bermuda. Through intermediate organizations, defendant AbbVie Inc. owns defendant AbbVie Biotechnology Ltd. Defendant AbbVie Inc. and defendant AbbVie Biotechnology Ltd. are collectively referred to herein as "AbbVie."

21.     All of the actions described in this complaint are part of, and in furtherance of, the unlawful conduct alleged herein and were authorized, ordered, or undertaken by AbbVie's officers, agents, employees, or other representatives while actively engaged in the management of AbbVie's affairs and within the course and scope of their duties and employment or with AbbVie's actual, apparent, or ostensible authority.

22.    Defendant Amgen Inc. is a corporation organized and existing under the laws of Delaware with its corporate headquarters at One Amgen Center Drive, Thousand Oaks, California, 91320-1799. Amgen Inc. is engaged in the development, sale, and distribution of a broad range of pharmaceutical and biologic drugs. Amgen Inc. is the holder of Abbreviated Biologic License Application ("ABLA") No. 761204 for Amjevita, whose active pharmaceutical ingredient is the antibody adalimumab-atto.

23.    Defendant Samsung Bioepis Co., Ltd. ("Samsung Bioepis") is a company organized and existing under the laws of the Republic of Korea with its principal place of business at 107, Cheomdan-daero, Yeonsu-gu, Incheon, Republic of Korea.

24.    Defendant Sandoz, Inc. ("Sandoz") is a Colorado corporation with its principal place of business at 100 College Rd. West, Princeton, NJ 08540. Sandoz is a subsidiary of Novartis AG, a global pharmaceutical company based in Basel, Switzerland.

25.    Defendant Fresenius Kabi USA, LLC ("Fresenius") is a Delaware limited liability company with its principal place of business at Three Corporate Drive, Lake Zurich, IL 60047.

26.    Defendants AbbVie, Amgen, Samsung Bioepis, Sandoz, and Fresenius are collectively referred to as "Defendants."

27.    All of Defendants' actions described in this Consolidated Amended Complaint are part of, and in furtherance of, the unlawful conduct alleged in this Consolidated Amended Complaint. These actions were authorized, ordered, or undertaken by Defendants' various officers, agents, employees, or other representatives while engaged in the management of Defendants' affairs (or those of their predecessors-in-interest) within the course and scope of their duties and employment or with the actual, apparent, and/or ostensible authority of Defendants.

### III.    JURISDICTION AND VENUE

28.    The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337(a) and

15 U.S.C. § 15. This action alleges violations of sections 1 and 2 of the Sherman Act, 15 U.S.C.

§§ 1 & 2, and seeks injunctive relief. Those violations are actionable under section 16 of the

Clayton Act, 15 U.S.C. § 26. The Court also has subject matter jurisdiction under 28 U.S.C.

§§ 1331, 1332(d), 1337(a), and 1367.

29.    Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) & 22 and

28 U.S.C. §§ 1391(b), (c), and (d). During the class period (December 31, 2016, to the present),

Defendants have resided, transacted business, been found, or had agents in this District.

30.    This Court has personal jurisdiction over Defendants. Defendants' wrongful

conduct had a substantial effect on interstate commerce of the United States, including in this

District. During the class period, AbbVie manufactured, sold, and shipped Humira in a

continuous and uninterrupted flow of interstate commerce, which included sales of Humira in

and from this District, advertisement of Humira in media in this District, monitoring

prescriptions of Humira by prescribers within this District, and employment of product detailers

in this District, who as agents of AbbVie marketed Humira to prescribers in this District.

Defendants' conduct had a direct, substantial, and reasonably foreseeable effect on interstate

commerce, including commerce within this District.

31.    Throughout the United States and including in this District, Defendants transacted

business, maintained substantial contacts, or committed overt acts in furtherance of the illegal

scheme. The scheme has been directed at, and has had the intended effect of, causing injury to

persons residing in, located in, or doing business throughout the United States, including in this

District.

## IV.    REGULATORY BACKGROUND

**A.    The federal regulatory structure encourages competition among drug companies.**

32.    Drugs generally fall into one of two categories: small molecule drugs and biologic drugs.[1] Small molecule drugs constitute the majority of drugs on the market and are manufactured using chemical processes. Biologics, in contrast, are derived from biological sources such as animals or microorganisms; the resulting molecules are much larger and more complex. Federal regulatory frameworks guide the approval and marketing of both brand name small molecule and biologic drugs as well as their follow-on competitors: generic drugs and biosimilars, respectively. The frameworks, while slightly different, share overarching goals: fostering innovation and promoting price competition for the benefit of consumers.

33.    Biologics are not new; they include vaccines, first developed in the late eighteenth century. But technological advances in the past few decades have resulted in more biologics coming to market than ever before.

34.    The approval process for a new biologic drug is similar to the pathways for small molecule drugs. Small molecule drugs are regulated under the Food Drug, and Cosmetics Act ("FDCA"), as amended by the Drug Price Competition and Patent Term Restoration Act ("Hatch-Waxman Act").[2] Under this framework, a drug company may file a New Drug Application ("NDA") with the FDA to market a new small molecule drug. This first entrant may have a patent or regulatory exclusivity that lawfully prevents competition for a limited time, during which the first entrant may charge supracompetitive prices to recoup its research and development costs and obtain a reasonable profit as a reward for its innovation. Once this limited

---

[1] Biologic drugs are sometimes referred to as biopharmaceuticals.

[2] Pub. Law No. 98-417, 98 Stat. 1585 (1984).

time is up, however, other drug companies may file Abbreviated NDAs ("ANDAs") to obtain approval to market generic drugs that are bioequivalent to the first entrant's drug (known as the "branded drug" or the "reference listed drug"). Because generics are copies of the first entrant's drug, they can compete only on price, and they consistently enter the market at much lower price points and take substantial market share. This system effectively incentivizes innovation while allowing consumers to benefit from lower prices in the long run, and it has proven successful: after patent expiration, nearly all small molecule drugs face generic competition.

35. Similarly, a manufacturer of a biologic may market the drug only if the FDA has licensed it pursuant to either of two review processes set forth in 42 U.S.C. § 262. The pathway for approval for new biologics is set forth in 42 U.S.C. § 262(a). Under that subsection, the drug manufacturer submits a Biologic License Application ("BLA"), which must include data similar to that included in an NDA; the FDA may license a new biologic if, among other things, the manufacturer demonstrates that it is "safe, pure, and potent."[3]

36. The statute also prescribes an alternative, abbreviated route for FDA approval of biosimilars, set forth in 42 U.S.C. § 262(k), enacted as part of the Biologics Price Competition and Innovation Act of 2009 ("BPCIA").[4]

37. The FDA has explained that the BPCIA "is similar to the way the Hatch-Waxman amendments sought to establish balance between innovation for brand products and availability of generic competition."[5] Likewise, legislators and the Obama Administration expressed that the

---

[3] 42 U.S.C. § 262(a)(2)(C)(i)(I).

[4] 124 Stat. 808.

[5] Food & Drug Administration, *Biosimilar Action Plan: Balancing Innovation and Competition*, available at
https://www.fda.gov/downloads/Drugs/DevelopmentApprovalProcess/HowDrugsareDevelopedandAppro

primary purpose of the BPCIA was, like the Hatch-Waxman Act, to promote competition by increasing the number of biosimilars in the market. For example, in its proposed budget released in February 2009, the Obama Administration noted that "[p]rescription drug costs are high and rising" and proposed "accelerate[d] access" with a "legal pathway for generic versions of biologic drugs."[6] Similarly, in June 2009, Senator Sherrod Brown stated, "[p]erhaps nowhere [is the need to bring down costs and increase access] more obvious than the area of biopharmaceuticals or so-called biologics . . . . With costs to biologics ranging anywhere from $10,000 to $200,000 per patient per year, biologic treatments pose a significant financial challenge for patients, for insurance companies, for employers who are paying the bills, and for Federal and State governments that are also paying the bills."[7] Representative Frank Pallone noted that "[i]f biologics are the future, then we should do everything we can now to control costs while aiding innovation, just like Hatch-Waxman did."[8]

38.     The BPCIA created a shortened pathway for approval of biosimilars via an Abbreviated Biologic License Application ("ABLA").

39.     To obtain approval, the applicant may piggyback on the showing made by the manufacturer of a previously licensed biologic ("reference product").[9] A biosimilar manufacturer

---

ved/ApprovalApplications/TherapeuticBiologicApplications/Biosimilars/UCM613761.pdf (last accessed March 7, 2019).

[6] Office of Mgmt. & Budget, *A New Era of Responsibility* 28 (2009), available at http://www.washingtonpost.com/wp-srv/politics/budget2010/fy10-new-era.pdf.

[7] 155 Cong. Rec. S6793 (daily ed. June 18, 2009).

[8] *Emerging Health Care Issues: Follow-On Biologic Drug Competition: Hearing Before the Subcomm. on Health of the H. Comm. on Energy & Commerce*, 111th Cong. 2 (2009).

[9] *See* 42 U.S.C. § 262(k)(2)(A)(iii).

must show that its product is "highly similar" to the reference product and that there are no

"clinically meaningful differences" between the two in terms of "safety, purity, and potency."[10]

40.   The BPCIA provides that an ABLA seeking approval of a biological product as a

biosimilar must include information demonstrating that:

i.   the biological product is biosimilar to a reference product based upon data derived from [certain kinds of studies];

ii.   the biological product and reference product utilize the same mechanism or mechanisms of action for the condition or conditions of use prescribed, recommended, or suggested in the proposed labeling, but only to the extent the mechanism or mechanisms of action are known for the reference product;

iii.   the condition or conditions of use prescribed, recommended, or suggested in the labeling proposed for the biological product have been previously approved for the reference product;

iv.   the route of administration, the dosage form, and the strength of the biological product are the same as those of the reference product; and

v.   the facility in which the biological product is manufactured, processed, packed, or held meets standards designed to assure that the biological product continues to be safe, pure, and potent.[11]

41.   A biosimilar company may not submit an ABLA for FDA approval until four

years after the reference product is first approved, and the FDA may not approve a biosimilar

until twelve years after the reference product is first approved.[12] As a result, the manufacturer of

a new biologic enjoys a statutory 12-year period when its biologic may be marketed without

competition from biosimilars. After that point, no regulatory exclusivities exist that would

prevent competition from biosimilars.

---

[10] 42 U.S.C. §§ 262(i)(2)(A), (B); *see also* 42 U.S.C. § 262(k)(2)(A)(i)(I).

[11] *Id.* § 262(k)(2).

[12] 42 U.S.C. §§ 262(k)(7)(A), (B).

42. The Hatch-Waxman Act provides an incentive for generic drug companies to challenge bad patents held by first entrants: the first generic company that submits a certification that a patent is invalid, unenforceable, or not infringed may, under certain circumstances, be eligible for a 180-day period of exclusivity during which no other generics can be approved. This 180-day exclusivity can be worth tens or hundreds of millions of dollars to generic companies. However, absent a determination of interchangeability with the reference biologic, the BPCIA does not allow for a period of exclusivity for the first biosimilar to seek to come to market. Rather, once the 12-year period for biologic exclusivity has expired, the FDA may approve for marketing and sale any and all biosimilar products that meet the requirements.

**B.    Follow-on drugs (including biosimilars) have a real effect on competition.**

43. The effect of competition for small molecule drugs is well-established. Once a brand drug company's lawful exclusivities over its patented drug expire and it faces generic competition, brand sales fall rapidly as the market shifts toward the less-expensive competitor products. Without generic competition, a brand manufacturer can charge supra-competitive prices without fear of losing profits or market share. The introduction of a generic drug, however, results in a predictable and rapid loss of revenue and market share for the brand drug seller. Once a generic hits the market, it quickly erodes the sales of the corresponding brand drug, often capturing 80% or more of the market within the first six months after launch, 90% of the brand's unit drug sales after a year, and eventually nearly all of the market.

44. It does so by pricing at a discount. The first generic manufacturer to launch prices its product below the price of the branded counterpart. Once additional generic competitors enter the market, price competition between the generics begins, with multiple generic sellers driving prices down toward marginal manufacturing costs.

45.     According to the FDA and Federal Trade Commission, the greatest price reduction for pharmaceutical products arrives when the number of generic competitors goes from one to two. Prices continue to decline as more generic manufacturers enter the market.

46.     This all results in dramatic savings for drug purchasers. According to the Congressional Budget Office, generic drugs save consumers an estimated $8 to $10 billion a year at retail pharmacies. Even more billions are saved when hospitals use generics.

47.     Biologic and biosimilar drugs are newer to the U.S. marketplace. The FDA approved the first biosimilar in 2015 and only seven biosimilars are currently marketed in the United States. As such, less data exists concerning the impact of biosimilars as compared to the comprehensive information about ANDA-approved generics. While there are differences in distribution, substitution laws, and prescription writing between biosimilars and generic drugs, the general principle is the same: competition from FDA-approved follow-on products lowers prices for consumers.

48.     Numerous studies have been issued estimating the cost savings (determined by estimated price reductions, penetration, and the like) on the introduction of follow-on biologics and biosimilar drugs.

49.     A 2014 study by the Rand Corporation canvassed existing studies estimating U.S. biosimilars' price impact and market penetration, as well as the overall savings they cause. Combining the results of these studies, Rand estimated overall market penetration of 60 percent, and a biosimilar price discount due to competition of 35 percent. It acknowledged that the Congressional Budget Office anticipates an even larger 40 percent reduction in the long term. All studies reviewed by Rand anticipated some amount of substantial price decreases.

16

50.     In 2017, Rand Corporation updated its earlier article based on empirical evidence from the emerging biosimilar market. It predicted that "biosimilars will lead to a reduction of $54 billion in direct spending on biologic drugs from 2017 to 2026."

51.     In Europe—where biosimilar versions of Humira are available—biosimilars have captured a large share of the market and competition has led to significant price reductions. Samsung Bioepis's biosimilar Imraldi, for example, took 62% of the market in Germany, the largest national market in Europe, within a month of its launch.[13] As a result of biosimilar competition, Humira's price in Europe has dropped between 10% and 80%.[14] The graphic below shows that in certain European countries the annual cost of Humira biosimilars was significantly less than Humira.[15]



---

[13] http://www.koreabiomed.com/news/articleView.html?idxno=5556

[14] *Why The U.S. Remains The Most Expensive Market For 'Biologic' Drugs In The World*, NPR, https://www.npr.org/sections/health-shots/2018/12/19/676401634/why-the-u-s-remains-the-most-expensive-market-for-biologic-drugs-in-the-world (last accessed Mar. 13, 2019).

[15] Eversana, "Who wants the biggest slice of the biosimilar pie?": The Humira biosimilar wave in Europe, https://www.eversana.com/insights/who-wants-the-biggest-slice-of-the-biosimilar-pie-the-humira-biosimilar-wave-in-europe/.

52.     Germany, for example, has seen up to 40% discounts on Humira biosimilars. Regions in Italy received a "65% reduction in the price of adalimumab after including biosimilars of Humira . . . in a joint procurement process."[16]

**C.     New products may be protected by valid patents for a limited time, but not forever.**

53.     A drug company may hold patents covering a brand or biologic drug, its therapeutic uses, and the processes used to manufacture it, among other things. Such patents may constrain an ABLA applicant's ability to market its biosimilar even after the expiration of the BPCIA's twelve-year exclusivity period.

54.     A patent must claim a novel invention. If the matter claimed in the patent application "was patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention," the application must be denied.[17] Prior patents, publications, and other publicly known material before the filing date of the patent are called "prior art."

55.     As time passes, prior art accumulates: patents issue, publications reveal new discoveries, and new drugs go on sale. Thus, in general, later-filed patent applications face a greater volume of prior art than earlier-filed patent applications. One exception to this general rule is the "continuation application." If a company has a pending patent application, it may file a continuation application explicitly relating to the original (called the "parent") application and prosecute both the parent and the continuation. Each application may issue as a separate patent. Continuation applications have the same specification as their parent applications, but they add

---

[16] *Id.*

[17] 35 U.S.C. § 102(a).

new, related claims.[18] They have the same effective filing dates (called their "priority dates") as their parent applications, so intervening advances in the art generally do not render them invalid for obviousness.

56. If the claims of the continuation patents are simple, obvious variations on the claims of the co-pending parent application, the applicant generally must file a terminal disclaimer under 37 C.F.R. § 1.321(b), relinquishing any portion of the new patent term that would extend beyond the life of the original patent. Failing to file a proper terminal disclaimer may result in rejection of application on the ground of obviousness-type double patenting, which is "primarily intended to prevent prolongation of the patent term by prohibiting claims in a second patent not patentably distinct from claims in a first patent."[19]

57. Patent prosecutions before the U.S. Patent and Trademark Office ("PTO") are non-adversarial. Accordingly, patent applicants are subject to special oaths and duties designed to protect the public's interest in the PTO's issuance of valid patents. Because patents usually enable a first entrant to exclude competition and charge supra-competitive prices, it is crucial that any patent covering a brand drug or biologic be valid and lawfully obtained.

58. To help ensure the "public interest is best served" when the PTO issues a patent, patent applications are subject to the duties of disclosure, candor, and good faith, which requires the applicant to disclose to the PTO "all information known to be material to patentability," including any prior art.[20] This duty is imposed on those responsible for making the application, including each of the named inventors; each "attorney or agent who prepares or prosecutes the

---

[18] See 35 U.S.C. § 120; 37 C.F.R. § 1.78(d).

[19] Manual of Patent Examining Procedure § 804.

[20] See 37 C.F.R. § 1.56(a).

application"; and "[e]very other person who is substantively involved in the preparation or prosecution of the application."[21]

**D.      Regulatory frameworks permit challenges to drug patents.**

59.      Like the Hatch-Waxman Act, the BPCIA implicitly acknowledges that the biologic manufacturer (also known as the "reference product sponsor") may use the patent system inappropriately to forestall competition and lays out a framework for challenging patents that the reference product sponsor claims covers the reference biologic.

60.      In general, a patent owner may not file an action for patent infringement until another person makes, uses, offers to sell, or sells the patented invention within the United States.[22] But the Hatch-Waxman Act and the BPCIA enable the reference product sponsor to bring an infringement action before the allegedly infringing drug is on sale. Both provide that the mere submission of application for FDA approval of a generic or biosimilar constitutes an act of infringement,[23] and both lay out procedures for resolving patent disputes.

61.      Under the Hatch-Waxman Act, the brand manufacturer may submit a list of patents allegedly covering its drug to the FDA, which lists the patents publicly in a reference called the "Orange Book." But the equivalent reference for biologic drugs—the "Purple Book"—does not list patents. Instead, the BPCIA lays out a five-step set of pre-litigation exchanges (sometimes called the "patent dance") that may culminate in patent litigation if the parties do not resolve their disputes. It also provides remedies for this infringement, including injunctive relief and damages.[24]

---

[21] *Id.* § 1.56(c).

[22] *See* 35 U.S.C. § 271(a).

[23] 35 U.S.C. §§ 271(e)(2)(C)(i), (ii).

[24] 35 U.S.C. § 271(e)(4)

62.     First, no more than twenty days after the FDA accepts an application for review,

the applicant must provide the ABLA and other confidential information about how the

biosimilar is manufactured to the reference product sponsor.[25] This set of disclosures is

sometimes called the "2A disclosure," named for the section of the BPCIA requiring this

disclosure. These disclosures enable the reference product sponsor to evaluate the biosimilar for

possible infringement of patents it holds.[26] The information the applicant provides is subject to

strict confidentiality rules.[27]

63.     Second, the parties exchange information to identify relevant patents and to flesh

out the legal arguments that they might raise in future litigation. Within sixty days of receiving

the application and manufacturing information and based on a review of those materials, the

reference product sponsor must respond with a list of patents for which it believes "a claim of

patent infringement could reasonably be asserted" against the ABLA applicant if it made, used,

offered to sell, sold, or imported "the biological product that is the subject of the [biosimilar]

application" without a license.[28] This list of patents is sometimes called the "3A list." The

reference product sponsor must also identify any patents on the 3A list that it would be willing to

license.[29]

64.     Third, within sixty days of receiving the 3A list, the ABLA applicant must

provide to the reference product sponsor, for each patent, "a detailed statement that describes, on

a claim by claim basis, the factual and legal basis of the opinion of the [ABLA] applicant that

---

[25] 42 U.S.C. § 262(l)(2)(A).

[26] 42 U.S.C. § 262(l)(1)(D).

[27] *See* 42 U.S.C. § 262(l)(1)(H).

[28] 42 U.S.C. § 262(l)(3)(A)(i).

[29] 42 U.S.C. § 262(l)(3)(A)(ii).

such patent is invalid, unenforceable, or will not be infringed by the commercial marketing of the" biosimilar or a statement that it "does not intend to begin commercial marketing of the [biosimilar] product before the date that such patent expires."[30] This statement is sometimes called the applicant's "3B statement." In the 3B statement, the ABLA applicant also must respond to the reference product sponsor's offer to license particular patents[31] and may provide to the sponsor a list of patents that the ABLA applicant believes are relevant but were omitted from the 3A list.[32]

65.     Fourth, within sixty days of receiving the 3B statement, the reference product sponsor must reply with "a detailed statement" that, for each patent that the ABLA applicant identified as invalid, unenforceable, or not infringed, describes "on a claim by claim basis, the factual and legal basis of the opinion of the reference product sponsor that such patent will be infringed by the commercial marketing of the [biosimilar] and a response to the statement concerning validity and enforceability provided" in the applicant's 3B statement.[33] This response is sometimes called the reference product sponsor's "3C statement."

66.     By the conclusion of step four, which may be up to 200 days after the biosimilar manufacturer obtains FDA acceptance of its application to market a biosimilar, the parties have identified in this patent dance all of the patents whose validity, enforceability, and/or infringement that either party believes may be at issue and provided detailed explanations of the bases of their beliefs about why each is or is not invalid, unenforceable, and/or infringed.

---

[30] *Id.* § 262(l)(3)(B).

[31] 42 U.S.C. § 262(l)(3)(B)(iii).

[32] 42 U.S.C. § 262(l)(3)(B)(i).

[33] *Id.* § 262(l)(3)(C).

67.     Fifth, the parties attempt to negotiate a list of patents that "shall be the subject of an action for patent infringement[.]"[34] If they do not agree on a list within fifteen days of receipt of the ABLA applicant's receipt of the 3C statement, each party selects a list of patents (its "(*l*)(5) list") that will become the subject of a patent infringement suit.[35] The ABLA applicant may limit the number of patents on the (*l*)(5) lists: it must tell the reference product sponsor how many patents it will select, and the reference product sponsor cannot select a greater number of patents than the ABLA applicant.[36] No later than five days after the ABLA applicant notifies the reference product sponsor of the number of patents it will select, the parties must simultaneously exchange their lists.[37]

68.     Once the parties complete the pre-litigation exchanges, the first phase of BPCIA litigation begins. Under the statute, the reference product sponsor "shall bring an action" in court within thirty days of the date of agreement or the simultaneous list exchange.[38] This patent infringement action concerns the patents on the parties' (*l*)(5) lists, but it does not address the remaining patents.

69.     A second phase of BPCIA litigation may address the remaining patents. The ABLA applicant must provide the reference product sponsor at least 180-days' notice before commercially marketing the biosimilar.[39] Upon receiving such notice, the reference product sponsor may file for a preliminary injunction prohibiting the manufacture or sale of the

---

[34] *Id.* § 262(l)(4).

[35] *Id.* § 262(l)(5).

[36] *Id.* If the ABLA applicant does not select any patents, the reference product sponsor may list one patent. *Id.* § 262(l)(5)(B)(ii)(II).

[37] *Id.* § 262(l)(5)(B)(i).

[38] 42 U.S.C. §§ 262(l)(6)(A), (B).

[39] *Id.* § 262(l)(8).

biosimilar until adjudication of the validity, enforcement, and/or infringement of any patent on the original 3A list.[40] The second phase of BPCIA litigation thus concerns all patents that the sponsor alleges are relevant.

70.     Once the 180-day notice period has expired, and provided that the FDA has licensed (*i.e.*, approved) the ABLA, the ABLA applicant may launch its biosimilar regardless of whether the patent litigation has been resolved. Launch of a product that allegedly infringes patents before a final court decision on the validity and infringement of the patents is commonly called an "at-risk" launch. A manufacturer that launches at risk, however, risks having to pay substantial damages to the brand or biologic manufacturer in the event that the patents are found valid, enforceable, and infringed.

**E.     Biologic companies can abuse the patent system and BPCIA framework.**

71.     First entrants—both for small molecule drugs and biologics—generally obtain patents for their new drugs shortly before they seek FDA approval, during the approval process, or immediately afterward. Patents obtained in this timeframe may reflect a genuine technological breakthrough. These original patents become "prior art," limiting the scope of follow-on patents that the manufacturers may obtain. As the number of patent filings for the drug grows, so does the volume of prior art that a patent application must distinguish. Later-issued patents become increasingly narrow and more difficult to obtain. Even if narrower coverage is obtained, these later-issuing patents are more vulnerable to invalidation for covering subject matter that is old or obvious.

72.     For decades, drug manufacturers have manipulated the system by obtaining meritless patents to use as weapons against would-be competitors, even though such patents

---

[40] *Id.* § 262(l)(8).

would not withstand challenges in court. A white paper examining federal district court patent cases in Westlaw and LexisNexis from 2007 to 2011 found that, in more than 86% of cases that reached a disposition on the validity of a patent, the claims challenged in the patent were determined to be invalid and/or not infringed. The biotechnology field, which includes biologic drugs, has an even higher invalidity rate. An academic paper that examined all substantive decisions rendered by any court in any patent case filed in 2008 and 2009 found that biotechnology patentees won only 5.6% of the time. The authors concluded that their "data set suggests that the biotechnology patents that reach a merits ruling overwhelmingly lose." They added that, "[o]f the litigated patents in our data set, biotechnology patents are much more likely to be invalidated than any other type of patent, and they are less likely than average to be infringed."

73. Concerned that invalid patents were being issued and improperly enforced, to the detriment of both innovation and the economy, Congress passed the Leahy-Smith America Invents Act ("AIA") in 2011. A centerpiece of the AIA is the *inter partes* review system, which allows patent challenges through an administrative process that differs from traditional patent litigation and expands the universe of potential patent challengers.

74. *Inter partes* review commences when a party—often an alleged patent infringer—petitions the Patent Trial and Appeals Board ("PTAB") to reconsider the PTO's issuance of an existing patent and invalidate it on the grounds that it was obvious or anticipated by prior art. The petition cannot be based on other grounds for invalidity, such as inequitable conduct.

75. The PTAB will grant a request for an *inter partes* review only if the challenger of the patent shows "a reasonable likelihood that the petitioner would prevail with respect to at least

one of the claims challenged in the petition."[41] The PTAB must decide the review within one year of the institution date.

76.     *Inter partes* review has not solved the problems associated with companies improperly obtaining and asserting patents. In July 2018, Scott Gottlieb, the Commissioner of the FDA, observed that biosimilar competition was "anemic because litigation has delayed market access for biosimilar products that are, or shortly will be, available in markets outside the U.S. several years before they'll be available to patients here. These delays can come with enormous costs for patients and payers." He added that "patent thickets that are purely designed to deter the entry of approved biosimilars are spoiling this sort of competition."

## V.     FACTS

### A.     Humira is the best-selling drug in the world and AbbVie's lifeblood.

77.     "Humira" is an acronym for "**Hu**man **m**onoclonal antibody **i**n **r**heumatoid **a**rthritis." Its active ingredient is adalimumab, an anti-inflammatory biologic medicine that binds to tumor necrosis factor alpha (TNFα). The inflammatory response of many autoimmune diseases is triggered when TNFα binds to TNFα receptors in the body. Humira interferes with that process, reducing the body's inflammatory response.

78.     The antibody adalimumab was originally developed through a collaboration between BASF AG and Cambridge Antibody Technology. Formulations of adalimumab were disclosed in U.S. Application No. 08/599,226, filed on February 9, 1996, which issued as U.S. Patent No. 6,090,382 ("the '382 patent") on July 18, 2000. BASF AG was the original assignee for the '382 patent, which expired on December 31, 2016.

---

[41] 35 U.S.C. § 314(a).

79.     On March 2, 2001, AbbVie's predecessor, Abbott Laboratories, completed its purchase of BASF AG's pharmaceutical business, acquiring the rights to adalimumab and the '382 patent.

80.     Abbott obtained FDA approval for Humira in late 2002 and launched Humira shortly thereafter.

81.     Although Humira was first researched and approved as a treatment for rheumatoid arthritis, it is now indicated to treat a range of other autoimmune conditions as well, including juvenile idiopathic arthritis, psoriatic arthritis, ankylosing spondylitis, adult and pediatric Crohn's disease, ulcerative colitis, plaque psoriasis, hidradenitis suppurativa, and uveitis.

82.     Humira is administered by subcutaneous injection. Once acclimated, patients need to be injected, or to inject themselves, approximately every two weeks. Patients on Humira are captive users: once they start, they are advised to stay on Humira indefinitely. Indeed, patients are warned that if they abruptly stop treating with Humira, they may have a "severe" reaction or "flare up" of their condition and may not respond thereafter to Humira or other similar treatments. AbbVie's commercial efforts are focused on keeping existing patients on the drug without interruption for the long haul and obtaining new users. And with no alternative available, Humira users—and their health benefit providers—are forced to pay higher prices or else sacrifice their health.

83.     Humira is one of the largest-selling drugs of all time in the United States (and worldwide), with its growth accelerating from entry to present day. The following table shows the sales of Humira since its launch in 2003:[42]

---

[42] U.S. sales are not available until 2006.

| Year | U.S. sales | Worldwide sales |
|---|---|---|
| 2003 | • | $280,000,000 |
| 2004 | • | $852,000,000 |
| 2005 | • | $1,400,000,000 |
| 2006 | $1,200,000,000 | $2,000,000,000 |
| 2007 | $1,600,000,000 | $3,000,000,000 |
| 2008 | $2,200,000,000 | $4,500,000,000 |
| 2009 | $2,500,000,000 | $5,500,000,000 |
| 2010 | $2,872,000,000 | $6,508,000,000 |
| 2011 | $3,427,000,000 | $7,932,000,000 |
| 2012 | $4,377,000,000 | $9,265,000,000 |
| 2013 | $5,236,000,000 | $10,659,000,000 |
| 2014 | $6,524,000,000 | $12,543,000,000 |
| 2015 | $8,405,000,000 | $14,012,000,000 |
| 2016 | $10,432,000,000 | $16,078,000,000 |
| 2017 | $12,361,000,000 | $18,427,000,000 |
| 2018 | $13,685,000,000 | $19,936,000,000 |
| TOTAL | $74,819,000,000.00 | $132,892,000,000.00 |

84.     Humira has been the top-selling drug in the U.S. for more than six years, generating more than ***$56 billion*** in domestic sales over that period. It was not, however, the most prescribed drug in any of those years; for example, Humira was the 150th most-prescribed drug in 2016. Its immense revenue was due to its high price: Humira has cost as much as $50,000 per patient per year and currently costs approximately $4,500 per one-month prescription.

**B.      AbbVie works to preserve its Humira profits at all costs, purposely creating a minefield of patents to trap its would-be competitors.**

85.     AbbVie and its predecessor, Abbott, recognized that thwarting competition from biosimilars for as long as possible would be key to extending Humira's sales and AbbVie's profits. With enough patents tying potential competitors in knots, AbbVie could wield—and has

been wielding—its patent thicket as an anticompetitive weapon: the sheer volume of patents and claims would deter biosimilar companies from seeking approval and litigating the patents to conclusion. Regardless of the ultimate merits, AbbVie could keep biosimilars off the market because few if any companies could litigate all of AbbVie's patents; indeed, few could even parse through the morass of patents to determine whether any were valid and infringed. And even if a company chose to do so, it would not obtain a final judgment for many years.

86.     Meanwhile, even if a biosimilar company evaluated each and every claim of all known Humira patents and concluded that they were all invalid or not infringed, it might still be hesitant to launch at risk. If any of AbbVie's patent claims was held valid and infringed, the biosimilar company could be subject to crushing damages based on sales of the best-selling drug in the world. Thus, through its threats of protracted litigation, AbbVie could maintain its monopoly through its abuse of government process, regardless of whether it prevailed.

**1.     AbbVie has admitted that it sought to extend its exclusivity over Humira by several years by creating an elaborate minefield of patents.**

87.     In early 2013, AbbVie was created as a spinoff of Abbott's biologic and branded drug business. Since its inception, AbbVie has been highly dependent on Humira sales. The Chicago Tribune reported that "[i]nvestors . . . initially raised concerns that the spinoff was a way to separate Abbott from the looming liability presented by the 2016 U.S. patent expiration of Humira, which represent[ed] about half of the drug division's sales."

88.     AbbVie publicly acknowledged that it was heavily dependent on Humira sales until it could develop new drugs. Shortly after AbbVie was spun off, at a June 13, 2013 Goldman Sachs Healthcare Conference, AbbVie's EVP and CFO Bill Chase stated:

> [W]hat's beautiful about this business is *its relatively simple business model*, right. At the end of the day, ***it's about making sure we achieve everything we can with Humira***, which has tremendous growth potential, and it's about making sure

our pipeline ultimately is launched and delivers meaningful growth. So that's basically what we're aligned around. It's about those two things . . . .

89.     Because it obtained approval for Humira in December 2002, AbbVie's 12-year exclusivity under the BPCIA terminated in December 2014. AbbVie thus could not count on statutory or regulatory exclusivities to protect Humira. But AbbVie knew and explicitly stated that patents on biologic drugs could deter biosimilar competition. On an October 25, 2013 earnings call, AbbVie's CEO Rick Gonzalez noted that, in seeking to make a handful of biosimilars:

> *[Y]ou're going to be walking your way through an absolute minefield of IP, thousands of patents around all of these products.* And you have to make sure that you don't step on any one of them along the way because that's going to create a big problem for you *because I can assure you just like us, every innovator is going to protect their patent position.*

90.     Knowing that creating an "absolute minefield of IP" could deter competition, AbbVie sought to obtain as many patents as it could. Some of the patents claimed Humira, its uses, or its manufacturing processes. Other patents included ingredients, formulations, and/or processes that AbbVie did not use but which an innovative biosimilar company might employ to make a competitor to Humira. AbbVie sought to patent the entire field of Humira-like drugs to foreclose any possible competition. AbbVie has admitted that its patent strategy is aimed not at securing legitimate patents on novel Humira uses and processes but instead on making it difficult for any company to make a biosimilar that is sufficiently similar to Humira without infringing AbbVie's patents. At a June 11, 2014 Goldman Sachs Healthcare Conference, Mr. Chase stated to investors:

> Well, we do have a very robust collection of IP, and that IP certainly covers manufacturing process—a variety of different things. *And we're obviously not very specific about what's in there.* But let me—*suffice to say that, with a product as important and as attractive as Humira, you do everything you can on the IP front to ensure that you've protected it to the best you can.*

***The bulk of that IP strategy, although there's a lot of strategies in there, is designed to make it more difficult for a biosimilar to follow behind you and come up with a very, very similar biosimilar.*** Right? And the less similar, the greater likelihood of a difference in efficacy, or, very importantly, a difference in safety.

91. In 2015, AbbVie acknowledged that the "vast majority" of its patent minefield around Humira had been developed in the two years prior—that is, since the 2013 split with Abbott. The following graphic from an AbbVie-generated October 2015 investor presentation demonstrates the numerous patents AbbVie acquired in an effort to exclude would-be competitors and extend its monopoly beyond the December 2016 expiration of the main composition of matter patent:[43]

---

[43] *AbbVie Long-Term Strategy* – October 30, 2015 (presented by CEO Richard Gonzalez), http://www.biotechduediligence.com/uploads/6/3/6/7/6367956/abbvie_strategy_presentation__1_.pdf (last accessed Mar. 13, 2019).

## Broad U.S. Humira Patent Estate

| Approved Indication | Rheumatoid Arthritis | Gastro Indications | Psoriasis | Psoriatic Arthritis | Ankylosing Spondylitis | Juvenile Idiopathic Arthritis | Hidradenitis Suppurativa |
|---|---|---|---|---|---|---|---|
| Composition of Matter | Expires Dec. 31, 2016 | | | | | | |
| Indication / Method of Treatment | 4 patents Earliest Expiry: 2022 | 6 patents Earliest Expiry: 2022 | 3 patents Earliest Expiry: 2023 | 4 patents Earliest Expiry: 2023 | 3 patents Earliest Expiry: 2022 | 1 patent Earliest Expiry: 2030 | 1 Patent Expiry: 2031 |
| Formulation | 14 Patents Expire 2022 –2028 | | | | | | |
| Manufacturing | 24 patents Expire 2027 – 2034 | | | | | | |
| Other (Device, Diagnostics, etc.) | 15 patents Expire 2024–2032 | | | | | | |

abbvie                                    AbbVie Long-Term Strategy © 2015    14

92.    As the December 2016 expiration of the composition patent approached, AbbVie was particularly aggressive in obtaining additional patents: "A review of Humira's patents by the Association for Accessible Medicines shows that the drugmaker has been obtaining patents at a feverish clip in recent years: 21 in 2016 and 32 in 2015."[44]

93.    The degree of patenting AbbVie sought for Humira is atypical of patenting found for other drugs. In an extensive study on new drug patents and generic challenges, New York University School of Law Professor Scott Hemphill analyzed nearly 700 new drugs between

---

[44] *This Shield of Patents Protects the World's Best-Selling Drug*, Bloomberg Businessweek, https://www.bloomberg.com/news/articles/2017-09-07/this-shield-of-patents-protects-the-world-s-best-selling-drug (last accessed Mar. 13, 2019).

1985 and 2002.[45] Over the final three years of that time period, the *mean number of patents per new drug was only 3.9*—nowhere close to the over 100 patents currently blanketing Humira. Even then, though, Professor Hemphill's analysis is illuminating:

> These patents, though weak, nevertheless have the effect of making the patent portfolio stronger. If they overlap in duration with a strong composition of matter patent, they provide an additional barrier to generic entry prior to expiration of the strong patent, since the generic firm must defeat the weak patent in addition to the strong one. Indeed, the prospect of having to defeat both patents might cause a generic firm to decline or delay a challenge. Moreover, the additional patent strengthens the portfolio in a second way. A patent that expires later than the strong patent potentially provides a substantial temporal extension in a brand-name drug maker's effective exclusivity.[46]

94.     AbbVie also noted that patent litigation could delay competition (regardless of the outcome), and that a biosimilar was unlikely to launch during litigation because of the threat of "extremely large" damages. On an October 30, 2015 earnings call, Mr. Gonzalez stated:

> Turning to our U.S. patent estate, . . . we have built a robust portfolio of intellectual property. ***Beyond our composition of matter patent, we have more than 70 additional later-expiring U.S. patents related to HUMIRA. The vast majority of these patents . . . were granted by the U.S. Patent and Trademark Office within the past two years.*** These patents expire between 2022 and 2034.
>
> . . .
>
> ***Any company seeking to market a biosimilar version of HUMIRA will have to contend with this extensive patent estate, which AbbVie intends to enforce vigorously.*** With respect to formulating the drug, we have patents on formulating the HUMIRA antibody, that also expire no earlier than 2022. Biologic drugs must be administered intravenously or as injections and can be difficult to formulate properly. Given our extensive experience with HUMIRA, ***these patents cover not only our commercial formulation, but also other related formulations that biosimilar companies might employ.*** 14 patents have been issued covering different formulations of HUMIRA.
>
> . . .

---

[45] C. Scott Hemphill & Bhaven N. Sampat, *When Do Generics Challenge Drug Patents?*, 8 J. Empirical Legal Stud. 613 (2011).

[46] *Id.* at 12.

Since the biosimilar statute requires the biosimilar to obtain approval for one or more indications previously approved for the innovator drug, and have the same route of administration, dosage form and strength, ***we know biosimilars will infringe these method of use patents.*** We have method of treatment patents covering all the indications for which HUMIRA has been approved. These patents do not expire until 2022 or later.

. . .

***Again, a biosimilar company will have to contend with our method of treatment patents for every indication for which it seeks approval, as well as our formulation and manufacturing patents which are not limited to any particular indication.***

. . .

***As you evaluate the timeframe for a potential U.S. biosimilar market entry, it is important that you consider the legal process and the likely timeline for resolution.*** While it's always difficult to estimate the precise duration of the litigation process, the average time to trial for a patent action is nearly 3.5 years. Appeals to the Federal Circuit Court usually take one year. ***So, based on similar cases, the total litigation timing may be as long as four or five years****. **At risk launches** . . . **are relatively rare due to the potential exposure. Because of HUMIRA's success such damages could be extremely large.***

. . .

***However, in the event a biosimilar attempts to launch at risk, AbbVie will seek injunctive relief.*** For the reasons we've already discussed, ***biosimilars will necessarily infringe our patents.***

95.     AbbVie repeatedly emphasized that its IP strategy relied on having many patents, not just a few. And to make things even more difficult, it would not describe the patents in detail or disclose its specific intentions regarding those patents. For example, at the June 2014 Goldman Sachs Healthcare Conference, in reference to the lack of public disclosure about the scope of the patents AbbVie held for Humira, Mr. Chase stated "***And we're obviously not very specific about what's there***." Later, on a July 29, 2016 earnings call, Mr. Gonzalez further stated:

Back in October, we outlined in detail the extensive portfolio of IP that we have for HUMIRA and our confidence in that IP and *it goes beyond any one single patent*. And I can tell you we remain confident in that IP portfolio and *we've made it very clear that we intend to vigorously defend all of our IP against anyone that potentially infringes it*. And, so that process will play out. So, as I said, *it's just not prudent for us now in this space to ultimately lay out in detail the play-by-play*. And so we're just not in a position to be able to do that.

96.    AbbVie needed a huge volume of patents because it did not want to rely on the validity of any individual patent. And AbbVie was aware that it was likely to lose if required to defend its patents from challenges. On an April 27, 2017 earnings call, Mr. Gonzalez stated:

[I]f you look at our level of confidence in what we've described to the market about our ability to protect Humira, it remains the same. *And that confidence was built around a large portfolio of IP; it was never contingent upon any one set of IP or any single set of patents or individual patents. . . .*

Having said that, *if I look at the pure statistics around IPR decisions, I would say the statistics are against you, right?* More times than not, they're not upheld at an individual level.

97.    As AbbVie openly acknowledges, its IP strategy is substantially the same now as it was in 2013. It has sought, and continues to seek, to delay biosimilar competition until many years after the 2016 expiration of the '382 patent by threatening, and sometimes filing, patent infringement litigation and promising crushing damages for any biosimilar that dares to launch at risk. On an October 27, 2017 earnings call, Mr. Gonzalez stated:

[W]e believe . . . that we will not see direct biosimilar competition in the U.S. until at least the 2022 timeframe. *Importantly, this will allow a number of key assets within our robust late-stage pipeline to enter the marketplace and establish a strong growth trajectory.*

. . .

[I]f you look at our objective when we launched the company, *we knew from day one that there was a point of time when we would be dealing with biosimilar competition on HUMIRA.* And our whole focus on building a pipeline, a robust pipeline, was designed to allow us to be able to grow through that period.

35

*And we talked over and over again about the importance of the 2019 date in order to launch those products and ultimately be able to drive them up the growth curve to the point where they are profitable and they are contributing significantly.* And I think as we continue to advance, we are hitting all of those milestones that we set for ourselves to be able to do that. *And so I would tell you that our whole intent was to be able to drive through that erosion curve that we expected.*

. . .

And so I think what gives us confidence is we fundamentally believe, one, *[an at-risk launch is] an incredibly risky strategy for someone to take based on the size of this asset and the damage that would be done and the consequences of that damage if they lost.* Number two, I don't know that I can be any clearer about what our intent is, but *I think they understand what our intent would be to defend it.*

98.    AbbVie's goal was not to protect its legitimate interests, but instead to create a minefield of patents that—regardless of their validity—could impede and deter potential competitors.

### 2.    AbbVie's patent minefield consists of overlapping patents, drawn from just a few families, and largely from applications filed more than a decade after Humira launched.

99.    Because the Purple Book currently does not require biologic manufacturers to identify patents allegedly covering their products, there is no publicly available catalogue of AbbVie's Humira-related patents. However, one analyst estimated that AbbVie has filed 247 patent applications and obtained 132 patents related to Humira, while noting that its methodology "likely undercounted" the "overall number of patent applications and granted patents[.]"

100.    AbbVie obtained this enormous portfolio of patents by filing a seemingly never-ending series of continuation applications of the Humira-related patent applications that Abbott had been prosecuting since it acquired BASF's adalimumab intellectual property in 2001. In general, the continuation applications are substantially similar to the parent applications with

36

minor variations. Moreover, AbbVie frequently filed continuation applications just before patents issued so that it could keep alive the original application's priority date and seek even more duplicative patents.

101.    AbbVie's conduct concerning a family of formulation patents illustrates how the scheme worked.

102.    On August 16, 2002, Abbott filed U.S. Application No. 10/222,140 ("the '140 application"). The '140 application never resulted in a patent; Abbott abandoned the application in 2005. But the 2002 priority date of the '140 application was critical: Abbott began selling Humira in 2003, and these sales would invalidate any formulation patent with a priority date more than a year later.[47] Abbott—and later AbbVie—went to great lengths to keep alive the 2002 priority date of the '140 application.

103.    On August 15, 2003, before abandoning the '140 application, Abbott filed an international continuation patent application, PCT/IB2003/004502, now expired. On October 27, 2005, it filed a continuation of this international patent application, U.S. Application No. 10/525,292, a U.S. National Stage Application under 35 U.S.C. § 371. Abbott prosecuted this application for nearly seven years until it issued as U.S. Patent No. 8,216,583 on July 10, 2012. On May 15, 2012, shortly before the patent issued, Abbott filed another continuation application, U.S. Application No. 13/471,820, so that it could use the priority date of the '140 application to obtain more patents. The '820 application ultimately issued as U.S. Patent No. 8,932,591 on January 13, 2015, but, before it did, AbbVie filed four more continuation applications. AbbVie employed this technique over and over again, filing new continuation applications shortly before new patents issued, so as to keep alive the 2002 priority date.

---

[47] *See* 35 U.S.C. § 102.

104.    Altogether, the '140 application resulted in at least twenty-two patents, all of which were based on applications that, but-for the claimed priority to the '140 application, would have been barred, and all of which issued more than nine years after AbbVie began selling Humira. The specification of the 9,732,152 patent, issued August 15, 2017, provides a narrative of one chain of AbbVie's serial continuation applications. It reads, in part:

> This application **is a continuation** of U.S. patent application Ser. No. 15/095,393, filed Apr. 11, 2016, **which is a continuation** of U.S. patent application Ser. No. 14/826,357, filed Aug. 14, 2015, now U.S. Pat. No. 9,327,032, issued May 3, 2016, **which is a continuation** of U.S. patent application Ser. No. 14/558,182, filed Dec. 2, 2014, now U.S. Pat. No. 9,114,166, issued Aug. 25, 2015, **which is a continuation** of U.S. patent application Ser. No. 14/453,490, filed Aug. 6, 2014, now U.S. Pat. No. 8,916,158, issued Dec. 23, 2014, **which is a continuation** of U.S. patent application Ser. No. 14/322,581, filed Jul. 2, 2014, now U.S. Pat. No. 8,911,741, issued Dec. 16, 2014, **which is continuation** of U.S. patent application Ser. No. 14/091,938, filed Nov. 27, 2013, now U.S. Pat. No. 8,795,670, issued Aug. 5, 2014, **which is a continuation** of U.S. patent application Ser. No. 13/471,820, filed May 15, 2012, now U.S. Pat. No. 8,932,591, issued Jan. 13, 2015, **which is a continuation** of U.S. patent application Ser. No. 10/525,292 filed Oct. 27, 2005, now U.S. Pat. No. 8,216,583, issued Jul. 10, 2012, which is a United States National Stage Application under 35 U.S.C. § 371 of PCT/IB2003/004502, filed Aug. 15, 2003 (now expired), **which is a continuation** of U.S. patent application Ser. No. 10/222,140, filed Aug. 16, 2002 (now abandoned).

105.    AbbVie followed a similar approach with several other patent applications that date to the early 2000s.

106.    Abbott filed a few patent applications shortly after it acquired rights to adalimumab, and AbbVie again used serial continuation applications to apply for hundreds of patents.

**3.    AbbVie sought to obtain patents regardless of their merits.**

107.    AbbVie focused more on the sheer number of patents and claims it could assemble than on the validity of the individual patents and claims. As a result, many of its patents do not withstand scrutiny.

### a. Many of AbbVie's use patents are obvious in light of prior art.

108.    The Patent Trial and Appeal Board (PTAB) instituted *inter partes* review proceedings on at least five of AbbVie's use patents and found three patents invalid due to obviousness: U.S. Patent No. 8,889,135; U.S. Patent No. 9,017,680; and U.S. Patent No. 9,073,987. The two other IPR proceedings, regarding U.S. Patent Nos. 9,090,689 and 9,067,992, were terminated by settlement after institution but before the PTAB reached a final decision. As demonstrated by the PTAB's decision to institute proceedings, the PTAB had already concluded that there was a reasonable likelihood that at least one of the claims in each patent was invalid, and had AbbVie not settled with the challenger Sandoz, the PTAB would have held that all the claims of these two patents were invalid.

109.    U.S. Patent No. 9,512,216 is no better than the patents for which the PTAB instituted IPRs. The '216 patent claims, generally, a method for treating plaque psoriasis with a dosing regimen of adalimumab. The earliest application to which it claims priority was filed on April 9, 2004. But by then, Humira had been approved and sold to treat rheumatoid arthritis for over a year, with the dosing regimen described in the '216 patent, and it was known in the art that rheumatoid arthritis and plaque psoriasis are both chronic autoimmune diseases that were often treated by the same drugs administered in the same or similar doses and dosing regimens.

110.    U.S. Patent No. 9,187,559 is similarly deficient. The '559 patent claims a method for treating idiopathic inflammatory bowel disease in a human subject by administering a first dose of 160 mg of adalimumab and a second dose of 80 mg of adalimumab two weeks later. Once again, the earliest application to which it claims priority was filed on April 9, 2004. But Humira had been sold commercially to treat rheumatoid arthritis for over a year before this date, and a World Intellectual Property Organization publication on December 19, 2002, disclosed that a similar subcutaneous injection of adalimumab could treat idiopathic inflammatory bowel

disease. The same WIPO reference also taught an 80 mg biweekly dosing regimen to treat rheumatoid arthritis and idiopathic inflammatory bowel disease, and a doubled initial dose was well known in the art at the time. The prior art demonstrates that the claims of this patent were obvious as of its priority date.[48]

>    b.    **There is significant invalidating prior art for AbbVie's formulation patents.**

111.    AbbVie's formulation patents generally claim priority to the '140 application, filed on August 16, 2002.

112.    The '382 patent discloses adalimumab (under its older name "D2E7") and describes incorporating adalimumab into pharmaceutical compositions, including liquid dosage forms that may comprise polyalcohols, buffers, or surfactants. The '382 patent issued on July 18, 2000, before the '140 application's filing date. As such, the '382 patent is invalidating prior art to all the formulation patents.

113.    The '382 patent describes every element of the later formulation patents' claims except for the concentration of adalimumab, the type of surfactant, the concentration of surfactant, and, for some patents, the type of buffer. But each of these other elements are routine optimization that a skilled artisan could perform. And they were all easily discoverable in other prior art available in 2002, including publications by van de Putte,[49] Barrera,[50] Remington,[51] and

---

[48] This prior art includes, but is not limited to, Goodman & Gilman's The Pharmacological Basis Of Therapeutics 25-27 (Joel G. Hardman et al. eds., 10th ed. 2001); Physicians' Desk Reference, *Remicade entry* 1178-1182 (57th ed. 2003); Stephen B. Hanauer & Themistocles Dassopoulos, *Evolving Treatment Strategies for Inflammatory Bowel Disease*, 52 Annual Review Med. 299-318 (2001).

[49] L. B. A. van de Putte et al., *Efficacy of the Fully Human Anti-TNF Antibody D2E7 in Rheumatoid Arthritis*, 42 Arthritis & Rheumatism (1999) (ACR Abstract Concurrent Session, RA: TNF- Blockade, Wednesday, Nov. 17, 1999 S400).

[50] P. Barrera et al., *Effects of Treatment with a Fully Human Anti-Tumour Necrosis Factor α Monoclonal Antibody on the Local and Systemic Homeostasis of Interleukin 1 and TNFα in Patients with Rheumatoid Arthritis*, 60 Annals Rheumatic Disease 660 (July 2001).

others,[52] as well as United States Patent Nos. 6,171,586 and 6,252,055, issued January 9, 2001, and June 26, 2001, respectively.

> ### c. AbbVie made material misrepresentations and omissions to the PTO during the prosecution of its patents.

114.    In 2006, Abbott filed U.S. Provisional Application Nos. 60/845,158 and 60/876,374, followed by a series of continuation applications that issued as, among others, U.S. Patent Nos. 8,093,045, 8,911,964, and 9,090,867. These patents claim a fed batch method of producing a protein or various antibodies, including adalimumab. Abbott had been using a substantially similar process since it began manufacturing and selling Humira in 2002. But Abbott did not reveal that the process it was seeking to patent was not new, and was, in fact, embodied in its prior commercial sales. Instead, it concealed this information. In the prosecution of the '867 patent, the PTO observed that certain prior art[53] "teaches a generic high-yield fed batch method of making antibodies" and stated that "[a]pplicants are urged to provide any details they see as pertinent to the instant claims (e.g., 2 g/L antibody production, pH ramp, two different temperatures)." AbbVie (who by this time had been spun off from Abbott) argued in response that "none of the cited documents teach, suggest, or render obvious . . . a fed batch method for making an anti-TNFα antibody[,]" but AbbVie did not disclose its prior use of the process to make a product that it had sold commercially for several years before the application's priority date.

---

[51] Remington: The Science and Practice of Pharmacy (Alfonso R. Gennaro ed., 20th ed. 2000).

[52] These include, but are not limited to, L. B. A. van de Putte et al., *Six Month Efficacy of the Fully Human Anti-TNF Antibody D2E7 in Rheumatoid Arthritis*, 59 Annals of the Rheumatic Diseases Supp.1 (2000).

[53] Y.H. Chang, *Abstracts of Papers of the American Chemical Society*, 219(1-2), pp. BIOT 171, print. Meeting Info.: 219th Meeting of the American Chemical Society. San Francisco, CA. March 26-30, 2000.

115.    Likewise, in the prosecution of the 9,018,361 patent, AbbVie misrepresented material information. This patent claims "[a] process for purifying adalimumab from a fermentation harvest of a Chinese Hamster Ovary (CHO) cell culture expressing said adalimumab," where the process comprises "a) binding adalimumab from said fermentation harvest to a Protein A resin, b) eluting the bound adalimumab at an elution pH of 3.6-4, and c) incubating the eluted adalimumab for 1 to 3 hours." As a continuation of U.S. Patent Application No. 12/582,506, which claims the benefit of U.S. Provisional Application No. 61/196,753, the patent's priority date is October 20, 2008. During prosecution, the PTO rejected the claims as obvious in light of U.S. Patent No. 5,429,746 and a publication of U.S. Patent No. 7,820,799. Although it does not specifically mention the adalimumab antibody itself, the '746 patent teaches nearly every step of the process claimed in the '361 patent, except those aspects that were routine optimization. And the '799 patent taught the use of Protein A chromatography for purifying adalimumab. The PTO concluded that the two prior art references together rendered the claims of the '361 patent obvious.

116.    AbbVie responded with a declaration from Diane Dong, who affirmed under oath, among other things:

> [I]t is my opinion that it was unexpected that adalimumab could be successfully purified from CHO cells without significantly [sic] degradation, even with acidic elution of protein A resins followed by a substantial period of viral inactivation under low-pH conditions.

117.    But three specific items of prior art made clear that the success of Protein A purification was not unexpected. First, the '382 patent disclosed that adalimumab "can be recovered from the culture medium using standard protein purification methods." This suggests that a standard method of purification, such as Protein A purification, would be effective for adalimumab.

42

118.    Second, the prior art WO2007117490 publication—a publication of now-abandoned application 11/296,926—disclosed that "Protein A capture, in which an antibody-HCP mixture is applied to a protein A column such that the antibody binds to protein A and HCPs flow through, typically is used as an initial purification step in antibody purification procedures as a means to remove HCPs." This makes clear that Protein A purification is a standard purification method for antibody purification.

119.    Third, U.S. Patent No. 9,090,867—the application for which was pending during the prosecution of the '361 patent—disclosed that "[i]t is also possible to utilize an affinity column comprising a polypeptide-binding polypeptide, such as a monoclonal antibody to the recombinant protein, to affinity-purify expressed polypeptides." One of the polypeptides discussed is adalimumab. The patent's specification adds that "[o]ther types of affinity purification steps can be a Protein A or a Protein G column, which affinity agents bind to proteins that contain Fc domains." This again suggests that Protein A purification would be effective for adalimumab. AbbVie did not disclose this application during the prosecution of the '361 patent.

120.    These prior art references make clear that Protein A purification was known in the art, and it was a misrepresentation for Dr. Dong to claim that the process yielded unexpected results.

**C.    AbbVie is precluded from raising, as a defense to antitrust liability, most of the patents that comprise its minefield of IP for adalimumab.**

121.    Fundamental aspects of patent law, under the circumstances of this case, preclude AbbVie from asserting here scores of the patents it acquired and arranged as a minefield around the rights to adalimumab. In particular, at least two categories of patents cannot stand as bars to antitrust liability: (a) formulation and manufacturing/process patents applied for more than one

year following Humira's launch and (b) formulation and manufacturing/process patents acquired outside of the original formulation or compound patent.

**1.     AbbVie is precluded from raising, as a defense to antitrust liability, formulation and manufacturing/process patents applied for more than one year after Humira's market entry.**

122.    Patented inventions must be novel. If, however, "the claimed invention was patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention,"[54] subject to a grace period in select circumstances, it fails the novelty condition for patentability. This makes sense: the law encourages innovation and to obtain a patent and the legally protected monopoly that goes with it, the invention must be new.

123.    Section 102 of the patent laws, 35 U.S.C. § 100 *et seq*., does allow an inventor a one-year grace period; s/he may publicly disclose the invention and still obtain a patent so long as s/he files a patent application within one year of the disclosure.

124.    Where the patented invention concerns a pharmaceutical formulation or a method or process of making/manufacturing that pharmaceutical formulation, the date of disclosure of the invention is, at the latest, the date the drug was made available for sale following FDA approval.

125.    The FDA approved Humira for sale in the United States on December 31, 2002 and AbbVie's predecessor Abbott launched Humira almost immediately. The one-year patent application deadline, then, for any Humira formulation and manufacturing/process patents lapsed in early 2004.

---

[54] 35 U.S.C. § 102(a)(1).

126.    Any formulation patents resulting from patent applications filed more than one year after Humira's launch must fall into one of two categories: the specified formulation describes Humira as approved or not. Likewise, any manufacturing or process patents resulting from patent applications filed more than one year after Humira's launch either describe a method used to manufacture Humira at launch or not. Either way, such post-one-year patents cannot be used to prevent biosimilar entry.

127.    The logic is this: If a formulation was used to make Humira at its launch, a patent application filed on that formulation more than a year after Humira's launch fails the novelty requirement of 35 U.S.C. § 102. It falls outside of the one-year grace period granted to the inventor and the invention is therefore not patentable.

128.    Similarly, if a particular manufacturing method or process was used to make Humira at its launch in early 2003, any patent application filed on that method/process more than a year after Humira's launch fails the novelty requirement.

129.    If a patented formulation does not describe Humira as approved by the FDA and made at its launch, the patented formulation is not Humira but instead some modification of it; the patent on that post-launch non-Humira formulation thus cannot be used to block biosimilar versions of Humira. Likewise, if a patented process was not used to make Humira at its launch, that process is not necessary to make Humira. Manufacturers must therefore be able to use a different method—one other than the patented post-launch method—to make biosimilar versions of Humira.

130.    Since 1996, AbbVie has filed approximately 200 patent applications, resulting in more than 100 patents it claims cover adalimumab. All 200 or so patent applications and 100+ patents stem from the same 20+ patent trees or families. In other words, each of the 200 or so

patent applications and 100+ patents flow from and can be traced back to one or another of 20 patents or patent applications.

131.    The patent applications and patents fall roughly into three categories: formulation patents, manufacturing/process patents, and method of use patents. Fifteen of the 20+ trees are comprised of formulation and manufacturing/process patents; these 15 trees account for at least 84 patents.

132.    Table 1, below, shows the earliest patent application date and the resulting patent terms for each of these 16 patent trees. (The darker section is the period from the earliest filing ("priority") date, including provisional applications, through the date of issue of the first patent in the family; the lighter section is the period from the date of issue of the first patent in the family through the expected expiration date, *i.e.*, the period of patent protection.) Twelve of the 15 trees, and all of the patents in them, post-date 2004; indeed, the earliest patent application date in any of these 12 trees is 2006, at least three years after Humira was first offered for sale following FDA approval.



133.    Because they fail the novelty requirement of the patent laws, AbbVie is precluded from raising, as a bar to antitrust liability, any of the formulation and manufacturing/process patents in these 12 patent trees, which together account for two-thirds of the formulation and manufacturing patents AbbVie asserted in the patent dances with potential biosimilar competitors.

**2.    AbbVie is precluded from raising, as a defense to antitrust liability, formulation and manufacturing patents acquired outside the original formulation patent group.**

134.    Novelty is not the only requirement for a validly issued patent. Importantly here, 35 U.S.C. § 112(a) requires that a patent be enabled, meaning it describes "the manner and process of making and using [the invention], in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains . . . to make and use the same." Likewise, the best mode requirement derived from 35 U.S.C. § 112(a) requires that the patent applicants

"set forth the best mode contemplated by the inventor or joint inventor of carrying out the invention." The majority of AbbVie's formulation and manufacturing/process patents fail these requirements as well and AbbVie is therefore precluded from asserting in an antitrust case that those patents would have barred potential competitors.

135.     Section 112(a)'s enablement requirement is straightforward. As the Supreme Court has noted, "As a reward for inventions and to encourage their disclosure, the United States offers a . . . monopoly to an inventor who refrains from keeping his invention a trade secret. But the quid pro quo is disclosure of a process or device in sufficient detail to enable one skilled in the art to practice the invention once the period of the monopoly has expired; and the same precision of disclosure is likewise essential to warn the industry concerned of the precise scope of the monopoly asserted."[55] "To be enabling, the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without undue experimentation."[56]

136.     To fulfill § 112(a)'s best mode requirement, the patent applicant must fully disclose the best version of the invention—the best materials to use or the best way to bring that invention into creation—contemplated by the inventor at the time of filing. The inventor has no obligation to identify or label a specific mode as best; the best embodiment merely needs to be mentioned in the patent. As the Federal Circuit has noted, the intent of the best mode requirement is to "preclude[] inventors "from applying for patents while at the same time concealing from the public preferred embodiments of their inventions which they have in fact

---

[55] *Universal Oil Products Co. v. Globe Oil & Refining Co.*, 322 U.S. 471, 484 (1944).

[56] *MagSil Corp. v. Hitachi Global Storage Techs., Inc.,* 687 F.3d 1377, 1380 (Fed.Cir.2012).

conceived."[57] This comports with the fundamental bargain of the patent laws: fully disclosing an invention—giving up a trade secret—in order to enjoy a government-granted monopoly for a period. Failing to disclose the best mode is also inefficient: competitors would waste resources re-inventing the wheel to discover the undisclosed best mode.

137.    For pharmaceuticals, a patent that describes the active pharmaceutical ingredient or compound meets the best mode and enablement requirements, describing for the public how the compound—the best version of the invention—is made and how others can make it.

138.    If a patent meets the enablement and best mode requirements, appropriately claiming the invention, that patent stands as prior art to any future formulation and manufacturing patents ostensibly claiming the invention.

139.    The first patent AbbVie claimed covered Humira is the '226 patent, the application for which was filed in February 1996. In disclosing the adalimumab compound, the '226 patent both provides the best mode of the invention and enables others to make and use it.

140.    AbbVie is precluded from asserting, in antitrust litigation, that any later formulation and manufacturing patents, including those in the remaining 14 families identified above, would have or could have prevented potential biosimilar competitors from coming to market.

**D.    Amgen submits the first application for a Humira biosimilar and ultimately gets paid to delay entry by five years.**

141.    Beginning in 2015, pharmaceutical manufacturers—including some of the biggest pharmaceutical companies in the world—submitted ABLAs under 42 U.S.C. § 262(k) for approval to manufacture biosimilars to Humira. Amgen filed the first such application.

---

[57] *High Concrete Structures, Inc. v. New Enterprise Stone and Lime Co., Inc.*, 377 F.3d 1379, 1383 (Fed. Cir. 2004).

142.     On November 25, 2015, Amgen submitted ABLA No. 761204 to the FDA seeking approval to market Amjevita, a biosimilar to Humira. The FDA accepted Amgen's ABLA on January 22, 2016.

143.     On January 25, 2016, Amgen informed AbbVie that the FDA had accepted its ABLA for review. On February 10, 2016, Amgen provided AbbVie with a copy of its ABLA under the confidentiality provisions set forth in 42 U.S.C. § 262(*l*)(1) of the BPCIA. On April 11, 2016, AbbVie identified, on its 3A list, 66 patents AbbVie contended that Amgen's biosimilar would infringe.

144.     On June 10, 2016, Amgen responded with its 3B statement explaining in over 2,750 pages why 65 of the patents on AbbVie's 3A list are invalid and/or would not be infringed by Amgen's biosimilar Amjevita. Amgen supported its 3B statement with detailed claim charts, citations to the specifications of AbbVie's patents, and numerous prior art references. The lone patent for which Amgen did not contest validity or infringement was the '382 patent; instead, Amgen certified that it did not intend to begin commercial marketing of its biosimilar Amjevita before December 31, 2016, the date the '382 patent expired.

145.     On June 21, 2016, a mere eleven days into its 60-day period for responding, AbbVie sent its 3C response to Amgen. AbbVie provided no response at all to Amgen's contentions regarding six patents. For the other 59 patents, AbbVie responded in part but largely failed to address Amgen's non-infringement assertions or to state the basis for any infringement assertions it might make. Despite having Amgen's ABLA, providing information on the composition of Amjevita and the uses for which Amgen sought approval, as well as manufacturing information for the drug, AbbVie repeatedly contended that it did not have sufficient information available to it to formulate an infringement theory. AbbVie did not ask for

any additional information from Amgen, though, a step it presumably would have taken if it sought a good faith assessment of any potential infringement. AbbVie's 3C response also ignored many of Amgen's invalidity contentions and did not respond to Amgen's invalidity claim charts.

146.    Amgen notified AbbVie on at least three separate occasions—June 24, 2016, July 1, 2016, and July 15, 2016—that AbbVie had not complied with paragraph 3(C) and provided a detailed list of deficiencies, including a specific list of the Amgen non-infringement and invalidity contentions to which AbbVie had not responded.

147.    AbbVie refused to remedy the deficiencies and instead stated its desire to assert 61 patents (covering more than 1,000 patent claims) in the litigation. Lacking AbbVie's bases for assertions of infringement of many of these claims, Amgen attempted to narrow the scope of the litigation, suggesting, for example, that the parties select a smaller number of patents and claims that presented unique issues of invalidity or infringement; AbbVie refused.

148.    On July 30, 2016, Amgen informed AbbVie that it would identify six patents to be the subject of an infringement action (or at least the first phase of such an action); under the statute, this limited AbbVie to identifying six patents as well. On August 4, 2016, the parties exchanged their lists of patents, and AbbVie filed suit on all listed patents. AbbVie identified U.S. Patent Nos. 8,911,964; 8,916,157; 8,986,693; 8,961,973; 9,096,666; and 9,272,041. Amgen identified U.S. Patent Nos. 8,663,945; 8,986,693; 9,096,666; 9,220,781; 9,359,434; and 9,365,645. Because both parties identified the '693 and '666 patents, the total number of patents in suit was 10.

149.    On September 23, 2016, the FDA granted approval of Amgen's biosimilar Amjevita. Amjevita is the fourth biosimilar ever approved by the FDA.

150. On November 17, 2016, the court set a schedule for discovery, briefing, and trial in the AbbVie-Amgen litigation. The schedule called for the close of fact discovery in January 2018, the close of expert discovery in May 2019, and trial in November 2019.

151. On September 28, 2017, many months before the close of fact discovery and without any substantive rulings, AbbVie and Amgen settled their litigation. Although the settlement is confidential, AbbVie's press release makes clear that the parties agreed that Amgen agreed to drop its patent challenges and not to enter the market for and compete with Humira until January 31, 2023, more than five years later. In exchange for this delay, even though it was the defendant in the litigation and had no claim to damages or other monetary relief, Amgen received a valuable exclusivity worth hundreds of millions of dollars.

152. Amgen was the first to file for FDA approval of a biosimilar to Humira but it was not the only one. Many other manufacturers have filed for FDA approval for their biosimilars, looking to compete with and take a piece of the market for Humira, the largest-selling drug in the United States for several years running. The FDA has approved at least two other biosimilars since approving Amgen's.

153. Unlike the Hatch-Waxman Act's framework that allows 180 days of exclusivity for the first generic under certain circumstances, Amgen was not entitled to any period of exclusivity on the market to compete with Humira. The AbbVie-Amgen deal, though, gave Amgen precisely that. AbbVie agreed not to settle with any other manufacturers on terms that would let them enter the market at the same time as Amgen, or for five months thereafter, thus ensuring that Amgen would not have to compete with any other biosimilars to Humira for the first five months it is on the market. All biosimilar sales—and thus all biosimilar profits—during those five months will go into Amgen's pocket.

154. Such a period of exclusivity is highly valuable. In 2018, revenues from Humira U.S. sales were $13.7 billion. Had one or more biosimilars been in the market then, they would have taken a significant portion of those revenues for themselves. Even if biosimilars captured only 20% of the market with price reductions of 20% (both conservative figures used here for emphasis only), biosimilar revenues would have been $2.2 billion in 2018 or $913 million for five months.

155. Instead of splitting those revenues among multiple biosimilar competitors, AbbVie and Amgen's agreement ensured that Amgen can monopolize the Humira biosimilar market for five months. Assuming that Amgen and another biosimilar competitor would have evenly split the biosimilar market, Amgen could have expected $456.5 million in revenues in five months of exclusivity in 2018; as a result of the deal, however, the entire $913 million would have been allocated to Amgen. In short, the exclusivity period AbbVie used to pay Amgen to delay entry is worth hundreds of millions of dollars at 2018 levels of Humira sales. Depending on the growth of Humira until 2023, Amgen's payment for waiting to launch may be worth significantly more.

156. Both AbbVie, by extending its Humira monopoly, and Amgen, by gaining hundreds of millions of dollars in expected revenue as a result of the *de facto* exclusivity period it received, benefit greatly from their reverse payment agreement. But while AbbVie and Amgen win, payers are the big losers in the deal, forced to continue paying supra-competitive prices for Humira for many more years without competition and then denied the benefits of competition between biosimilars during Amgen's five-month exclusivity period.

**E.**     **AbbVie enters into deals with other would-be competitors, delaying their entry and preserving Amgen's *de facto* five-month exclusivity payment.**

**1.**     **AbbVie next settles with Samsung Bioepis despite there being no litigation between the companies.**

157.     On April 5, 2018, AbbVie and Samsung Bioepis announced a "global resolution of all intellectual property-related litigation with Samsung Bioepis over its proposed biosimilar adalimumab product." AbbVie secured this deal with Samsung Bioepis three months before Samsung Bioepis even filed an application with the FDA for approval of a biosimilar to Humira and thus before any U.S. patent dance occurred or litigation commenced.

158.     The deal delays the Samsung Bioepis market entry until June 30, 2023 in the United States, five months after the date of Amgen's agreed entry. AbbVie's press release notes that the deal with Samsung Bioepis does not include an acceleration clause, meaning Samsung Bioepis cannot enter the market earlier if Amgen or any other Humira biosimilar enters before it.

159.     In July 2018, three months after securing the deal, Samsung Bioepis submitted an ABLA for Hadlima, its Humira biosimilar. On July 23, 2019, the FDA approved Samsung's ABLA.

**2.**     **The third would-be biosimilar to settle receives the third earliest entry date.**

160.     In or around early 2018, Mylan submitted an ABLA for Hulio, a biosimilar to Humira. On July 17, 2018, AbbVie announced a deal with Mylan, allowing Mylan to enter the U.S. market on July 31, 2023, six months after Amgen, the first to settle, and one month after Samsung Bioepis, the second to settle. Like the Samsung Bioepis deal, Mylan's U.S. launch date will not be accelerated by entry of other biosimilars.

**3.**     **AbbVie next settles with Sandoz and gives it the next entry date.**

161.     On January 16, 2018, the FDA accepted Sandoz's ABLA for Hyrimoz, a biosimilar to Humira, and on January 17, 2018, Sandoz commenced the pre-litigation exchanges

provided for in the BPCIA by sharing its ABLA, which describes the formulation of its biosimilar Hyrimoz, with AbbVie.

162.    On March 18, 2018, AbbVie provided Sandoz its 3A list, which described patents for which AbbVie asserted that it believed a claim of patent infringement could be reasonably asserted. AbbVie supplemented that list on April 24, 2018, and May 1, 2018, each time adding a recently issued patent.

163.    On May 16, 2018, Sandoz responded with its 3B statement, describing in detail why it believed that each patent identified by AbbVie was invalid or would not be infringed by its biosimilar.

164.    On July 15, 2018, AbbVie provided Sandoz with its 3C statement. AbbVie's 3C statement identified 84 patents that it asserted would be infringed by Sandoz's biosimilar.

165.    On August 5, 2018, Sandoz stated that it would identify one patent to be the subject of an infringement action, which limited AbbVie to identifying one patent as well.

166.    On August 10, 2018, the parties exchanged their (*l*)(5) lists of patents. The parties identified U.S. Patent Nos. 9,187,559 and 9,750,808. Later the same day, AbbVie filed suit on both listed patents.

167.    Despite having Sandoz's ABLA and manufacturing data and thus knowing the formulation for Hyrimoz, AbbVie unfairly and deceptively included in the patent dance patents for which there was not even an arguable claim of infringement by Hyrimoz. For example, nine of the formulation patents AbbVie included specify the use of a buffer system with a particular ingredient:

| U.S. Patent No. | Claims a buffer system comprising |
|---|---|
| 8,795,670 | Histidine |
| 8,802,101 | Acetate |
| 8,802,102 | Succinate |

| | |
|---|---|
| 8,940,305 | Gluconate |
| 9,272,041 | Acetate |
| 9,295,725 | Succinate |
| 9,327,032 | Histidine |
| 9,732,152 | Histidine |
| 9,738,714 | Succinate |

168. None of the ingredients identified in the table above is in Sandoz's biosimilar. **They are not even in Humira**. Nonetheless, even though the BPCIA requires that the brand manufacturer list only those patents for which "a claim of patent infringement could reasonably be asserted," AbbVie asserted in its 3C statement that Sandoz would infringe all nine of these patents.

169. Additionally, one of the two patents-in-suit claimed buffer systems not present in Hyrimoz. Claims 3, 19, 21, 23, 25, and 26 claim a formulation with a buffer system comprising succinate, acetate, or histidine, none of which is in Hyrimoz **or even Humira**. Nonetheless, AbbVie's complaint alleged that Sandoz's biosimilar infringed, among others, claims 3, 25, and 26.

170. On October 11, 2018, just two months after AbbVie filed suit against Sandoz regarding the two patents, before Sandoz responded to AbbVie's complaint, and without any litigation on the other 82 patents AbbVie claimed were infringed, AbbVie and Sandoz announced a deal to allow Sandoz's biosimilar to enter the U.S. market on September 30, 2023, eight months after Amgen. The deal, like others, has no acceleration clause.

171. On October 31, 2018, the FDA approved Hyrimoz.

**4. Fresenius settles on the heels of Sandoz and gets the same entry date without even filing a biosimilar application in the United States.**

172. On December 19, 2017, Fresenius announced that it had submitted a Marketing Authorization Application for MSB11022, a biosimilar to Humira to the European Medicines

Agency ("EMA") and that the EMA had accepted it for review. There is no indication that Fresenius filed an ABLA with the FDA or engaged in the patent dance with AbbVie and AbbVie did not sue Fresenius in the United States.

173.    Yet, on October 18, 2018, AbbVie and Fresenius announced a "global resolution of all intellectual property-related litigation" related to MSB11022—which was later approved in Europe as Indacio—delaying U.S. entry of Fresenius' biosimilar until September 30, 2023, the same day Sandoz is allowed to enter. Like the deals before it, the AbbVie-Fresenius deal does not include an acceleration clause for U.S. market entry.

     **5.     AbbVie enters a deal with Momenta without litigation, allowing it the fifth entry date.**

174.    In May 2018, Momenta announced its intention to submit an ABLA for M923, a biosimilar of Humira, after "business development discussions." On October 1, 2018, Momenta announced that it had completed these discussions. On November 6, 2018, AbbVie and Momenta announced a deal allowing Momenta to begin marketing its Humira biosimilar in the United States (and thus competing with Humira and other biosimilars) on November 20, 2023, approximately ten months after Amgen's agreed entry, five months after Samsung Bioepis's agreed entry, four months after Mylan's agreed entry, and two months after Sandoz and Fresenius' agreed entry. The deal contains no acceleration clause.

     **6.     AbbVie makes its next deal with Pfizer in a matter of weeks, allowing it to enter with Momenta.**

175.    On August 20, 2018, Pfizer announced positive results from its Phase 3 trials of PF-06410293, a biosimilar of Humira. Three months later, on November 30, 2018, AbbVie and Pfizer announced "a global resolution of all intellectual property-related litigation concerning Pfizer's proposed biosimilar adalimumab." The deal allows Pfizer to enter on November 20,

2023, the same date as Momenta, in the United States and upon EMA approval in the European Union. As with AbbVie's other deals, the agreement with Pfizer contains no acceleration clause.

### 7. AbbVie gives Coherus the latest entry date.

176. Between 2015 and 2017, Coherus filed a number of petitions for *inter partes* review of Humira-related patents. On January 25, 2019, Coherus announced a global settlement resolving "all pending disputes between [Coherus and AbbVie] related to Coherus' adalimumab biosimilar." Under the terms of the deal, Coherus can begin marketing its Humira biosimilar on December 15, 2023.

### 8. AbbVie settles with Boehringer, the last biosimilar manufacturer who was challenging AbbVie's patents.

177. On October 27, 2016, Boehringer submitted ABLA No. 761058 for Cyltezo, a biosimilar to Humira. On January 9, 2017, the FDA accepted Boehringer's ABLA. Four days later consistent with the statutorily-required disclosures, Boehringer provided AbbVie with 93,750 pages relating to ABLA 761058.

178. On March 13, 2017, AbbVie, in its 3A statement, identified 72 patents it argued would be infringed by Boehringer's adalimumab biosimilar, including the '382 patent that expired more than two months earlier, on December 31, 2016. AbbVie subsequently added three more patents to its 3A list.

179. On May 12, 2017, Boehringer provided AbbVie with 1,841 pages describing in detail the bases for non-infringement and invalidity of 73 patents identified by AbbVie (and provided details on the bases for non-infringement and invalidity for the two later added patents in July 2017).

180. On July 11, 2017, AbbVie responded, alleging infringement and validity of 71 of the 72 patents (omitting only the expired '382 patent from its contentions), and including

multiple patents that the PTAB invalidated. On July 21, 2017, Boehringer requested that AbbVie remove from the patent dance at least 16 patents that it had asserted for which AbbVie admitted it lacked any evidence to allege infringement; AbbVie declined, claiming it needed additional, but unspecified, information. (AbbVie did not then request any such information.)

181.    Boehringer stated that it would identify five patents to be the subject of an infringement action; this limited AbbVie to identifying five patents as well. On July 31, 2017, the parties exchanged their lists of patents. AbbVie identified U.S. Patent Nos. 8,926,975; 9,018,361; 9,266,949; 9,272,041; and 9,546,212. Boehringer identified U.S. Patent Nos. 8,926,975; 9,090,867; 9,096,666; 9,255,143; and 9,272,041. AbbVie filed suit on all listed patents on August 2, 2017. Because both parties identified the '975 and '041 patents, the total number of patents in suit was eight.

182.    On August 28, 2017, the FDA approved Boehringer's biosimilar.

183.    Boehringer asserted in its counterclaims that AbbVie has "engaged in a pattern of pursuing numerous overlapping and non-inventive patents for the purpose of developing a 'patent thicket,' using the patenting process itself as a means to seek to delay competition against its expensive and lucrative adalimumab product. That strategy has generated . . . more than 100 patents." For example, "all 74 patents [in AbbVie's 3A list] . . . were issued between 2012 and 2017" and "stem from less than half as many patent families. Many of the patents identified by [AbbVie] share common specifications and have overlapping and nearly identical claims."

184.    On May 14, 2019, AbbVie and Boehringer announced that they had reached a settlement that allows Boehringer to launch its biosimilar on July 1, 2023, the day after Samsung Bioepis's licensed entry date.

**F.    AbbVie manipulates the European patent system and enters unlawful agreements with biosimilar manufacturers to ensure delayed entry in the United States.**

**1.    AbbVie manipulates European patent regimes to thwart biosimilar rivals.**

185.    As it did in the United States, AbbVie also abused the patent system in Europe. Its primary strategy was to file dubious patent applications, and when those applications or patents were challenged, not to pursue or enforce them but to contemporaneously file divisional applications to seek new patents. In this way, AbbVie has been able to maintain intellectual property ostensibly covering Humira regardless of the merits.

186.    Divisional applications, like continuation applications in the United States, are generally filed when an earlier, "parent" application describes multiple inventions. The divisional application maintains the same filing ("priority") date as the parent application and is prosecuted separately from the parent application.

187.    When a particular AbbVie Humira patent was challenged, AbbVie would typically abandon or withdraw the patent, either centrally at the European Patent Office ("EPO") for all European jurisdictions, or in a particular jurisdiction to avoid that current challenge, while leaving the patent in force in other European countries. It would then file other divisional applications in the EPO covering virtually the same subject matter, allow those patents to issue, and file additional divisional applications when those later patents were challenged. AbbVie also sought to, and did, draw out and delay opposition proceedings before the European Patent Office and litigation elsewhere to ensure that few potential competitors could withstand what, in-effect, became AbbVie's stacked game of patent "whack-a-mole."

188.    AbbVie was also able to take advantage of fractured patent litigation and enforcement regimes in Europe. Europe, like the United States, has a central authority for issuing patents—the EPO, which operates in parallel with member-state patent offices. The EPO also

provides for post-grant "opposition" proceedings, where interested parties can challenge the propriety of any EPO-issued patent within nine months of grant.

189.    However, challenging patents through litigation must occur at the member-state level, where each patent is registered. While member states often consider the decisions of other national courts pertaining to patents stemming from the same EPO application, there are notable and significant differences between certain member states' legal regimes. For example, while the United Kingdom is generally viewed as a more challenger friendly jurisdiction, Germany, which is the biggest European market, is generally viewed as more patentee friendly. Further, in the United Kingdom, patent infringement claims and defenses are heard together (as they are in the U.S.). By contrast, in Germany, patent infringement claims are heard in one proceeding, while validity challenges are heard in a separate proceeding.

190.    In total, AbbVie filed at least 72 patent applications with the EPO relating to adalimumab, resulting in at least 11 patents, two of which remain in force today: EP 1,737,491(B1) ("the '491 patent") and EP 2,940,044(B1) ("the '044 patent").

191.    AbbVie's European patent gamesmanship was laid bare in a U.K. litigation, where two Humira biosimilar rivals—Fujifilm Kyowa-Kirin Biologics ("FKB") and Samsung Bioepis—challenged certain Humira patents that AbbVie had registered in the United Kingdom: EP (UK) 1,406,656 ("the '656 patent") and EP (UK) 1,944,322 ("the '322 patent"), both of which addressed the treatment of rheumatoid arthritis through a 40 mg subcutaneous injection once every two weeks. In their actions, FKB and Samsung Bioepis challenged the propriety of these patents and requested judicial "declarations" stating that their respective biosimilar products would have been obvious before the priority dates of AbbVie's key dosing regimen patents. In effect, FKB and Samsung Bioepis sought a judicial opinion that AbbVie's patents

claimed a dosing regimen that was itself obvious in light of prior art and therefore invalid and unenforceable against FKB and Samsung Bioepis.

192.    Rather than take the risk of an adverse judicial verdict, AbbVie decided to abandon those patents, as well as the '044 patent (which FKB and Samsung Bioepis had threatened to add to the litigation once it issued), in the United Kingdom. In the U.K. proceeding, FKB and Samsung Bioepis invited AbbVie to agree to entry of the declarations FKB and Samsung Bioepis sought, and AbbVie refused to do so. By simply revoking the '656 and '322 patents and de-designating the '044 patent for the U.K., instead of admitting to the obviousness of the patents, AbbVie was able to limit the explicit territorial reach of the U.K. court's judicial pronouncement to the UK, thus maintaining its ability to enforce these patents elsewhere in Europe and seek more patent protection on the same subject matter.

193.    AbbVie's conduct with respect to the '656 patent is particularly illustrative of AbbVie's litigation gamesmanship. After grant, the '656 patent was the subject of over a dozen opposition requests before the EPO, and after delaying those combined opposition proceedings, AbbVie ultimately abandoned the '656 patent. However, before abandoning it, AbbVie filed a fourth divisional application covering essentially the same subject matter as the '656 patent. This application was granted as the '044 patent.

194.    FKB claimed that this maneuver was done to (1) "avoid adjudication on its patentability by the UK court and the [EPO] Opposition Division, whilst seeking to ensure that the subject matter of the 656 patent was maintained by the Fourth Divisional Application," and

62

(2) "prevent FKB from the clearing the way in respect to its FKB327 biosimilar after the expiration of the [exclusivity] for the basic adalimumab patent."[58]

195.    Others agreed. For example, during the '656 EPO opposition proceedings, one of the opposers noted that the "there is a clear intention [by AbbVie] to continue prosecution of what is in essence identical subject matter claimed in the parent [application] in a divisional. The challenger continued:

> ***The effect of the Proprietor now deciding to no longer defend the present patent*** (where the central arguments had been exchanged despite the Proprietor's delaying tactics and a date for an oral hearing was looming) ***but pursuing its subject matter through the divisional applications is to postpone the decision on the patentability***, including the decision on the lack of valid priority claim which makes the subject matter unpatentable in view of the prior clinical trial publications underlying the subject matter.[59]

196.    The challenger also noted that AbbVie had further delayed resolution by requesting and obtaining numerous extensions of time.[60]

197.    AbbVie denied these contentions but failed to present evidence demonstrating that its withdrawal of the '656 patent was legitimate and not done as part of a plan to perpetuate commercial uncertainty and stymie competition.

198.    Further illustrating its bad faith, without explanation, AbbVie de-designated the '044 patent, the '322 patent, and the '491 patent in the U.K. Yet, as it did with the '656 patent, prior to de-designating the '044 patent, AbbVie filed a new divisional application to the '044 patent. This had the effect of further obscuring the patent landscape that FKB and other would-be biosimilar rivals would have to contend with—especially if the divisional resulted in a patent

---

[58] Fujifilm Kyowa Kirin Biologics Co. Ltd. v. AbbVie Biotechnology Ltd., 2017 EWHC 295 [PAT], at ¶347 (Mar. 3, 2017).

[59] Letter from William Edward Bird (Patentive) to EPO, re: Opposition against European Patent EPI 406656 (Nov. 16, 2015), at 3.

[60] *Id.*

grant.[61] Consistent with its pattern of obfuscation, AbbVie did not disclose this fifth divisional

application to FKB. Nor was AbbVie willing—despite requests from FKB's counsel—to

represent that it would not file additional divisional applications covering the same subject

matter of previously abandoned patents.[62]

199.     The U.K. High Court of Justice ("the UK High Court") ultimately granted the

declarations sought by FKB and Samsung Bioepis, over AbbVie's objections that the

declarations served no useful purpose in light of its abandonment of the patents at issue. The

U.K. High Court of Justice stated:

> I consider that the grant of a declaration would serve a useful purpose, for the
> following reasons. ***First, commercial certainty. Mr Inman and Dr Gilbert
> [FKB's attorneys] suggested in their evidence that the reason why AbbVie had
> abandoned its UK patents was to shield them from the scrutiny of the UK
> Courts***. They claimed that AbbVie continued to resist the declarations precisely
> because they would serve a useful purpose, namely to provide the Claimants with
> adequate certainty as regards the intended launch of their biosimilar adalimumab
> products; see for example Gilbert (3) [33].
>
> I consider that these claims are justified. ***I have set out above the extensive
> history of the proceedings in the EPO and the UK, which shows, in my
> judgment, that AbbVie has made every effort to shield the claims of its patents
> from scrutiny in the EPO and in the UK Court***. Had the patents not been
> voluntarily de-designated or revoked, the Claimants would have had the
> opportunity to seek findings of invalidity of the granted patents . . . and thereby to
> dispel any uncertainty. ***AbbVie's conduct has been designed to prevent that from
> happening, and has had that objective effect.***

200.     Reflecting on the evidence presented by FKB demonstrating AbbVie's publicly

stated intentions of using its extensive patent portfolio to deter biosimilar competition (some of

which are cited above at, e.g., ¶ 94), the UK High Court found:

---

[61] Fujifilm Kyowa Kirin Biologics Co. Ltd. v. AbbVie Biotechnology Ltd., 2017 EWHC 295 [PAT],
at ¶353

[62] Fujifilm Kyowa Kirin Biologics Co. Ltd. v. AbbVie Biotechnology Ltd., 2017 EWHC 295 [PAT],
at ¶352.

*In my judgment, AbbVie has consistently adopted a policy of publicly expressing its confidence in its Humira patent portfolio, and its intention to enforce it against competition from biosimilars, whilst at the same time shielding patents within the portfolio from scrutiny by the court.* When patent protection has been abandoned by AbbVie, another sub-divisional has been applied for, thereby perpetuating commercial uncertainty.[63]

201.    However, despite FKB and Samsung Bioepis's success in obtaining a UK High Court declaration finding that FKB and Samsung Bioepis's biosimilar products would have been obvious at the priority dates of the '656 and '322 patents, the declaration itself has no preclusive effect on courts in other European member states where these patents were registered. As a result, even with this victory in hand, FKB, Samsung Bioepis, and other would-be Humira biosimilar manufacturers, were still at risk of being sued by AbbVie in patent infringement actions in other national courts and possibly facing infringement damages in the event that those national courts disagreed with the High Court's conclusions.[64]

202.    At the time of the settlements, AbbVie had made it costly and time-consuming for would-be competitors to overcome AbbVie's patent gamesmanship and there was uncertainty about certain patents' enforceability.

---

[63] Fujifilm Kyowa Kirin Biologics Co. Ltd. v. AbbVie Biotechnology Ltd., 2017 EWHC 295 [PAT], at ¶¶394-397 (emphases added).

[64] In fact, in March 2019 (after the UK High Court decision), the EPO rejected various challenges to the '044 patent, a divisional off the abandoned '656 patent that was the subject of the U.K. litigation. In rejecting those challenges, the EPO Opposition Division ("OD") acknowledged that "a National court in [the] UK and the PTAB [Patent Trial and Appeal Board] in the US have come to different conclusions on the issue of inventive step." But it ultimately brushed them aside because "*[t]he decisions of these courts are in any case not binding on the EPO*. OD Decision on Application No. 15 165 133.8, at ¶36 (Apr. 26, 2019) (emphasis added).

      2.    **AbbVie agrees to permit its biosimilar rivals to launch in Europe in exchange for their agreement to delay entry in the United States.**

203.    While AbbVie's 'global resolutions' with certain biosimilar challengers delayed

sales of adalimumab biosimilars in the U.S. market until at least January 2023, they allowed the

biosimilar manufacturers to enter European markets much sooner:

- Under AbbVie's September 28, 2017, agreement with Amgen, AbbVie granted Amgen a license to launch its biosimilar product (which is currently marketed in Europe under the name Amgevita) in Europe on October 16, 2018, the date that AbbVie's European patent and related exclusivity on adalimumab expired.[65] By contrast, Amgen's license for the U.S. blocks a U.S. launch until January 31, 2023—more than four years later.

- Under AbbVie's April 5, 2018, agreement with Samsung Bioepis, AbbVie granted Samsung Bioepis a license to launch its biosimilar product (which is currently marketed in Europe under the name Imraldi) in Europe on October 16, 2018. By contrast, Samsung Bioepis's license for the U.S. blocks a U.S. launch until June 30, 2023—again more than four years later.

- Under AbbVie's October 11, 2018, agreement with Sandoz, AbbVie granted Sandoz a license to launch its biosimilar product in Europe on October 16, 2018. By contrast, Sandoz's license for the U.S. blocks a U.S. launch until September 30, 2023—nearly five years later.

- Under AbbVie's On October 18, 2018, agreement with Fresenius, AbbVie granted Fresenius a license to launch in Europe upon approval from the EMA. In April 2019, Fresenius received European marketing authorization from the EMA, and in May 2019, Fresenius launched Idacio in Germany. By contrast, Fresenius's license for the U.S. blocks a U.S. launch until September 30, 2023.

204.    As a result of this market division arrangement, AbbVie has blocked biosimilars

from the U.S. market until 2023, thereby preserving billions of dollars in revenue. Meanwhile,

Defendants who settled are today selling biosimilars in Europe, long before 2023.

---

[65] In the European Union, pharmaceutical companies are eligible for "Supplementary protection certificates," which "serve as an extension to a patent right. They apply to specific pharmaceutical and plant protections products that have been authorised by regulatory authorities." *See* European Commission, Supplementary protection certificates for pharmaceutical and plant protection products, https://ec.europa.eu/growth/industry/intellectual-property/patents/supplementary-protection-certificates_en.

205. Access to the European market for Humira is extremely valuable. At the time of biosimilar entry, Humira had European sales of roughly €3.5 billion (approximately $4 billion at exchange rates in October 2018). And biosimilars stood to take a huge portion of that. In January 2019, AbbVie expected biosimilars to erode Humira sales by the end of 2019. Samsung Bioepis's biosimilar Imraldi took 62% of the market in Germany, the largest national market in Europe, within a month of its launch.[66]

206. Through these agreements, AbbVie and other Defendants have allocated the markets for Humira and its biosimilars between the United States and Europe. In exchange for European market entry in 2018, AbbVie received the remaining Defendants' promises to delay entry into the U.S. market until 2023. AbbVie has maintained its Humira monopoly in the U.S., where patients and other customers are, in effect, subsidizing lower prices charged for biosimilars in Europe.

207. AbbVie's motive is plain enough. AbbVie's price for Humira in Europe has remained significantly lower than in the U.S., as depicted by the chart below comparing Humira costs per carton in 2013.[67] So, competition in Europe affects AbbVie's profits far less than would competition in the U.S. Accordingly, AbbVie chose to agree to biosimilar competition to drive down the prevailing—already lower—prices in Europe while maintaining its monopoly on Humira and the associated supracompetitive prices in the U.S.

---

[66] http://www.koreabiomed.com/news/articleView.html?idxno=5556

[67] *Our Health Spending Problem is All About Prices*, Vox, https://www.vox.com/2014/4/17/18076656/health-prices (last accessed Mar. 14, 2019).



208. Biosimilar developers were equally motivated to avoid the long and arduous task of litigating likely AbbVie infringement actions in multiple national courts. Such litigation likely would have delayed market entry for many years after the expiration of the main European Humira patents in October 2018. Thus, it was in their interests to accept a "cease-fire" that allowed them to begin monetizing the significant investments they made in their biosimilar products, even though as a condition for immediate access in Europe while avoiding long and arduous patent fights in Europe, they had to agree to additional years of delay before they could enter the U.S. market.

209. Biosimilar competition has a significant impact on pricing. From its already lower price in Europe, with biosimilar entry, Humira's price has dropped between 10% and 80%.[68] If

---

[68] *Why The U.S. Remains The Most Expensive Market For 'Biologic' Drugs In The World*, NPR, https://www.npr.org/sections/health-shots/2018/12/19/676401634/why-the-u-s-remains-the-most-expensive-market-for-biologic-drugs-in-the-world (last accessed Mar. 13, 2019).

comparable discounts were applied to U.S. prices, the hit to AbbVie's profits would be dramatically larger.

210.    Defendants' unlawful market division agreement has injured Plaintiff and the members of the Classes. They are denied the ability to buy less expensive adalimumab biosimilars—an injury that is ongoing.

**G.    AbbVie's deals are having their intended effect: delaying competition for Humira and maintaining high prices for payers.**

211.    All nine would-be competitors to AbbVie for Humira have agreed not to launch their biosimilars until 2023. AbbVie paid the first to settle—Amgen—with five months as the *de facto* exclusive Humira biosimilar on the market. AbbVie also paid the remaining settling biosimilars by allowing them access to the lucrative European market. The biosimilar entrants' U.S. dates are staggered: generally, the later the deal, the later the agreed entry date.

| Company | Settlement/Agreement Date | Agreed Entry Date | Biosimilar Approved |
| --- | --- | --- | --- |
| Amgen | September 28, 2017 | January 31, 2023 | September 23, 2016 |
| Samsung Bioepis | April 5, 2018 | June 30, 2023 | July 23, 2019 |
| Mylan | July 17, 2018 | July 31, 2023 | |
| Sandoz | October 11, 2018 | September 30, 2023 | October 31, 2018 |
| Fresenius Kabi | October 17, 2018 | September 30, 2023 | |
| Momenta | November 6, 2018 | November 20, 2023 | |
| Pfizer | November 30, 2018 | November 20, 2023 | |
| Coherus | January 25, 2019 | December 15, 2023 | |
| Boehringer Ingelheim | May 14, 2019 | July 1, 2023 | August 28, 2017 |

212.    Four biosimilars have been approved and, but for AbbVie's anticompetitive conduct, would be able to launch.

**H.      Abbvie's conduct draws legislative scrutiny over patent abuse.**

213.      AbbVie's patent thicket—or minefield of IP—and regulatory gamesmanship has

drawn considerable scrutiny from the public because of the pernicious effects it has on healthcare

costs. For example:

- Bloomberg Businessweek reported on the "shield of patents" protecting Humira: "The real challenge [for biosimilar versions] was the seemingly impregnable fortress of patents AbbVie has methodically constructed around its prized moneymaker."[69]

- The *Wall Street Journal* similarly reported that "U.S. patients and insurers will have to wait to access less-expensive versions" as a result of "a formidable wall of patents built up by Humira-maker AbbVie Inc."[70]

- Even then-FDA Commissioner, Scott Gottlieb voiced his concern over patent thickets. He stated that manufacturers use patent thicket "schemes" to "hamstring biosimilar competition . . . "deter[ring] market entry for years after FDA approval."[71] He stated just one year ago that, despite the FDA having approved nine biosimilars at the time, only three had entered the market.

214.      Congress, too, has been frustrated by the AbbVie's conduct. A bipartisan group of

U.S. Senators recently criticized this type of anticompetitive scheme. For example, Senator Mike

Braun (R-IN) called out "the legal tricks contributing to higher prices" amid the "skyrocketing"

patients "costs for critical biologic medications." And Senator Tim Kaine (D-VA) remarked that

"patents can be used to deter competition" in the biologic market.[72] In response, Congress has

---

[69] *This Shield of Patents Protects the World's Best-Selling Drug*, Bloomberg Businessweek, https://www.bloomberg.com/news/articles/2017-09-07/this-shield-of-patents-protects-the-world-s-best-selling-drug (emphasis added) (last accessed Mar. 13, 2019).

[70] *By Adding Patents, Drugmaker Keeps Cheaper Humira Copies Out of U.S.*, Wall Street Journal, https://www.wsj.com/articles/biosimilar-humira-goes-on-sale-in-europe-widening-gap-with-u-s-1539687603 (last accessed Mar. 13, 2019).

[71] *Advancing Patient Care Through Competition*, Remarks by FDA Commissioner Scott Gottlieb, https://www.fda.gov/NewsEvents/Speeches/ucm605143.htm.

[72] *Bipartisan Group of Senators Launch Effort to Stop Patent Gaming & Increase Access to Lower-Cost Drugs*, https://www.collins.senate.gov/newsroom/bipartisan-group-senators-launch-effort-stop-patent-gaming-increase-access-lower-cost-drugs (last accessed Mar. 13, 2019).

held hearings, and several members have recently introduced pieces of legislation to address the very abuse AbbVie has perpetrated.

### 1. Senators introduce the Biologic Patent Transparency Act in March 2019.

215.    On March 5, 2019, U.S. Senators Susan Collins (R-ME) and Tim Kaine introduced the Biologic Patent Transparency Act ("BPTA").[73] Recognizing that "[b]iologic manufacturers often seek to protect their products by using 'patent thickets,'"[74] Senator Collins intended the BPTA to target "competition-stymieing patent thickets that delay competition without providing meaningful product improvements."[75]

216.    In her floor statement, Senator Collins mentioned Humira as an example where biologics are protected by "an extensive portfolio of patents," keeping "lower cost alternatives from reaching the market."[76] Citing to one estimate, Senator Collins noted that more than 70 patents covering Humira were applied for and granted within three years prior to the expiration of the initial patents.[77] She exhorted her colleagues: "[W]e cannot be blind to the cost of these drugs, *nor to cases where patent laws are manipulated to preserve monopolies*."[78]

---

[73] *See* Press Releases, Susan Collins, *Bipartisan Group of Senators Launch Effort to Stop Patent Gaming & Increase Access to Lower-Cost Drugs* (Mar. 6, 2019, 3:51 PM), https://www.collins.senate.gov/newsroom/bipartisan-group-senators-launch-effort-stop-patent-gaming-increase-access-lower-cost-drugs (the "Collins Press Release").

[74] Press Releases, Susan Collins, *Senator Collins Urges Colleagues to Support Her Legislation to Stop Patent Gaming and Increase Access to Lower-Cost Drugs* (Mar. 11, 2019, 5:22 PM), https://www.collins.senate.gov/newsroom/senator-collins-urges-colleagues-support-her-legislation-stop-patent-gaming-and-increase.

[75] Biologic Patent Transparency Act One Pager for Release, https://www.collins.senate.gov/sites/default/files/Biologic%20Patent%20Transparency%20Act%20One%20Pager%20for%20Release.pdf.

[76] 165 Cong. Rec. S1753 (daily ed. Mar. 11, 2019) (statement of Sen. Collins).

[77] *See Id.*

[78] *See* Susan Collins Press Release (emphasis added).

## 2. Senators introduce the Affordable Prescriptions for Patients Act in May 2019.

217.    On May 9, 2019 Senators John Cornyn (R-TX) and Richard Blumenthal (D-CT) introduced the Affordable Prescriptions for Patients Act ("APPA") also aims to curb major drug companies' anti-competitive use of patents to prevent generic and biosimilar competition from entering the market.[79]

218.    The APPA proposes to limit the number of patents that any innovator can sue upon in the context of the BPCIA.[80] Specifically, the APPA limits the number of patents that can be asserted to "a total of not more than 20 patents," with "not more than 10" of which shall have issued after the date the biologic product sponsor exchanges its patent list with the biosimilar applicant.[81]

219.    In support of the APPA, Senator Cornyn noted that companies such as AbbVie "take advantage of our country's robust innovation protection in order to hang onto their monopolies as long as possible."[82]

220.    Additionally, Senator Blumenthal stated that, by creating a patent thicket, drug companies like AbbVie are able to "double the number of years of market exclusivity that they have before a competitor can enter the market" and charge consumers extraordinarily high prices during those years.[83] Using Humira as an example, Senator Blumenthal cited reports showing

---

[79] *See* Newsroom, John Cornyn, *Cornyn, Blumenthal Introduce Bill to Prevent Drug Companies from Abusing Patent* System (May 9, 2019), https://www.cornyn.senate.gov/content/news/cornyn-blumenthal-introduce-bill-prevent-drug-companies-abusing-patent-system.

[80] Affordable Prescriptions for Patients Act of 2019, S. 1416, 116th Cong. § 3 (2019).

[81] *Id.*

[82] 165 Cong. Rec. S2717 (daily ed. May 8, 2019) (statement of Sen. Cornyn).

[83] 165 Cong. Rec. S2868-69 (daily ed. May 15, 2019) (statement of Sen. Blumenthal).

that the average amount Medicare and Medicaid spent on each patient using Humira doubled between 2012 and 2015 from $16,000 to $33,000.[84]

### 3. The House passes the Purple Book Continuity Act in May 2019.

221. On May 9, 2019, the Purple Book Continuity Act ("PBCA") passed unanimously in the House of Representatives by bipartisan votes of 421-0.[85] Introduced by Representative Anna Eshoo (D-CA 18th District), the PBCA aims to increase the transparency and accessibility of information regarding biologic patents.[86] The PBCA requires publication of patents of approved biological products in the Purple Book to conform to the requirements of the Orange Book.[87] The bill further requires such information to be published electronically on the FDA's website and updated routinely.[88]

222. When testifying at a March 2019 committee hearing concerning the PBCA, Chester Davis, Jr., President and CEO of the Association for Accessible Medicines, expressed his concern about the prolonged monopoly period of Humira due to the use of patent thickets.[89] In his written statement, Mr. Davis further highlighted AbbVie's expansive patent portfolio: "The world's top-selling brand-name drug, Humira, treats arthritis and other chronic conditions.

---

[84] *Id.*

[85] *See* News, Congresswomen Anna G. Eshoo, *House Passes Eshoo's Bipartisan Legislation to Address Drug Pricing* (May 10, 2019), https://eshoo.house.gov/news-stories/press-releases/house-passes-eshoos-bipartisan-legislation-to-address-drug-pricing.

[86] 165 Cong. Rec. H3485-86 (daily ed. May 8, 2019) (statement of Rep. Eshoo) ("The Purple Book Continuity Act takes an important step to make it easier for the manufacturers to access patent and exclusivity information they need to invest in biosimilar development.").

[87] *See* Purple Book Continuity Act of 2019, H.R. 1520, 116th Cong. § 1 (2019).

[88] *See id*.

[89] *See* Hearing on *"Lowering the Cost of Prescription Drugs: Reducing Barriers to Competition"*, House Comm. on Energy & Commerce (Mar. 13, 2019), https://energycommerce.house.gov/committee-activity/hearings/hearing-on-lowering-the-cost-of-prescription-drugs-reducing-barriers-to (see livestream video at 1:43:29 – 1:43:46).

On the market since 2002, 132 patents block competition for up to 39 years. The price of Humira increased 144 percent since 2012."[90]

****

223.    The legislative initiatives of these members of Congress clearly demonstrate the wrongful nature of AbbVie's behavior. However, Plaintiffs and the Classes cannot wait for Congress to provide relief through new legislation. Existing antitrust, unfair competition, and consumer protection laws have been and continue to be violated by Defendants' conduct, and form the basis of their suit here.

## VI.    CLASS ALLEGATIONS

224.    Plaintiffs bring this action under Federal Rules of Civil Procedure 23(a) and (b)(2) as a representative of a class seeking injunctive relief ("Injunctive Relief Class") defined as follows:

> All entities in the United States, the District of Columbia, and Puerto Rico who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of Humira, other than for resale, from December 31, 2016, through the present.

225.    Plaintiffs also bring this action under Federal Rules of Civil Procedure 23(a) and (b)(3) as a representative of a class seeking damages ("Damages Class") defined as follows:

> All entities who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for Humira, other than for resale, in Alaska, Arizona, California, Connecticut, the District of Columbia, Florida, Georgia, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin from December 31,

---

[90] *See* Chester Davis, Jr., *Hearing on "Lowering the Cost of Prescription Drugs: Reducing Barriers to Competition"*, House Comm. on Energy & Commerce (Mar. 13, 2019), https://energycommerce.house.gov/sites/democrats.energycommerce.house.gov/files/documents/Testimony-Davis-Drug%20Pricing%20Hearing-031319.pdf.

2016, through the present, for consumption by their members, employees, insureds, participants, or beneficiaries.

226.    The following persons and entities are excluded from the Injunctive Relief Class and the Damages Class (together, the "classes"):

    a.   Natural persons;

    b.   Defendants and their subsidiaries and affiliates;

    c.   All federal and state governmental entities except for cities, towns, municipalities, or counties with self-funded prescription drug plans;

    d.   All entities who purchased Humira for purposes of resale or directly from AbbVie or its affiliates;

    e.   Fully insured health plans, *i.e.*, plans that purchased insurance covering 100% of their reimbursement obligation to members; and

    f.   Pharmacy benefit managers.[91]

227.    The members of each class are so numerous that joinder is impracticable. Each class includes at least thousands of members. Members of the classes are widely dispersed throughout the country.

228.    Plaintiffs' claims are typical of the claims of all class members. Plaintiffs' claims arise out of the same common course of conduct that gives rise to the claims of the other class members. Plaintiffs and all class members were and will continue to be damaged by the same wrongful conduct, *i.e.*, they paid and will continue to pay artificially inflated prices for Humira and were and continue to be deprived of the benefits of competition as a result of Defendants' conduct.

229.    Plaintiffs will fairly and adequately protect and represent the interests of the classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the classes.

---

[91] Pharmacy benefit managers do not fit within the class definition as they do not purchase, pay, and/or provide reimbursement, and are included in the list of exclusions for the avoidance of doubt.

230.     Plaintiffs are represented by counsel who are experienced and competent in the prosecution of class action litigation and have particular expertise in class action antitrust litigation in the pharmaceutical industry.

231.     Questions of law and fact common to the classes include:

     a.   Whether Defendants' agreements constitute violations of the federal and state laws listed below;

     b.   Whether Defendants conspired to restrain biosimilar competition to Humira;

     c.   Whether there were legitimate procompetitive justifications explaining AbbVie and Amgen's agreement;

     d.   Whether AbbVie's conduct was unfair and/or unconscionable in violation of the state laws listed below;

     e.   Whether AbbVie possessed market power in the relevant market;

     f.   To the extent a relevant market must be defined, what that definition is; and

     g.   The quantum of aggregate overcharge damages paid by the Damages Class.

232.     Questions of law and fact common to the Damages Class members predominate over any questions that may affect only individual class members, because Defendants have acted on grounds generally applicable to the entire Damages Class.

233.     Class treatment is a superior method for the fair and efficient adjudication of the controversy because, among other things, class treatment will permit a large number of similarly situated persons to prosecute their common claims in a similar forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons and entities with a means of obtaining redress on claims that

might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

234.     Class treatment also is appropriate under Rule 23(b)(2). The prosecution of separate actions by individual members of the Injunctive Relief Class would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for Defendants. In addition, the prosecution of separate actions by individual members of the Injunctive Relief Class would create a risk of adjudication of their rights that, as a practical matter, would be dispositive of the interests of other class members not parties to such adjudications or would substantially impair or impede other class members' ability to protect their interests. Lastly, Defendants have acted and refused to act on grounds that apply generally to the Injunctive Relief Class such that final injunctive relief and/or declaratory relief is warranted with respect to the class as a whole.

235.     Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

## VII.    MARKET POWER AND RELEVANT MARKET

236.     The relevant geographic market is the United States and its territories and possessions.

237.     Direct evidence demonstrates AbbVie's market power. It shows that (1) but for the anticompetitive conduct alleged above, biosimilar versions of Humira would have entered the market at substantially lower prices than Humira; (2) AbbVie maintained and raised the price of Humira despite the presence of other drugs on the market; and (3) AbbVie never lowered Humira prices or lost sales volume in response to the pricing of other drugs. Humira is the best-selling product in the world, indicating that its sales are not constrained by any other products.

238.     To the extent Plaintiffs are required to show market power indirectly, the relevant

product market is the sale of adalimumab and has consisted solely of Humira. Biosimilar versions of Humira will also be in the relevant market once they are available. At all relevant times, AbbVie's share of the relevant adalimumab market was and remains 100%.

239.     Biologic drugs like Humira are differentiated from other drugs based on features and benefits (including safety and efficacy), and not only based upon price. Doctors and patients are generally price-insensitive when prescribing and purchasing prescription drugs like Humira, in part because insurers typically bear much of the cost of prescriptions. Even drugs within its same therapeutic class do not constrain the price of Humira.

240.     Humira is not reasonably interchangeable with any products apart from biosimilar versions of Humira. Other products are not practical substitutes for Humira.

241.     At all relevant times, potential entrants into the market for adalimumab faced high barriers to entry due, in large part, to the lengthy and complex process of maintaining FDA approval and AbbVie's patent minefield.

242.     Humira does not exhibit significant, positive cross-price elasticity of demand with any other medication. The existence of non-adalimumab products that may be used to treat similar indications as Humira did not constrain AbbVie's ability to raise or maintain Humira prices without losing substantial sales, and therefore those other drug products do not occupy the same relevant antitrust market as Humira.

243.     AbbVie needed to control only Humira, and no other products, to maintain profitably a supra-competitive price for Humira while preserving all or virtually all of its sales. Only market entry of a competing, biosimilar version of Humira would render AbbVie unable to profitably maintain its Humira prices without losing substantial sales.

## VIII.   MARKET EFFECTS AND CLASS DAMAGES

244.     But for the anticompetitive conduct alleged above, multiple manufacturers would

have entered the market with biosimilars of Humira starting as early as December 31, 2016.

245. Instead, AbbVie willfully and unlawfully maintained its monopoly power in the market for adalimumab through a scheme to exclude competition. The scheme forestalled competition by biosimilars and brought about the anticompetitive effect of maintaining supra-competitive prices for Humira. AbbVie implemented its scheme by entering into unlawful agreements with would-be biosimilar competitors and creating a patent thicket intended to frustrate competitors' efforts to bring biosimilar versions of Humira to the market. These acts, individually and in combination, were anticompetitive.

246. Four Humira biosimilar manufacturers have received FDA approval, and the only impediments to them launching their biosimilar versions of Humira have been Defendants' unlawful agreements and AbbVie's minefield of IP.

247. AbbVie's scheme—including its agreements with would-be biosimilar competitors—had, and continues to have, the purpose and effect of preventing biosimilar competition, permitting AbbVie to maintain supra-competitive monopoly prices for Humira, and enabling AbbVie to sell Humira without competition. Absent Defendants' conduct, biosimilar versions of Humira would have been available sooner.

248. Competition among drug manufacturers enables all purchasers of the drug to buy biosimilar versions of a drug at substantially lower prices or to buy the reference biologic product at reduced prices. Consequently, reference biologic manufacturers have a strong incentive to delay biosimilar competition, and purchasers experience substantial cost inflation from that delay.

249. If competition from biosimilar manufacturers had not been restrained and forestalled, end payers like Plaintiffs would have paid less for adalimumab by (a) purchasing,

and providing reimbursement for, biosimilar versions of Humira instead of more-expensive Humira and (b) purchasing, and providing reimbursement for, Humira at lower prices.

250. As a result, Defendants' conduct has caused and will continue to cause Plaintiffs and the classes to pay more than they would have paid for Humira and biosimilar Humira absent that conduct.

## IX. ANTITRUST IMPACT

251. The effect of Defendants' conduct was to net AbbVie billions of dollars in revenue at the expense of end payers, including Plaintiffs and the proposed classes, who paid hundreds of millions, if not billions, of dollars in unlawful overcharges.

252. During the relevant period, Plaintiffs and members of the classes purchased substantial amounts of Humira indirectly from AbbVie.

253. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the classes paid supra-competitive prices for Humira that were substantially higher than the prices they would have paid absent Defendants' conduct because they were deprived of the opportunity to purchase lower-priced biosimilar versions of Humira.

254. As a result, Plaintiffs and members of the classes have sustained substantial losses and damage to their business and property in the form of overcharges. The full amount and forms and components of such damages will be calculated after discovery and upon proof at trial.

255. The overcharges resulting from Defendants' conduct are directly traceable through the pharmaceutical distribution chain to Plaintiffs and other end payers. A manufacturer first sells the drug to direct purchaser wholesalers based on the listed WAC, minus applicable discounts. Wholesalers then sell the drug to pharmacies, which in turn sell the drugs to consumers. In this short chain of distribution, drug products are not altered or incorporated into other products. Each drug purchase is documented and closely tracked by pharmacies, pharmacy

benefit managers, and third-party payers (such as insurers and health and welfare funds). The products and their prices are thus directly traceable from the manufacturer until they reach the hands of the consumer at a pharmacy.

## X.  INTERSTATE AND INTRASTATE COMMERCE

256.  Defendants' efforts to restrain and forestall competition for Humira have substantially affected interstate commerce.

257.  At all material times, AbbVie manufactured, marketed, promoted, distributed, and sold substantial amounts of Humira in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States.

258.  At all material times, AbbVie transmitted funds, as well as contracts, invoices and other forms of business communications and transactions, in a continuous and uninterrupted flow of commerce across state and national lines in connection with the sale of Humira.

259.  In furtherance of its efforts to restrain and forestall competition in the relevant market, AbbVie employed the U.S. mails and interstate and international phone lines, as well as means of interstate and international travel. Defendants' activities were within the flow of and have substantially affected interstate commerce.

260.  Defendants' conduct also had substantial intrastate effects in that, among other things, retailers within each state were prevented from offering more affordable biosimilar Humira to end payers inside each state. Defendants' conduct materially deprived the consuming public—including hundreds, if not thousands, of end payers in each state—of any choice to purchase more affordable biosimilar Humira. The continued absence of competition to Humira directly and substantially affects and disrupts commerce within each state.

## XI.   CLAIMS FOR RELIEF

### COUNT I

**Violation of Section 1 of the Sherman Act: Pay-For-Delay Agreements**
**(Against All Defendants on Behalf of the Injunctive Relief Class)**

261.    Plaintiffs repeat and incorporate by reference all preceding paragraphs and allegations.

262.    AbbVie granted Amgen a period of exclusivity to which it was not entitled and which was worth hundreds of millions of dollars. In exchange for this substantial consideration, Amgen agreed to drop its patent challenges and not to launch its FDA-approved biosimilar to compete with Humira until January 31, 2023.

263.    AbbVie also granted the biosimilar defendants early entry in the European market, which was worth tens or hundreds of millions of dollars to each defendant, in exchange for dropping their patent challenges and agreeing not to launch their biosimilars to compete with Humira in the United States until 2023.

264.    These settlements are unlawful pay-for-delay agreements and illegal contracts, combinations, and conspiracies in restraint of trade. The purposes and effects of these agreements were to: (a) delay and prevent the entry of more affordable biosimilar versions of Humira in the United States; (b) fix, raise, maintain, or stabilize the prices of Humira; (c) allocate 100% of the U.S. adalimumab market to AbbVie.

265.    Defendants implemented the terms of the agreements, and they achieved their intended purpose. As a direct and proximate result of Defendants' anticompetitive conduct, alleged herein, Plaintiffs suffered harm in the form of overcharges.

266.    There was and is no legitimate, non-pretextual, procompetitive justification for the reverse payments from AbbVie to the biosimilar defendants that outweighs their harmful

effect. Even if there were some conceivable justification, the payments were not necessary to achieve that purpose. The payments were far in excess of the amount of saved litigation costs.

267. Plaintiffs and members of the Injunctive Relief Class will continue to suffer injury, in the form of overcharges paid for Humira, if Defendants' unlawful conduct is not enjoined.

268. Plaintiffs and the members of the Injunctive Relief Class therefore seek equitable and injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable laws, to correct for the anticompetitive market effects caused by Defendants' unlawful conduct, and to assure that similar anticompetitive conduct and effects do not continue or reoccur in the future.

## COUNT II

### Violation of State Law: Pay-For-Delay Agreements
### (Against All Defendants on Behalf of the Damages Class)

269. Plaintiffs repeat and incorporate by reference all preceding paragraphs and allegations.

270. AbbVie granted Amgen a period of exclusivity to which it was not otherwise entitled and which was worth hundreds of millions of dollars. In exchange for this substantial consideration, Amgen agreed to drop its patent challenges and not to launch its FDA-approved biosimilar to compete with Humira until January 31, 2023.

271. AbbVie also granted the biosimilar defendants early entry in the European market, which was worth tens or hundreds of millions of dollars to each defendant, in exchange for dropping their patent challenges and agreeing not to launch their biosimilars to compete with Humira in the United States until 2023.

272. These settlements are an unlawful pay-for-delay agreement and illegal contracts,

combinations, and conspiracies in restraint of trade. The purposes and effects of these agreements were to: (a) delay and prevent the entry of more affordable biosimilar versions of Humira in the United States; (b) fix, raise, maintain, or stabilize the prices of Humira; (c) allocate 100% of the U.S. adalimumab market to AbbVie.

273. Defendants implemented the terms of the agreements, and they achieved their intended purpose. As a direct and proximate result of Defendants' anticompetitive conduct, alleged herein, Plaintiffs suffered harm in the form of overcharges.

274. There was and is no legitimate, non-pretextual, procompetitive justification for the reverse payments from AbbVie to the biosimilar defendants that outweighs its harmful effect. Even if there were some conceivable justification, the payments were not necessary to achieve that purpose. The payments were far in excess of the amount of saved litigation costs.

275. Defendants' pay-for-delay agreements violate the following state antitrust laws:

  a. Ariz. Rev. Stat. Ann. §§ 44-1400, *et seq.*, with respect to purchases in Arizona by Damages Class members and/or purchases by Arizona residents.

  b. Cal. Bus. & Prof. Code §§ 16700, *et seq.*, with respect to purchases in California by Damages Class members and/or purchases by California residents.

  c. C.G.S.A. §§ 35-26 and 28, *et seq.*, with respect to purchases in Connecticut by Damages Class members and/or purchases by Connecticut residents.

  d. D.C. Code §§ 28-4502, *et seq.*, with respect to purchases in D.C. by Damages Class members and/or purchases by D.C. residents.

  e. Haw. Rev. Stat. §§ 480-2, 480-4, *et seq.*, with respect to purchases in Hawaii by Damages Class members and/or purchases by Hawaii residents.

f.   740 Ill. Comp. Stat. §§ 10/3, *et seq.*, with respect to purchases in Illinois by
     Damages Class members and/or purchases by Illinois residents.

g.   Iowa Code §§ 553.4, *et seq.*, with respect to purchases in Iowa by Damages
     Class members and/or purchases by Iowa residents.

h.   Kan. Stat. Ann. §§ 50-112, *et seq.*, with respect to purchases in Kansas by
     Damages Class members and/or purchases by Kansas residents.

i.   Me. Rev. Stat. Ann. 10 §§ 1101, *et seq.*, with respect to purchases in Maine by
     Damages Class members and/or purchases by Maine residents.

j.   MD Code Ann., Com. Law, §§ 11-204, *et seq.*, with respect to purchases in
     Maryland by Damages Class members and/or purchases by Maryland
     residents.

k.   Mich. Comp. Laws Ann. §§ 445.772, *et seq.*, with respect to purchases in
     Michigan by Damages Class members and/or purchases by Michigan
     residents.

l.   Minn. Stat. §§ 325D.51, *et seq.*, and Minn. Stat. §§ 8.31, *et seq.*, with respect
     to purchases in Minnesota by Damages Class members and/or purchases by
     Minnesota residents.

m.   Miss. Code Ann. §§ 75-21-3, *et seq.*, with respect to purchases in Mississippi
     by Damages Class members and/or purchases by Mississippi residents.

n.   Neb. Rev. Stat. §§ 59-801, *et seq.*, with respect to purchases in Nebraska by
     Damages Class members and/or purchases by Nebraska residents.

o.   Nev. Rev. Stat. Ann. §§ 598A.060, *et seq.*, with respect to purchases in
     Nevada by Damages Class members and/or purchases by Nevada residents.

p.  N.H. Rev. Stat. Ann. §§ 356:2, *et seq.*, with respect to purchases in New Hampshire by Damages Class members and/or purchases by New Hampshire residents.

q.  N.M. Stat. Ann. §§ 57-1-1, *et seq.*, with respect to purchases in New Mexico by Damages Class members and/or purchases by New Mexico residents.

r.  N.Y. Gen. Bus. Law § 340 with respect to purchases in New York by Damages Class members and/or purchases by New York residents.

s.  N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to purchases in North Carolina by Damages Class members and/or purchases by North Carolina residents.

t.  N.D. Cent. Code Ann. §§ 51-08.1-02, *et seq.*, with respect to purchases in North Dakota by Damages Class members and/or purchases by North Dakota residents.

u.  Or. Rev. Stat. §§ 646.725, *et seq.*, with respect to purchases in Oregon by Damages Class members and/or purchases by Oregon residents.

v.  R.I. Gen. Laws §§ 6-36-4, *et seq.*, with respect to purchases in Rhode Island by Damages Class members and/or purchases by Rhode Island residents.

w.  S.D. Codified Laws §§ 37-1-3.1, *et seq.*, with respect to purchases in South Dakota by Damages Class members and/or purchases by South Dakota residents.

x.  Tenn. Code Ann. §§ 47-25-101, *et seq.,* with respect to purchases in Tennessee by Damages Class members and/or purchases by Tennessee residents.

y. Utah Code Ann. §§ 76-10-3104, *et seq.*, with respect to purchases by Utah residents in the Damages Class.

z. W.Va. Code §§ 47-18-4, *et seq.*, with respect to purchases in West Virginia by Damages Class members and/or purchases by West Virginia residents.

aa. Wis. Stat. §§ 133.03, *et seq.*, with respect to purchases in Wisconsin by Damages Class members and/or purchases by Wisconsin residents.

276. Defendants' pay-for-delay agreements also violate the following state consumer protection laws that prohibit anticompetitive conduct:

a. Alaska Stat. Ann. § 45.50.471 with respect to purchases in Alaska by Damages Class members and/or purchases by Alaska residents. Defendants' pay-for-delay agreements are unfair methods of competition and an unfair practice occurring in the conduct of trade and commerce.

b. Cal. Bus. & Prof. Code §§ 17200, *et seq.*, with respect to purchases in California by Damages Class members and/or purchases by California residents.

c. Fla. Stat. §§ 501.201, *et seq.*, with respect to purchases in Florida by Damages Class members and/or purchases by Florida residents.

d. Ga. Code Ann. § 10-1-393 with respect to purchases in Georgia by Damages Class members and/or purchases by Georgia residents Defendants' pay-for-delay agreements are unfair methods of competition and an unfair practice occurring in the conduct of trade and commerce.

e. S.C. Code Ann. §§ 39-5-20, *et seq.*, with respect to purchases in South Carolina by Damages Class members and/or purchases by South Carolina

residents. Defendants' pay-for-delay agreements are unfair methods of competition and an unfair practice occurring in the conduct of trade and commerce. It is also offensive to public policy and immoral, unethical, and oppressive.

f.  Vt. Stat. Ann. tit. 9, §§ 2453, *et seq.*, with respect to purchases in Vermont by Damages Class members and/or purchases by Vermont residents. Defendants' pay-for-delay agreements are unfair methods of competition and an unfair practice occurring in the conduct of trade and commerce.

277.    Plaintiffs and Damages Class members have been injured in their business or property by reason of Defendants' violations of the laws set forth above, in that Plaintiffs and Damages Class members (i) were denied the ability to purchase lower-priced biosimilar versions of Humira, and (ii) paid higher prices for Humira than they would have paid but for the unlawful conduct. These injuries are of the type that the above laws were designed to prevent, and flow from that which makes the conduct unlawful.

278.    Plaintiffs and Damages Class members accordingly seek damages and multiple damages as permitted by law.

**COUNT III**

**Violation of Sherman Act § 1: Market Allocation Agreements**
**(Against All Defendants on Behalf of the Damages Class)**

279.    Plaintiffs repeat and incorporate by reference all preceding paragraphs and allegations.

280.    An agreement by competing companies to cease competing is "anticompetitive regardless of whether the parties split a market within which both do business or whether they

merely reserve one market for one and another for the other."[92] Defendants entered into an unlawful market division agreements that restrained competition in the market for Humira and its biosimilars. Their agreement is and was a contract, combination, and/or conspiracy that substantially, unreasonably, and unduly restrained trade in the relevant market, the purpose and effect of which was to:

      a.   prevent biosimilar defendants from competing with AbbVie by selling its adalimumab biosimilar in the U.S. until 2023; and

      b.   raise to and maintain at supra-competitive levels the prices that Plaintiff and the Injunctive Class Members paid and continue to pay for Humira.

281.    The unlawful market division agreements are a *per se* violations of the respective state antitrust and consumer protection laws identified below. Moreover, if the conduct alleged in this Complaint is held subject to a "quick look" analysis, it satisfies the Supreme Court's test in *California Dental*.[93]

282.    Even if the conduct alleged in this Complaint is held subject to the Rule of Reason, there is no legitimate, non-pretextual, procompetitive business justification for the value the biosimilar defendants received that outweighs the agreement's harmful effects.

283.    Here, in exchange for each biosimilar defendant's agreement to delay entering the market until 2023, under these market division agreements, the biosimilar Defendants received from AbbVie the opportunity to launch their biosimilars in Europe well before 2023, as a result of which the biosimilar Defendants were able to and did sell millions of dollars of their Humira biosimilars in Europe and realized profits from those sales.

---

[92] *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49-50 (1990).

[93] *California Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999).

284.    As a direct and proximate result of Defendants' violation of Sherman Act § 1, Plaintiff and the Injunctive Class have been injured in their business and property throughout the Class Period.

285.    Plaintiff and the Injunctive Class are entitled to injunctive and other equitable relief, pursuant to 15 U.S.C. § 26, to correct for the anticompetitive market effects caused by Defendants' unlawful conduct, and to assure that similar anticompetitive conduct and effects do not continue or reoccur in the future.

## COUNT IV

**Violation of State Law: Market Allocation Agreements
(Against All Defendants on Behalf of the Damages Class)**

286.    Plaintiffs repeat and incorporate by reference all preceding paragraphs and allegations.

287.    An agreement by competing companies to cease competing is "anticompetitive regardless of whether the parties split a market within which both do business or whether they merely reserve one market for one and another for the other." Defendants entered into an unlawful market division agreements that restrained competition in the market for Humira and its biosimilars. Their agreement is and was a contract, combination, and/or conspiracy that substantially, unreasonably, and unduly restrained trade in the relevant market, the purpose and effect of which was to:

a.  prevent biosimilar defendants from competing with AbbVie by selling its adalimumab biosimilar in the U.S. until 2023; and

b.  raise to and maintain at supra-competitive levels the prices that Plaintiff and the Injunctive Class Members paid and continue to pay for Humira.

90

288. The unlawful market division agreements are a *per se* violations of the respective state antitrust and consumer protection laws identified below. Moreover, if the conduct alleged in this Complaint is held subject to a "quick look" analysis, it satisfies the Supreme Court's test in *California Dental*.

289. Even if the conduct alleged in this Complaint is held subject to the Rule of Reason, there is no legitimate, non-pretextual, procompetitive business justification for the value the biosimilar defendants received that outweighs the agreement's harmful effects.

290. Here, in exchange for each biosimilar defendant's agreement to delay entering the market until 2023, under these market division agreements, the biosimilar defendants received from AbbVie the opportunity to launch their biosimilars in Europe well before 2023, as a result of which the biosimilar Defendants were able to and did sell millions of dollars of their Humira biosimilars in Europe and realized profits from those sales.

291. Defendants' market division agreements violate the following state antitrust laws:

    a. Ariz. Rev. Stat. Ann. §§ 44-1400, *et seq.*, with respect to purchases in Arizona by Damages Class members and/or purchases by Arizona residents.

    b. Cal. Bus. & Prof. Code §§ 16700, *et seq.*, with respect to purchases in California by Damages Class members and/or purchases by California residents.

    c. C.G.S.A. §§ 35-26 and 28, *et seq.*, with respect to purchases in Connecticut by Damages Class members and/or purchases by Connecticut residents.

d.   D.C. Code §§ 28-4502, *et seq.*, with respect to purchases in D.C. by Damages Class members and/or purchases by D.C. residents.

e.   Haw. Rev. Stat. §§ 480-2, 480-4, *et seq.*, with respect to purchases in Hawaii by Damages Class members and/or purchases by Hawaii residents.

f.   740 Ill. Comp. Stat. §§ 10/3, *et seq.*, with respect to purchases in Illinois by Damages Class members and/or purchases by Illinois residents.

g.   Iowa Code §§ 553.4, *et seq.*, with respect to purchases in Iowa by Damages Class members and/or purchases by Iowa residents.

h.   Kan. Stat. Ann. §§ 50-112, *et seq.*, with respect to purchases in Kansas by Damages Class members and/or purchases by Kansas residents.

i.   Me. Rev. Stat. Ann. 10 §§ 1101, *et seq.*, with respect to purchases in Maine by Damages Class members and/or purchases by Maine residents.

j.   MD Code Ann., Com. Law, §§ 11-204, *et seq.*, with respect to purchases in Maryland by Damages Class members and/or purchases by Maryland residents.

k.   Mich. Comp. Laws Ann. §§ 445.772, *et seq.*, with respect to purchases in Michigan by Damages Class members and/or purchases by Michigan residents.

l.   Minn. Stat. §§ 325D.51, *et seq.*, and Minn. Stat. §§ 8.31, *et seq.*, with respect to purchases in Minnesota by Damages Class members and/or purchases by Minnesota residents.

m.  Miss. Code Ann. §§ 75-21-3, *et seq.*, with respect to purchases in Mississippi by Damages Class members and/or purchases by Mississippi residents.

n.  Neb. Rev. Stat. §§ 59-801, *et seq.*, with respect to purchases in Nebraska by Damages Class members and/or purchases by Nebraska residents.

o.  Nev. Rev. Stat. Ann. §§ 598A.060, *et seq.*, with respect to purchases in Nevada by Damages Class members and/or purchases by Nevada residents.

p.  N.H. Rev. Stat. Ann. §§ 356:2, *et seq.*, with respect to purchases in New Hampshire by Damages Class members and/or purchases by New Hampshire residents.

q.  N.M. Stat. Ann. §§ 57-1-1, *et seq.*, with respect to purchases in New Mexico by Damages Class members and/or purchases by New Mexico residents.

r.  N.Y. Gen. Bus. Law § 340 with respect to purchases in New York by Damages Class members and/or purchases by New York residents.

s.  N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to purchases in North Carolina by Damages Class members and/or purchases by North Carolina residents.

t.  N.D. Cent. Code Ann. §§ 51-08.1-02, *et seq.*, with respect to purchases in North Dakota by Damages Class members and/or purchases by North Dakota residents.

u.  Or. Rev. Stat. §§ 646.725, *et seq.*, with respect to purchases in Oregon by Damages Class members and/or purchases by Oregon residents.

v.  R.I. Gen. Laws §§ 6-36-4, *et seq.*, with respect to purchases in Rhode Island by Damages Class members and/or purchases by Rhode Island residents.

w.  S.D. Codified Laws §§ 37-1-3.1, *et seq.*, with respect to purchases in South Dakota by Damages Class members and/or purchases by South Dakota residents.

x.  Tenn. Code Ann. §§ 47-25-101, *et seq.,* with respect to purchases in Tennessee by Damages Class members and/or purchases by Tennessee residents.

y.  Utah Code Ann. §§ 76-10-3104, *et seq.*, with respect to purchases by Utah residents in the Damages Class.

z.  W.Va. Code §§ 47-18-4, *et seq.*, with respect to purchases in West Virginia by Damages Class members and/or purchases by West Virginia residents.

aa.  Wis. Stat. §§ 133.03, *et seq.*, with respect to purchases in Wisconsin by Damages Class members and/or purchases by Wisconsin residents.

292.  Defendants' market division agreements also violate the following state consumer protection laws that prohibit anticompetitive conduct:

a.  Alaska Stat. Ann. § 45.50.471 with respect to purchases in Alaska by Damages Class members and/or purchases by Alaska residents. Defendants' pay-for-delay and market division agreements are unfair methods of

94

competition and an unfair practice occurring in the conduct of trade and commerce.

b. Cal. Bus. & Prof. Code §§ 17200, *et seq.*, with respect to purchases in California by Damages Class members and/or purchases by California residents.

c. Fla. Stat. §§ 501.201, *et seq.*, with respect to purchases in Florida by Damages Class members and/or purchases by Florida residents.

d. Ga. Code Ann. § 10-1-393 with respect to purchases in Georgia by Damages Class members and/or purchases by Georgia residents. Defendants' pay-for-delay and market division agreements are unfair methods of competition and an unfair practice occurring in the conduct of trade and commerce.

e. S.C. Code Ann. §§ 39-5-20, *et seq.*, with respect to purchases in South Carolina by Damages Class members and/or purchases by South Carolina residents. Defendants' pay-for-delay and market division agreements are unfair methods of competition and an unfair practice occurring in the conduct of trade and commerce. It is also offensive to public policy and immoral, unethical, and oppressive.

f. Vt. Stat. Ann. tit. 9, §§ 2453, *et seq.*, with respect to purchases in Vermont by Damages Class members and/or purchases by Vermont residents. Defendants' pay-for-delay and market division agreements are unfair methods of competition and an unfair practice occurring in the conduct of trade and commerce.

293.     Plaintiffs and Damages Class members have been injured in their business or property by reason of Defendants' violations of the laws set forth above in that Plaintiffs and Damages Class members (i) were denied the ability to purchase lower-priced biosimilar versions of Humira, and (ii) paid higher prices for Humira than they would have paid but for the unlawful conduct. These injuries are of the type that the above laws were designed to prevent, and flow from that which makes the conduct unlawful.

294.     Plaintiffs and Damages Class members accordingly seek damages and multiple damages as permitted by law.

## COUNT V

### Violation of Sherman Act § 2: Monopolization
### (Against AbbVie on Behalf of the Injunctive Relief Class)

295.     Plaintiffs repeat and incorporate by reference all preceding paragraphs and allegations.

296.     During all relevant times, AbbVie has possessed market power in the relevant market. No other manufacturer sold a competing biosimilar version of Humira in the United States.

297.     AbbVie's development, acquisition, and enforcement of its patent thicket—or minefield—was undertaken and executed without regard to the merits of the patents. It was not undertaken and executed in furtherance of legitimate uses of the patent system or out of a genuine interest in redressing grievances. AbbVie's conduct was instead intended solely to restrain trade, harass potential competitors, and perpetuate AbbVie's monopoly in the relevant market.

298.     Through its anticompetitive conduct, AbbVie intentionally and willfully maintained monopoly power in the relevant market.

299.     Plaintiffs and members of the Injunctive Relief Class will continue to suffer injury, in the form of overcharges paid for Humira, if Defendants' unlawful conduct is not enjoined.

300.     Plaintiffs and the members of the Injunctive Relief Class therefore seek equitable and injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable laws, to correct for the anticompetitive market effects caused by Defendants' unlawful conduct, and to assure that similar anticompetitive conduct and effects do not continue or reoccur in the future.

## COUNT VI

**Violation of State Law Monopolization**
**(Against AbbVie on Behalf of the Damages Class)**

301.      Plaintiffs repeat and incorporate by reference all preceding paragraphs and allegations.

302.     During all relevant times, AbbVie has possessed market power in the relevant market. No other manufacturer sold a competing biosimilar version of Humira in the United States.

303.     AbbVie's development, acquisition, and enforcement of its patent thicket was undertaken and executed without regard to the merits of the patents. It was not undertaken and executed in furtherance of legitimate uses of the patent system or out of a genuine interest in redressing grievances. AbbVie's conduct was instead intended solely to restrain trade, harass potential competitors, and perpetuate AbbVie's monopoly in the relevant market.

304.     Through its anticompetitive conduct, AbbVie intentionally and willfully maintained monopoly power in the relevant market.

305.     AbbVie's monopolistic conduct violates the following state antitrust laws:

a. Ariz. Rev. Stat. Ann. §§ 44-1403, *et seq.*, with respect to purchases in Arizona by Damages Class members and/or purchases by Arizona residents.

b. C.G.S.A. §§ 35-27, *et seq.*, with respect to purchases in Connecticut by Damages Class members and/or purchases by Connecticut residents.

c. D.C. Code §§ 28-4503, *et seq.*, with respect to purchases in D.C. by Damages Class members and/or purchases by D.C. residents.

d. Haw. Rev. Stat. §§ 480-2, 480-9, *et seq.*, with respect to purchases in Hawaii by Damages Class members and/or purchases by Hawaii residents.

e. 740 Ill. Comp. Stat. §§ 10/3, *et seq.*, with respect to purchases in Illinois by Damages Class members and/or purchases by Illinois residents.

f. Iowa Code §§ 553.5, *et seq.*, with respect to purchases in Iowa by Damages Class members and/or purchases by Iowa residents.

g. Me. Rev. Stat. Ann. 10 §§ 1102, *et seq.*, with respect to purchases in Maine by Damages Class members and/or purchases by consumer Maine residents.

h. MD Code Ann., Com. Law, §§ 11-204, *et seq.*, with respect to purchases in Maryland by Damages Class members and/or purchases by Maryland residents.

i. Mich. Comp. Laws Ann. §§ 445.773, *et seq.*, with respect to purchases in Michigan by Damages Class members and/or purchases by Michigan residents.

j. Minn. Stat. §§ 325D.52, *et seq.* and Minn. Stat. §§ 8.31, *et seq.*, with respect to purchases in Minnesota by Damages Class members and/or purchases by Minnesota residents.

k.   Miss. Code Ann. §§ 75-21-3, *et seq.*, with respect to purchases in Mississippi by Damages Class members and/or purchases by Mississippi residents.

l.   Neb. Rev. Stat. §§ 59-802, *et seq.*, with respect to purchases in Nebraska by Damages Class members and/or purchases by Nebraska residents.

m.   Nev. Rev. Stat. Ann. §§ 598A.060, *et seq.*, with respect to purchases in Nevada by Damages Class members and/or purchases by Nevada residents.

n.   N.H. Rev. Stat. Ann. §§ 356:3, *et seq.*, with respect to purchases in New Hampshire by Damages Class members and/or purchases by New Hampshire residents.

o.   N.M. Stat. Ann. §§ 57-1-2, *et seq.*, with respect to purchases in New Mexico by Damages Class members and/or purchases by New Mexico residents.

p.   N.C. Gen. Stat. §§ 75-2.1, *et seq.*, with respect to purchases in North Carolina by Damages Class members and/or purchases by North Carolina residents.

q.   N.D. Cent. Code Ann. §§ 51-08.1-03, *et seq.*, with respect to purchases in North Dakota by Damages Class members and/or purchases by North Dakota residents.

r.   Or. Rev. Stat. §§ 646.730, *et seq.*, with respect to purchases in Oregon by Damages Class members and/or purchases by Oregon residents.

s.   R.I. Gen. Laws §§ 6-36-5, *et seq.*, with respect to purchases in Rhode Island by Damages Class members and/or purchases by Rhode Island residents.

t.   S.D. Codified Laws §§ 37-1-3.2, *et seq.*, with respect to purchases in South Dakota by Damages Class members and/or purchases by South Dakota residents.

u. Utah Code Ann. §§ 76-10-3104, *et seq.*, with respect to purchases by Utah residents.

v. W.Va. Code §§ 47-18-4, *et seq.*, with respect to purchases in West Virginia by Damages Class members and/or purchases by West Virginia residents.

w. Wis. Stat. §§ 133.03, *et seq.*, with respect to purchases in Wisconsin by Damages Class members and/or purchases by Wisconsin residents.

306. AbbVie's conduct also violates the following state consumer protection laws that prohibit monopolization:

a. Alaska Stat. Ann. § 45.50.471 with respect to purchases in Alaska by Damages Class members and/or purchases by Alaska residents. AbbVie's monopolistic conduct is an unfair method of competition and an unfair practice occurring in the conduct of trade and commerce.

b. Cal. Bus. & Prof. Code §§ 17200, *et seq.*, with respect to purchases in California by Damages Class members and/or purchases by California residents.

c. Fla. Stat. §§ 501.201, *et seq.*, with respect to purchases in Florida by Damages Class members and/or purchases by Florida residents.

d. Ga. Code Ann. § 10-1-393 with respect to purchases in Georgia by Damages Class members and/or purchases by Georgia residents. AbbVie's monopolistic conduct is an unfair method of competition and an unfair practice occurring in the conduct of trade and commerce.

e. S.C. Code Ann. §§ 39-5-20, *et seq.*, with respect to purchases in South Carolina by Damages Class members and/or purchases by South Carolina

residents. AbbVie's monopolistic conduct is an unfair method of competition and an unfair practice occurring in the conduct of trade and commerce. It is also offensive to public policy and immoral, unethical, and oppressive.

f. Vt. Stat. Ann. tit. 9, §§ 2453, *et seq.*, with respect to purchases in Vermont by Damages Class members and/or purchases by Vermont residents. Defendants' anti-competitive agreements are unfair methods of competition and an unfair practice occurring in the conduct of trade and commerce.

307. Plaintiffs and Damages Class members have been injured in their business or property by reason of Defendants' violations of the laws set forth above, in that Plaintiffs and Damages Class members (i) were denied the ability to purchase lower-priced biosimilar versions of Humira, and (ii) paid higher prices for Humira than they would have paid but for the unlawful conduct. These injuries are of the type that the above laws were designed to prevent, and flow from that which makes the conduct unlawful.

308. Plaintiffs and Damages Class members accordingly seek damages and multiple damages as permitted by law.

## COUNT VII

### Violation of State Law: Unfair and Unconscionable Conduct
### (Against AbbVie on Behalf of the Damages Class)

309. Plaintiffs repeat and incorporate by reference all preceding paragraphs and allegations.

310. AbbVie engaged in unfair methods of competition and unfair and unconscionable acts and practices to wrongfully frustrate the process of biosimilar versions of Humira coming to market. AbbVie abused the regulatory and judicial system with its conduct, which was not

intended to redress legitimate grievances, but was instead undertaken for purposes of harassing would-be manufacturers.

311.    AbbVie's conduct has offended public policy. The BPCIA established the abbreviated biosimilar approval process as a means to provide more treatment options, increase access to lifesaving medications, and potentially lower health care costs. In addition, public policy permits companies to obtain patents to protect their legitimate intellectual property rights, but patents are not intended to provide a vehicle for companies to create a patent minefield whose very existence is intended only to frustrate other companies' efforts to lawfully and legitimately bring products to market. In addition to offending public policy, AbbVie's conduct is also immoral, unethical, oppressive, and unscrupulous.

312.    The purposes and effects of this agreement were to: (a) delay and prevent the entry of more affordable biosimilar versions of Humira in the United States; (b) fix, raise, maintain, or stabilize the prices of Humira; and (c) allocate 100% of the U.S. adalimumab market to AbbVie. As a direct and proximate result of AbbVie's unfair and unconscionable conduct, Plaintiffs and members of the Damages Class were denied the opportunity to purchase lower-priced biosimilar versions of Humira, were forced to pay higher prices for Humira than they would have had a biosimilar been available, and lost money or property as a result.

313.    There was and is a gross disparity between the price that Plaintiffs and Damages Class members paid for Humira and the value they received. Much more affordable, biosimilar versions of Humira would have been available sooner and in greater quantity, and prices for branded Humira would have been lower, but for AbbVie's unfair and unconscionable conduct. Plaintiffs and class members purchased, paid and/or provided reimbursement for some or all of the price of Humira for purchases intended primarily for personal, family, and/or household use.

314.     AbbVie's conduct was intended to, and did, cause substantial injury to end payers in the form of denying them the ability to purchase less-expensive biosimilar versions of Humira. Plaintiffs and other end payers could not reasonably have avoided injury from AbbVie's wrongful conduct. AbbVie's conduct occurred in connection with consumer transactions related to the availability and sale of adalimumab products.

315.     There are no countervailing benefits to AbbVie's conduct that would outweigh the injury caused to end payers.

316.     AbbVie's conduct violates the following state laws:

**A.     Alaska**

317.     The Alaska Unfair Trade Practices and Consumer Protection Act prohibits "unfair . . . acts or practices in the conduct or trade or commerce." ALASKA STAT. ANN. § 45.50.471.

318.     By reason of the conduct alleged herein, AbbVie has engaged in unfair methods of competition and unfair acts or practices in the conduct of trade or commerce. ALASKA STAT. ANN. §§ 45.50.471, *et seq.*

319.     Plaintiffs and members of the Damages Class purchased Humira within the State of Alaska during the class period. But for AbbVie's conduct set forth herein, the price paid would have been lower, in an amount to be determined at trial.

320.     As a direct and proximate cause of AbbVie's unlawful conduct, Plaintiffs and the members of the Damages Class suffered an ascertainable loss of money or property and are threatened with further injury.

321.     By reason of the foregoing, Plaintiffs and the Damages Class are entitled to seek all forms of relief, including up to treble damages, $500 in damages per violation, and reasonable attorneys' fees and costs. ALASKA STAT. ANN. § 45.50.531.

103

**B.      Arizona**

322.      The Arizona Consumer Fraud Act prohibits unfair acts and practices in connection with the sale or advertisement of any merchandise." ARIZ. REV. STAT. § 44-1522(A).

323.      By reason of the conduct alleged herein, AbbVie has engaged in unfair acts and practices in connection with the sale of Humira and has violated the Arizona Consumer Fraud Act, §§ 44-1521, *et seq*.

324.      Plaintiffs and members of the Damages Class purchased Humira within the State of Arizona during the class period. But for AbbVie's conduct set forth herein, the price paid would have been lower, in an amount to be determined at trial.

325.      As a direct and proximate cause of AbbVie's unlawful conduct, Plaintiffs and the members of the Damages Class have been injured in their business or property and are threatened with further injury.

326.      By reason of the foregoing, Plaintiffs and the Damages Class are entitled to seek all forms of relief, including up to treble damages and reasonable attorneys' fees and costs.

**C.      California**

327.      The California Unfair Competition Law prohibits any "unlawful" or "unfair . . . business act or practice." CAL. BUS. & PROF. CODE § 17200.

328.      By reason of the conduct alleged herein, AbbVie has engaged in unfair business acts and practices. AbbVie's conduct is also unlawful in that it violates, among other things, the Federal Trade Commission Act, 15 U.S.C. 45, *et seq*. CAL. BUS. & PROF. CODE §§ 17200, *et seq*.

329.      This claim is instituted pursuant to §§ 17203 and 17204 of the California Business and Professions Code, to obtain restitution from AbbVie for acts, as alleged herein, that violated the Unfair Competition Law.

330.    Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by AbbVie as a result of such business acts or practices.

331.    The unlawful and unfair business practices of AbbVie, and each of them, as described above, have caused and continue to cause Plaintiffs and members of the Damages Class to pay supra-competitive and artificially-inflated prices for Humira sold in the State of California. Plaintiffs and the members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition.

332.    As alleged in this complaint, AbbVie has been unjustly enriched as a result of their wrongful conduct and by AbbVie's unfair competition. Plaintiffs and the members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by AbbVie as a result of such business practices, pursuant to California Business and Professions Code §§ 17203 and 17204.

**D.    District of Columbia**

333.    The District of Columbia Consumer Protection Procedures Act prohibits "any person" from "engag[ing] in an unfair . . . trade practice." D.C. CODE § 28-3904.

334.    By reason of the conduct alleged herein, AbbVie has engaged in unfair trade practices in connection with consumer transactions. D.C. CODE §§ 28-3904, *et seq.*

335.    AbbVie is a "merchant" within the meaning of D.C. Code § 28-3901(a)(3).

336.    AbbVie's unlawful conduct substantially affected the District of Columbia's trade and commerce.

337.    As a direct and proximate cause of AbbVie's unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business or property and are threatened with further injury.

338.    By reason of the foregoing, Plaintiffs and members of the Damages Class are entitled to seek all forms of relief, including treble damages or $1,500 per violation (whichever is greater) plus punitive damages, reasonable attorney's fees and costs under D.C. Code §§ 28-3901, *et seq*.

**E.    Florida**

339.    The Florida Deceptive & Unfair Trade Practices Act prohibits "unconscionable acts or practices" and "unfair . . . act or practices in the conduct of any trade or commerce." FLA. STAT. § 501.204.

340.    By reason of the conduct alleged herein, AbbVie has engaged in unconscionable and unfair acts and practices in the conduct of trade and commerce. FLA. STAT. §§ 501.204, *et seq*.

341.    The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." FLA. STAT. § 501.202(2).

342.    Plaintiffs and Members of the Damages Class purchased Humira within the State of Florida during the class period. But for AbbVie's conduct set forth herein, the price of Humira or biosimilar versions of Humira would have been lower, in an amount to be determined at trial.

343.    AbbVie's unlawful conduct substantially affected Florida's trade and commerce.

344.    As a direct and proximate cause of AbbVie's unlawful conduct, Plaintiffs and the members of the Damages Class have been injured in their business or property by virtue of overcharges for Humira and are threatened with further injury.

345.    By reason of the foregoing, Plaintiffs and the members of the Damages Class are entitled to seek all forms of relief, including injunctive relief pursuant to Florida Statutes § 501.208 and declaratory judgment, actual damages, reasonable attorneys' fees and costs pursuant to Florida Statutes § 501.211.

**F.    Georgia**

346.    The Georgia Fair Business Practices Act prohibits "unfair . . . acts or practices." GA. CODE ANN. § 10-1-393.

347.    By reason of the conduct alleged herein, AbbVie has engaged in unfair acts and practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce. GA. CODE ANN. §§ 10-1-393, *et seq*.

348.    AbbVie's unlawful conduct substantially affected Georgia trade and commerce.

349.    As a direct and proximate cause of AbbVie's unlawful conduct, Plaintiffs and the members of the Damages Class have been injured in their business or property and are threatened with further injury

350.    By reason of the foregoing, Plaintiffs and members of the Damages Class are entitled to seek all forms of relief available under GA. CODE ANN. §§ 10-1-399, *et seq*.

**G.    Illinois**

351.    The Illinois Consumer Fraud and Deceptive Business Practices Act prohibits "unfair . . . acts or practices." 815 ILCS § 505/2.

352. By reason of the conduct alleged herein, AbbVie has engaged in unfair acts and practices. 815 ILCS §§ 505/2, *et seq*. AbbVie's conduct was directed at the market generally and implicates the welfare of consumers.

353. AbbVie's unlawful conduct substantially affected Illinois's trade and commerce.

354. As a direct and proximate cause of AbbVie's unlawful conduct, Plaintiffs and members of the Damages Class were actually deceived and have been injured in their business or property and are threatened with further injury.

355. By reason of the foregoing, Plaintiffs and members of the Damages Class are entitled to seek all forms of relief, including actual damages or any other relief the Court deems proper under 815 Illinois Compiled Statutes 505/10a, *et seq*.

## H. Nebraska

356. The Nebraska Consumer Protection Act prohibits "unfair . . . acts or practices in the conduct of any trade or commerce." NEB. REV. ST. § 59-1602.

357. By reason of the conduct alleged herein, AbbVie has engaged in unfair acts and practices in the conduct of trade or commerce.

358. AbbVie's unlawful conduct substantially affected Nebraska's trade and commerce.

359. As a direct and proximate cause of AbbVie's unlawful conduct, Plaintiffs and the members of the Damages Class have been injured in their business or property and are threatened with further injury.

360. By reason of the foregoing, Plaintiffs and members of the Damages Class are entitled to seek all forms of relief available under Nebraska Revised Statutes § 59-1614.

## I. Nevada

361.    The Nevada Deceptive Trade Practices Act prohibits companies from engaging conduct that violates "a state or federal statute or regulation relating to the sale or lease of goods or service." N.R.S. § 598.0923.

362.    By reason of the conduct alleged herein, AbbVie's conduct violates state and federal law, in particular the Federal Trade Commission Act, 15 U.S.C. § 45, *et seq*.

363.    AbbVie's unlawful conduct substantially affected Nevada's trade and commerce.

364.    AbbVie's conduct was willful.

365.    As a direct and proximate cause of AbbVie's unlawful conduct, the members of the Damages Class have been injured in their business or property and are threatened with further injury.

366.    By reason of the foregoing and pursuant to N.R.S. § 41.600, the Damages Class is entitled to seek all forms of relief, including damages, reasonable attorneys' fees and costs, and a civil penalty of up to $5,000 per violation under Nevada Revised Statutes § 598.0993.

## J. New Hampshire

367.    The New Hampshire Consumer Protection Act prohibits "any unfair . . . act or practice in the conduct of any trade or commerce." N.H. REV. STAT. § 358-A:2

368.    By reason of the conduct alleged herein, AbbVie has engaged in unfair acts and practices in the conduct of trade or commerce and has violated N.H. REV. STAT. §§ 358-A:2, *et seq*.

369.    AbbVie's conduct was willful and knowing.

370.    AbbVie's unlawful conduct substantially affected New Hampshire's trade and commerce.

371.    As a direct and proximate cause of AbbVie's unlawful conduct, Plaintiffs and the members of the Damages Class have been injured in their business or property and are threatened with further injury.

372.    By reason of the foregoing, Plaintiffs and the members of the Damages Class are entitled to seek all forms of relief available under New Hampshire Revised Statutes §§ 358-A:10 and 358-A:10-a.

**K.      New Mexico**

373.    The New Mexico Unfair Practices Act prohibits "unfair . . . trade practices and unconscionable trade practices in the conduct of any trade or commerce." N.M.S.A. § 57-12-3.

374.    By reason of the conduct alleged herein, AbbVie has engaged in unfair and unconscionable trade practices in the conduct of trade or commerce and has violated N.M.S.A. §§ 57-12-3, *et seq.*

375.    AbbVie's conduct constituted "unconscionable trade practices" in that such conduct resulted in a gross disparity between the value received by the New Mexico Damages Class members and the price paid by them for Humira as set forth in New Mexico Statutes §§ 57-12-2E.

376.    AbbVie's conduct was willful.

377.    As a direct and proximate cause of AbbVie's unlawful conduct, Plaintiffs and the members of the Damages Class have been injured in their business or property and are threatened with further injury.

378.    By reason of the foregoing, Plaintiffs and members of the Damages Class are entitled to seek all forms of relief, including actual damages or up to $300 per violation, whichever is greater, plus reasonable attorney's fees under New Mexico Statutes § 57-12-10.

**L.** **North Carolina**

379.    The North Carolina Unfair Trade and Business Practices Act prohibits "unfair . . . acts or practices in or affecting commerce." N.C. GEN. STAT. § 75-1.1

380.    By reason of the conduct alleged herein, AbbVie has engaged in unfair acts and practices affecting commerce and has violated N.C. GEN. STAT. §§ 75-1.1, *et seq*. AbbVie's conduct is offensive to public policy and is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers

381.    AbbVie's conduct constitutes consumer-oriented acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large and harmed the public interest of North Carolina consumers.

382.    Plaintiffs and members of the Damages Class purchased Humira within the State of North Carolina during the class period. But for AbbVie's conduct set forth herein, the price paid would have been lower, in an amount to be determined at trial.

383.    As a direct and proximate cause of AbbVie's unlawful conduct, Plaintiffs and the members of the Damages Class have been injured in their business or property and are threatened with further injury.

384.    By reason of the foregoing, Plaintiffs and the members of the Damages Class are entitled to seek all forms of relief, including treble damages under North Carolina General Statutes § 75-16.

**M.** **North Dakota**

385.    The North Dakota Unfair Trade Practices Law prohibits "the act, use, or employment . . . of any act or practice . . . which is unconscionable" NDCC § 51-15-02.

386.    By reason of the conduct alleged herein, AbbVie has engaged in unconscionable acts and practices and has violated NDCC §§ 51-15-02, *et seq*.

387. AbbVie's unlawful conduct substantially affected North Dakota's trade and commerce.

388. AbbVie's conduct was willful.

389. As a direct and proximate cause of AbbVie's unlawful conduct, Plaintiffs and the members of the Damages Class have been injured in their business or property and are threatened with further injury.

390. By reason of the foregoing, Plaintiffs and the members of the Damages Class are entitled to seek all forms of relief, including damages and injunctive relief under NDCC § 51-10-06.

**N.     South Carolina**

391. The South Carolina Unfair Trade Practices Act prohibits "unfair . . . acts or practices in the conduct of any trade or commerce." S.C. CODE ANN. § 39-5-20.

392. By reason of the conduct alleged herein, AbbVie has engaged in unfair acts and practices in the conduct of trade or commerce and has violated South Carolina Code §§ 39-5-10, *et seq*. AbbVie's conduct is offensive to public policy and is immoral, unethical, and oppressive.

393. AbbVie's unlawful conduct substantially affected South Carolina's trade and commerce.

394. Plaintiffs and members of the Damages Class purchased Humira within the State of South Carolina during the class period. But for AbbVie's conduct set forth herein, the price paid would have been lower, in an amount to be determined at trial.

O.    **Utah**

395.    The Utah Consumer Sales Practices Act prohibits any "unconscionable act or practice." UTAH CODE ANN. § 13-11-5.

396.    By reason of the conduct alleged herein, AbbVie has engaged unconscionable acts and practices in connection with consumer transactions. UTAH CODE ANN. §§ 13-11-5, *et seq.*

397.    Plaintiffs and members of the Damages Class purchased Humira within the State of Utah during the class period. But for AbbVie's conduct set forth herein, the price paid would have been lower, in an amount to be determined at trial.

398.    AbbVie knew or had reason to know that their conduct was unconscionable.

399.    AbbVie's unlawful conduct substantially affected Utah's trade and commerce.

400.    As a direct and proximate cause of AbbVie's unlawful conduct, Plaintiffs and the members of the Damages Class have been injured in their business or property and are threatened with further injury.

401.    By reason of the foregoing, Plaintiffs and the members of the Damages Class are entitled to seek all forms of relief, including declaratory judgment, injunctive relief, damages, and ancillary relief, pursuant to Utah Code Ann. §§ 13-11-19(5) and 13-11-20.

P.    **West Virginia**

402.    The West Virginia Consumer Credit and Protection Act prohibits "unfair . . . acts or practices in the conduct of any trade or commerce." W. VA. CODE § 46A-6-104.

403.    By reason of the conduct alleged herein, AbbVie has engaged in unfair acts and practices in the conduct of trade or commerce and has violated §§ 46A-6-101, *et seq.* of the West Virginia Code.

404.     Plaintiffs and members of the Damages Class purchased Humira within the State of West Virginia during the class period. But for AbbVie's conduct set forth herein, the price paid would have been lower, in an amount to be determined at trial.

405.     As a direct and proximate cause of AbbVie's unlawful conduct, Plaintiffs and the members of the Damages Class have been injured in their business or property and are threatened with further injury.

406.     As a result of AbbVie's violation of § 47-18-3 of the West Virginia Antitrust Act, Plaintiffs and members of the Damages Class seek all recoverable damages and their cost of suit, including reasonable attorneys' fees, pursuant to §§ 46A-5-101(a) and 46A-5-104 of the West Virginia Code.

## XII.    DEMAND FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the proposed classes, respectfully demand that the Court:

i.      Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. Rule 23(a), (b)(2), and (b)(3), direct that reasonable notice of this action, as provided by Rule 23(c)(2), be given to the classes, and declare Plaintiffs as named representatives of the classes;

ii.     Conduct expedited discovery proceedings leading to a prompt trial on the merits before a jury on all claims and defenses;

iii.    Enter judgment against Defendants and in favor of Plaintiffs and the classes;

iv.     Award damages (*i.e.*, three times overcharges) to the Damages Class in an amount to be determined at trial, plus interest in accordance with law;

v.      Enter injunctive relief to stop Defendants' unlawful conduct;

vi.     Award Plaintiffs and the classes their costs of suit, including reasonable attorneys' fees as provided by law; and

vii.    Award such further and additional relief as is necessary to correct for the anticompetitive market effects AbbVie's unlawful conduct caused and as the Court may deem just and proper under the circumstances.

## XIII. JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs, on behalf of themselves and the proposed classes, demand a trial by jury on all issues so triable.

Dated: August 9, 2019 Respectfully submitted,

/s/ Karin E. Garvey
Karin E. Garvey
Gregory S. Asciolla
Jay L. Himes
Matthew J. Perez
Lara Goldstone
Jonathan Crevier
LABATON SUCHAROW LLP
140 Broadway
New York, New York 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
kgarvey@labaton.com
gasciolla@labaton.com
jhimes@labaton.com
mperez@labaton.com
lgoldstone@labaton.com
jcrevier@labaton.com

/s/ Dena C. Sharp
Dena C. Sharp
Scott Grzenczyk
Tom Watts
GIRARD SHARP LLP
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846
dsharp@girardsharp.com
scottg@girardsharp.com
tomw@girardsharp.com

/s/ Lauren Guth Barnes
Lauren Guth Barnes
Thomas M. Sobol
HAGENS BERMAN SOBOL SHAPIRO LLP
55 Cambridge Parkway
Suite 301
Cambridge, MA 02142
Tel: (617) 482-3700
Fax: (617) 482-3003
tom@hbsslaw.com
lauren@hbsslaw.com

Steve W. Berman (Bar No. 3126833)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

*Interim Co-Lead Counsel for the Classes*

James R. Dugan, II
David S. Scalia
THE DUGAN LAW FIRM, LLC
One Canal Place – Suite 1000
365 Canal Street
New Orleans, LA 70130
Tel: 504-648-0180
Fax: 866-328-7670
jdugan@dugan-lawfirm.com
dscalia@dugan-lawfirm.com
dplymale@dugan-lawfirm.com
bonnie@dugan-lawfirm.com

Robert G. Eisler
Deborah A. Elman
GRANT & EISENHOFER P.A.
485 Lexington Avenue, 29th Floor
New York, NY
Tel: (646) 722-8500
Fax: (646) 722-8501
reisler@gelaw.com
delman@gelaw.com

Lisa B. Weinstein (Bar No. 6290253)
GRANT & EISENHOFER PA
30 N. LaSalle Street, Suite 2350
Chicago, IL 60602
Tel: (312) 214-0000
Fax: (312) 214-0001
lweinstein@gelaw.com

Roberta D. Liebenberg
Jeffrey S. Istvan
Paul Costa
Adam J. Pessin (pro hac vice pending)
FINE, KAPLAN AND BLACK,
R.P.C.
One South Broad Street, 23rd Floor
Philadelphia, PA 19107
Tel: (215) 567-6565
Fax: (215) 568-5872
rliebenberg@finekaplan.com
jistvan@finekaplan.com
pcosta@finekaplan.com
apessin@finekaplan.com

David W. Mitchell
Brian O. O'Mara
Arthur L. Shingler III
ROBBINS GELLER RUDMAN &
DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058 619/231-
7423 (fax)
E-mail: davidm@rgrdlaw.com
bomara@rgrdlaw.com
ashingler@rgrdlaw.com

116

Christopher A. Seeger
Jennifer Scullion
SEEGER WEISS LLP
77 Water Street, 8th Floor
New York, NY 10005
Telephone: 212/584-0700 212/584-0799 (fax)
E-mail: cseeger@seegerweiss.com
jscullion@seegerweiss.com

Sharon K. Robertson
Donna M. Evans
Royce Zeisler
COHEN MILSTEIN SELLERS & TOLL PLLC
88 Pine Street, 14th Floor
New York, NY 10005
Telephone: (212) 838-7797
Facsimile: (212) 838-7745
srobertson@cohenmilstein.com
devans@cohenmilstein.com
rzeisler@cohenmilstein.com

Carol V. Gilden - Bar No. 6185530
COHEN MILSTEIN SELLERS & TOLL PLLC
190 S LaSalle St # 1705
Chicago, IL 60603
Telephone: (312) 629-3737
Facsimile: (312) 357-0369
cgilden@cohenmilstein.com

*Plaintiffs' Executive Committee*

Allison Pham
Jessica Chapman
Charles A. O'Brien
LOUISIANA HEALTH SERVICE & INDEMNITY COMPANY, D/B/A BLUE CROSS AND BLUE SHIELD OF LOUISIANA
5525 Reitz Avenue
P.O. Box 98029
Baton Rouge, Louisiana 80809
Tel.: (225) 295-2199
Fax: (225) 297-2760

*Counsel for Louisiana Health Service*

117

*& Indemnity Company, d/b/a Blue*
*Cross and Blue Shield of Louisiana*

Jayne A. Goldstein (Bar No. 6310724)
SHEPHERD FINKELMAN, MILLER
& SHAH, LLP
1625 North Commerce Parkway, Ste.
320
Fort Lauderdale, FL 33326
Telephone: (654) 515-0123
Facsimile: (866) 300-7367
Email: jgoldstein@sfmslaw.com

*Counsel for Fraternal Order of Police,*
*Miami Lodge 20, Insurance Trust Fund*

Kenneth A. Wexler - Bar No. 3127810
Justin N. Boley - Bar No. 6302433
WEXLER WALLACE LLP
55 West Monroe St.
Suite 3300
Chicago, IL 60603
Tel: (312) 346-2222
Fax: (312) 346-0022
kaw@wexlerwallace.com
jnb@wexlerwallace.com

*Counsel for the Mayor and City*
*Council of Baltimore*

Andre M. Davis
Suzanne Sangree
City of Baltimore Department of Law
City Hall, Room 109
100 N. Holiday Street
Baltimore, MD 21202
Telephone: (443) 388-2190
Andre.Davis@baltimorecity.gov
Suzanne.Sangree2@baltimorecity.gov

*Counsel for the Mayor and City*
*Council of Baltimore*

Katrina Carroll
Kyle A. Shamberg
LITE DEPALMA GREENBERG, LLC
111 W. Washington Street, Suite 1240
Chicago, IL 60602
Telephone: 312.750.1265
Facsimile: 312.212.5919
kcarroll@litedepalma.com

Karen Hanson Riebel
Heidi M. Silton
Elizabeth Odette
Jessica N. Servais
LOCKRIDGE GRINDAL NAUEN
P.L.L.P.
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401
Telephone: 612.339.6900
Facsimile: 612.339.0981
khriebel@locklaw.com
hmsilton@locklaw.com
erodette@locklaw.com
jnservais@lacklaw.com

*Counsel for Pipe Trades Services MN
Welfare Fund*

Renae D. Steiner
HEINS MILLS & OLSON, P.L.C.
310 Clifton Avenue
Minneapolis, MN 55403
Tel: (612) 338-4605
Fax: (612) 338-4692
rsteiner@heinsmills.com

Frank R. Schirripa
David R. Cheverie
Daniel B. Rehns
HACH ROSE SCHIRRIPA
& CHEVERIE LLP
112 Madison Avenue, 10th Floor
New York, New York 10016
Tel: 212-213-8311
Fax: 212-779-0028
Email: fschirripa@hrsclaw.com
Email: dcheverie@hrsclaw.com

Email: drehns@hrsclaw.com

Renae D. Steiner
HEINS MILLS & OLSON, P.L.C.
310 Clifton Avenue
Minneapolis, MN 55403
Tel: (612) 338-4605
Fax: (612) 338-4692
rsteiner@heinsmills.com

Joe P. Leniski, Jr. (TN BPR#022891)
J. Gerard Stranch, IV (TN
BPR#023045)
James G. Stranch, III (TN BPR#2542)
BRANSTETTER, STRANCH &
JENNINGS, PLLC
223 Rosa Parks Ave. Suite 200
Nashville, TN 37203
Telephone: 615/254-8801
Facsimile: 615/255-5419
Email: joeyl@bsjfirm.com
gerards@bsjfirm.com
jims@bsjfirm.com

Peter J. Flowers
Myers & Flowers
3 North Second Street, Suite 300
St. Charles, IL 60174
Telephone: 630/232-6333 630/845-
8982 (fax)
E-mail: pjf@meyers-flowers.com

Michael J. Freed
Steven A. Kanner
Robert J. Wozniak
Brian M. Hogan
FREED KANNER LONDON &
MILLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
(224) 632-4500
skanner@fklmlaw.com
mfreed@fklmlaw.com
rwozniak@fklmlaw.com
bhogan@fklmlaw.com

120

Stephanie A. Scharf
SCHARF BANKS MARMOR LLC
333 West Wacker Drive, Suite 450
Chicago, IL 60606
Tel: (312) 662-6999
sscharf@scharfbanks.com

Joseph Goldberg
FREEDMAN BOYD HOLLANDER
GOLDBERG URIAS & WARD P.A.
20 First Plaza, Suite 700
Albuquerque, NM 87102
Tel: (505) 244-7520
jg@fdblaw.com

*Counsel for Locals 302 & 612 of the
International Union of Operating
Engineers-Employers Construction
Industry health and Security Trust
Fund*

Joseph H. Meltzer
Terence S. Ziegler
Donna Siegel Moffa
KESSLER TOPAZ MELTZER &
CHECK LLP
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056
jmeltzer@ktmc.com
tziegler@ktmc.com
dmoffa@ktmc.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 9, 2019, the Status Report was served via CM/ECF on counsel of Record.

/s/ *Dena C. Sharp*
Dena C. Sharp