**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE: HUMIRA (ADALIMUMAB) ANTITRUST LITIGATION | Case No. 1:19-cv-01873<br><br>Hon. Manish S. Shah<br>Magistrate Judge Jeffrey Cummings |

## <u>PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS</u>

# REDACTED

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. iv

I.  INTRODUCTION ...................................................................................................1

II.  FACTS ....................................................................................................................2

    A.  Humira is regulated by the BPCIA, which establishes a potentially lengthy and expensive process for challenging invalid or unenforceable patents. ...............3

    B.  AbbVie constructed an unlawful patent thicket around Humira to prevent competition and protect its profits. ...................................................................4

    C.  AbbVie further protected its monopoly by agreeing with the biosimilar defendants to eliminate potential competition in the United States until 2023. ......7

III.  ARGUMENT ...........................................................................................................9

    A.  AbbVie's monopolization of Humira violates the antitrust laws...........................10

        1.  AbbVie's patents do not exempt it from antitrust liability. .......................11

            a.  Patentees are subject to antitrust liability for many different types of abuse of the patent system...................................................11

            b.  The plaintiffs have plausibly alleged that AbbVie has abused both the BPCIA and the patent system in ways that cause anticompetitive effects and subject it to antitrust scrutiny.............13

            c.  Courts have addressed the dangers inherent in vast accumulations of patents..............................................................18

            d.  AbbVie's arguments about denials of petitions for IPR are premature and unpersuasive..........................................................22

            e.  AbbVie's other arguments are unpersuasive. ...............................24

        2.  The First Amendment does not exempt AbbVie from antitrust liability. .......................................................................................................25

            a.  Those who abuse government petitioning systems may be subject to antitrust liability..........................................................25

            b.  The *Noerr-Pennington* doctrine does not exempt AbbVie's conduct from antitrust scrutiny. ....................................................28

    c. AbbVie's arguments regarding subjective intent are unpersuasive........................................................................29

 B. The defendants' market division and reverse payment agreements violate the antitrust laws. ...............................................................................30

  1. The defendants' market division agreements are *per se* unlawful.............31

  2. Even under a "quick look" or rule of reason analysis, the plaintiffs' claims pass muster. ...............................................................35

   a. Reverse-payment settlements should be viewed in their totality. .......................................................................37

   b. The defendants' agreements paid biosimilar entrants to delay competition in the United States in exchange for early, date-certain access and profits in Europe................................40

 C. The plaintiffs have pleaded antitrust injury by alleging that they paid overcharges for Humira. ...............................................................45

  1. The plaintiffs have pleaded facts plausibly suggesting that, if the defendants behaved lawfully, the biosimilars could have negotiated earlier entry dates or won the patent litigation..........................................46

   a. Lawful alternative settlements with patent licenses would have provided earlier entry dates...........................................46

   b. The plaintiffs plausibly allege that absent the defendants' unlawful conduct, biosimilar companies could have won the patent litigation. ...........................................................48

  2. The plaintiffs can establish causation without proving that each and every one of AbbVie's patents was invalid or not infringed. ....................51

 D. The plaintiffs have sufficiently pleaded their state law claims.............................53

  1. The plaintiffs sufficiently plead that the defendants' conduct affected trade and commerce in each state. ...........................................................53

  2. The plaintiffs can assert damages claims under Alaska law......................56

  3. The plaintiffs can bring class action claims under the Illinois Antitrust Act in federal court. ...............................................................57

  4. The plaintiffs have standing to represent Utah residents under Utah's antitrust statute...............................................................57

5.    The plaintiffs' consumer protection claims are actionable even if their antitrust claims are dismissed. ...................................................................58

6.    The plaintiffs' state consumer protection claims satisfy Rule 8. ................59

7.    Indirect purchasers may bring consumer protection claims regardless of whether *Illinois Brick* bars them from asserting antitrust claims. .........62

8.    The plaintiffs do not allege a freestanding claim for unjust enrichment under California law. .................................................................................63

9.    The plaintiffs' District of Columbia consumer protection claim is not limited to consumers. ..................................................................................63

10.   The plaintiffs complied with the Georgia and Nevada notice requirements. ...............................................................................................64

11.   The plaintiffs have sufficiently alleged unconscionability under the Utah Consumer Sales Practices Act. ...........................................................64

12.   The plaintiffs' claims fall within the scope of the West Virginia Consumer Credit and Protection Act. .........................................................65

IV.   CONCLUSION................................................................................................................65

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AbbVie Inc. v. Boehringer Ingelheim Int'l GmbH*,
2019 WL 498797 (D. Del. Feb. 8, 2019) ........................................................................19, 40

*In re Actos End Payor Antitrust Litigation*,
2015 WL 5610752 (S.D.N.Y. Sept. 22, 2015) ........................................................................44

*In re Aftermarket Filters Antitrust Litig.*,
2009 WL 3754041 (N.D. Ill. Nov. 5, 2009) ............................................................59, 61, 65

*In re Aggrenox Antitrust Litig.*,
2015 WL 4459607 (D. Conn. July 21, 2015) ........................................................................53

*In re Aggrenox Antitrust Litig.*,
2016 WL 4204478 (D. Conn. Aug. 9, 2016) ........................................................................57

*In re Aggrenox Antitrust Litig.*,
94 F. Supp. 3d 224 (D. Conn. 2016) ..............................................................................39, 61

*Agnew v. NCAA*,
683 F.3d 328 (7th Cir. 2012) ................................................................................................42

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
486 U.S. 492 (1988) ..............................................................................................................18

*In re Androgel Antitrust Litig. (No. II)*,
2018 WL 2984873 (N.D. Ga. June 14, 2018) ........................................................................46

*In re Asacol Antitrust Litig.*,
2016 WL 4083333 (D. Mass. July 20, 2016) ........................................................................58

*Asahi Glass Co. v. Pentech Pharm., Inc.*,
289 F. Supp. 2d 986 (N.D. Ill. 2003), *dismissed*, 104 F. App'x 178 (Fed. Cir.
2004) ......................................................................................................................................44

*Atari Games Corp. v. Nintendo of Am., Inc.*,
897 F.2d 1572 (Fed. Cir. 1990) ......................................................................................11, 13

*In re Auto. Parts Antitrust Litig.*,
50 F. Supp. 3d 869 (E.D. Mich. 2014) ............................................................................54, 62, 63

*Axis, S.p.A. v. Micafil, Inc.*,
870 F.2d 1105 (6th Cir. 1989) ..............................................................................................24

*Barry Aviation Inc. v. Land O'Lakes Mun. Airport Comm'n*,
377 F.3d 682 (7th Cir. 2004) ......................................................................................65

*Bd. of Trade of City of Chicago v. United States*,
246 U.S. 231 (1918)......................................................................................................18

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
603 F.2d 263 (2d Cir. 1979)............................................................................14, 16, 17

*Blackburn v. Sweeny*,
53 F.3d 825 (7th Cir. 1995) .............................................................................31, 32, 33

*Blue Cross Blue Shield of Wis. v. Marshfield Clinic*,
152 F.3d 588 (7th Cir. 1998) ......................................................................................31

*Bosse v. Oklahoma*,
137 S. Ct. 1 (2016).......................................................................................................28

*BRFHH Shreveport, LLC v. Willis Knighton Med. Ctr.*,
176 F. Supp. 3d 606 (W.D. La. 2016).........................................................................15

*In re Broiler Chicken Antitrust Litig.*,
290 F. Supp. 3d 772 (N.D. Ill. 2017) ..........................................................................57

*Cal. Dental Ass'n v. FTC*,
526 U.S. 756 (1999).....................................................................................................35

*California Motor Transport Co. v. Trucking Unlimited*,
404 U.S. 508 (1972).............................................................................25, 26, 27, 28

*Carlson v. CSX Transp., Inc.*,
758 F.3d 819 (7th Cir. 2014) ...................................................................................9, 10

*Chicago Prof'l Sports Ltd. P'ship v. NBA*,
961 F.2d 667 (7th Cir. 1992) .................................................................................35, 36

*In re Chocolate Confectionary Antitrust Litig.*,
749 F. Supp. 2d 224 (M.D. Pa. 2010) ...................................................................55, 62

*In re Cipro Cases I & II*,
348 P.3d 845 (Cal. 2015) ........................................................................................48, 53

*City of Rockford v. Mallinckrodt ARD, Inc.*,
360 F. Supp. 3d 730 (N.D. Ill. 2019) .....................................................................30, 31

*City of Sterling Heights Gen. Emps' Ret. Sys. v. Hospira, Inc.*,
2013 WL 566805 ...................................................................................................42

*Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*,
690 F.2d 1240 (9th Cir. 1982) ................................................................................25

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
370 U.S. 690 (1962)................................................................................................38

*Contant v. Bank of Am. Corp.*,
2018 WL 5292126 (S.D.N.Y. Oct. 25, 2018)........................................................57

*CyberOptics Corp. v. Yamaha Motor Co.*,
1996 WL 673161 (D. Minn. July 29, 1996) ...........................................................12

*Dairy Foods Inc. v. Dairy Maid Prod. Co-op.*,
297 F.2d 805 (7th Cir. 1961) .................................................................................20

*Datascope Corp. v. Vascular Solutions, Inc.*,
165 F. Supp. 2d. 933 (D. Minn. 2001).....................................................................30

*In re DDAVP Indirect Purchaser Antitrust Litig.*,
903 F. Supp. 2d 198 (S.D.N.Y. 2012).................................................................55, 56

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
362 F. Supp. 3d 477 (N.D. Ill. 2019) ...................................................33, 57, 58, 59

*In re Domestic Drywall Antitrust Litig.*,
2016 WL 3769680 (E.D. Pa. July 13, 2016).............................................................62

*In re Ductile Pipe Iron Pipe Fittings (DIPF) Indirect Purchaser Antitrust Litig.*,
2013 WL 5503308, at *22 (D.N.J. Oct. 2, 2013)....................................................56

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
516 F. Supp. 2d 1072 (N.D. Cal. 2007) ..................................................................56

*E-Watch, Inc. v. Lorex Canada, Inc.*,
2013 WL 5425298 (S.D. Tex. Sept. 26, 2013) ......................................................23

*In re EpiPen (Epinephrine Injection, USP), Mkt'g, Sales Practices & Antitrust
Litig.*,
336 F. Supp. 3d 1256 (D. Kan. 2018)................................................................31, 39

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust
Litig.*,
2017 WL 6524839 (D. Kan. Dec. 21, 2017)...........................................................20

*Ethicon, Inc. v. Quigg*,
849 F.2d 1422 (Fed. Cir. 1988)...............................................................................49

*In re Flash Memory Antitrust Litigation*,

643 F. Supp. 2d 1133 (N.D. Cal. 2009) .................................................................55

*F.T.C. v. AbbVie*,
107 F. Supp. 3d 428 (E.D. Pa. 2015) ............................................................39, 40

*F.T.C. v. Actavis, Inc.*,
570 U.S. 136 (2013)............................................................................... *passim*

*F.T.C. v. Cephalon, Inc.*,
08-cv-2141 (E.D. Pa. 2019) ..........................................................................44

*F.T.C. v. Superior Court Trial Lawyers Ass'n*,
493 U.S. 411 (1990)......................................................................................28

*FMC Corp. v. Manitowoc Co.*,
835 F.2d 1411 (Fed. Cir. 1987)......................................................................24

*Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co., Ltd.*,
2016 WL 756568 (E.D. Wis. Feb. 26, 2016)..................................................18

*Garot Anderson Agencies, Inc. v. Blue Cross & Blue Shield United of Wis.*,
1993 WL 78756 (N.D. Ill. Feb. 26, 1993) ........................................32, 33, 34

*GEICO v. Hazel*,
2014 WL 4628655 (E.D.N.Y. Aug. 11, 2014).................................................30

*In re Generic Pharms. Pricing Antitrust Litig.*,
368 F. Supp. 3d 814 (E.D. Pa. 2019) .................................................. *passim*

*George v. Kraft Foods Glob., Inc.*,
674 F. Supp. 2d 1031 (N.D. Ill. 2009) ...........................................................42

*In re Graphics Processing Unit Antitrust Litigation*,
527 F. Supp. 2d 1011 (N.D. Cal. 2007) ....................................................61, 62

*Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*,
806 F.3d 162 (3d Cir. 2015).......................................................................26, 27

*High Sierra Sport Co. v. Travelers Club Luggage, Inc.*,
2010 WL 5174390 (N.D. Ill. Dec. 15, 2010)..................................................10

*In re High-Tech Emp. Antitrust Litig.*,
856 F. Supp. 2d 1103 (N.D. Cal. 2012) ..........................................................31

*Hohn v. United States*,
524 U.S. 236 (1998)......................................................................................27

*Hospital Auth. of Metro. Gov't of Nashville v. Momenta Pharms., Inc.*,
353 F. Supp. 3d 678 (M.D. Tenn. 2018).............................................54, 56, 58

*In Porters, S.A. v. Hanes Printables, Inc.*,
663 F. Supp. 494 (M.D.N.C. 1987) ................................................................56

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
280 F. Supp. 3d 691 (D. Md. 2017) ...............................................................21

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
937 F.3d 1359 (Fed. Cir. 2019)......................................................................22

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
99 F. Supp. 3d 610 (D. Md. 2015) .............................................................20, 21

*Intellectual Ventures I LLC v. Symantec Corp.*,
2014 WL 4773954 (D. Del. Sept. 24, 2014)................................................20, 21

*Jenn-Air Corp. v. Modern Maid Co.*,
499 F. Supp. 320 (D. Del. 1980), *aff'd without opinion*, 659 F.2d 1068 (3d
Cir. 1981) .......................................................................................................12

*In re K-Dur Antitrust Litig.*,
686 F.3d 197 (3d Cir. 2012), *judgment vacated sub nom., Merck & Co. v.
Louisiana Wholesale Drug Co.*, 570 U.S. 913 (2013), *judgment reinstated by*
2013 WL 5180857 (3d Cir. Sept. 9, 2013) ......................................................47

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
383 F. Supp. 3d 187 (S.D.N.Y. 2019)..............................................................15

*King Drug Co. of Florence, Inc. v. Cephalon, Inc.*,
2015 WL 12645764 (E.D. Pa. Dec. 22, 2015)..................................................17

*King Drug Co. of Florence, Inc. v. Cephalon, Inc.*,
2015 WL 8620989 (E.D. Pa. Dec. 14, 2015)....................................................35

*King Drug Co. of Florence Inc. v. Smithkline Beecham Corp.*,
791 F.3d 388 (3d Cir. 2015)..............................................................40, 41, 44

*Kobe, Inc. v. Dempsey Pump Co.*,
198 F.2d 416 (10th Cir. 1952) ............................................................11, 19, 20, 21

*Laumann v. Nat'l Hockey League*,
907 F. Supp. 2d 465 (S.D.N.Y. 2012)..............................................................33

*In re Lidoderm Antitrust Litig.*,
103 F. Supp. 3d 1155 (N.D. Cal. 2015) ......................................................56, 64

*In re Lipitor Antitrust Litig.*,
2013 WL 4780496 (D.N.J. Sept. 5, 2013), *rev'd on other grounds*, 868 F.3d
231 (3d Cir. 2017)..........................................................................................45

*In re Lipitor Antitrust Litig.*,
  868 F.3d 231 (3d Cir. 2017)............................................................................ *passim*

*In re Lipitor Antitrust Litigation*,
  336 F. Supp. 3d 395 (D.N.J. 2018) ..................................................................62

*In re Liquid Aluminum Sulfate Antitrust Litig.*,
  2017 WL 3131977 (D.N.J. July 20, 2017).................................................57, 58

*In re Lithium Ion Batteries Antitrust Litig.*,
  2014 WL 4955377 (N.D. Cal. Oct. 2, 2014)......................................................57

*Livingston Downs Racing Ass'n Inc. v. Jefferson Downs Corp.*,
  192 F. Supp. 2d 519 (M.D. La. 2001)................................................................26

*In re Loestrin 24 Fe Antitrust Litig.*,
  261 F. Supp. 3d 307 (D.R.I. 2017)....................................................................39

*Mack v. Bristol–Myers Squibb Co.*,
  673 So.2d 100 (Fla. Dist. Ct. App. 1996) ........................................................63

*Mannington Mills, Inc. v. Congoleum Indus., Inc.*,
  610 F.2d 1059 (3d Cir. 1979)............................................................................39

*Marion Healthcare, LLC v. S. Illinois Healthcare*,
  2015 WL 3466585 (S.D. Ill. May 29, 2015)................................................15, 16

*Mercatus Grp., LLC v. Lake Forest Hosp.*,
  641 F.3d 834 (7th Cir. 2011) ............................................................................26

*In re Metoprolol Succinate Direct Purchaser Antitrust Litig.*,
  2010 WL 1485328 (D. Del. Apr. 13, 2010)........................................................25

*Milwaukee Elec. Tool Corp. v. Snap-On Inc.*,
  271 F. Supp. 3d 990 (E.D. Wis. 2017)..............................................................23

*Moraine Products v. ICI America, Inc.*,
  538 F.2d 134 (7th Cir. 1976) ............................................................................35

*Muir v. Nature's Bounty (DE), Inc.*,
  2018 WL 3647115 (N.D. Ill. Aug. 1, 2018) ......................................................57

*My Health, Inc. v. Lifescan, Inc.*,
  2015 WL 13469638 (E.D. Tex. Mar. 19, 2015) ................................................22

*In re Namenda Direct Purchaser Antitrust Litig.*,
  331 F. Supp. 3d 152 (S.D.N.Y. 2018)................................................................45

*In re Neurontin Antitrust Litig.*,
2009 WL 2751029 (D.N.J. Aug. 28, 2009) ....................................................................11, 27

*In re New Motor Vehicles Canadian Export Antitrust Litig.*,
350 F. Supp. 2d 160 (D. Maine 2004) ...............................................................................55

*In re Nexium Antitrust Litig.*,
777 F.3d 9 (1st Cir. 2015)...................................................................................................46

*In re Nexium (Esomeprazole) Antitrust Litig.*,
297 F.R.D. 168 (D. Mass. 2013)........................................................................................60

*In re Nexium (Esomeprazole) Antitrust Litig.*,
968 F. Supp. 2d 367 (D. Mass. 2013) ................................................................................41

*In re Niaspan Antitrust Litig.*,
42 F. Supp. 3d 735 (E.D. Pa. 2014) ........................................................................ *passim*

*In re Novartis and Par Antitrust Litigation*,
2019 WL 3841711 (S.D.N.Y. Aug. 15, 2019).....................................................................34

*Omnicare, Inc. v. Unitedhealth Group, Inc.*,
524 F. Supp. 2d 1031 (N.D. Ill. 2007) ...............................................................................10

*In re Opana ER Antitrust Litig.*,
162 F. Supp. 3d 704 (N.D. Ill. 2016) (Leinenweber, J.) ..................................... *passim*

*Oracle Am., Inc. v. CedarStone, Inc.*,
938 F. Supp. 2d 895 (N.D. Cal. 2013) ...............................................................................42

*In re Packaged Seafood Prods. Antitrust Litig.*,
242 F. Supp. 3d 1033 (S.D. Cal. 2017).................................................................55, 56, 62

*Palmer v. BRG of Georgia*,
498 U.S. 46 (1990).............................................................................................................33

*Primetime 24 Joint Venture v. Nat'l Broad.*,
Co., 219 F.3d 92 (2d Cir. 2000)........................................................................................26

*Princo Corp. v. Int'l Trade Comm'n*,
616 F.3d 1318 (Fed. Cir. 2010).........................................................................................12

*In re Processed Eggs Antitrust Litig.*,
851 F. Supp. 2d 867 (E.D. Pa. 2012) .................................................................................62

*Procter & Gamble Co. v. Paragon Trade Brands, Inc.*,
61 F. Supp. 2d 102 (D. Del. 1996).....................................................................................22

*Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*,
   508 U.S. 49 (1993) ................................................................................................ *passim*

*In re Propranolol Antitrust Litig.*,
   249 F. Supp. 3d 712 (S.D.N.Y. 2017) .............................................................. 11, 57

*Pyour B.V. v. Ingredion, Inc.*,
   2017 WL 9729695 (N.D. Ill. Feb. 22, 2017) ................................................... 10, 43

*In re Refrigerant Antitrust Litigation*,
   2013 WL1431756 (E.D. Mich. Apr. 9, 2013) ......................................................... 56

*In re Remeron Antitrust Litig.*,
   335 F. Supp. 2d 522 (D.N.J. 2004) ....................................................................... 12

*In re Remicade Antitrust Litig.*,
   345 F. Supp. 3d 566 (E.D. Pa. 2018) .......................................................... 54, 56, 64

*In re Restasis (Cyclosporine Opthalmic Emulsion) Antitrust Litig.*,
   355 F. Supp. 3d 145 (E.D.N.Y. 2018) .................................................................... 60

*Rex Chainbelt Inc. v. Harco Prod., Inc.*,
   512 F.2d 993 (9th Cir. 1975) ................................................................................. 20

*Richards v. Mitcheff*,
   696 F.3d 635 (7th Cir. 2012) ........................................................................... 10, 42

*Robertson v. Sea Pines Real Estate Companies, Inc.*,
   679 F.3d 278 (4th Cir. 2012) ................................................................................. 15

*Saint Regis Mohawk Tribe v. Mylan Pharm. Inc.*,
   896 F.3d 1322 (Fed. Cir. 2018) (Dyk, J., concurring) ........................................... 17

*Salomon S.A. v. Alpina Sports Corp.*,
   737 F. Supp. 720 (D.N.H. 1990) ........................................................................... 12

*SCM Corp. v. Xerox Corp.*,
   645 F.2d 1195 (2d Cir. 1981) ................................................................................ 20

*Scott Paper Co. v. Marcalus Mfg. Co.*,
   326 U.S. 249 (1945) ......................................................................................... 13, 18

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, PLC*,
   2018 WL 7197233 (S.D.N.Y. Dec. 26, 2018) .............................................. 46, 57, 65

*Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co.*,
   559 U.S. 393 (2010) .............................................................................................. 57

*SmithKline Corp. v. Eli Lilly & Co.*,
575 F.2d 1056 (3d Cir. 1978)................................................................................................12

*Spectrum Sports, Inc. v. McQuillan*,
506 U.S. 447 (1993)...............................................................................................................13

*Standard Oil Co. v. Fed. Trade Comm'n*,
340 U.S. 231 (1951)...............................................................................................................13

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*,
64 F. Supp. 3d 665 (E.D. Pa. 2014) .....................................................................................11

*Sun Dun, Inc. of Washington v. Coca-Cola Co.*,
740 F. Supp. 381 (D. Md. 1990)...........................................................................................54

*Tawfilis v. Allergan, Inc.*,
157 F. Supp. 3d 853 (C.D. Cal. 2015) ..................................................................................34

*In re Terazosin Hydrochloride Antitrust Litig.*,
335 F. Supp. 2d 1336 (S.D. Fla. 2004) .................................................................................52

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
586 F. Supp. 26 1109, 1127 (N.D. Cal. 2008) .....................................................................62

*In re Thalomid & Revlimid Antitrust Litig.*,
2015 WL 9589217 (D.N.J. Oct. 29, 2015).............................................................................51

*Timken Roller Bearing Co. v. United States*,
341 U.S. 593 (1951)...............................................................................................................31

*In re TLI Commc'ns LLC Patent Litig.*,
87 F. Supp. 3d 773 (E.D. Va. 2015), *aff'd*, 823 F.3d 607 (Fed. Cir. 2016)............................23

*Total Renal Care, Inc. v. W. Nephrology & Metabolic Bone Disease, P.C.*,
2009 WL 2596493 (D. Colo. Aug. 21, 2009) ........................................................................26

*UIRC-GSA Holdings, Inc. v. William Blair & Co., LLC*,
2018 WL 6573226 (N.D. Ill. Dec. 13, 2018)........................................................................42

*United Food & Commercial Workers Local 1776 & Participating Emp'rs Health*
*& Welfare Fund v. Teikoku Pharma USA*,
296 F. Supp. 3d 1142 (N.D. Cal. 2017) ....................................................................48, 49, 53

*United Food & Commercial Workers Local 1776 & Participating Emp'rs Health*
*& Welfare Fund v. Teikoku Pharma USA, Inc.*,
74 F. Supp. 3d 1052 (N.D. Cal. 2014) ......................................................................41, 63

*United States v. Aluminum Co. of Am.*,
 148 F.2d 416 (2d Cir. 1945)....................................................................................14, 16

*United States v. Griffith*,
 334 U.S. 100 (1948), *overruled on other grounds by Copperweld Corp. v. Ind.
 Tube Corp.*, 467 U.S. 752 (1984).................................................................................14

*United States v. Grinnell Corp.*,
 384 U.S. 563 (1966)......................................................................................................11

*United States v. Line Material Co.*,
 333 U.S. 287 (1948).........................................................................................12, 15, 17

*United States v. LaSalle Bank, N.A.*,
 2008 WL 4874169 (N.D. Ill. July 29, 2008)..........................................................10, 43

*United States v. Perez–Ruiz*,
 169 F.3d 1075 (7th Cir. 1999) .....................................................................................40

*United States v. Sealy, Inc.*,
 388 U.S. 350 (1967)......................................................................................................31

*United States v. Swift & Co.*,
 286 U.S. 106 (1932)......................................................................................................14

*United States v. Topco Assocs., Inc.*,
 405 U.S. 596 (1972)................................................................................................31, 33

*USS-POSCO Indus. v. Contra Costa Cty. Bldg. & Const. Trades Council, AFL-
 CIO*,
 31 F.3d 800 (9th Cir. 1994) ..............................................................................26, 51, 52

*In re Vitamins Antitrust Litigation*,
 2001 WL 849928 (D.D.C. Apr. 11, 2001) ...................................................................55

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*,
 382 U.S. 172 (1965)......................................................................................................11

*Walter Kidde Portable Equip., Inc. v. Univ. Sec. Instruments, Inc.*,
 669 F. Supp. 2d 895 (N.D. Ill. 2009) ...........................................................................10

*Waugh Chapel S., LLC v. United Food & Commercial Workers Union Local 27*,
 728 F.3d 354 (4th Cir. 2013) ........................................................................................26

*In re Wellbutrin XL Antitrust Litigation Indirect Purchaser Class*,
 868 F.3d 132 (3d Cir. 2017)..........................................................................................49

*White v. Wyeth*,
705 S.E.2d 828 (W. Va. 2010)...................................................................................65

*Xechem, Inc. v. Bristol-Myers Squibb Co.*,
274 F. Supp. 2d 937 (N.D. Ill. 2003), *rev'd on other grounds*, 372 F.3d 899
(7th Cir. 2004)..........................................................................................................45

*Zenith Radio Corp., v. Hazeltine Research, Inc.*,
395 U.S. 100 (1969)..................................................................................................45

*In re Zetia (Ezetimibe) Antitrust Litig.*,
2019 WL 1397228 (E.D. Va. Feb. 6, 2019)....................................................... *passim*

**Statutes**

15 U.S.C. § 2..........................................................................................................10, 13, 17

15 U.S.C. § 45..................................................................................................................59

35 U.S.C. § 112(a) ...........................................................................................................24

35 U.S.C. § 154................................................................................................................11

35 U.S.C. § 311(b)...........................................................................................................23

740 Ill. Comp. Stat. § 10/7(2) ....................................................................................57, 62

815 Ill. Comp. Stat. § 505/2............................................................................................59

D.C. Code § 28-3901 ..................................................................................................61, 64

D.C. Code § 28-3905 ........................................................................................................64

D.C. Code § 28-4502 ........................................................................................................54

D.C. Code § 28-4503 ........................................................................................................54

Fla. Stat. § 501.204 ..........................................................................................................59

Ga. Code Ann. § 10-1-399(b) ..........................................................................................64

Miss. Code Ann. § 75-21-3...............................................................................................54

N.C. Gen. Stat. Ann. § 75-1..............................................................................................54

N.C. Gen. Stat. Ann. § 75-1.1...........................................................................................56

N.C. Gen. Stat. Ann. § 75-2..............................................................................................54

N.H. Rev. Stat. Ann. § 358-A ...................................................................................................55

S.C. Code Ann. § 39-5-20.........................................................................................................59

Tenn. Code § 47-25-101 ...........................................................................................................54

U.S. Const. art. I, § 8, cl. 8.......................................................................................................13

W. Va. Code § 46A-6-101 ........................................................................................................59

W. Va. Code § 46A-6-104 ........................................................................................................59

Wis. Stat. § 133.03 ...................................................................................................................54

**Rules**

Fed. R. Civ. P. 8 .......................................................................................................................59

Fed. R. Civ. P. 23 .....................................................................................................................57

**Other Authorities**

Areeda & Hovenkamp, *Antitrust Law* (3d ed. 2012) ..........................................................31, 32

Association for Accessible Medicines, *The Case for Competition: Generic Drug*
*& Biosimilars Access & Savings in the U.S. Report* (September 2019),
*available at* https://accessiblemeds.org/sites/default/files/2019-09/AAM-
2019-Generic-Biosimilars-Access-and-Savings-US-Report-WEB.pdf...................................19

Initiative for Medicines, Access & Knowledge (I-MAK), *Overpatented,*
*Overpriced: How Excessive Pharmaceutical Patenting is Extending*
*Monopolies and Driving up Drug Prices* (August 2018), *available at*
http://www.i-mak.org/wp-content/uploads/2018/08/I-MAK-Overpatented-
Overpriced-Report.pdf...........................................................................................................19

Mark S. Popofsky & Michael D. Laufert, *Antitrust Attacks on Patent Assertion*
*Entities*, 79 Antitrust L.J. 445 (2014) ...................................................................................48

Robin Feldman, *May Your Drug Price Be Evergreen*, 5 J. L. & Biosciences 590
(2018), *available at*
https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3061567 ...............................................7

## I.     INTRODUCTION

This case concerns AbbVie's anticompetitive conduct regarding Humira®, an intravenous pharmaceutical used to treat several serious autoimmune diseases, which is the world's best-selling drug. In 2013, when AbbVie was spun off from Abbott, AbbVie faced a problem: the patent for Humira was due to expire in 2016, but AbbVie did not have enough in the pipeline to replace the substantial loss of revenue it would face. AbbVie thus engaged in a massive campaign to prevent competition for Humira for many more years by creating an artificial barrier to entry for less expensive, competing biosimilars—a "thicket" of more than 100 patents. Even though AbbVie had already enjoyed exclusivity over Humira since 2003, AbbVie filed at least 247 patent applications to re-patent Humira and extend its monopoly for more than another decade. It filed these applications without regard to the merits: barely half were allowed, and of those that were, dozens are invalid due to obviousness, inequitable conduct, or another reason. AbbVie publicly announced that it would sue, and then did sue, every company that sought to market a biosimilar of Humira—in some circumstances, asserting patents that had been invalidated or were not even arguably infringed.

AbbVie's anticompetitive scheme succeeded. Facing this patent thicket, all nine biosimilar companies settled their patent disputes with AbbVie on terms that delay biosimilar launches in the U.S. until 2023, even though the FDA has approved four would-be biosimilar competitors to Humira. In exchange for this delay, these agreements provide an enormous monetary benefit to several of the biosimilar companies (the "biosimilar defendants" here): early access to the multibillion dollar European market. These agreements thus allocate the entire U.S. market to AbbVie, preserving its Humira monopoly for several more years, and end payers—including the plaintiffs—have paid higher prices as a result. The plaintiffs have plausibly pleaded that AbbVie's conduct violates the antitrust laws.

In their motions, the defendants assert a variety of arguments, but none warrant dismissal.

*First*, AbbVie argues that its conduct is entirely immune to antitrust scrutiny by operation of patent law and the First Amendment. But the antitrust laws prohibit abuses of the patent system to protect or enhance monopolies. And the plaintiffs have plausibly pleaded that AbbVie's serial petitioning falls outside the protection of the First Amendment.

*Second*, the defendants assert that their agreements permitting early biosimilar competition in Europe and arresting competition in the United States are non-actionable. But agreements to limit competition in different territories are *per se* unlawful. At a minimum, the enormous value—hundreds of millions of dollars—conferred by AbbVie to the biosimilar defendants for their agreement to forego competition in the United States is a reverse payment under *F.T.C. v. Actavis, Inc.*, 570 U.S. 136 (2013).

*Third*, the defendants argue that they did not cause injury to the plaintiffs. But had AbbVie not engaged in anticompetitive conduct, the biosimilar companies could have negotiated settlements with earlier entry dates or won their patent litigations, whether by showing that the patents were invalid, unenforceable, or not infringed or by asserting an unclean hands defense. Biosimilars thus would have launched earlier in the United States and at lower prices.

*Finally*, the defendants assert a grab-bag of purported deficiencies in the plaintiffs' state law claims, none of which withstand scrutiny. Courts have repeatedly rejected the same arguments that the defendants advance and the Court should do likewise here.

For these reasons, the defendants' motions to dismiss should be denied.

## II.    FACTS

Defendant AbbVie has every incentive to protect its prize pharmaceutical, Humira—the best-selling drug worldwide—from competition. Humira is a biologic drug, administered by injection, used to treat a range of serious autoimmune conditions, including rheumatoid arthritis

and Crohn's disease. Consol. Class Action Compl. ("Compl."), ECF No. 109, ¶¶ 81-82. Once acclimated to Humira, its users are captive: they are advised to stay on the drug indefinitely or risk "severe" reactions, "flare ups" of their conditions, or the chance that they will stop responding to Humira or other autoimmune treatments. *Id.* ¶ 82.

Over the last 16 years, AbbVie has made more than $132 *billion* in revenues from Humira. *Id.* ¶¶ 83-84. In 2018 alone, the drug netted AbbVie more than $13.6 billion in the United States and nearly $20 billion worldwide. *Id.* ¶ 83. These massive profits are the result of Humira's high price: approximately $50,000 per patient per year. *Id.* ¶ 84. And as long as no competition for Humira exists, AbbVie can and will continue to charge these monopoly prices and reap billions more in profits. *Id.* ¶ 247. Humira has been and remains critical to AbbVie's success, generating roughly two-thirds of the company's revenue in recent years. *Id.* ¶¶ 3, 87-88.

But a threat loomed: with Humira's original patent set to expire in late 2016, the potential entry of competing biosimilars threatened to put downward pressure on prices. *Id.* ¶¶ 2, 43-52, 243. AbbVie took anticompetitive and unlawful steps to protect its cash cow from competition by: (1) submitting hundreds of patent applications and asserting the resulting patents against potential competitors without regard to the merits, *id.* ¶¶ 85-140, and (2) entering into agreements with multiple other potential competitors to delay their entry in the U.S. in exchange for earlier, date-certain entry in Europe. *Id.* ¶¶ 185-210. AbbVie has unlawfully extended its monopoly and maintained supracompetitive pricing, causing purchasers to overpay for Humira.

**A.**      **Humira is regulated by the BPCIA, which establishes a potentially lengthy and expensive process for challenging invalid or unenforceable patents.**

Biologic pharmaceuticals, including Humira, are governed by the Biologics Price Competition and Innovation Act of 2009 ("BPCIA"). Compl. ¶¶ 36-42. The BPCIA rewards biologic companies' efforts to bring new products to market with an exclusivity period before

facing competition from biosimilar competitors, which are akin to generic drugs. *Id.* ¶ 41. Like the Hatch-Waxman Act for generics, the BPCIA was intended to promote competition by providing an accelerated path to regulatory approval for biosimilars, increasing their number, and reducing prices. *Id.* ¶¶ 37-38. Studies and experience show that upon introduction of a biosimilar, biologic prices drop significantly—for example, in one European country where Humira now faces competition, Humira's prices have dropped by 80%. *Id.* ¶¶ 49, 51.

The BPCIA establishes a five-step process for biosimilar manufacturers to challenge a biologic company's patents, starting with the identification of patents and exchange of patent-related information (the "patent dance"). *Id*. ¶¶ 61-67. If, during the patent dance, the companies cannot resolve their dispute, litigation proceeds in two phases: first, the parties litigate a limited list of disputed patents, and second, they address any remaining patents. *Id.* ¶¶ 68-69. This litigation process can be lengthy and costly; AbbVie estimated that patent challenges—regardless of merit—could take "as long as four or five years." *Id.* ¶ 94.

**B.    AbbVie constructed an unlawful patent thicket around Humira to prevent competition and protect its profits.**

AbbVie's predecessor obtained approval for Humira in late 2002. *Id*. ¶ 80. U.S. Patent No. 6,090,382 ("the '382 patent"), which was assigned to AbbVie and claims Humira's active ingredient, adalimumab, protected the drug from competition until its expiration on December 31, 2016. *Id*. ¶¶ 77-80. Between 2003 and 2016, AbbVie enjoyed exclusivity for Humira and collected monopoly profits as a result. *See id.* ¶¶ 83, 89. In 2016 alone, before the '382 patent expired, AbbVie made more than $10 billion on Humira sales in the United States. *Id.* ¶ 83.

But when the threat of biosimilar competition grew nearer as the 2016 patent expiration date approached, AbbVie took action to preserve and extend its monopoly. AbbVie sought to evade competition by obtaining as many patents on as many Humira uses, formulations, and

processes as possible. Compl. ¶¶ 4-6, 85-98. While the average pharmaceutical is covered by just 3.9 patents, Humira is surrounded by at least 100 and as many as 130 patents[1]–more than *twenty-five times* the average. *Id.* ¶¶ 4, 93, 99. And AbbVie sharply increased its patent-accumulation as the risk of biosimilar competition increased, bombarding the U.S. Patent and Trademark Office ("PTO") with hundreds of applications. *Id.* ¶ 99. More than 90% of Humira's patents were issued in 2014 or later, despite Humira's 2002 initial approval and launch. *Id.* ¶ 4; *see also id.* at ¶ 92.

AbbVie executives were clear about the company's patent thicket strategy. In 2015, AbbVie's CEO admitted that the "bulk of [the] IP strategy . . . is designed to make it more difficult for a biosimilar to follow behind you and come up with a very, very similar biosimilar." *Id*. ¶ 90. Despite the impending expiration of key patents, AbbVie sought to expand its monopoly by accumulating an "absolute minefield of IP[.]" *Id.* ¶ 89. Executives admitted that, due to Humira's profitability, AbbVie needed to "do everything [it could] on the IP front to ensure that [it has] protected [Humira] to the best [it] can." *Id.* ¶ 90.

AbbVie's portfolio includes scores of patents that are weak, invalid, and/or unenforceable. *See id*. ¶¶ 99-140. In *inter partes* review ("IPR") challenges, the Patent Trial and Appeal Board cancelled the claims of at least three of AbbVie's patents due to obviousness; at least two other proceedings were terminated before adjudication due to a settlement between AbbVie and a would-be biosimilar competitor. *Id.* ¶ 108. Additionally, many of AbbVie's patents are invalid because: (1) they are obvious in light of prior art, *id*. ¶¶ 108-13; (2) AbbVie made material misrepresentations and omissions to the PTO while prosecuting its patents, *id*.

---

[1] Biologic manufacturers are not required to publicly identify all of the patents allegedly covering their products, so the plaintiffs have no way to ascertain the exact number of patents AbbVie has obtained for Humira. Compl. ¶ 99. One analyst has estimated that AbbVie filed 247 patent applications and obtained at least 132 patents for Humira. *Id.*

¶¶ 114-20; (3) the patented inventions are not novel, *id.* ¶¶ 122-33. And numerous AbbVie patents may not be asserted here because of the best mode requirement. *Id.* ¶¶ 134-40.

Even weak patents, however, posed hurdles to biosimilar entry: weak and strong patents alike must be challenged. Compl. ¶ 93. The sheer number of patents made any litigation against AbbVie lengthy and costly, erecting an effective deterrent regardless of each individual patent's strength. *Id.* ¶¶ 4-5, 86, 94. AbbVie's CEO candidly touted that AbbVie's "confidence was built around a *large portfolio* of IP; it was never contingent upon any one set of IP or any single set of individual patents." *Id.* ¶ 96 (emphasis added).

After constructing its patent thicket, AbbVie made clear to any would-be competitors that it intended to litigate these patents aggressively. AbbVie's CEO warned that any would-be competitor would "have to make sure that [it doesn't] step on any one of [AbbVie's patents] along the way" because AbbVie would "protect [its] patent position." *Id*. ¶ 89. He stressed that he couldn't be "any clearer" about AbbVie's intent to defend its Humira patents. *Id.* ¶ 97. In this way, AbbVie sought to weaponize the BPCIA for its benefit. AbbVie knew that by layering on so many patents, it was highly unlikely that any competitor would attempt to launch at risk, *i.e.*, before the patents covering Humira expired or a final ruling on validity or infringement, no matter how remote the chance of losing the patent litigation: even a small chance of crushing damages based on the sales of the best-selling drug in the world was simply too great of a risk. *Id.* ¶ 86. AbbVie knew and banked on this: executives bragged that an at-risk launch would be "an incredibly risky strategy for someone to take based on the size of this asset and the damage that would be done and the consequences of that damage if they lost." *Id.* ¶ 97; *see also id.* ¶ 94.

As would-be competitors began obtaining FDA approval for Humira biosimilars in 2016, AbbVie made good on its threats by pursuing claims against these biosimilar companies in the

patent dance and in federal court, seeking to enforce patents it knew or should have known were non-infringed, invalid, or unenforceable—such as patents for ingredients not used in Humira or contemplated for use in the biosimilars. *See, e.g.*, Compl. ¶¶ 141-51, 161-70 (describing Humira litigation history), 167-69, 180 (example of asserting non-infringed patents). But, once again, the strength of the patents was irrelevant: AbbVie knew that even if its patents were ultimately found invalid or not infringed, the litigation process itself would delay biosimilars by many years. *See id.* ¶¶ 5, 94, 97. Under the BPCIA, would-be competitors would have to respond to each and every claim of each and every asserted patent before the dispute could even reach the courts. *Id.* ¶¶ 61-66. And once federal litigation commenced, the biosimilar companies would face two rounds of litigation. *Id.* ¶¶ 68-69; *see also* Amgen Br., ECF No. 125, at 4-5 (acknowledging the long timeline it faced in litigating against AbbVie); Samsung Br., ECF No. 130, at 3 (same). This delay would buy AbbVie years of extended monopoly pricing.

AbbVie's conduct is a particularly egregious instance of "evergreening": extending the monopoly period for a product by obtaining additional patents or other exclusivities. *See* Robin Feldman, *May Your Drug Price Be Evergreen*, 5 J. L. & Biosciences 590, 590 (2018), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3061567. And it worked: even though the FDA approved four Humira biosimilars, including the biosimilar defendants' products, no company has launched a Humira biosimilar in the United States. *Id*. ¶¶ 7, 211.

**C.** **AbbVie further protected its monopoly by agreeing with the biosimilar defendants to eliminate potential competition in the United States until 2023.**

AbbVie's patent abuses extended to Europe where AbbVie engaged in evasive and obstructive litigation tactics and then entered into agreements with the biosimilar defendants to eliminate potential competition in the United States until 2023 in exchange for earlier date-certain, risk-free entry in Europe. *See* Compl. ¶¶ 185-210. AbbVie's European conduct had the

intent and effect of protecting the artificially high prices Humira enjoyed in the United States. *Id.* ¶ 207.

The European patent system is more fragmented than the U.S. system: there is a central authority for issuing patents (the European Patent Office, or EPO) and individual member-state patent offices where patent disputes are litigated. *Id.* ¶¶ 188-89. Judicial decisions in one member state are not binding outside of that jurisdiction. *Id.* ¶ 189.

AbbVie filed at least 72 patent applications with the EPO and secured 11 patents relating to adalimumab. *Id.* ¶ 190. As potential competitors began to develop biosimilar products, AbbVie executed a patent "whack-a-mole" strategy to exploit the European patent system by litigating in multiple member states and utilizing "divisional applications" to prevent biosimilar competitor entry. *Id.* ¶¶ 185-86, 191-202. Specifically, AbbVie developed a pattern of abandoning its patents in the midst of litigation with biosimilar companies, preferring to revoke the patents and try to cabin bad rulings to one jurisdiction rather than risk an adverse verdict on the merits. *See, e.g., id.* ¶¶ 192-93, 201. However, shortly before abandoning the patents, AbbVie would seek a divisional patent covering essentially the same subject matter of the soon-to-be-abandoned-patent. *Id.* ¶¶ 193-95, 198. This maneuver preserved substantive patent protection, delayed decisions on patentability of the subject matter at issue, and further obscured the patent landscape to prevent biosimilar entry. *Id.* ¶ 194-96, 198. The U.K. High Court of Justice found that "AbbVie has made every effort to shield the claims of its patents from scrutiny in the EPO and in the UK Court," *id.* ¶ 199, in an attempt to "perpetuat[e] commercial uncertainty." *Id.* ¶ 200. Even where biosimilar competitors were able to secure judicial victories, their successes were not binding in other member states. *Id.* ¶ 201 & n.64.

As it engaged in these obstructive maneuvers, AbbVie began striking deals with its would-be biosimilar competitors: it would allow them earlier, date-certain, risk-free entry in Europe (where Humira profits were substantial, though lower than in the United States) in exchange for later entry dates in the United States, extending AbbVie's U.S. monopoly. Compl. ¶¶ 203-10. In its agreements with the biosimilar defendants, AbbVie agreed to European launch dates of October 16, 2018, while the same manufacturers' American launch dates were delayed until 2023. *Id.* ¶ 203.

By dividing the American and European markets in this way, AbbVie and the biosimilar defendants benefitted—AbbVie protected its monopoly in the more lucrative U.S. market, preserving billions of dollars in revenue, while the biosimilar defendants were handsomely compensated in the form of risk-free and substantial profits in Europe. *Id.* ¶¶ 204-08. All the while, however, the plaintiffs continue to suffer: Humira prices in Europe declined between 10-80% upon biosimilar entry, but United States, prices remain at monopoly levels. *Id.* ¶¶ 9, 209-10.

*    *    *

AbbVie's anticompetitive and unlawful scheme has succeeded. Despite the expiration of Humira's primary patent in 2016 and the approval of several biosimilars, Humira has not faced any biosimilar competition in the United States, and AbbVie's Humira sales have continued to grow. *Id*. ¶¶ 7, 11. While AbbVie and the biosimilar defendants have found ways to illegally extend AbbVie's monopoly and divide markets for maximum profits, the plaintiffs continue to pay artificially high prices for Humira. *Id*.; *see also id.* ¶ 12.

### III. ARGUMENT

A complaint need only be "plausible," and the question for the district court at the pleading stage is "*could* these things have happened, not *did* they happen." *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 826-27 (7th Cir. 2014) (emphasis in original) internal quotation

- 9 -

marks and citations omitted). In reviewing the sufficiency of a complaint, courts "must construe it in the light most favorable to the plaintiff, accept well-pleaded facts as true, and draw all inferences in the plaintiff's favor." *Id.* at 826.[2] "The Court does not engage factual disputes raised in a motion under Rule 12(b)(6), because '*Twombly* does not require a court at the motion-to-dismiss stage to consider whether the factual allegations are probably true.'" *Pyour B.V. v. Ingredion, Inc.*, 2017 WL 9729695, at *2 (N.D. Ill. Feb. 22, 2017) (citation omitted). Where the "parties have presented competing, yet plausible factual scenarios," courts "should not attempt to resolve factual disputes on a motion to dismiss." *United States v. LaSalle Bank, N.A.*, 2008 WL 4874169, at *2 (N.D. Ill. July 29, 2008). Accordingly, "[a] complaint that invokes a recognized legal theory . . . and contains plausible allegations . . . cannot be dismissed under Rule 12." *Richards v. Mitcheff*, 696 F.3d 635, 638 (7th Cir. 2012). "'In antitrust cases * * * dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly.'" *High Sierra Sport Co. v. Travelers Club Luggage, Inc.*, 2010 WL 5174390, at *2 (N.D. Ill. Dec. 15, 2010) (quoting *Hosp. Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 746 (1976)).

## A. AbbVie's monopolization of Humira violates the antitrust laws.[3]

In general, anyone who monopolizes or attempts to monopolize any part of interstate trade or commerce is subject to liability under the antitrust laws. 15 U.S.C. § 2. Monopolization

---

[2] *See also Walter Kidde Portable Equip., Inc. v. Univ. Sec. Instruments, Inc.*, 669 F. Supp. 2d 895, 898 (N.D. Ill. 2009) ("A complaint need not set forth all of the relevant facts, but must allege enough facts to state a claim for relief that is plausible on its face."); *Omnicare, Inc. v. Unitedhealth Group, Inc.*, 524 F. Supp. 2d 1031, 1036-37 (N.D. Ill. 2007) (internal quotes omitted) ("This involves two easy-to-clear hurdles: the plaintiff must plead sufficient facts to give fair notice of the claim and the grounds upon which it rests, and those facts, if true, must plausibly suggest that the plaintiff is entitled to relief, raising that possibility above a speculative level.") (internal quotes omitted).

[3] AbbVie argues that the "mere accumulation of patents" is not by itself illegal. Memo. in Support of Defendants' Motion to Dismiss ("Defs.' Br."), ECF No. 124, at 13 (citing *Automatic Radio Mfg. Co. v. Hazeltine Research*, 339 U.S. 827, 834 (1950), *overruled in part on other grounds by Lear, Inc. v. Adkins*, 395 U.S. 653 (1969)). The plaintiffs do not assert an "accumulation of patents" claim. The plaintiffs assert monopolization and unfair competition claims.

"has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). In its motion, AbbVie does not dispute that it possesses monopoly power in the market for Humira or that it has willfully acquired and maintained that power. Instead, AbbVie argues that patent law and the First Amendment exempt it from the antitrust laws. Neither exemption applies here.

    **1.    AbbVie's patents do not exempt it from antitrust liability.**

        **a.    Patentees are subject to antitrust liability for many different types of abuse of the patent system.**

Ownership of a patent gives "the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States . . . ." 35 U.S.C. § 154. While companies with valid patents may lawfully exclude competition temporarily, "[t]he fact that a patent is obtained does not wholly insulate the patent owner from the antitrust laws." *Atari Games Corp. v. Nintendo of Am., Inc.*, 897 F.2d 1572, 1576 (Fed. Cir. 1990). Courts have permitted antitrust claims for many types of abuse of the patent system, including:

- Obtaining a patent by fraud. *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 176-77 (1965).[4]

- Bringing an infringement suit, even with a good-faith belief that the defendant is infringing a valid patent, when the suit is prosecuted to give effect to a monopolistic scheme. *Kobe, Inc. v. Dempsey Pump Co.*, 198 F.2d 416, 425 (10th Cir. 1952).

- Gaming regulatory processes by delaying patent issuance. *In re Neurontin Antitrust Litig.*, 2009 WL 2751029, at *18-20 (D.N.J. Aug. 28, 2009).

---

[4] The defendants argue that the plaintiffs, as end payers, lack standing to assert a *Walker Process* claim and have not adequately pleaded such a claim, Defs.' Br. at 15-16. This is a red herring: the plaintiffs have not asserted a *Walker Process* claim. End payers have standing to assert the claims that plaintiffs assert here: state-law antitrust and consumer protection claims. *See, e.g.*, *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 64 F. Supp. 3d 665, 696-98 (E.D. Pa. 2014); *In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712, 724-26 (S.D.N.Y. 2017).

- Submitting a pharmaceutical patent to the FDA only after the statutory deadline for doing so. *In re Remeron Antitrust Litig.*, 335 F. Supp. 2d 522, 529-32 (D.N.J. 2004).

- Requiring, as a condition for a license of the patent, that licensees purchase unpatented goods or pay licensing fees beyond the expiration of the patent. *Princo Corp. v. Int'l Trade Comm'n*, 616 F.3d 1318, 1327 (Fed. Cir. 2010); *accord SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1065 (3d Cir. 1978).

- Cross-licensing patents with other patent owners on the condition that each licensee charge a fixed price. *United States v. Line Material Co.*, 333 U.S. 287, 295 (1948).

- Settling an infringement suit on terms under which the patentee pays the alleged infringer not to enter the market. *Actavis*, 570 U.S. at 158.

In these cases, courts have policed the line between what is permitted under the patent laws and what is unlawful under the antitrust laws. As creative business minds invent new anticompetitive ways to use patents that courts have not addressed before, courts routinely determine on which side of the line these new practices fall without any specific new guidance from the other branches. No new legislation or regulations led to these decisions; federal courts decided whether the conduct was lawful or unlawful, given the policies underlying the patent and antitrust laws. This Court can and should do the same here.[5]

As the Supreme Court held in *Actavis*, when a patentee uses its patents in "unusual" ways that have "significant adverse effects on competition," "it would be incongruous to determine antitrust legality by measuring the [conduct's] anticompetitive effects solely against patent law

---

[5] Similarly, courts have policed the line between what is permitted under the patent laws and what is unlawful under the unfair competition laws. *See CyberOptics Corp. v. Yamaha Motor Co.*, 1996 WL 673161, at *2, *23 (D. Minn. July 29, 1996) (denying a motion to dismiss unfair competition claims where the plaintiff alleged "misrepresentations concerning the scope of the Defendant's patents" because the defendant had filed numerous patent applications claiming "minor, incremental changes" surrounding the plaintiff's core technology); *Salomon S.A. v. Alpina Sports Corp.*, 737 F. Supp. 720, 723 (D.N.H. 1990) (denying a motion to dismiss an unfair competition counterclaim where the counterclaim plaintiff alleged that the counterclaim defendant acquired patents "for the sole purpose of creating a vast patent portfolio to enforce against competition and to limit competition"); *Jenn-Air Corp. v. Modern Maid Co.*, 499 F. Supp. 320, 334 (D. Del. 1980) (denying motion to for judgment on the pleadings on an unfair competition counterclaim based on allegations that "despite its knowledge that defendant's product did not infringe the '320 patent and despite its knowledge that the '320 patent was invalid, Jenn-Air instituted this suit"), *aff'd without opinion*, 659 F.2d 1068 (3d Cir. 1981).

policy, rather than by measuring them against procompetitive antitrust policies as well." 570 U.S. at 147-48. Instead, "patent and antitrust policies are both relevant . . . ." *Id*. at 148. Thus, courts must "answer[] the antitrust question by considering traditional antitrust factors such as likely anticompetitive effects, redeeming virtues, market power, and potentially offsetting legal considerations present in the circumstances, such as here those related to patents." *Id*. at 149. In other words, there is no blanket antitrust exemption for patent-related conduct.

      **b.**     **The plaintiffs have plausibly alleged that AbbVie has abused both the BPCIA and the patent system in ways that cause anticompetitive effects and subject it to antitrust scrutiny.**

"[T]he aims and objectives of patent and antitrust laws" are "complementary, as both are aimed at encouraging innovation, industry and competition." *Atari Games Corp.*, 897 F.2d at 1576. Patent laws "promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries[.]" U.S. Const. art. I, § 8, cl. 8. "[T]he means adopted by Congress of promoting the progress of science and the arts is the limited grant of the patent monopoly in return for the full disclosure of the patented invention and its dedication to the public on the expiration of the patent." *Scott Paper Co. v. Marcalus Mfg. Co.*, 326 U.S. 249, 255 (1945).

The antitrust laws protect competition and thereby the consumer. "In the Sherman and Clayton Acts . . . , Congress was dealing with competition, which it sought to protect, and monopoly, which it sought to prevent." *Standard Oil Co. v. Fed. Trade Comm'n*, 340 U.S. 231, 248-49 (1951) (internal quotation marks omitted). The purpose of the Sherman Act is "to protect the public from the failure of the market" by prohibiting "conduct which unfairly tends to destroy competition itself." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993). "[I]t is [] monopoly power, whether lawfully or unlawfully acquired, [that] may itself constitute an evil and stand condemned under § 2 even though it remains unexercised. . . . It follows *a fortiori*

- 13 -

that the use of monopoly power, however lawfully acquired, to foreclose competition, to gain a competitive advantage, or to destroy a competitor is unlawful." *United States v. Griffith*, 334 U.S. 100, 107 (1948), *overruled on other grounds by Copperweld Corp. v. Ind. Tube Corp.*, 467 U.S. 752 (1984); *United States v. Swift & Co.*, 286 U.S. 106, 116 (1932) ("'mere size . . . is not an offense against the Sherman Act unless magnified to the point at which it amounts to a monopoly . . . but size carries with it an opportunity for abuse that is not to be ignored when the opportunity is proved to have been utilized in the past.").

Underpinning this prohibition is the understanding "that [the] possession of unchallenged economic power deadens initiative, discourages thrift and depresses energy; that immunity from competition is a narcotic, and rivalry is a stimulant, to industrial progress; that the spur of constant stress is necessary to counteract an inevitable disposition to let well enough alone." *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 427 (2d Cir. 1945) ("*Alcoa*"); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 272 (2d Cir. 1979) ("Section 2 . . . is aimed primarily not at improper conduct but at a pernicious market structure in which the concentration of power saps the salubrious influence of competition."). Thus, Congress "did not condone 'good trusts' and condemn 'bad' ones; it forbad all." *Alcoa*, 148 F.2d at 427.

The patent laws do not act in derogation of the antitrust laws: the former is merely a limited exception to the latter. As the Supreme Court explained:

> The progress of our economy has often been said to owe much to the stimulus to invention given by the rewards allowed by patent legislation. The Sherman Act was enacted to prevent restraints of commerce but has been interpreted as recognizing that patent grants were an exception. . . . [T]he advantages of competition in opening rewards to management, in encouraging initiative, in giving labor in each industry an opportunity to choose employment conditions and consumers a selection of product and price, have been considered to overbalance the disadvantages. . . . . *[I]t is crystal clear from the legislative history and accepted judicial interpretations of the Sherman Act that competition on prices is the rule of congressional purpose* and that where exceptions are

- 14 -

made, Congress should make them. *The monopoly granted by the patent laws is a statutory exception to this freedom for competition and consistently has been construed as limited to the patent grant.*

*Line Material*, 333 U.S. at 308-10 (emphases added; citations omitted). Accordingly, the Supreme Court held that "the possession of a valid patent or patents does not give the patentee any exemption from the provisions of the Sherman Act beyond the limits of the patent monopoly. *By aggregating patents in one control, the holder of the patents cannot escape the prohibitions of the Sherman Act.*" *Id.* at 308 (emphasis added).

Courts balance the interests of patent and antitrust law through a rule of reason analysis. *See Actavis*, 570 U.S. at 156 (applying rule of reason to reverse payment arrangements). In a rule of reason case, at the pleading stage, the plaintiff must only allege that "a monopolist's conduct has had an 'anticompetitive effect.'" *Marion Healthcare, LLC v. S. Illinois Healthcare*, 2015 WL 3466585, at *7 (S.D. Ill. May 29, 2015) (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001)). When "Plaintiffs have met their *prima facie* burden," "*going forward*, the burden shifts to Defendants to offer pro-competitive justifications for [the anticompetitive conduct]. But such justifications, like any affirmative defense, cannot be resolved on a motion to dismiss." *In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d 704, 719 (N.D. Ill. 2016) (citations omitted); *Robertson v. Sea Pines Real Estate Cos., Inc.*, 679 F.3d 278, 291-92 (4th Cir. 2012) (holding that "[i]t is sufficient that the alleged anticompetitive effects are economically plausible in light of the MLS restrictions recounted in the complaint" and that at the motion to dismiss stage, "we are not in a position to weigh the alleged anticompetitive risks of the MLS rules against their procompetitive justifications"); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 239 (S.D.N.Y. 2019); *BRFHH Shreveport, LLC v. Willis Knighton Med. Ctr.*, 176 F. Supp. 3d 606, 624 (W.D. La. 2016) (denying a motion to dismiss based on procompetitive justifications because "the Plaintiffs' complaint does not demonstrate as

- 15 -

a matter of law either that that there were nonpretextual, procompetitive justifications"); *Marion Healthcare*, 2015 WL 3466585 at *8 (denying a motion to dismiss because "[t]hese alleged facts allow the inference that the exclusive dealing and tying arrangements had an anticompetitive effect on the relevant markets" without considering procompetitive justifications).

Under these principles, the plaintiffs have plausibly alleged that AbbVie's conduct is contrary to the purposes of the patent and antitrust laws and that it causes significant and unjustified anticompetitive effects. AbbVie has already been richly rewarded for its investment. Humira launched soon after FDA approval in late 2002. *See* Compl. ¶ 80. Since launch, AbbVie has enjoyed exclusivity on the market for Humira and the high prices that accompany a monopoly. In 2016 alone, before the '382 patent expired, AbbVie made over $10 billion on Humira sales in the U.S. *Id*. ¶ 83. AbbVie's original patent allowed it to recoup the value of its investment and much, much more. The sales that AbbVie made during the lawful exclusivity period of the '382 patent are sufficient to provide every drug company a strong incentive to invent the next Humira.

But with its more than 200 additional patent applications and more than 100 follow-on patents, nearly all of which were filed or granted less than three years before the expiration of the '382 patent, AbbVie seeks to extend its exclusivity by nearly two decades. *Id*. ¶¶ 91, 97. The follow-on patents contribute little, if anything, to the progress of science because they largely do not involve new inventions; they simply re-patent Humira over and over again, attempting to create an impenetrable thicket around Humira. As Judge Hand found with Alcoa, AbbVie abused its power by "effectively anticipat[ing] and forestall[ing] all competition, and succeeded in holding the field alone." *Alcoa*, 148 F.2d at 430; *see also Berkey Photo*, 603 F.2d at 274 ("Even

- 16 -

if the origin of the monopoly power was innocent, . . . maintaining or extending market control by the exercise of that power is sufficient to complete a violation of § 2.").

More troubling, many of AbbVie's patents are invalid due to obviousness, inequitable conduct, or other flaws.[6] Compl. ¶¶ 107-20. *See Line Material*, 333 U.S. at 308 ("[A]n invalidated patent carries with it no such right [to exclude]. And even a valid patent confers no right to exclude products or processes that do not actually infringe."); *accord Actavis*, 570 U.S. at 147. But despite knowing that many of them were invalid, unenforceable, or not infringed, AbbVie nonetheless asserted them against biosimilar manufacturers in the patent dance and district court litigation, *see id*. ¶¶ 167-69, 180, seeking to tie up the biosimilars in the patent dance and litigation for years. This anticompetitive conduct serves only to stifle competition and make AbbVie more money at the expense of those who pay for Humira. *See Berkey Photo*, 603 F.2d at 294 ("Excessive prices, maintained through exercise of a monopolist's control of the market, constituted one of the primary evils that the Sherman Act was intended to correct."). It is also contrary to Congress's aims in passing the BPCIA: to promote innovation by providing biologic drug developers with limited periods of exclusivity and to foster competition by creating a streamlined system for biosimilar manufacturers to bring their products to market once those legitimate exclusivities have ended. Compl. ¶¶ 36-38. And improperly extending a patent

---

[6] AbbVie characterizes the patent examination process for *its own* patents as "thorough" and "rigorous" by citing cases that discuss *other* patents. Defs. Br., at 17. Views on the Patent Office's process vary and are often the subject of expert testimony. *See, e.g.*, *Saint Regis Mohawk Tribe v. Mylan Pharm. Inc.*, 896 F.3d 1322, 1331 (Fed. Cir. 2018) (Dyk, J., concurring) ("[T]he USPTO . . . is an agency with finite resources that sometimes issues patents in error. Currently, for instance, the USPTO receives over 600,000 applications a year. Patent examiners receive roughly 22 hours to review each application, an amount of time that 70% of examiners report as insufficient."); *King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, 2015 WL 12645764, at *5 (E.D. Pa. Dec. 22, 2015) (denying motion to exclude testimony of expert who opined that "(1) patent examiners spend a 'rather brief period of time'—approximately eighteen hours—reviewing each patent application; (2) many patents are 'improvidently granted;' and (3) thus, 'the validity of a patent is not fully tested until litigation occurs.'"). The cases that AbbVie cites cannot demonstrate as a matter of law the robustness of the review of *AbbVie's* patent applications.

monopoly is contrary to the fundamental bargain in patent law: a patent confers exclusive rights to the patented invention for a limited time, after which competitors must be allowed to enter the market. *See Scott Paper*, 326 U.S. 249 at 255; Compl. ¶ 135.

AbbVie never seeks to justify its conduct as procompetitive. Instead, AbbVie argues that allowing the plaintiffs' claims will result in difficult line-drawing questions. Defs.' Br. at 13. AbbVie further suggests that allowing the plaintiffs' claims would convert this Court into a central planner, "identifying the proper price, quantity, and other terms of dealing[.]" Defs.' Br. at 13 (quoting *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004)). But courts have applied the rule of reason for over a century. *See, e.g.*, *Bd. of Trade of City of Chicago v. United States*, 246 U.S. 231, 238 (1918) (articulating the rule of reason standard). Neither this Court nor a jury will be asked to determine the socially optimal price or quantity of Humira. As in every rule of reason case, the plaintiffs instead will seek ordinary factual and legal determinations, such as the price and quantity that would have prevailed but for AbbVie's anticompetitive conduct, and the court and jury will weigh the anticompetitive harm against the procompetitive benefits, if any, of the restraint. *See, e.g.*, *Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co., Ltd.*, 2016 WL 756568, at *2 (E.D. Wis. Feb. 26, 2016) (describing the calculation of a but-for price); *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 497 (1988) (discussing a jury verdict in a rule of reason case).

            **c.**       **Courts have addressed the dangers inherent in vast accumulations of patents.**

                 **(1)**      **Large accumulations of patents are likely to create significant anticompetitive effects.**

Large accumulations of patents are subject to special scrutiny because of their potential for abuse. While one patent or a small number of patents may be litigated in a normal judicial process, litigating dozens or hundreds of patents is exponentially more complex and resource-

intensive. The biologic drug industry in particular is suffering from anticompetitive effects of huge accumulations of patents.[7]

AbbVie knew the anticompetitive power of amassing a large number of patents. AbbVie's CEO said that AbbVie's confidence in its ability to forestall competition "was built around a large portfolio of IP; it was never contingent upon any one set of IP or any single set of patents or individual patents . . . ." Compl. ¶ 96. AbbVie knew that if it only had a small number of patents, those patents could easily be litigated and found non-infringed, invalid, or unenforceable. It deliberately amassed a huge number of patents to encumber the litigation process and prevent resolution.

> **(2)** **Courts have held that antitrust claims may be asserted when patentees accumulate large numbers of patents and wield them as anticompetitive weapons.**

No court has ruled on the legality of a patent thicket in the context of the statutory framework around biologic drugs.[8] But courts have recognized that large accumulations of patents require special scrutiny because patentees may use them anticompetitively.

For example, in *Kobe v. Dempsey Pump*, Kobe held all patents on hydraulic pumps in the oil industry and licensed them only to certain manufacturers. 198 F.2d at 419-21. After Dempsey invented a new pump, Kobe sued it for patent infringement. *Id.* at 421. Kobe was found liable at trial on Dempsey's antitrust counterclaims and the Tenth Circuit affirmed. *Id.* at 417. As a result

---

[7] *See* Initiative for Medicines, Access & Knowledge (I-MAK), *Overpatented, Overpriced: How Excessive Pharmaceutical Patenting is Extending Monopolies and Driving up Drug Prices* (August 2018), *available at* http://www.i-mak.org/wp-content/uploads/2018/08/I-MAK-Overpatented-Overpriced-Report.pdf; Association for Accessible Medicines, *The Case for Competition: Generic Drug & Biosimilars Access & Savings in the U.S. Report* (September 2019), *available at* https://accessiblemeds.org/sites/default/files/2019-09/AAM-2019-Generic-Biosimilars-Access-and-Savings-US-Report-WEB.pdf.

[8] In relation to discovery motions in the patent litigation, the court discussed Boehringer's unclean hands defense but did not rule on the merits of the defense. *See, e.g.*, *AbbVie Inc. v. Boehringer Ingelheim Int'l GmbH*, 2019 WL 498797 (D. Del. Feb. 8, 2019). Boehringer settled before dispositive motions.

of its scheme, Kobe had "every important patent which was issued[] relating to this field of the industry," even those that were "never used," and consequently "no other such pump was manufactured by anyone else but Kobe . . . until Dempsey put one on the market in 1948." *Id.* at 423. Although individual portions of Kobe's monopolistic scheme, like filing the patent infringement suit, may have been lawful if taken in isolation, "when considered with the entire monopolistic scheme which preceded them we think, as the trial court did, that they may be considered as having been done to give effect to the unlawful scheme." *Id.* at 425.[9]

As another example, in *Intellectual Ventures I LLC v. Capital One Financial Corp.*, the defendant sought to assert a counterclaim based on Intellectual Ventures's practice of obtaining a huge number of patents covering product designs in the financial services industry and threatening serial litigation to extort licensing fees from banks that used the designs. 99 F. Supp. 3d 610, 626 (D. Md. 2015). Further, Intellectual Ventures, like AbbVie here, also kept secret its full range of patents so that banks could not avoid infringement. *Id.*; *see also* Compl. ¶ 95. Also like AbbVie here, Intellectual Ventures argued that its conduct was lawful under *SCM Corp. v. Xerox Corp.*, 645 F.2d 1195 (2d Cir. 1981); Defs.' Br. at 16-20. Unpersuaded, the court noted that, unlike *SCM*, "here, the alleged conduct is not a refusal to license; nor is it narrowly focused on specific patents." *Intellectual Ventures*, 99 F. Supp. 3d at 626. The court held that "[c]ounterclaimants have alleged sufficiently that Plaintiffs willfully acquired their monopoly power" and that "amendment to include a Sherman Act claim for monopolization would not be

---

[9] *See also Dairy Foods Inc. v. Dairy Maid Prod. Co-op.*, 297 F.2d 805, 809 (7th Cir. 1961) ("Where an infringement suit is brought as part of and in furtherance of a combination and conspiracy which violates the antitrust laws and results in injury such as is here alleged the person injured may recover threefold the damages he sustains."); *Rex Chainbelt Inc. v. Harco Prod., Inc.*, 512 F.2d 993, 1004 (9th Cir. 1975) ("Infringement suits may . . . play a part in an overall plan to unduly restrain or monopolize commerce. Threats of suit under a group of narrow and weak patents may be potent to harass and deter competition."); *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, 2017 WL 6524839, at *14 -15 (D. Kan. Dec. 21, 2017) (denying motion to dismiss "overall scheme" claim, citing *Kobe*).

- 20 -

futile[.]" *Id.* at 627. In addition, based on similar reasoning and similar facts, another court held that a different defendant was permitted to assert a defense of patent misuse in an infringement suit filed by Intellectual Ventures. *See Intellectual Ventures I LLC v. Symantec Corp.*, 2014 WL 4773954, at *3-4 (D. Del. Sept. 24, 2014).

Like the counterclaim defendants in *Kobe* and *Intellectual Ventures*, AbbVie has accumulated a huge number of patents and wielded them to monopolize a market. Its conduct is therefore subject to antitrust scrutiny.

> **(3)** **AbbVie cites no case holding that the anticompetitive abuse of a large portfolio of patents is exempt from antitrust scrutiny.**

AbbVie cites two cases discussing the anticompetitive use of a large number of patents, but neither applies here. In another case by Intellectual Ventures against Capital One, the defendant asserted antitrust counterclaims but failed to allege a relevant market, that Intellectual Ventures ("IV") had market power in the relevant market, "any specific litigation history" by IV, or "any particular patents IV has attempted or threatened to enforce that have expired, been cancelled or adjudicated to be invalid." *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 2013 WL 6682981, at *4-7 (E.D. Va. Dec. 18, 2013). After acknowledging that "[i]t can be imagined that, at some point, were IV to engage in the kind of endless, unsuccessful litigation described by Capital One, IV would incur legal liability[,]" the court held that "Capital One has failed to allege facts that make plausible its claim that IV has engaged in monopolization in violation of Section 2 of the Sherman Antitrust Act." *Id.* at *8.[10] In contrast, the plaintiffs here

---

[10] Based on this decision, the court in the Maryland *Intellectual Ventures* case granted summary judgment to Intellectual Ventures because of issue preclusion relating to the relevant market. *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 280 F. Supp. 3d 691, 716-24 (D. Md. 2017). The court also held that *Noerr-Pennington* protected Intellectual Ventures because it had filed only two lawsuits against Capital One, even though it had filed many similar suits against others. *Id.* at 708-16. Whatever the merits of that approach for a competitor antitrust suit, it does not apply in a purchaser antitrust suit like this one, where every anticompetitive act by a monopolist, even if directed at different competitors, inflicts harm

- 21 -

have alleged a relevant market, market power, and specific litigation history and specific patents with specific flaws. Compl. ¶¶ 107-120, 167-69, 180, 236-43.

AbbVie's reliance on *Procter & Gamble Co. v. Paragon Trade Brands, Inc.*, 61 F. Supp. 2d 102 (D. Del. 1996) is similarly misplaced because the case turned in part on the fact that, after discovery, Paragon failed to adequately demonstrate the objective baselessness prong of *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49 (1993) ("*PRE*"). *Procter & Gamble,* 61 F. Supp. 2d at 110. Here, the plaintiffs do not assert a claim under *PRE* and have pleaded in detail numerous flaws in AbbVie's patents and its assertion of them. Compl. ¶¶ 107-120, 167-69, 180. *Procter & Gamble* does not suggest that the plaintiffs must do more at this stage.

### d. AbbVie's arguments about denials of petitions for IPR are premature and unpersuasive.

AbbVie notes that some petitions for IPR of its patents were denied and implies that the patents are therefore valid. Defs.' Br. at 18. But patent validity should rarely be decided on a motion to dismiss. "While the claim language of some patents may be so clear that the court need only undertake a facial analysis to render it invalid at the pleading stage, that will not be the norm . . . ." *My Health, Inc. v. Lifescan, Inc.*, 2015 WL 13469638, at *2 (E.D. Tex. Mar. 19, 2015). The plaintiffs have pleaded numerous flaws in AbbVie's patents. Factual challenges to the plaintiffs' allegations should wait for summary judgment.

Moreover, denial of an IPR petition does not demonstrate the reasonableness of asserting the patent in litigation or patent validity. A petition for IPR may challenge a patent only "on a ground that could be raised under section 102 [anticipation] or 103 [obviousness] and only on the

---

on purchasers. The Federal Circuit affirmed the grant of summary judgment solely on issue preclusion without reaching the *Noerr-Pennington* issue. *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 937 F.3d 1359, 1370 (Fed. Cir. 2019).

basis of prior art consisting of patents or printed publications." 35 U.S.C. § 311(b). Thus, a patent invalid for other reasons may nonetheless survive an IPR petition. *See, e.g.*, *In re TLI Commc'ns LLC Patent Litig.*, 87 F. Supp. 3d 773 (E.D. Va. 2015) (holding that a patent was invalid under section 101 after an IPR petition was denied), *aff'd*, 823 F.3d 607 (Fed. Cir. 2016).

Furthermore, in addition to the substantive limitations, procedural limitations on a petition exist. *See* Ex. 2 at 14 n.10 (declining to consider much of an expert's declaration when the patentee argued that the petitioner's reliance on a declaration violated applicable page limits). Thus, a petition may be denied for procedural reasons, even though the patent is invalid for the exact reasons stated in the petition. And denial of a petition for IPR does not prevent assertion of the same arguments and the same prior art in a later district court proceeding. *See Milwaukee Elec. Tool Corp. v. Snap-On Inc.*, 271 F. Supp. 3d 990, 1027 (E.D. Wis. 2017) (citing *Shaw Indus. Grp., Inc. v. Automated Creel Sys., Inc.*, 817 F.3d 1293, 1300 (Fed. Cir. 2016)). The fact that nine petitions for IPR of AbbVie's Humira patents were denied does not demonstrate that the patents are valid, infringed, or enforceable, or that their assertion in litigation was lawful.[11] *E-Watch, Inc. v. Lorex Canada, Inc.*, 2013 WL 5425298 (S.D. Tex. Sept. 26, 2013), cited by AbbVie, does not suggest otherwise. There, the court granted a stay pending resolution of an IPR challenging the patents-in-suit because it would simplify the issues in the case. *Id.* at *2. It did not discuss the significance of IPR denials or the objective reasonableness of asserting a patent in litigation.

Additionally, the defendants' focus on IPR proceedings ignores other arguments available to, and made here by, antitrust plaintiffs that are not available in IPR proceedings or in

---

[11] Moreover, the nine patents that AbbVie asserts are a small percentage of its portfolio. As discussed below, even if a few of AbbVie's patents could properly be asserted against the biosimilars, AbbVie's conduct still violates the antitrust laws.

infringement litigation. For example, patent applicants are required to "set forth the best mode contemplated . . . of carrying out the invention." 35 U.S.C. § 112(a). Once a patent discloses the best mode, that patent stands as prior art for future formulation and manufacturing patents purporting to claim the same invention. Compl. ¶ 138. As a result of the best mode requirement, AbbVie is estopped from asserting, in this antitrust litigation, that its formulation and manufacturing patents post-dating its original adalimumab patent would have or could have prevented biosimilar competitors from coming to market. Compl. ¶¶ 134-40.

### e. AbbVie's other arguments are unpersuasive.

AbbVie also argues that obtaining patents that are an "impenetrable barrier" to market entry is not unlawful in itself. Defs.' Br. at 13 (citing *Axis, S.p.A. v. Micafil, Inc.*, 870 F.2d 1105, 1107 (6th Cir. 1989)). *Axis*, however, is distinguishable. There, the plaintiff alleged that Micafil's purchase of another company was unlawful because, in the transaction, Micafil acquired patents that prevented plaintiff's entry to the market. But Micafil was not accumulating patents; it was just acquiring patents owned by another company. Thus, the patents were as much a barrier to plaintiff's entry prior to the allegedly unlawful acquisition as they were after. As a result, the court held that the purchase did not result in antitrust injury. *Axis*, 870 F.2d at 1111. Here, in contrast, there was no barrier before AbbVie's unlawful conduct, and there was afterward. *Axis* does not apply here.

AbbVie's citation to *FMC Corp. v. Manitowoc Co.* is similarly misplaced because, in that case, "there [wa]s no indication in the briefs or the record that the interest sought to be protected by the antitrust laws, *i.e.*, the welfare of the consumer, was adversely affected by anything Manitowoc did." 835 F.2d 1411, 1418 (Fed. Cir. 1987). AbbVie's conduct has delayed and will delay lower-priced biosimilars for years, and has resulted and will continue to result in overcharges to purchasers. Compl. ¶¶ 244-50.

2. **The First Amendment does not exempt AbbVie from antitrust liability.**

a. **Those who abuse government petitioning systems may be subject to antitrust liability.**

AbbVie also asserts that it is not subject to the antitrust laws because the First Amendment confers a limited antitrust exemption, known as the *Noerr-Pennington* doctrine, for petitioning the government for redress—including obtaining patents and filing patent infringement litigation. But the *Noerr-Pennington* doctrine does not confer blanket antitrust immunity. For example, petitioners have no antitrust immunity when their petitions are merely anticompetitive shams. *PRE*, 508 U.S. at 56-60; *see also In re Metoprolol Succinate Direct Purchaser Antitrust Litig.*, 2010 WL 1485328, at *10 (D. Del. Apr. 13, 2010) (applying *PRE* to sham patent infringement litigation). Sham petitioning is not protected because "not all activity that appears as an effort to influence government is actually an exercise of the first amendment right to petition. At times this activity, disguised as petitioning, is simply an effort to interfere directly with a competitor." *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1255 (9th Cir. 1982).

Similarly, in *California Motor Transport Co. v. Trucking Unlimited*, the plaintiffs alleged a "concerted action by [defendants] to institute state and federal proceedings to resist and defeat applications by [plaintiffs] to acquire operating rights or to transfer or register those rights. These activities, it is alleged, extend to rehearings and to reviews or appeals from agency or court decisions on these matters." 404 U.S. 508, 509 (1972). The plaintiffs further alleged that "the power, strategy, and resources of the [defendants] were used to harass and deter [plaintiffs] in their use of administrative and judicial proceedings so as to deny them 'free and unlimited access' to those tribunals." *Id.* at 511. Thus, the plaintiffs claimed that "the machinery of the agencies and the courts was effectively closed to [plaintiffs], and [defendants] indeed became

- 25 -

'the regulators of the grants of rights, transfers and registrations' to respondents—thereby depleting and diminishing the value of the businesses of [plaintiffs] and aggrandizing [defendants'] economic and monopoly power." *Id.* Like AbbVie here, the defendants in *California Motor* argued that their conduct was protected by the *Noerr-Pennington* doctrine, but the Court held that "First Amendment rights may not be used as the means or the pretext for achieving 'substantive evils' which the legislature has the power to control." *Id.* at 515 (citation omitted). Thus, the defendants' alleged "massive, concerted, and purposeful activities" seeking "to harass and deter their competitors from having 'free and unlimited access' to the agencies and courts" were not exempt from antitrust liability. *Id.* The Court noted that "[i]f the end result is unlawful, it matters not that the means used in violation may be lawful." *Id.*

*California Motor* and *PRE* discuss sham petitioning in different contexts: *PRE* applies to one petition and *California Motor* applies to a series. *See Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162, 180 (3d Cir. 2015); *Waugh Chapel S., LLC v. United Food & Commercial Workers Union Local 27*, 728 F.3d 354, 363 (4th Cir. 2013); *Primetime 24 Joint Venture v. Nat'l Broad.*, Co., 219 F.3d 92, 101 (2d Cir. 2000); *USS-POSCO Indus. v. Contra Costa Cty. Bldg. & Const. Trades Council, AFL-CIO*, 31 F.3d 800, 810-11 (9th Cir. 1994).[12]

As the Ninth Circuit has explained, "[T]he filing of a whole series of lawsuits and other legal actions without regard to the merits has far more serious implications than filing a single action, and can serve as a very effective restraint on trade." *USS-POSCO*, 31 F.3d at 811. In contrast to cases involving a single petition, "a more flexible standard is appropriate when

---

[12] *Accord Total Renal Care, Inc. v. W. Nephrology & Metabolic Bone Disease, P.C.*, 2009 WL 2596493, at *11 (D. Colo. Aug. 21, 2009) (adopting the *POSCO* approach in the absence of Tenth Circuit authority); *Livingston Downs Racing Ass'n Inc. v. Jefferson Downs Corp.*, 192 F. Supp. 2d 519, 538 (M.D. La. 2001) (same in the Fifth Circuit). The Seventh Circuit has not addressed the relationship between *California Motor* and *PRE. See Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 842 n.3 (7th Cir. 2011).

dealing with a pattern of petitioning" because "[n]ot only do pattern cases often involve more complex fact sets and a greater risk of antitrust harm, but the reviewing court sits in a much better position to assess whether a defendant has misused the governmental process to curtail competition." *Hanover 3201 Realty*, 806 F.3d at 180.

Under *California Motor*, "even if a small number of the petitions turn out to have some objective merit, that should not automatically immunize defendants from liability." *Id*. Similarly, the claims here do not depend on each individual patent application being a sham under *PRE*. The plaintiffs have alleged a scheme involving at least 247 patent applications, barely half of which resulted in patents, *see* Compl. ¶ 99, many of which are invalid, unenforceable, or not infringed. *Id*. ¶¶ 107-120, 167-69, 180. The fact that some applications were granted, *see* Defs.' Br. at 17-18, is irrelevant. Nor would it matter if AbbVie demonstrates that a small number of patents could properly have been asserted against the biosimilars. The plaintiffs' claims are based on AbbVie's entire course of conduct, not any individual patent application. *See Neurontin*, 2009 WL 2751029, at *15 ("Courts have routinely upheld the validity of 'overall monopolization scheme' claims in the patent context, even in the absence of allegations that any one of the scheme's predicate actions was independently violative of antitrust laws.").[13]

Although AbbVie seems to assume that *PRE* implicitly overruled *California Motor*, *PRE* cited *California Motor* with approval, 508 U.S. at 56-57, and the Supreme Court's "decisions remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality." *Hohn v. United States*, 524 U.S. 236,

---

[13] For this reason, AbbVie's reliance on cases involving one or just a few invalid patents for which there were colorable arguments for validity is misplaced. *See, e.g.*, Defs.' Br. at 14 (citing *Ritz Camera & Image, LLC v. SanDisk Corp.*, 700 F.3d 503, 506 (Fed. Cir. 2012)).

252-53 (1998); *see also Bosse v. Oklahoma*, 137 S. Ct. 1, 2 (2016) (cautioning lower courts against holding that one Supreme Court decision implicitly overruled another).[14]

> **b.** **The *Noerr-Pennington* doctrine does not exempt AbbVie's conduct from antitrust scrutiny.**

The First Amendment does not confer blanket antitrust immunity; when an antitrust defendant asserts application of the *Noerr-Pennington* doctrine, as AbbVie does here, courts must analyze the purposes of the doctrine and the antitrust laws. *See Trial Lawyers*, 493 U.S. at 430-36. The *Noerr-Pennington* doctrine derives from the First Amendment's Petition Clause. *Id.* at 424. The purpose of the doctrine is to permit bringing a well-founded petition for government action. However, petitions that are asserted without regard for their merits and are intended to interfere with their competitors fall outside the doctrine's purposes and are not protected. *See California Motor*, 404 U.S. at 512. Here, AbbVie was explicit about its purpose to interfere with its competitors' ability to market their products. *See, e.g.*, Compl. ¶¶ 90, 94.

Thus, the plaintiffs have plausibly alleged that AbbVie's conduct is not consistent with the purposes of *Noerr-Pennington* doctrine because these facts, which must be credited on a motion to dismiss, demonstrate that AbbVie was not genuinely petitioning the government for redress. Obtaining and asserting swaths of invalid, unenforceable, or non-infringed patents without regard to the patents' merits so as to delay competition is not a genuine effort to petition the government; it is an effort to *impede* resolution of the issues in the courts. Asserting a huge volume of patents in the patent dance, even when a claim of infringement would be frivolous, *see id.* ¶¶ 167-69, 180, is a means of impeding competitors' access to the courts because, under the

---

[14] To be the only limit on the First Amendment exemption from antitrust liability, *PRE* would have had to implicitly overrule other decisions as well. *See, e.g.*, *F.T.C. v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411 (1990) ("*Trial Lawyers*") (rejecting an argument that a strike was exempt from antitrust scrutiny because of the First Amendment).

BPCIA, the alleged infringer must respond to each and every claim of each and every asserted patent before the dispute can even reach the courts. *See id.* ¶¶ 61-67. Once the dispute reached the courts, the biosimilar companies could limit the number of patents involved in the first phase of litigation, but the additional patents needed to be addressed in a second phase before a biosimilar could launch. *See id.* ¶¶ 68-69. Far from petitioning the government for redress with the hope of a favorable decision, AbbVie's actions had the purpose and effect of preventing a final judgment on the merits of its claims: only three biosimilar companies—Amgen, Sandoz, and Boehringer—made it through the patent dance, and none completed even the first phase of BPCIA litigation, much less the second phase. *See id.* ¶¶ 141-84. AbbVie's efforts to stall and delay by gumming up the patent dance and BPCIA litigation with invalid, unenforceable, and non-infringed patents fall outside any protection offered by the First Amendment.

### c. AbbVie's arguments regarding subjective intent are unpersuasive.

AbbVie also argues that the plaintiffs were required to plead more regarding AbbVie's subjective intent. Defs.' Br. at 19-20. The plaintiffs pleaded numerous statements by AbbVie executives, including its CEO, explaining the anticompetitive purpose of the scheme. For example:

- An AbbVie executive stated that the "bulk" of its "IP strategy" was "designed to make it more difficult for a biosimilar to follow behind you and come up with a very, very similar biosimilar." Compl. ¶ 90.

- AbbVie's CEO stated that "AbbVie intends to enforce vigorously" its Humira-related patents and that "the total litigation timing may be as long as four or five years." *Id.* ¶ 94.

- In addition to noting that "it's just not prudent for us now in this space to ultimately lay out in detail the play-by-play" of its patent strategy, AbbVie's CEO stated that AbbVie's "level of confidence" in its ability to forestall competition "was never contingent upon any one set of IP or any single set of patents or individual patents . . . ." *Id.* ¶¶ 95-96.

- AbbVie's CEO, after conceding that at some point AbbVie would lose its exclusivity on Humira, stated that "our whole intent was to be able to drive through that erosion curve that we expected." *Id*. ¶ 97.

The plaintiffs thus pleaded that "AbbVie's goal was not to protect its legitimate interests, but instead to create a minefield of patents that—regardless of their validity—could impede and deter potential competitors." *Id*. ¶ 98. The plaintiffs further pleaded that "AbbVie focused more on the sheer number of patents and claims it could assemble than on the validity of the individual patents and claims." *Id*. ¶ 107. These allegations establish AbbVie's anticompetitive intent.

AbbVie's reliance on *GEICO v. Hazel*, 2014 WL 4628655, at *19 (E.D.N.Y. Aug. 11, 2014), and *Datascope Corp. v. Vascular Solutions, Inc.*, 165 F. Supp. 2d. 933, 936-37 (D. Minn. 2001), are misplaced. Both cases applied *PRE* which, as explained above, does not apply to the plaintiffs' allegations here. *See, e.g.*, Compl. ¶ 94. And unlike the plaintiffs in those cases, the plaintiffs here have pleaded that AbbVie sought to interfere with competitors through the use of government processes and did so in bad faith.

**B. The defendants' market division and reverse payment agreements violate the antitrust laws.**[15]

The plaintiffs plead a plausible market division agreement in violation of federal and state antitrust laws by alleging that AbbVie and the biosimilar defendants entered into reciprocal agreements that provided that AbbVie would maintain its monopoly in the U.S., and the biosimilar defendants would obtain early, risk-free access to the $4 billion per year European market. *Id*. ¶¶ 9, 203-205. On a motion to dismiss, it is not necessary for this Court to decide whether the defendants' agreements constitute *per se* violations of the antitrust laws or whether a quick-look or rule of reason analysis should be applied. *See City of Rockford v. Mallinckrodt*

---

[15] For purposes of this motion, the plaintiffs have withdrawn, without prejudice, their reverse payment allegations concerning Amgen's *de facto* five months of exclusivity. *See* Compl. ¶¶ 8, 151 (third sentence), 153-56, 211 (second sentence), 262, 270.

*ARD, Inc.*, 360 F. Supp. 3d 730, 754 (N.D. Ill. 2019) (deferring decision on whether *per se* or rule of reason applies); *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1122 (N.D. Cal. 2012) (same; "that decision is more appropriate on a motion for summary judgment"). "In ruling [on a motion to dismiss], the court just needs to determine whether the class plaintiffs have alleged a plausible conspiracy under the antitrust laws." *In re EpiPen (Epinephrine Injection, USP), Mkt'g, Sales Practices & Antitrust Litig.*, 336 F. Supp. 3d 1256, 1297 n.8 (D. Kan. 2018); *accord City of Rockford*, 360 F. Supp. 3d at 754.

However, regardless of the analytical framework used, as explained below, the plaintiffs have met their burden in pleading a plausible violation of Section 1 and analogous state laws.

**1.    The defendants' market division agreements are *per se* unlawful.**

"One of the classic examples of a *per se* violation of Section 1 is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition." *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972); *Blue Cross Blue Shield of Wis. v. Marshfield Clinic*, 152 F.3d 588, 591 (7th Cir. 1998) (market allocation agreements unlawful); *Blackburn v. Sweeny*, 53 F.3d 825, 828-29 (7th Cir. 1995) (agreement to restrain former law partners' ability to advertise services within a given territory unlawful). Territorial divisions are not immunized from *per se* treatment simply because intellectual property rights are involved. *See United States v. Sealy, Inc.*, 388 U.S. 350, 351, 357-58 (1967) (allocation of exclusive territories unlawful even when intellectual property rights are involved); *Timken Roller Bearing Co. v. United States*, 341 U.S. 593, 597-99 (1951) (rejecting allocation of international markets under guise of joint venture or trademark licensing agreement).[16]

---

[16] A leading treatise notes that "if *A* owned a patent on a particular type of widget and entered into an agreement with *B* that in exchange for a monetary payment *B* would simply not produce that type of widget in California, that agreement . . . [i]f naked . . . would be a per se unlawful territorial division." Areeda & Hovenkamp, *Antitrust Law*, ¶ 2044a1 (3d ed. 2012). While the authors also note that such

The plaintiffs allege that, in exchange for avoiding the risk of biosimilar competition in the United States, AbbVie agreed to allow the biosimilar defendants earlier, date-certain entries in Europe, where they would be able reap hundreds of millions of dollars from biosimilar sales in competitive European markets. Compl. ¶¶ 9, 203-205. Public data supports the plaintiffs' plausible allegation that the biosimilar defendants "stood to take a huge portion" of the nearly $4 billion European Humira market from AbbVie. *See id.* ¶ 205 (Samsung's Humira biosimilar, Imraldi, took 62% of the German market, the largest national market in Europe). AbbVie, in turn, was permitted to keep for itself the entire U.S. market, where it has imposed monopoly-level prices on Humira sales—and will continue to do so for at least another five years. *See id.* ¶ 207. As a result, U.S. consumers are in effect subsidizing competition in Europe.

The defendants contend that the plaintiffs fail to adequately allege a *per se* market division because AbbVie continues to sell Humira in Europe. Defs.' Br. at 28. But an agreement need not "completely foreclose access to a territory" to be *per se* illegal. *Garot Anderson Agencies, Inc. v. Blue Cross & Blue Shield United of Wis.*, 1993 WL 78756, at *11 (N.D. Ill. Feb. 26, 1993); *Blackburn*, 53 F.3d at 827 ("To fit under the *per se* rule an agreement need not foreclose all possible avenues of competition."). In fact, as a leading treatise notes, "[M]any horizontal market division agreements cover something less than, or different from, absolute bans on selling in one another's designated territory . . . . The case law is clear that a market division *need not be an agreement that each firm will stay completely out of the assigned territory of the other*." Areeda & Hovenkamp, *Antitrust Law*, ¶ 2030c (3d ed. 2012) (emphasis added) (collecting authorities).

---

agreements "may receive special consideration if they resolve bona fide intellectual property disputes," *id.*, as noted above, the plaintiffs plead that the bona fides of AbbVie's conduct are highly suspect.

For example, in *Topco*, the court found a per se violation where the defendants did not have completely exclusive territories. *Topco*, 405 U.S. at 601-02. And in *Garot*, the Northern District of Illinois expressly rejected the defendants' argument that a market allocation agreement must include reciprocal exclusive territories:

> Assuming Blue Cross entered an agreement whereby it agreed to stay out of the Illinois health insurance market, but Health Care did not reciprocally agree to stay out of the Wisconsin health insurance market, the net effect is an anticompetitive effect on the Illinois health insurance market. This is sufficient to render the agreement between Blue Cross and Health Care unlawful on its face . . . .

1993 WL 78756, at *13. *See also Blackburn*, 53 F.3d at 827 (rejecting defendants' contention that "because all parties to the Agreement can still practice law in all parts of Indiana, the mutual geographic restrictions on advertising do not constitute an allocation of markets and are thus not subject to *per se* treatment").

The defendants misread several authorities that they claim support the need for the plaintiffs to plead "mutually exclusive territories." Indeed, *none* requires such allegations. In *Palmer v. BRG of Georgia*, 498 U.S. 46, 49-50 (1990), the Supreme Court, unsurprisingly, held that two competitors may not create mutually exclusive territories. The court in *In re Dealer Management Systems Antitrust Litigation*, 362 F. Supp. 3d 477, 493 (N.D. Ill. 2019), never addressed the sufficiency of the plaintiff's market division claims. Rather, it found that "[n]either party sufficiently addresse[d] the relevant legal standards" and denied the motion to dismiss. And contrary to the defendants' contentions, in *Laumann v. National Hockey League*, 907 F. Supp. 2d 465 (S.D.N.Y. 2012), the court held that the plaintiffs *actually had* stated a market division claim despite the fact that some defendants had no horizontal agreements among themselves because plaintiffs had pleaded plausible "vertical agreements that not only facilitate, but are essential to the horizontal market divisions." *Id.* at 487-88.

- 33 -

*Tawfilis v. Allergan, Inc*., 157 F. Supp. 3d 853 (C.D. Cal. 2015) is instructive. The plaintiffs there alleged that Allergan had entered into a cross-licensing agreement giving Allergan worldwide rights to a drug that a foreign competitor was seeking to market in the United States in competition with Allergan's drug. *Id.* at 858. Even though the agreement permitted Allergan to compete with the South Korean company in multiple international markets, the license agreement eliminated the potential competition Allergan could face from the South Korean company in the United States, enabling Allergan to charge supracompetitive prices to the plaintiff. *Id.* at 863-64. The Court thus denied the defendant's motion to dismiss.

The same reasoning in *Tawfilis* applies to the plaintiffs' allegations here. In exchange for early date-certain entry and profits in Europe beginning in October 2018, AbbVie received the biosimilar defendants' promises to forgo U.S. entry until 2023. Compl. ¶ 206. By agreeing to allow Humira competition in Europe, AbbVie could keep the U.S. market exclusively for itself and continue to extract supracompetitive prices from the plaintiffs and the classes. The "net effect" of such an arrangement is an "anticompetitive effect" on the U.S. market and is "unlawful on its face." *Garot*, 1993 WL 78756, at *13. Accordingly, the plaintiffs have satisfied their burden to demonstrate that the defendants' market division agreements are *per se* unlawful.

The defendants' authorities do not preclude the application of *per se* treatment here. *Actavis*, which arises from Hatch-Waxman related litigation and regulations not at issue here,[17] did not address territorial limitations on competition. Rather, as the court recognized in *In re Novartis and Par Antitrust Litigation*, the rule of reason analysis that *Actavis* described applies to temporal allocations. 2019 WL 3841711, at *4 (S.D.N.Y. Aug. 15, 2019) (distinguishing "geographic" from "temporal market division[s]" and rejecting extension of *per se* treatment to

---

[17] However, as explained in Section III.B.2, below, even if *Actavis*-type rule of reason applies, the plaintiffs have pleaded, consistent with *Actavis*, that the agreements are nonetheless unlawful.

temporal ones based on *Actavis*). *See also In re Zetia (Ezetimibe) Antitrust Litig.*, 2019 WL 1397228, at *19-20 (E.D. Va. Feb. 6, 2019) (temporal allocation); *King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, 2015 WL 8620989, at *2 (E.D. Pa. Dec. 14, 2015) (same). *Moraine Products v. ICI America, Inc.*, 538 F.2d 134 (7th Cir. 1976) is similarly inapposite because the court's ruling on *per se* treatment came "*after presentation to the jury* of the plaintiff's case in chief," and *not* on a motion to dismiss (emphasis added). *Id.* at 136. Also, *Moraine* concerned whether an exclusive license to a single patent was a *per se* violation, which is not an issue here. *Id.*

       2.       **Even under a "quick look" or rule of reason analysis, the plaintiffs' claims pass muster.**

Even if the Court does not find that the plaintiffs' market division claim is *per se* unlawful, the plaintiffs have satisfied their initial, *prima facie* burden under either a "quick look" or rule of reason analysis, and therefore the market division claim should not be dismissed.

**Quick Look:** Under a quick look test, a practice can be judged in violation of the antitrust laws if "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999); *Chicago Prof'l Sports Ltd. P'ship v. NBA*, 961 F.2d 667, 674 (7th Cir. 1992) ("*Chicago Professional Sports*") ("[A]ny agreement to reduce output measured by the number of televised games requires some justification—some explanation connecting the practice to consumers' benefits—before the court attempts an analysis of market power. Unless there are sound justifications, the court condemns the practice without ado, using the 'quick look' version of the Rule of Reason . . . .") (citing *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85, 109-11, nn. 39, 42 (1984)). In *Chicago Professional Sports*, for example, the Seventh Circuit affirmed the

district court's condemnation of a league-imposed limit on the number of games each team could televise because agreements between competitors restricting output have well-known adverse effects on consumers. 961 F.2d at 674 ("Agreements limiting to whom, and how much, a firm may sell are the defining characteristics of cartels and may not be invoked as *justifications* of a cutback in output. That the NBA's cutback is only five games per year is irrelevant; long ago the [Supreme] Court rejected the invitation to inquire into the 'reasonableness' of price and output decisions.").

This logic applies with equal force here. The anticompetitive effects of the reciprocal agreements between AbbVie and the biosimilar defendants are clear. By giving the biosimilar defendants early, date-certain, and risk-free sales of their competing Humira biosimilar products in Europe, AbbVie was able to secure at least five additional years of monopoly profits for itself at the expense of American consumers. This is enough to satisfy a quick-look analysis.

**Rule of Reason:** Even if the plaintiffs' claims do not warrant *per se* or quick look treatment, the plaintiffs have sufficiently pleaded an *Actavis*-type rule of reason claim. *Actavis* distinguished a reverse-payment settlement from the traditional kind of patent settlement and explained that in

> the traditional example [] . . . a party with a claim . . . for damages receives a sum equal to or less than the value of its claim. In reverse-payment settlements, in contrast, a party with no claim for damages (something that is usually true of a paragraph IV litigation defendant) walks away with money simply so it will stay away from the patentee's market.

570 U.S. at 152. The defendants miscategorize the plaintiffs' allegations as falling into the "traditional" bucket, Defs.' Br. at 24, but the allegations demonstrate otherwise.

The plaintiffs have pleaded that the defendants reached a reverse-payment settlement under the *Actavis* paradigm: the patent-challenger biosimilar defendants, with no claims for

- 36 -

damages, walked away from a settlement with the patent holder AbbVie with the right to immediate, date-certain entry in Europe and an unrestricted right to sell their biosimilar products (a payment) in exchange for their promise to stay away from the U.S. for an extended period of time. The European agreements conferred substantial value equal to hundreds of millions of dollars to the biosimilar defendants. Compl. ¶¶ 204-05. These payments cannot be explained as saved litigations costs, nor were they necessary to resolve U.S. litigation. *Id.* ¶¶ 266, 274.

As pleaded in the complaint, the European risk-free, early-entry agreements are "large and unjustified payment[s]" from the patent owner to the alleged infringer to induce it to drop a patent challenge and refrain from competition. Thus the plaintiffs have satisfied the *Actavis* pleading requirements. *See, e.g.*, *Opana ER*, 162 F. Supp. 3d at 716 (citing *Actavis*, 570 U.S. at 158).

### a. Reverse-payment settlements should be viewed in their totality.

Taking all inferences in the plaintiffs' favor, as the Court must, the complaint plausibly demonstrates that the U.S.-European agreements between AbbVie and the biosimilar defendants were two halves of the same agreement—the European agreements, which allowed for immediate, risk-free entry and sales, served as a *quid pro quo* for the U.S. agreements, which eliminated the risk of competition in the United States for Humira. Compl. ¶¶ 263, 271. The defendants' recent disclosure of the U.S.-European patent agreements between AbbVie and Amgen reinforces this allegation. The two agreements were ██████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████ *Compare* Ex. 14, § 10.2, *with* Ex. 15, § 10.2 ██████████████████ *compare* Ex. 14, § 5.5, *with* Ex. 15, § 5.7 ██████████████; *see also In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 752 (E.D. Pa. 2014) (considering separate agreements executed on the same day as part of the same transaction).

The defendants ignore these facts and instead argue that, as a matter of law, the Court must consider the parts in isolation. Defs.' Br. at 24. But the law is clear that in antitrust cases, "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each. . . . [T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962).

Viewing the defendants' U.S.-European patent agreements together accords with the central directive of *Actavis*, which is to consider whether "the basic reason" that the parties settled patent litigation with a reverse payment is a "desire to maintain and to share patent-generated monopoly profits." *Actavis*, 570 U.S. at 158. Excluding half of their overall agreement, as the defendants suggest, would prevent the Court from considering all facts that are essential to the *Actavis* inquiry while determining "the basic reason" here.

Indeed, in reverse payment cases, numerous courts have eschewed the formalism the defendants advance to conclude that ostensibly distinct agreements were part of an overarching agreement in violation of the antitrust laws. For instance, in *In re Lipitor Antitrust Litig.*, 868 F.3d 231, 243-44, 253 (3d Cir. 2017), the Third Circuit held that a large payment could be made up of allegedly separate agreements concerning entirely unrelated products. Likewise, in *Opana ER*, 162 F. Supp. 3d at 718, Judge Leinenweber declined the defendants' invitation to assess allegedly distinct agreements in a "piecemeal fashion" to determine whether "each individual payment fails to rise to the level of a large and unjustified payment" and instead chose to "determine whether, when taken as a whole, the total payment . . . was large and unjustified."

*Id.*[18] As explained above, the plaintiffs have plausibly alleged that the U.S. and European agreements were integrated agreements with the early access terms of the European agreements providing the large unexplained payment for the delayed entry terms in the U.S. agreements.

The defendants' authorities do not support the balkanized approach to review reverse payment allegations they advocate or are otherwise distinguishable. Defs.' Br. at 22-23. For example, contrary to the defendants' assertion, in *In re Loestrin 24 Fe Antitrust Litigation*, 261 F. Supp. 3d 307 (D.R.I. 2017), the court did not state that it would undertake a piecemeal review of the allegations. Rather it proceeded on a two-step inquiry, with the second step taking "*a broad and holistic look* at the deal to determine whether the entire deal, *taken as a whole*, amounted to a large and unjustified reverse payment." *Id.* at 331 (emphasis added). This approach is consistent with precedent in this Circuit and others with respect to reverse payment allegations, which the *Loestrin* Court itself acknowledged. *See id.*

The defendants' reliance on *F.T.C. v. AbbVie*, 107 F. Supp. 3d 428, 436 (E.D. Pa. 2015), is also misplaced. First, the court there found that there was no *reverse* payment—that is, the brand manufacturer did not make a payment to the generic challenger (*i.e.*, the defendant in the patent case) in either of the two agreements at issue. Rather, the generic challenger paid the brand manufacturer for supply of product, which is not the case here. *Cf. EpiPen*, 336 F. Supp. 3d at 1303-04 (distinguishing *AbbVie* because plaintiffs alleged a large payment from the brand

---

[18] *See also In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 243 (D. Conn. 2016) ("A settlement agreement may be very simple or tremendously complex, and it may involve all manner of consideration; and if, when viewed holistically, it effects a large and unexplained net transfer of value from the patent-holder to the alleged patent-infringer, it may fairly be called a reverse-payment settlement."); *Niaspan*, 42 F. Supp. 3d at 752 ("[D]efendants may not improperly 'dismember' plaintiffs' Consolidated Amended Complaints by examining each of the three settlement agreements in isolation. Rather, the Licensing Agreement must be read in conjunction with the Co-Promotion and Manufacturing Agreements executed that same day.") (citations omitted); *cf. Mannington Mills, Inc. v. Congoleum Indus., Inc.*, 610 F.2d 1059, 1066 (3d Cir. 1979) (district court erred in concluding that two agreements "negotiated and executed simultaneously as part of the settlement of a single litigation" could not be read together as a single instrument).

to the generic in exchange for delayed entry). *Second*, to the extent that *AbbVie* suggests that two interrelated agreements must be viewed separately, prevailing precedent differs. *See Opana ER*, 162 F. Supp. 3d at 717; *Lipitor*, 868 F.3d at 243-44.[19]

> **b.**      **The defendants' agreements paid biosimilar entrants to delay competition in the United States in exchange for early, date-certain access and profits in Europe.**

AbbVie paid the biosimilar defendants to delay competitive entry in the United States by allowing them early entry into Europe—an agreement conferring hundreds of millions of dollars of benefit to the biosimilar defendants. Compl. ¶¶ 263, 273. And that payment was both large and unjustified. *Id.* ¶¶ 264, 274.

These allegations state a claim under *Actavis* because any "unexplained large transfer of value from the patent holder to the alleged infringer" that is "likely to present the same types of problems" as cash payments constitutes a reverse payment. *King Drug Co. of Florence Inc. v. Smithkline Beecham Corp.*, 791 F.3d 388, 403-04 (3d Cir. 2015). It does not matter if the value conferred by the patent holder to the patent challenger is a promise not to launch a product in competition with the patent challenger (*Opana ER*, 162 F. Supp. 3d at 718); the forgiving of a contingent infringement liability on another product unrelated to the patent litigation at issue (*Lipitor*, 868 F.3d at 257); or, as alleged here, access to a foreign market worth billions of dollars. Compl. ¶ 205. Despite differences in form, it is value all the same. *Cf. United States v. Perez–Ruiz*, 169 F.3d 1075, 1076 (7th Cir. 1999) ("Compensation is payment, and whether in specie or in some other form does not matter.").

In their attempt to dismiss the plaintiffs' claim, the defendants argue that the European early-entry agreements are, as a matter of law, not a "payment" under *Actavis*. Defs.' Br. at 22.

---

[19] The FTC is currently appealing the *AbbVie* ruling before the Third Circuit. *See FTC v. AbbVie Inc.*, No. 18-2621 (3d Cir.).

But, as the defendants' own authorities acknowledge, courts have rejected the argument that payments must be stacks of cash. *See, e.g.*, *Lipitor*, 868 F.3d at 252 (promise not to launch authorized generic ("no-AG promise") was a payment under *Actavis*); *King Drug Co. of Florence*, 791 F.3d at 399 (same); *Loestrin*, 261 F. Supp. 3d at 321 (same). *See also Opana ER*, 162 F. Supp. 3d at 718 (no-AG promise, among other payments); *United Food & Commercial Workers Local 1776 & Participating Emp'rs Health & Welfare Fund v. Teikoku Pharma USA, Inc.*, 74 F. Supp. 3d 1052, 1067-68 (N.D. Cal. 2014) ("*Lidoderm I*") (free product and no-AG promise); *In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 391-92 (D. Mass. 2013) (no-AG promise). Most courts have refused to "read into the [*Actavis*] opinion a strict limitation of its principles to monetary-based arrangements alone" because they have concluded that a broader interpretation "serves the purpose of aligning the law with modern-day realities." *Nexium*, 968 F. Supp. 2d at 391-92. That refusal is consistent with the reasoning underlying *Actavis*: patent settlements should not be a vehicle for agreements not to compete. *See Actavis*, 570 U.S. at 149 (citing *United States v. Singer Mfg. Co.*, 374 U.S. 174 (1963) and other cases holding that patent settlements are not immune from antitrust scrutiny).

The defendants also argue that each agreement was individually procompetitive, thus together they cannot create an antitrust violation. In support, they claim that (1) the Humira patent portfolios in the United States and Europe were not similarly situated and (2) biosimilar competitors were capable of entering Europe under certain, unpatented indications. Defs.' Br. at 25. But the defendants' arguments are flawed for two reasons.

*First*, as the plaintiffs allege, entry in Europe was far from certain. AbbVie's "patent-whack-a-mole" tactics in Europe, whereby it would disclaim patents or applications only to refile applications covering substantially the same subject matter, clouded any certainty of risk-free

entry for biosimilar competitors in Europe. Compl. ¶¶ 185-202. Thus, in light of AbbVie's patent gamesmanship in Europe, the biosimilar defendants sought the market certainty that the licenses conferred, which in turn, enabled them launch and reap significant profits without risking infringement damages. *Id.* ¶¶ 202, 205-06. But those European licenses came with a price—a contemporaneous promise to drop patent challenges in the United States and agree to at least a five-year delay in the launch of any competing Humira biosimilar in the United States. That exchange—the certainty of market entry and profits and elimination of risk in Europe in exchange for delayed launch in the United States—creates the large reverse payment.

*Second*, the defendants' attempt to argue affirmative defenses to their agreements is improper at the pleading stage. *See Richards*, 696 F.3d at 637-38 (The Seventh Circuit has "held many times that . . . complaints need not anticipate defenses," and that "[j]udges should respect the norm that complaints need not anticipate or meet potential affirmative defenses."); *Agnew v. NCAA*, 683 F.3d 328, 345 (7th Cir. 2012) (refusing to presume procompetitive nature of certain NCAA rules at motion to dismiss). Like the *Lipitor* plaintiffs, the plaintiffs here have "sufficiently alleged the absence of a convincing justification for the reverse payment and were not required to plead more than that." *Lipitor*, 868 F.3d at 257; *cf.* Compl. ¶¶ 266, 274, 282-83, 289-90 (alleging that no competitive justification exists for the defendants' agreements).[20]

---

[20] The defendants also claim that "lawful entry on non-patented indications could result in entry for all based on cross-labeling dispensing," citing materials outside the complaint and requesting judicial notice of their contents. Defs.' Br. at 26 & n.12. To the extent the defendants request the Court accept as true the content of these outside materials, that invitation should be rejected because when noticing public documents, only the fact of their existence may be noticed, *not* "the proof of the facts stated therein." *George v. Kraft Foods Glob., Inc.*, 674 F. Supp. 2d 1031, 1044 (N.D. Ill. 2009); *see also City of Sterling Heights Gen. Emps' Ret. Sys. v. Hospira, Inc.*, 2013 WL 566805, at *11 (same; collecting authorities). The defendants' authorities do not hold to the contrary and are distinguishable. In *UIRC-GSA Holdings, Inc. v. William Blair & Co., LLC*, 2018 WL 6573226, *2-*4 (N.D. Ill. Dec. 13, 2018), while the court noticed certain definitions from a website, it nonetheless denied defendant's motion to dismiss because even the judicially noticed definitions did not resolve factual issues concerning copyright infringement. And in *Oracle America, Inc. v. CedarStone, Inc.*, 938 F. Supp. 2d 895, 901 (N.D. Cal. 2013), the plaintiff did not challenge the defendant's request for judicial notice.

The defendants next argue that a reverse payment theory is implausible because Mylan and Boehringer did not receive licenses to the European markets. Defs.' Br. at 26. That some biosimilar competitors did not receive similar, reciprocal agreements from AbbVie says nothing about those that did—the biosimilar defendants here. And similar to the defendants' argument about the pro-competitiveness of their U.S.-Europe agreements, the defendants here are simply arguing a competing set of facts, which is impermissible on a motion to dismiss. *See Pyour B.V.*, 2017 WL 9729695, at *2 ("The Court does not engage factual disputes raised in a motion under Rule 12(b)(6), because '*Twombly* does not require a court at the motion-to-dismiss stage to consider whether the factual allegations are probably true.'") (citation omitted); *LaSalle Bank, N.A.*, 2008 WL 4874169, at *2 (where the "parties have presented competing, yet plausible factual scenarios[,]" courts "should not attempt to resolve factual disputes on a motion to dismiss"); *cf. Lipitor*, 868 F.3d at 258 ("Lipitor defendants' argument that the settlement agreement here is a commonplace one does not withstand Lipitor plaintiffs' plausible allegations and the reasonable inferences arising therefrom.").

Next, the defendants complain that the plaintiffs' antitrust theory would forbid companies from settling multinational patent disputes "unless it had the same patent estate in every country and agreed to the same entry date everywhere." Defs.' Br. at 27. That argument is based on a flawed understanding of the plaintiffs' theory. The plaintiffs do not seek to forbid global resolutions of intellectual property disputes, no more than the plaintiffs in *Lipitor* sought to arrest resolution of litigation involving separate products. It is the particular circumstances of AbbVie's patent gamesmanship in both the United States and Europe that, taken together with the contemporaneously executed settlement agreements, creates the violation. Thus, AbbVie can

find no shelter in *Actavis*'s safe-harbor for settlements "with an entry date that reflects the strength of the patents and the patent challenges." Defs.' Br. at 27.

Finally, the defendants' authorities in support of their sweeping argument that their agreements are immune from antitrust scrutiny are factually distinguishable or rely on outdated understandings of reverse payments or overly strict interpretations of *Actavis*. *Asahi*'s near endorsement of reverse payment settlements is contrary to the Supreme Court's holding in *Actavis* and shows that the reasoning applied in *Asahi* is outdated. Moreover, the court's statements regarding reverse payments are all dicta. *Asahi Glass Co. v. Pentech Pharm., Inc.*, 289 F. Supp. 2d 986, 994 (N.D. Ill. 2003), *dismissed*, 104 F. App'x 178 (Fed. Cir. 2004).[21] *In re Actos End Payor Antitrust Litigation*, 2015 WL 5610752, at *17 (S.D.N.Y. Sept. 22, 2015), relies on the flawed view that there can be no payment where the patent challenger obtains early access to a different market (there a different product). As explained above, this is an overly narrow interpretation of the kind of payments that can be unlawful under *Actavis* and thus should not be followed here. *See King Drug*, 791 F.3d at 403.[22]

In short, the defendants' agreement contains an "unexplained large transfer of value from the patent holder"—here, AbbVie—"to the alleged infringer"—here, the biosimilar defendants. *King Drug*, 791 F.3d at 403. It is a payment under *Actavis* because it is part of a broader

---

[21] *Asahi* defined reverse-payment-settlements as those leaving the "competitive situation unchanged from before the defendant tried to enter the market," and held that the agreement at issue resulted in *more* competition in the United States, not *less*. *Id.* at 994. But the plaintiffs here allege that the agreements avoided competition in the United States entirely. In addition, plaintiffs in *Asahi* lacked standing, and the court only addressed the merits only in the alternative. *Id.* at 990.

[22] The defendants also over-read the FTC's settlement in *F.T.C. v. Cephalon, Inc.*, 08-cv-2141 (E.D. Pa. 2019), Def Br. at 23 n.10, because—as the defendants themselves note—the FTC permits settlements to resolve "different litigation claim[s]," without running afoul of *Actavis* "so long as the . . . *separate* agreement independently" does not contain an unlawful payment. Here, the plaintiffs allege that the agreements between AbbVie and the biosimilar defendants were intertwined, not separate, agreements that delayed biosimilar competition in the United States in exchange for early access to—and millions of dollars in sales in—Europe.

settlement that gave the biosimilar defendants clear access to Europe, which was worth hundreds of millions of dollars, in exchange for delayed competition in the United States.

**C.      The plaintiffs have pleaded antitrust injury by alleging that they paid overcharges for Humira.**

The defendants argue that the plaintiffs have not adequately pleaded antitrust injury. Defs.' Br. at 33-38. But "[t]he Seventh Circuit generally recognizes that establishing antitrust injury involves complex questions of fact. . . . Rule 12(b)(6) motions are not normally intended to resolve such complex factual issues." *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 274 F. Supp. 2d 937, 943-44 (N.D. Ill. 2003) (internal quotation marks and citations omitted), *rev'd on other grounds*, 372 F.3d 899 (7th Cir. 2004); *see also In re Lipitor Antitrust Litig.*, 2013 WL 4780496, at *24 (D.N.J. Sept. 5, 2013) ("[C]ausation is generally a factual issue, and particularly here where Defendants contest the allegation that generic competition would have and could have entered the market sooner but for Defendants' conduct."), *rev'd on other grounds*, 868 F.3d 231 (3d Cir. 2017).

To allege antitrust injury, "it is enough that the illegality is shown to be a 'material cause' of the injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury . . . ." *Zenith Radio Corp., v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9 (1969); *accord In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 179 (S.D.N.Y. 2018). "Any doubts about [plaintiffs'] assertions as they relate to causation 'should be resolved against the person whose behavior created the problem,' at least at this stage of the litigation." *Lipitor*, 2013 WL 4780496, at *24 (quoting Areeda & Hovenkamp, *Antitrust Law* ¶ 651c), *rev'd and remanded on other grounds*, 868 F.3d 231 (3d Cir. 2017).

The plaintiffs have alleged that four biosimilars of Humira have FDA approval: the FDA approved Amgen's biosimilar on September 23, 2016; Boehringer's on August 28, 2017;

Sandoz's on October 31, 2018; and Samsung's on July 23, 2019. Compl. ¶ 211. None has

launched in the United States, though three of these four—those of the biosimilar defendants

here—have launched in Europe. *Id*. ¶ 203. The plaintiffs have alleged that the only reason that

the biosimilars have not launched in the United States is the defendants' unlawful conduct. *Id*.

¶ 244. Thus, the defendants' conduct has caused the plaintiffs to pay for higher-priced Humira

instead of lower-priced biosimilars. This is antitrust injury. *See In re Nexium Antitrust Litig.*, 777

F.3d 9, 27 (1st Cir. 2015) ("[I]f a class member is overcharged, there is an injury . . . .").

> 1. **The plaintiffs have pleaded facts plausibly suggesting that, if the defendants behaved lawfully, the biosimilars could have negotiated earlier entry dates or won the patent litigation.**

>> a. **Lawful alternative settlements with patent licenses would have provided earlier entry dates.**

The defendants wrongly contend that plaintiffs must show that all of AbbVie's patents

were invalid and that a biosimilar would have launched at-risk during the patent litigation. Defs.'

Br. at 33-38. To plead antitrust injury in delayed entry cases, the plaintiffs need only allege facts

sufficient to infer that absent the anticompetitive behavior, the biosimilars would have negotiated

earlier entry dates in their settlements. *See Sergeants Benevolent Ass'n Health & Welfare Fund v.*

*Actavis, PLC*, 2018 WL 7197233, at *18 (S.D.N.Y. Dec. 26, 2018) ("*Namenda*") ("[O]ther

courts have expressly recognized the viability of the 'alternative settlement' theory in this type of

litigation"); *In re Androgel Antitrust Litig. (No. II)*, 2018 WL 2984873, at *16-17 (N.D. Ga. June

14, 2018) (permitting alternative settlement theory and collecting cases).

>> (1) **Absent the unlawful terms of defendants' agreements, the biosimilars would have demanded a settlement with an earlier entry date.**

Whether defendants' agreements are viewed as market divisions or *Actavis*-type reverse

payments, absent those agreements' unlawful terms, biosimilar entry in the United States would

have occurred much earlier. In both cases, because a company is paying a potential competitor to delay its entry into the market, it is "likely to induce the generic to agree to enter the market at a date later than that to which it would otherwise agree based solely on the estimated strength of its litigation position." *Niaspan*, 42 F. Supp. 3d at 752. As the Third Circuit, citing the FTC, explained, "absent some proof of other offsetting consideration, it is logical to conclude that the *quid pro quo* for the payment was an agreement by the generic to defer entry beyond the date that represents an otherwise reasonable litigation compromise." *In re K-Dur Antitrust Litig.*, 686 F.3d 197, 218 (3d Cir. 2012), *judgment vacated sub nom.*, *Merck & Co. v. Louisiana Wholesale Drug Co.*, 570 U.S. 913 (2013), *judgment reinstated by* 2013 WL 5180857 (3d Cir. Sept. 9, 2013).[23] Thus, as compared to a pay-for-delay settlement, a settlement reflecting solely lawful litigation factors generally will have an earlier entry date.

The settlements at issue here provided large payments to the biosimilars: Amgen, Samsung, and Sandoz got access to the multi-billion-dollar European market. Compl. ¶¶ 203-05. On a motion to dismiss, where all reasonable inferences must be drawn in favor of the plaintiff, it is plausible that, if the settlements had not included these terms, the biosimilar companies would have negotiated earlier entry dates in the United States.[24]

> **(2)** **Absent the patent thicket, the biosimilar defendants would have had a stronger bargaining position and would have negotiated an earlier entry date.**

Similarly, the plaintiffs have alleged facts plausibly supporting an alternative settlement theory for their patent thicket monopolization claim. The plaintiffs allege that the patents created a "minefield of IP so extensive that competitors would have to engage in costly and time-

---

[23] *Actavis* only abrogated *K-Dur*'s quick-look approach to reverse payment settlements.

[24] Samsung and Sandoz also argue that they could not have settled with earlier entry dates because of the five-month exclusivity that AbbVie provided to Amgen. Samsung Br. at 4 n.5; Sandoz Br. at 5. Because the plaintiffs have dropped this allegation, this argument no longer applies.

consuming litigation over dozens upon dozens of patents before they could launch competing products." Compl. ¶ 4. AbbVie recognized that when "evaluat[ing] the timeframe for a potential U.S. biosimilar market entry, it is important that you consider the legal process and the likely timeline for resolution." *Id*. ¶ 5. AbbVie's confidence that it could keep biosimilars off the market "was built around a large portfolio of IP; it was never contingent upon any one set of IP or any single set of patents or individual patents . . . ." *Id*. ¶ 96.

Patent litigation is inherently probabilistic. *In re Cipro Cases I & II*, 348 P.3d 845, 859 (Cal. 2015) ("[A] critical insight undergirding *Actavis* is that patents are in a sense probabilistic . . . ."). Even the weakest patent has a very small chance of being successfully asserted in litigation. Thus, whatever the likelihood of a patentee prevailing in an infringement case with one ordinary patent, the likelihood is higher with one ordinary patent and dozens of weak patents.[25] If AbbVie had paid due regard to the merits and properly asserted only a few patents, its negotiating position would have been weaker, and the biosimilars could have negotiated an earlier entry date.

### b.    The plaintiffs plausibly allege that absent the defendants' unlawful conduct, biosimilar companies could have won the patent litigation.

Even if the plaintiffs were required to plead a causation theory dependent on the patent litigation's outcome, the plaintiffs have alleged enough for such a theory here. The plaintiffs need only plead sufficient facts to conclude that one of the biosimilars *could have* prevailed in patent litigation. *United Food & Commercial Workers Local 1776 & Participating Emp'rs Health & Welfare Fund v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1155 (N.D. Cal. 2017) ("*Lidoderm III*") (collecting cases and concluding that "[t]aken together, these cases stand for the

---

[25] *See* Mark S. Popofsky & Michael D. Laufert, *Antitrust Attacks on Patent Assertion Entities*, 79 Antitrust L.J. 445, 448-49 (2014).

proposition that a plaintiff must have 'some evidence' that the generic could have won the patent litigation").

Relying on *In re Wellbutrin XL Antitrust Litigation Indirect Purchaser Class*, 868 F.3d 132, 169 (3d Cir. 2017), the defendants contend that the plaintiffs must allege that the biosimilars would have been "more likely than not" to prevail. Defs.' Br. at 35-36. In *Wellbutrin*, the uncontested evidence at summary judgment showed that the generic had a 20% chance of success in the patent case. 868 F.3d at 169. Where there is conflicting evidence, however, the likelihood of success is left to the finder of fact. *See Lidoderm III*, 296 F. Supp. 3d at 1155 (discussing *Wellbutrin*); *see also Opana ER*, 162 F. Supp. 3d at 720 ("Defendants essentially contend that Plaintiffs must plead that the Endo patents would ultimately have been invalidated or found uninfringed. . . . But the Supreme Court in *Actavis* expressly disclaimed this line of analysis[.]"); *Niaspan*, 42 F. Supp. 3d at 755 ("[T]he Court is not convinced that the hurdle of 'antitrust injury' is as high as defendants contend. Under defendants' definition of the term, plaintiffs must allege—and ultimately prove—that, but for the settlement agreements between Kos and Barr, Barr would have secured a judgment of non-infringement, invalidity, and/or unenforceability of Kos's patents."). At this stage, the Court decides whether the plaintiffs have pleaded sufficient facts to conclude that the biosimilar defendants could have prevailed.

Here, the plaintiffs have done so. A great many of the patents were invalid or not infringed. Compl. ¶¶ 107-120, 167-69, 180. The plaintiffs have not pleaded, and no court or proceeding has found, that any of the patents were valid.[26] Furthermore, Boehringer asserted a

---

[26] As discussed above, denials of IPR petitions do not constitute findings of validity. No proceeding *can* find that patents are valid: "Courts do not find patents valid, only that the patent challenger did not carry the burden of establishing invalidity in the particular case before the court[.]" *Ethicon, Inc. v. Quigg*, 849 F.2d 1422, 1429 n.3 (Fed. Cir. 1988) (quotation marks and citations omitted). But AbbVie also has not prevailed on the merits of the patents in court.

potent "unclean hands" defense against AbbVie that provided a plausible basis for Boehringer to prevail. *Id*. ¶ 183. The other biosimilar companies could have asserted a similar defense. None of their cases against AbbVie reached such an advanced stage as to preclude assertion of such a defense: Amgen settled before the close of fact discovery, *id*. ¶ 150, Sandoz before it filed a responsive pleading, *id*. ¶ 170, and Samsung before it even began the patent dance, *id*. ¶ 157.

Some of the biosimilar companies suggest that, even if they had ultimately prevailed, they might not have been able to resolve the patent infringement litigation before 2023. *See* Samsung Br. at 3-4; Amgen Br. at 4-5. But Amgen's case was scheduled to go to trial in a little over three years, *see* Compl. ¶¶ 148, 150 (complaint filed in August 2016 and trial date in November 2019), and Boehringer's case, including the unclean hands defense, was scheduled to go to trial in about the same amount of time, *see id*. ¶ 181 (cased filed in August 2017); *AbbVie Inc. v. Boehringer Ingelheim Int'l GmbH*, No. 17-CV-01065 (D. Del. Apr. 23, 2019), ECF No. 488 (amended scheduling order providing a trial date in October 2020). Amgen thus could have prevailed well before its agreed entry date in 2023—even if, as Amgen argues, a year should be added to the litigation timeline to take into account an appeal. Amgen Br. at 2 & n.3.

Similarly, Sandoz and Samsung could have prevailed before their entry dates in 2023. Sandoz settled before a trial date was set, but AbbVie filed suit against Sandoz in August 2018, Compl. ¶ 166, and, given the three-year timelines for Boehringer and Amgen, the trial date likely would have been well before 2023. Samsung did not have a trial date either, but absent its settlement, it would have begun the patent dance soon after it submitted its ABLA in July 2018, *id*. ¶ 159, and it would have begun litigation in early 2019, *id*. ¶¶ 66-67. Thus, Samsung also would have had a trial date well before Samsung's agreed entry date of June 30, 2023.

- 50 -

The plaintiffs have alleged sufficient facts to show that at least one—if not several—of the biosimilars could have prevailed before 2023 and launched a lower-priced biosimilar, so the settlements caused injury to the plaintiffs.

> **2.** **The plaintiffs can establish causation without proving that each and every one of AbbVie's patents was invalid or not infringed.**

The defendants argue that, even though the plaintiffs have addressed several dozen of AbbVie's patents, the plaintiffs should have discussed all the rest. Defs.' Br. at 34-35. But the plaintiffs' allegations plausibly address AbbVie's patents. Under the alternative settlement scenario discussed above, the biosimilar companies could obtain licenses for any blocking patents—as they actually did—but with earlier start dates for those licenses. No more is necessary at this stage. *See In re Thalomid & Revlimid Antitrust Litig.*, 2015 WL 9589217, at \*13 (D.N.J. Oct. 29, 2015) (rejecting an argument that plaintiffs should address all potentially blocking patents on a motion to dismiss). Nonetheless, the plaintiffs have alleged more.

Regarding AbbVie's patent thicket, the plaintiffs allege that AbbVie filed for its patents and asserted them in the patent dance and litigation without regard to the merits. *See, e.g.*, Compl. ¶¶ 167-69, 180. As discussed above, it is unlawful to serially petition the government for anticompetitive purposes without regard to the merits, even if some patents may prove to be valid and properly asserted. *USS-POSCO*, 31 F.3d at 811. The validity and enforceability of the patents is relevant primarily as one piece of evidence showing AbbVie's regard for the merits: it is more likely that AbbVie was acting without regard to the merits if few of the patents were valid, enforceable, and infringed than if most of them were. The plaintiffs have pleaded sufficient details about the flaws in AbbVie's patents to make plausible the allegation that

- 51 -

AbbVie was acting without regard to the merits. Compl. ¶¶ 107-120, 134-40, 167-169, 180.[27] AbbVie has pointed to nothing that would establish the opposite as a matter of law, so, for the purposes of this motion, AbbVie's conduct in obtaining and asserting its patents was wholly unlawful. If AbbVie had not obtained its thicket—and all of the patents that comprise the thicket—Amgen could have entered the market as early as December 31, 2016, when the '382 patent expired, and the other biosimilar companies could have launched as soon as their biosimilars were approved. *See id*. ¶¶ 212, 244.[28]

The defendants argue that *In re Terazosin Hydrochloride Antitrust Litigation*, 335 F. Supp. 2d 1336 (S.D. Fla. 2004), shows that the plaintiffs must address every single patent (Defs.' Br. at 35), but, in that case, the court held that the defendant's lawsuits did not constitute serial petitioning. *Terazosin Hydrochloride*, 355 F. Supp. 2d at 1366-67. The court thus applied *PRE*, under which it considered each lawsuit and patent individually. *Id.* As explained above, that is not the correct standard here.

In addition, in a reverse payment case, "it is normally not necessary to litigate patent validity to answer the antitrust question . . . . An unexplained large reverse payment itself would normally suggest that the patentee has serious doubts about the patent's survival." *Actavis*, 570 U.S. at 157. Thus, "the size of the unexplained reverse payment can provide a workable surrogate for a patent's weakness, all without forcing a court to conduct a detailed exploration of

---

[27] *POSCO* calculated a "batting average" for the petitions. *See* 31 F.3d at 811. For the purposes of this motion, AbbVie has not established that any of its patents were valid and infringed. Alternatively, if one goes on a dispute-by-dispute basis, rather than a patent-by-patent basis, AbbVie did not prevail in litigation against any of the nine biosimilars. Compl. ¶ 211. Furthermore, as discussed above, the plaintiffs have plausibly alleged that the biosimilars could have prevailed in every suit. *See supra* Section III.C.1.b.

[28] Boehringer stated that "AbbVie's patents delayed Boehringer's launch plans[.]" *AbbVie Inc., et al. v. Boehringer Ingelheim Int'l GmbH, et al.*, No. 17-CV-01065 (D. Del. April 19, 2019), ECF No. 480 at 2.

the validity of the patent itself." *Id*. at 158. AbbVie's multiple large, unexplained reverse payments therefore suggest that AbbVie's patent thicket was weak as a whole, and AbbVie had serious doubts about its likelihood of success. This suffices for the plaintiffs' market allocation and reverse payment claims[29] and supports the plaintiffs' monopolization claim.

**D.      The plaintiffs have sufficiently pleaded their state law claims.**

The defendants raise a variety of challenges to the plaintiffs' state law claims, all of which the Court should reject. Their arguments focus on the paragraphs in which the plaintiffs set forth their legal claims while ignoring the detailed allegations in the rest of the complaint instead and rely on the minority viewpoint on a range of legal issues.

**1.      The plaintiffs sufficiently plead that the defendants' conduct affected trade and commerce in each state.**

The defendants' contention that several of the plaintiffs' state antitrust claims require that the unlawful conduct occur in-state, Defs.' Br. at 39-40, is incorrect: these laws only require that the effects of the conduct have been felt in the state or that commerce in the state have been disrupted. *See, e.g.*, *Opana ER*, 162 F. Supp. 3d at 724 ("The Court does not see why the *intrastate* effect of the *interstate* anticompetitive conduct would not be reached by the laws of [the District of Columbia and Mississippi, among others]; therefore, the Court declines to dismiss EPPs' claims on this basis."); *In re Generic Pharms. Pricing Antitrust Litig.*, 368 F. Supp. 3d 814, 836-38 (E.D. Pa. 2019) ("*Generics*") (sustaining antitrust claims under District of Columbia, North Carolina, Tennessee and West Virginia; "it is not obvious why the *intra* state

---

[29] The parties need not relitigate the patent case inside a reverse payment antitrust case. *Lidoderm III*, 296 F. Supp. 3d at 1155 ("That turducken is not only unappetizing as a matter of judicial efficiency, it is not required (or even suggested) by the *Actavis* opinion."); *Opana ER*, 162 F. Supp. 3d at 720; *Cipro Cases*, 348 P.3d at 870; *In re Aggrenox Antitrust Litig.*, 2015 WL 4459607, at *9 (D. Conn. July 21, 2015).

effect of anticompetitive conduct would not be reached by the cited statutes merely because *inter*

*state* conduct predominates") (emphasis in original).

The defendants also assert that the plaintiffs have not alleged that the defendants' *conduct*

had substantial effects in each state. But each of the relevant statutes simply requires intrastate

*effects*, not conduct:

- **District of Columbia**: prohibiting anticompetitive conduct affecting "all or any part" of commerce within the District of Columbia. D.C. Code §§ 28-4502, 28-4503. *Opana ER*, 162 F. Supp. 3d at 724; *Generics*, 368 F. Supp. 3d 836-38.

- **Mississippi:** prohibiting anticompetitive conduct without reference to effects on intrastate commerce. Miss. Code Ann. § 75-21-3. *Opana ER*, 162 F. Supp. 3d at 724; *Generics*, 368 F. Supp. 3d 836-38.

- **North Carolina:** prohibiting anticompetitive conduct affecting any part "trade or commerce in the State of North Carolina." N.C. Gen. Stat. Ann. §§ 75-1, 75-2. *Generics*, 368 F. Supp. 3d 836-38; *Hospital Auth. of Metro. Gov't of Nashville v. Momenta Pharms., Inc.*, 353 F. Supp. 3d 678, 696 (M.D. Tenn. 2018) ("*Enoxaparin*"); *In re Remicade Antitrust Litig.*, 345 F. Supp. 3d 566, 586 (E.D. Pa. 2018).

- **Tennessee:** prohibiting anticompetitive conduct that "lessen[s], or which tend to lessen, full and free competition in the importation or sale of articles imported into this state." Tenn. Code § 47-25-101. *Generics*, 368 F. Supp. 3d 836-38; *Enoxaparin*, 353 F. Supp. 3d at 696; *Remicade*, 345 F. Supp. 3d at 587.

- **Wisconsin:** prohibiting anticompetitive conduct without reference to effects on intrastate commerce. Wis. Stat. § 133.03. *Generics*, 368 F. Supp. 3d 836-38; *Enoxaparin*, 353 F. Supp. 3d at 696.

And the plaintiffs do allege that, as a result of the defendants' conduct, retailers were precluded

from offering competing biosimilar versions of Humira, and consumers were therefore deprived

of the opportunity to purchase less-expensive biosimilars—*i.e.*, similar *effects*. Compl. ¶ 260.

The defendants' authorities are inapposite. For example, multiple courts have held that

*Sun Dun, Inc. of Washington v. Coca-Cola Co.*, 740 F. Supp. 381, 397 (D. Md. 1990) does not

support dismissal of a District Columbia claim. *See Remicade*, 345 F. Supp. 3d at 586

(allegations that D.C. purchasers paid inflated prices are sufficient under *Sun Dun*); *In re Auto.*

*Parts Antitrust Litig.*, 50 F. Supp. 3d 869, 889 (E.D. Mich. 2014) (same). The defendants'

reliance on *In re Vitamins Antitrust Litigation*, 2001 WL 849928 (D.D.C. Apr. 11, 2001), is

similarly misplaced because more recent Tennessee state court cases have rejected the

defendants' interpretation. *See In re New Motor Vehicles Canadian Export Antitrust Litig.*, 350

F. Supp. 2d 160, 172-73 (D. Maine 2004) (discussing Tennessee state court cases). And the

defendants' own authority recognizes that pleading "substantial effects" is sufficient to state a

claim under Wisconsin law. Defs.' Br. at 40 (citing *Dealer Mgmt.,* 362 F. Supp. 3d at 549).

In its separate brief, AbbVie incorrectly argues that the plaintiffs' New Hampshire and

North Carolina consumer protection claims in Count VII also require that the challenged conduct

have occurred in each state. AbbVie Br., ECF No. 129, at 4. The New Hampshire statute reaches

"any unfair method of competition or any unfair or deceptive act or practice in the conduct of

any trade or commerce in this state." N.H. Rev. Stat. Ann. § 358-A:2. The words "trade" and

"commerce" include "any trade or commerce directly or indirectly affecting the people of" New

Hampshire. N.H. Rev. Stat. Ann. § 358-A:1. Thus, alleging that an antitrust conspiracy affected

the prices of goods purchased in New Hampshire is sufficient to state a claim under the statute.

*See In re Packaged Seafood Prods. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1081 (S.D. Cal. 2017)

(denying a motion to dismiss when plaintiffs pleaded the payment of inflated prices in New

Hampshire); *Zetia*, 2019 WL 3761680, at *15 (same); *Niaspan*, 42 F. Supp. 3d at 761 (same); *In

re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 231 (S.D.N.Y. 2012)

(same). Even under the "within New Hampshire" standard set forth in *In re Flash Memory

Antitrust Litigation*, 643 F. Supp. 2d 1133 (N.D. Cal. 2009), allegations that overcharged

products were "introduced into the New Hampshire market" are sufficient. *In re Chocolate

Confectionary Antitrust Litig.*, 749 F. Supp. 2d 224, 235 (M.D. Pa. 2010).

North Carolina's statute does not provide geographic limitations or require "substantial effects" on intrastate commerce. *See* N.C. Gen. Stat. Ann. § 75-1.1; *In re Lidoderm Antitrust Litig.*, 103 F. Supp. 3d 1155, 1174 (N.D. Cal. 2015) ("*Lidoderm II*") (rejecting a "substantial effects" test and holding that allegations of "in-state injury and that defendants' products were being sold in North Carolina" were "sufficient at this juncture to state a claim"); *Enoxaparin*, 353 F. Supp. 3d at 696 (denying motion to dismiss); *Remicade*, 345 F. Supp. 3d at 586 (same).[30] *In re Refrigerant Antitrust Litigation*, 2013 WL1431756 (E.D. Mich. Apr. 9, 2013) is distinguishable because the plaintiffs there did not market or sell products in North Carolina. *In re Ductile Pipe Iron Pipe Fittings (DIPF) Indirect Purchaser Antitrust Litig.*, 2013 WL 5503308, at *22 (D.N.J. Oct. 2, 2013). By contrast, the plaintiffs here provide pharmaceutical reimbursement services for North Carolina residents. Compl. ¶ 17.

### 2. The plaintiffs can assert damages claims under Alaska law.

Despite the defendants' contention (Defs.' Br. at 40), the plaintiffs do not assert claims under the Alaska Restraint of Trade Act but rather under the Alaska Unfair Trade Practices and Consumer Protection Act ("AUTPCPA"). Compl. ¶¶ 276, 292, 306, 317-321. AbbVie's contention that the plaintiffs' AUTPCPA claim is barred because indirect purchasers cannot seek damages under the statute for antitrust conduct (AbbVie Br. at 1) is similarly misplaced. Limitations on who can seek relief under Alaska's antitrust law do not apply to the AUTPCPA. *See Generics*, 368 F. Supp. 3d at 840-41, n.113.[31]

---

[30] *See also Zetia*, 2019 WL 3761680, at *15 (same); *Packaged Seafood*, 242 F. Supp. 3d at 1082-83 (same); *DDAVP*, 903 F. Supp. 2d at 231 (same). While some courts have applied a "substantial effects" test to satisfy due process concerns, those concerns are not at issue here. *See In Porters, S.A. v. Hanes Printables, Inc.*, 663 F. Supp. 494, 502 (M.D.N.C. 1987)).

[31] *Lidoderm II*, 103 F. Supp. 3d at 1163 and *In re Dynamic Random Access Memory (DRAM) Antitrust Litigation,* 516 F. Supp. 2d 1072, 1108 (N.D. Cal. 2007) ("*DRAM I*"), which the defendants cite, do not provide a basis for dismissal because each relied on a 2003 amendment to Alaska's *antitrust* law limiting indirect purchaser suits to those brought by Alaska's Attorney General.

**3. The plaintiffs can bring class action claims under the Illinois Antitrust Act in federal court.**

Courts in this district disagree about whether the Illinois Antitrust Act's prohibition on indirect purchaser class actions in state court, 740 Ill. Comp. Stat. § 10/7(2), applies in federal cases. *Compare Dealer Mgmt.*, 362 F.Supp.3d at 553 and *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 816-18 (N.D. Ill. 2017) (denying motion to dismiss) *with Opana ER*, 162 F. Supp. 3d at 722-23 (granting motion to dismiss). Under the both the plurality opinion and Justice Stevens' concurrence in *Shady Grove Orthopedic Association, P.A. v. Allstate Insurance Co.*, 559 U.S. 393 (2010), the Supreme Court held that Rule 23 preempted New York's class action ban because doing so would not alter a substantive state right. *Broiler Chicken*, 290 F. Supp. 3d at 817-18. Because "the availability of the class action procedure does not change the substantive rights or remedies available to [plaintiffs] under Illinois law," the plaintiffs may pursue a class action under Illinois's antitrust law, *id.* at 817-18.[32]

**4. The plaintiffs have standing to represent Utah residents under Utah's antitrust statute.**

The defendants are incorrect that the plaintiffs may not seek certification of a class that includes Utah residents despite not having individual standing to bring a Utah antitrust claim. Defs.' Br. at 41-42. "[T]he weight of recent authority" rejects the notion that a "plaintiff's lack of statutory standing under a particular legal theory strips the court of the power to decide if he can represent a class seeking relief under that theory." *Muir v. Nature's Bounty (DE), Inc.*, 2018 WL 3647115, at *7-*8 (N.D. Ill. Aug. 1, 2018); *see also Dealer Mgmt*, 362 F. Supp. 3d at 548

---

[32] *See also Zetia*, 2019 WL 3761680, at *11 (denying motion to dismiss under *Shady Grove*); *Namenda*, 2018 WL 7197233, at *33; *Contant v. Bank of Am. Corp.*, 2018 WL 5292126, at *12 (S.D.N.Y. Oct. 25, 2018) (same); *In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712, 728 (S.D.N.Y. 2017) (same); *In re Aggrenox Antitrust Litig.*, 2016 WL 4204478, at *5 (D. Conn. Aug. 9, 2016) (same); *In re Liquid Aluminum Sulfate Antitrust Litig.*, 2017 WL 3131977, at *25 (D.N.J. July 20, 2017) (same); *In re Lithium Ion Batteries Antitrust Litig.*, 2014 WL 4955377, at *21 (N.D. Cal. Oct. 2, 2014) (same).

(denying motion to dismiss Utah antitrust claim for lack of standing) (citing *Langan v. Johnson & Johnson Consumer Cos. Inc.*, 897 F.3d 88, 98 (2d Cir. 2018)). The extent to which a plaintiff can assert claims of absent class members in states in which it would not have individual standing should be "analyzed under the rubric of Rule 23, rather than the doctrine of statutory standing." *Id.*; *see also Enoxaparin*, 353 F. Supp. 3d at 695-96 (issue of whether non-residents of Utah can pursue Utah claims "is better decided at the class certification stage"). In addition, "members of the putative class presumably include Utah citizens and residents" and the statutory requirement is therefore met. *In re Asacol Antitrust Litig.*, 2016 WL 4083333, at *13 (D. Mass. July 20, 2016); *see also Zetia*, 2019 WL 3761680, at *12 (denying motion to dismiss Utah claim where the class included Utah residents); *Generics*, 368 F. Supp. 3d at 838 (same); *Enoxaparin*, 353 F. Supp. 3d at 696; *Aluminum Sulfate*, 2017 WL 3131977, at *28 (same).

### 5. The plaintiffs' consumer protection claims are actionable even if their antitrust claims are dismissed.

The defendants repeatedly assert that the plaintiffs' consumer protection claims are based on their antitrust claims and must be dismissed along with the antitrust claims. Defs.' Br. at 42-43. The defendants are correct that the plaintiffs' state law antitrust claims—including those brought under consumer protection statutes (*see* Compl. ¶¶ 276, 292, and 306)—should be dismissed if their federal antitrust claims are dismissed. But the plaintiffs' consumer protection claims are *independent* statutory grounds for relief. That the conduct alleged in the complaint may violate *both* laws does not mean that these distinct claims rise and fall together. "Whether [plaintiffs] can ultimately prove a consumer protection claim separate and apart from their antitrust claims is not a question for resolution at this stage of the litigation." *Generics*, 368 F.

Supp. 3d at 842.[33] In New Mexico, for example, an allegation that conduct resulted in a gross price disparity is actionable under the state's consumer protection law although it would not, standing alone, state an antitrust claim. *See In re Aftermarket Filters Antitrust Litig.*, 2009 WL 3754041, at *9 (N.D. Ill. Nov. 5, 2009).

Further, the defendants' argument would impermissibly and artificially limit the scope of consumer protection statutes to traditional antitrust conduct, a result inconsistent with the broad and remedial purposes of the statutes, which are all modeled on, or interpreted consistent with, the FTC Act, 15 U.S.C. § 45. *See, e.g.*, Fla. Stat. § 501.204 (prohibiting "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices," and requiring that "due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts" relating to the FTC Act); S.C. Code Ann. § 39-5-20 ("[u]nfair methods of competition" must be interpreted in accordance with the FTC Act); W. Va. Code §§ 46A-6-104, 46A-6-101(1) (prohibiting "[u]nfair methods of competition" and requiring that "courts be guided by the policies" of the FTC and interpretations of the FTC Act.); 815 Ill. Comp. Stat. § 505/2 (prohibiting "[u]nfair methods of competition and unfair or deceptive acts or practices"; "consideration shall be given to the interpretation of the [FTC] and federal courts relating to Section 5(a) of the [FTC Act]").

### 6. The plaintiffs' state consumer protection claims satisfy Rule 8.

The defendants argue that the plaintiffs' consumer protection claims are not adequately pleaded under Federal Rule of Civil Procedure 8. Defs.' Br. at 43-44; AbbVie Br. at 1-2. With

---

[33] AbbVie's separate brief makes a similar argument with respect to Illinois, Florida, South Carolina, and West Virginia (AbbVie Br. at 2, 3 and 5), all of which should similarly be rejected. The cases AbbVie cites do not support the notion that independent and freestanding consumer protection claims are not actionable where a party also brings antitrust claims. In one case, for example, the court dismissed Florida and South Carolina consumer protection claims that were "dependent" on dismissed federal antitrust claims. *Dealer Mgmt.*, 362 F. Supp. 3d at 539.

respect to the six consumer protection statutes under which the plaintiffs bring in their antitrust claims (*see* Compl. ¶¶ 276, 292, and 306), the defendants' antitrust violations are actionable under each statute. *See, e.g.*, *In re Restasis (Cyclosporine Opthalmic Emulsion) Antitrust Litig.*, 355 F. Supp. 3d 145, 154 (E.D.N.Y. 2018) ("The Florida Deceptive and Unfair Trade Practices Act . . . proscribes antitrust violations"). The defendants have not argued otherwise. The plaintiffs' allegations that the defendants violated antitrust law are therefore sufficient to state a claim under these statutes, and there is no need—or point—for an elaborate discussion of the elements of each claim. *See In re Nexium (Esomeprazole) Antitrust Litig.*, 297 F.R.D. 168, 175 (D. Mass. 2013) (as to claims under "consumer protection laws (Florida, California, Massachusetts, and Vermont), courts have held that the violation of traditional antitrust elements constitutes a violation of the relevant consumer protection statute").

While the defendants vaguely assert that the plaintiffs have not sufficiently pled their consumer protection claims, they only address a few statutes, and none of their arguments has merit. For example, the defendants complain that the plaintiffs' Arizona, District of Columbia, Nebraska, and North Dakota claims do not provide sufficient detail concerning how AbbVie's conduct was unconscionable and unfair. Defs.' Br. at 43-44; AbbVie Br. at 1-2. But paragraphs 310-315 of the complaint, which are incorporated into the state-specific allegations, specify the ways in which AbbVie's conduct is unconscionable and unfair. Paragraph 310, for example, alleges that AbbVie "abused the regulatory and judicial system" by engaging in conduct that was intended to harass competitors. This is sufficient to establish unfair or unconscionable conduct.

The defendants also allege that the plaintiffs do not plead facts showing that AbbVie is a "merchant" under District of Columbia law. Defs.' Br. at 43. The plaintiffs, however, allege that "AbbVie Inc. is engaged in the development, sale, and distribution of a broad range of

pharmaceutical and biologic drugs" (Compl. ¶ 19), which is sufficient to support a finding that AbbVie "sell[s] . . . consumer goods or services" under the statute. D.C. Code § 28-3901(a)(3). It is unclear what more the defendants think the plaintiffs should have done aside from copying and pasting the statutory definition of "merchant" into the complaint.

None of the defendants' cases support dismissal of the plaintiffs' consumer protection claims. In *Opana ER* and *Aggrenox*, the plaintiffs alleged consumer protection and unjust enrichment claims separate from their antitrust claims but, in doing so, "pleaded antitrust claims and the factual foundation for them, and . . . merely alleged that those claims are also actionable under state consumer protection laws and as unjust enrichment." *Opana ER*, 162 F. Supp. 3d at 726 (dismissing without prejudice consumer protection and unjust enrichment claims); *see also Aggrenox*, 94 F. Supp. 3d at 255 (dismissing without prejudice consumer protection claims that averred only that defendants had "'violated the following state unfair trade practices and consumer fraud laws,' followed by twenty-five subparagraphs, each of which . . . ends with a citation to a different state's statute, with no elaboration" (citation omitted)). Here, the plaintiffs have provided allegations tailored to the specific elements of each consumer protection statute. *See* Compl. ¶¶ 309-406.

AbbVie challenges the plaintiffs' New Mexico consumer protection claim on the basis that the plaintiffs only allege gross price disparity. AbbVie Br. at 3. To the contrary, the plaintiffs plead that AbbVie abused the regulatory and judicial system, making the holding of *In re Graphics Processing Unit Antitrust Litigation*, 527 F. Supp. 2d 1011 (N.D. Cal. 2007) irrelevant. And in any event, "[f]ederal courts have generally permitted claims under the New Mexico Unfair Practices Act in price fixing cases if the plaintiff alleges," as the plaintiffs have done here, "a gross disparity between the price paid and the value received." *Aftermarket Filters*, 2009 WL

3754041, at *9; *see also Packaged Seafood*, 242 F. Supp. 3d at 1082 (same); *In re Domestic Drywall Antitrust Litig.*, 2016 WL 3769680, at *8 (E.D. Pa. July 13, 2016) (same); *Chocolate Confectionary*, 602 F. Supp. 2d at 585-86 (same). In declining to follow *Graphics Processing*, the court in *In re Lipitor Antitrust Litigation* concluded that the end payers' "Complaint is replete with allegations of price fixing and anticompetitive schemes, and it is beyond cavil that these schemes resulted in consumers paying a substantial premium for goods . . . ." 336 F. Supp. 3d 395, 425 (D.N.J. 2018); *see also In re Auto. Parts*, 50 F. Supp. 3d at 860 (distinguishing *Graphics Processing* and denying motion to dismiss New Mexico claim); *In re Processed Eggs Antitrust Litig.*, 851 F. Supp. 2d 867, 906-07 (E.D. Pa. 2012) (same); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 26 1109, 1127 (N.D. Cal. 2008) (same).

> 7.    **Indirect purchasers may bring consumer protection claims regardless of whether *Illinois Brick* bars them from asserting antitrust claims.**

Referencing only Illinois and Alaska, the defendants argue that consumer protection claims "alleged under the laws of states that have not passed full *Illinois Brick* repealers" should be dismissed. Defs.' Br. at 45. But the Illinois Antitrust Act does not prohibit indirect purchasers from bringing suit; as discussed above, it only prohibits indirect purchasers from bringing class actions in state courts. *See* 740 Ill. Comp. Stat. § 10/7(2) ("No provision of this Act shall deny any person who is an indirect purchaser the right to sue for damages."). And, as explained above, indirect purchasers have standing under the Alaska consumer protection statute.

To the extent the defendants suggest a general rule that indirect purchasers cannot bring consumer protection claims in states in which *Illinois Brick* has not been repealed, they are wrong. In Florida, for example, the antitrust statute prohibits indirect purchaser actions, but the Florida Court of Appeals "disagreed" that allowing indirect purchasers to pursue antitrust claims under the Florida consumer protection act "is a repealer in disguise or that it will eviscerate

Florida's antitrust law." *Mack v. Bristol–Myers Squibb Co.*, 673 So.2d 100, 104 (Fla. Dist. Ct. App. 1996); *see also Generics*, 368 F. Supp. 3d at 840-41 (declining to dismiss South Carolina and Alaska consumer protection claims on the basis that those states antitrust claims bar indirect purchaser suits); *Zetia*, 2019 WL 3761680, at *14 (holding that antitrust violations stated a claim under Vermont consumer protection law). And for the reasons stated above, the plaintiffs have not, as the defendants assert, "recast[] their federal antitrust claims as state consumer protection claims." Defs.' Br. at 45. Thus, the defendants' circumvention argument is inapplicable.

8. **The plaintiffs do not allege a freestanding claim for unjust enrichment under California law.**

The defendants' contention that there is no claim for unjust enrichment under California law is a red herring: the plaintiffs do not assert any unjust enrichment causes of action, instead asserting a claim under the California Business and Professions Code section 17200, *et seq*. seeking restitution and disgorgement. Compl. ¶¶ 327-332. The two cases the defendants cite address a different issue than the plaintiffs' California Unfair Competition Law claim: whether the plaintiffs can assert "an independent [California] cause of action" for unjust enrichment. *Lidoderm I*, 74 F. Supp. 3d at 1091; *see also Auto. Parts*, 50 F. Supp. 3d at 862.

9. **The plaintiffs' District of Columbia consumer protection claim is not limited to consumers.**

AbbVie argues that plaintiffs do not have standing as "consumers" under the D.C. Consumer Protection Procedures Act (CPPA). AbbVie Br. at 2. But the plaintiffs are third-party payors—*e.g.* insurers and health and welfare plans—that provide prescription drug coverage; they do not actually purchase drugs. Compl. ¶¶ 13-17. Rather, their "members, employees, insureds, participants, or beneficiaries"—*i.e.*, consumers—purchase drugs for "personal, household, or family" purposes at retail and the plaintiffs pay and/or provide reimbursements for the majority of the drug cost. *Id*. Accordingly, the plaintiffs paid overcharges on "retail

- 63 -

transactions for consumer goods" (AbbVie Br. at 2) and have standing under the CPPA. *See Remicade*, 345 F. Supp. 3d at 588 (finding that health plans have standing under the CPPA).[34]

In addition, the plaintiffs, as third-party payors, fit squarely within the definition of "consumers" under the statute. A consumer is "a person who . . . does or would purchase . . . consumer goods" and includes anyone that provides "economic demand," including a "co-obligor or surety." D.C. Code § 28-3901(a)(2)(A). And a "person" includes businesses and organizations. D.C. Code § 28-3901(a)(1). The plaintiffs pay for the "economic demand" related to prescription drugs and are functionally very similar to co-obligors.

The plaintiffs also have standing under the CPPA because some of them are "non-profit" organizations with standing to assert claims on behalf of themselves or their members. *See* D.C. Code § 28-3901(a)(14), D.C. Code § 28-3905(k)(1)(C); *Remicade*, 345 F. Supp. 3d at 588.

**10.     The plaintiffs complied with the Georgia and Nevada notice requirements.**

The defendants also allege that the plaintiffs failed to comply with the statutory notice requirements in the Georgia and Nevada consumer protection claims. Several plaintiffs sent the required notice to the Nevada Attorney General. Grzenczyk Declaration, Ex. A. Notice is not required in Georgia if "the prospective respondent does not maintain a place of business or does not keep assets within the state," Ga. Code Ann. § 10-1-399(b), and the defendants have not demonstrated that they fit within that provision.

**11.     The plaintiffs have sufficiently alleged unconscionability under the Utah Consumer Sales Practices Act.**

AbbVie argues that unconscionability under the Utah Consumer Sales Practices Act (UCSPA) is limited to "contract law concepts." AbbVie Br. at 5. The UCSPA contains no such

---

[34] Respectfully, the court's decision in *Lidoderm II*, 103 F. Supp. 3d at 1164, was in error because it incorrectly concluded that payments by third-party payors are akin to "wholesale" transactions, instead of retail transactions.

limitation, and AbbVie admits that courts uphold reverse payments claims—which, while involving an agreement, involve no traditional contract law claims—under the statute. *Id*. In addition, in *Namenda*—which AbbVie cites—the court upheld a UCSPA claim where the primary conduct alleged was a unilateral "hard switch" from one version of a drug to another. 2018 WL 7197233, at *12-15; *see also Aftermarket Filters*, 2009 WL 3754041, at *9 (upholding UCSPA claim in price-fixing case).

**12.     The plaintiffs' claims fall within the scope of the West Virginia Consumer Credit and Protection Act.**

AbbVie contends that the plaintiffs' claim under the West Virginia Consumer Credit and Protection Act (WVCCPA)—which the plaintiffs assert in only Count VII—does not apply to cases involving prescription drugs. AbbVie Br. at 5. The only case AbbVie cites, however, prohibits only affirmative misrepresentation claims related to prescription drugs because doctors, not consumers, decide which products to prescribe. *See White v. Wyeth*, 705 S.E.2d 828, 838 (W. Va. 2010). The *Wyeth* court noted that in other contexts—such as failure to warn—the WVCCPA could be asserted against drug manufacturers. *Id*.

## IV.     CONCLUSION

For these reasons, the defendants' motion to dismiss should be denied. In the alternative, if the Court grants the motion, the plaintiffs request leave to amend. *See Barry Aviation Inc. v. Land O'Lakes Mun. Airport Comm'n*, 377 F.3d 682, 687 (7th Cir. 2004) ("Leave to amend a complaint should 'be freely given when justice so requires.'") (quoting Fed. R. Civ. P. 15(a)(2)).

DATED: November 19, 2019　　　　　　　　Respectfully submitted,

| /s/ Lauren G. Barnes | /s/ Karin E. Garvey | /s/ Dena C. Sharp |
|---|---|---|
| Lauren G. Barnes<br>HAGENS BERMAN SOBOL<br>　SHAPIRO LLP<br>55 Cambridge Parkway,<br>　Suite 301<br>Cambridge, MA 02142<br>Telephone: (617) 482-3700<br>Facsimile: (617) 482-3003<br>Email: lauren@hbsslaw.com | Karin E. Garvey<br>LABATON SUCHAROW LLP<br>140 Broadway<br>New York, NY 10005<br>Telephone: (212) 907-0700<br>Facsimile: (212) 818-0477<br>Email: kgarvey@labaton.com | Dena C. Sharp<br>GIRARD SHARP LLP<br>601 California Street,<br>　14th Floor<br>San Francisco, CA 94108<br>Telephone: (415) 981-4800<br>Facsimile: (415) 981-4846<br>Email: dsharp@girardsharp.com |
| *Interim Co-Lead Class Counsel for The Plaintiffs* | | |

- 67 -

## CERTIFICATE OF SERVICE

I certify that on November 19, 2019, I filed the foregoing using the Court's electronic CM/ECF filing system. Notice of this filing will be transmitted to all counsel of record who are registered users of the Court's electronic case filing system.

I also certify that I caused the forgoing under seal document to be served *via email* on counsel of record.

*/s/ Dena C. Sharp*